UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILLIAM PIERCE<br>　1313 R Street, NW<br>　Washington, DC 20009<br><br>　　　　Plaintiff,<br><br>　v.<br><br>DISTRICT OF COLUMBIA<br>　Office of the Attorney General<br>　441 4th Street, NW<br>　Washington, DC 20001<br><br>　　　　Defendant. | No. _____<br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

(Seeking damages for disability-based discrimination: violations of the Americans with Disabilities Act and the Rehabilitation Act)

**INTRODUCTION**

　　1.　　This is an action for damages and other relief by William Pierce, who was denied equal access to programs, services and activities of the District of Columbia because of the absence of accommodations for deaf inmates at the District of Columbia's Correctional Treatment Facility, in violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Defendant District of Columbia intentionally discriminated against Mr. Pierce on the basis of his disability by denying him adequate and effective means to communicate with individuals both inside the jail and by telephone with individuals outside the jail.  The defendant also retaliated against him for seeking accommodation to which he was entitled.  Mr. Pierce seeks damages, attorneys' fees, costs and other appropriate relief.

**JURISDICTION AND VENUE**

2.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).

3.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the plaintiff's claim occurred in the District of Columbia.

**PARTIES**

4.  Plaintiff William Pierce is a resident of the District of Columbia and is profoundly deaf.

5.  Defendant District of Columbia is a municipal corporation and the local government of Washington, DC. The Department of Corrections ("DOC") is an agency of the District of Columbia, the functions of which include overseeing the operation of the Correctional Treatment Facility.

**FACTS**

6.  William Pierce is a profoundly deaf individual. He communicates primarily using American Sign Language ("ASL"), which he considers his native language. He relies on sign language interpreters or other auxiliary aids to communicate with people who do not use sign language. Written English is a second language for Mr. Pierce, as it is for many individuals who are born deaf. His proficiency in reading and writing is not at the same level as it would be if he were a hearing person.

7.  On February 1, 2012, Mr. Pierce was sentenced in D.C. Superior Court to 60 days in jail for simple assault arising from a domestic dispute. The court also ordered Mr. Pierce to enter and complete domestic violence intervention and to receive mental health and substance abuse assessments. He was admitted to the Correctional Treatment Facility that same day. On

information and belief, Mr. Pierce was placed at the Correctional Treatment Facility rather than the D.C. Jail because DOC believed that the Correctional Treatment Facility provided those services and had better accommodations for deaf prisoners.

8. The Correctional Treatment Facility is a medium security facility in the District of Columbia that incarcerates male and female inmates. In 1997, the Corrections Corporation of America ("CCA"), a private prison company, entered into a 20-year contract with the District of Columbia to operate, maintain and manage the Correctional Treatment Facility as an annex to the D.C. Jail. That contract obligates CCA to operate the Correctional Treatment Facility in compliance with the Constitution and the laws of the United States and the District of Columbia. CCA is required to provide for all aspects of incarceration, including, but not limited to, staffing, medical and mental health care, religious services, and vocational, therapeutic and substance abuse programming.

9. The District of Columbia is required to provide reasonable accommodations for people with disabilities under the Americans with Disabilities Act and the Rehabilitation Act.

10. The Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The U.S. Department of Justice regulations implementing Title II of the Americans with Disabilities Act require the District of Columbia to "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). The District of Columbia is required to "furnish appropriate auxiliary aids and services where necessary to afford individuals with

disabilities … an equal opportunity to participate in, and enjoy the benefits of, a service, program or activity … ." 28 C.F.R. § 35.160(b)(1). "Auxiliary aids and services" include, but are not limited to, "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairment," 42 U.S.C. § 12103(1)(A), such as computer aided transcription services, teletypewriter devices and videophones. 28 C.F.R. § 35.104.

11. Mr. Pierce is a qualified individual with a disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12131(2). The District of Columbia is a "public entity" within the meaning of 42 U.S.C. § 12131(1).

12. The Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …." 29 U.S.C. § 794(a). The Department of Justice implementing regulations require the District of Columbia to "provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program or activity receiving Federal financial assistance." 28 C.F.R. § 42.503(f). Appropriate auxiliary aids include, but are not limited to, qualified interpreters and telephonic devices. *Id.*

13. The District of Columbia receives federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794(a). The operations of the Correctional Treatment Facility are programs or activities within the meaning of the Rehabilitation Act, 29 U.S.C. §

794(b)(1)(A)-(B). Mr. Pierce is a qualified individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(20).

14. The Americans with Disabilities Act and the Rehabilitation Act also require the District of Columbia to ensure that its contractors, including a contractor running a D.C. correctional facility, comply with the Americans with Disabilities Act. The District of Columbia is aware of its obligations under these federal statutes.

15. During his 51-day incarceration at the Correctional Treatment Facility, officials failed to provide Mr. Pierce with even the most basic communication accommodations. The District of Columbia intentionally did not furnish Mr. Pierce with auxiliary aids and services that were necessary to afford him an equal opportunity to participate in, and enjoy the benefits of, the services, programs or activities of the Correctional Treatment Facility. As a direct result of the District of Columbia's intentional failure to fulfill its obligations under the Americans with Disabilities Act and the Rehabilitation Act, Mr. Pierce was unable to obtain any real benefit from the anger management program offered at the facility or from the mental health and substance abuse assessments the court had ordered him to receive.

16. DOC policies require the Department to terminate the contract of any entity that fails or refuses to comply with the Americans with Disabilities Act. However, despite CCA's failure to comply with the requirements of the Americans with Disabilities Act, DOC has neither terminated its contract nor taken effective steps to assure compliance.

17. The DOC has failed to uphold its responsibilities under the Americans with Disabilities Act and the Rehabilitation Act, resulting in disability-based discrimination against Mr. Pierce and others at the Correctional Treatment Facility through (1) ineffective access to

qualified interpreters; (2) ineffective access to telecommunications; (3) lack of access to jail alerts and announcements; and (4) inadequate access to visitation.

### Inadequate Access to Qualified Interpreters

18.     Qualified sign language interpreters are needed for effective communication between individuals who rely on ASL to communicate and those who do not know the language. ASL is a complex language that utilizes signs made by hand motions, facial expressions and postures of the body. ASL is completely distinct from English and has its own syntax and grammar.

19.     For many deaf or hard of hearing individuals writing is not an effective form of communication. Deaf individuals frequently acquire written English as a second language, and their proficiency level is often much lower than that of hearing people. Writing is not an effective form of communication for Mr. Pierce.

20.     Lip reading is not an effective form of communication. Only a small percentage of the sounds found in English words are clearly visible on the mouth, and the ability to lip-read can be obstructed by external factors such as lighting or the speaker's facial structure. Even if a native ASL speaker were able to understand the sounds appearing on a speaker's lips, he or she would not necessarily understand the English language or the vocabulary being used.

21.     DOC policies recognize that an individual "who has only a rudimentary familiarity with sign language or finger spelling is not a 'qualified interpreter'" for communication with a deaf person.  D.C. Department of Corrections Directive 3800.3 § 12(e)(2)(a) (2003).

22.     Mr. Pierce made at least twelve written requests and filed three formal grievances seeking the services of a qualified ASL interpreter during his time at the Correctional Treatment

Facility. Mr. Pierce's case manager requested an interpreter on numerous occasions. Mr. Pierce's partner, David Holder, made repeated requests for accommodation on his behalf. Mr. Holder spoke with the Correctional Treatment Facility officials on at least 15 different occasions in addition to exchanging numerous emails with jail officials. However, jail officials did not provide Mr. Pierce with a qualified ASL interpreter, including for critical events during his incarceration, such as intake and orientation, grievance interviews, medical appointments, and most of his rehabilitative and educational classes. In response to Mr. Holder's requests for accommodation on Mr. Pierce's behalf, Correctional Treatment Facility officials told Mr. Holder they could not "justify" the expense of an interpreter. Officials also told Mr. Holder that it would take six to eight months to get an interpreter vetted and approved to work in the Correctional Treatment Facility, and that Mr. Pierce would be gone by then. On information and belief, officials at the Correctional Treatment Facility never initiated the process to employ an interpreter for Mr. Pierce.

23. On information and belief, Correctional Treatment Facility officials were aware of Mr. Pierce's disability immediately on intake. Mr. Pierce alerted corrections officers to his disability through hand gestures and written notes. He informed them that he needed an ASL interpreter to communicate and requested an interpreter for orientation and intake. DOC policies provide that "[w]ritten communication cannot be used as a substitute where the individual has expressed a preference for a sign language interpreter." D.C. Department of Corrections Directive 3800.3 § 12(a)(2) (2003). In the intake processing center at the Correctional Treatment Facility, a posted sign alerts inmates to their right to an interpreter. An inmate handbook distributed to all inmates on intake affirms every inmate's "right to be informed of the rules, procedures, programs and schedules concerning the operation of the institution." The handbook

continues, "You will have access to institutional programs and services without regard to … physical handicap." However, Correctional Treatment Facility officials ignored Mr. Pierce's requests and the requests of others for accommodation of his disability. On information and belief, Correctional Treatment Facility and DOC officials were aware of the risk of significant miscommunication without an interpreter but intentionally chose not to provide one.

24.     While Mr. Pierce was at the Correctional Treatment Facility, he had approximately five medical appointments for symptoms including an irregular heartbeat and blood in his stool. DOC and Correctional Treatment Facility officials were aware of the need for an interpreter during medical appointments and the risks inherent in providing medical care without an interpreter. DOC policies regarding inmate health care specifically provide that "Sign language interpreter services shall be made available to deaf and hearing-impaired individuals." Health Services Program Manual, Ch.1 § 2(f) (2012). Nevertheless, Correctional Treatment Facility officials provided no interpreters for any of Mr. Pierce's medical appointments.

25.     Without the assistance of an interpreter, Mr. Pierce was unable to explain his symptoms and concerns to the medical staff, or to understand their attempts to communicate with him. Mr. Pierce received some medical tests, but his inability to communicate effectively with staff resulted in Mr. Pierce not understanding what the tests were, why the tests were being performed or what the results were. Medical staff provided Mr. Pierce with medication after he reported blood in his stool, but could not adequately explain what the medication was or why they were giving it to him.

26.     Mr. Pierce is HIV positive and is on a drug regimen of five different medications each day. Medical staff only gave him four of his five medications, and could not explain why they were not providing the fifth medication without the assistance of an interpreter.

8

27. Though he attended some educational and therapeutic programming at the Correctional Treatment Facility, Mr. Pierce was unable to participate meaningfully in that programming without a qualified interpreter. A fellow inmate with a rudimentary knowledge of ASL sat in the classes with him, but Mr. Pierce was mostly unable to understand the inmate's attempts to sign. Mr. Pierce repeatedly informed (or attempted to inform) the instructor and corrections officers that the inmate was not an interpreter and that he was unable to get any benefit from the classes without an interpreter. They nevertheless failed to make other arrangements. Mr. Pierce stopped attending his graphic design class because of his inability to understand the instructor.

28. In the last two to three weeks of Mr. Pierce's incarceration, a concerned chaplain recruited Rev. Ron Friedrich, a chaplain at Gallaudet University and a qualified ASL interpreter, to volunteer his time and provide sign language interpretation for Mr. Pierce. Rev. Friedrich provided interpreter services for three of Mr. Pierce's approximately seven substance abuse classes. For the remainder of the programming, Mr. Pierce sat in the classes, uncomprehending, assisted only by occasional notes from the instructor. Mr. Pierce was completely unable to participate in group discussions, a key component of the programs. Despite his desire for rehabilitation, Mr. Pierce was unable to reap the benefits of the programming as a result of this lack of accommodation.

29. Mr. Pierce frequently tried to get the attention of corrections officers by waving in an attempt to communicate a need, question or concern. However, much of the time the officers deliberately ignored him. When he was able to summon a corrections officer, there were frequent miscommunications due to the lack of an ASL interpreter.

30. During the time he was at the Correctional Treatment Facility, corrections officers placed Mr. Pierce in solitary confinement for fourteen days. While in solitary confinement, Mr. Pierce was on 23-hour lock down. Through handwritten notes passed from corrections officers, Mr. Pierce was told that he had been placed in segregation on protective custody status, but the officers did not inform Mr. Pierce of what protective custody entailed, that his protective custody status was voluntary, or that he could sign himself out at any time. Without access to a qualified ASL interpreter, they had no effective way in which to do so. When Mr. Pierce refused to sign a form because he could not understand what it said, Correctional Treatment Facility officials moved him to an even smaller, more secluded solitary cell. Mr. Pierce was not finally released from solitary confinement until after Mr. Holder contacted officials about the situation.

**Inadequate Access to Telecommunications**

31. The Correctional Treatment Facility provides inmates access to a bank of telephones so that they can communicate with family, friends and other individuals in the outside world. On information and belief, hearing inmates have access to these telephones on a first come, first served basis, seven days a week between 7:00 a.m. and 11:00 p.m.

32. The Correctional Treatment Facility Inmate Handbook imposes a ten-minute time limit on telephone calls. On information and belief, in practice hearing inmates are allowed to have telephone conversations that may last as long as an hour.

33. Access to a telephone is extremely important for inmates at correctional facilities because it fosters family and community ties that are fundamental to an inmate's motivation to improve himself and fundamental to successfully re-entering the community upon release. Access to telecommunications was especially important for Mr. Pierce, because of his nearly total communicative isolation from other people during his incarceration.

34.     Because of his deafness, Mr. Pierce is unable to use a traditional telephone. In the outside world he uses a videophone to communicate via telephone using ASL.

35.     The Correctional Treatment Facility provides teletypewriter ("TTY") devices to deaf and hard of hearing inmates. A TTY is an outmoded electronic device that enables people with hearing and speech disabilities to communicate via telephone. A TTY consists of a keyboard, a display screen and a telephone, and both parties must have a TTY to have a direct conversation. Typed messages are sent over the telephone lines and appear on the screen of the other party. If one party does not have a TTY, federally mandated relay services are provided by telephone companies. Users can then communicate through the assistance of a third-party relay operator who types spoken words to be read by the deaf party and reads the typed responses to a hearing person. Two deaf individuals cannot communicate via TTY unless both parties have a TTY device. The TTY is an outdated and ineffective communication device.

36.     In contrast to the largely unrestricted access to telephones enjoyed by hearing inmates, Mr. Pierce had to make advance requests to use the TTY device. The TTY is kept in an office outside the housing unit, which is only open Monday through Friday from 9:00 a.m. to 5:00 p.m. Frequently, it would take one or two days for a corrections officer to grant Mr. Pierce's request to use the TTY and to provide him access to the device. Just as frequently, corrections officers denied Mr. Pierce's requests, writing to him: "That's not my job," or words to that effect.

37.     The DOC is aware of the need to provide additional time for TTY phone calls. Its 2003 Directive on "Communications for Deaf and Hearing Impaired" states, "In light of the fact that telephone calls placed via a TTY unit take three to five times longer than telephone calls placed using standard voice telephone equipment, DOC shall not impose on TTY calls a time

limit of less than four times the time allowed for voice telephone calls." D.C. Department of Corrections Directive 3800.3 § 14(e) (2003).

38. When granted access to the TTY, corrections officers deliberately limited Mr. Pierce's calls to ten minutes. Because of the time it takes to access and coordinate with a TTY relay operator, Mr. Pierce's calls were effectively limited to three to four minutes each.

39. Mr. Pierce was unable to communicate at all with his deaf friends because no videophone was available at the Correctional Treatment Facility. A videophone also would have enabled Mr. Pierce to communicate more effectively with hearing people, because telephone companies also provide ASL interpreters for videophone conversations, and Mr. Pierce's ability to communicate by TTY is limited because of his lack of proficiency in written English. Correctional Treatment Facility and DOC officials were or should have been aware that a videophone is a necessary auxiliary aid or service for deaf inmates.

### Lack of Access to Visual Notifications

40. DOC policy requires deaf inmates to be provided access to visual emergency alarms as well as visual signals or bed vibrators to alert them to notifications. D.C. Department of Corrections Directive 3800.3 § 15 (2003). On information and belief, DOC is aware of the need for visual and/or tactile notifications and the risks created by the failure to provide these notifications.

41. Mr. Pierce was not provided with access to a visual or tactile alarm for emergencies or any other notifications. Mr. Pierce worried about missing important announcements and notifications. The possibility that an emergency alarm would sound and he would be unaware caused Mr. Pierce emotional distress.

### Inadequate Access to Visitation

42. Like access to telephones, access to visitation is extremely important for inmates at correctional facilities because it fosters family and community ties that are fundamental to an inmate's motivation to improve himself and fundamental to successfully re-entering the community upon release. Access to visitation was especially important for Mr. Pierce to enable him to have contact with his partner after the domestic altercation that resulted in his incarceration, and because of his nearly total communicative isolation from other people during his incarceration.

43. Mr. Pierce uses American Sign Language to communicate with his mother. He is unable to communicate with her effectively in any other way. During the two weeks Mr. Pierce was in solitary confinement, he was handcuffed during visits from his mother and his partner. Placing Mr. Pierce in wrist restraints during a time when he needs to communicate is effectively the same as placing a gag in the mouth of a hearing prisoner. The restraints on his hands made it impossible for him to communicate effectively with his visitors. Mr. Pierce was forced to attempt to write notes with cuffed hands in the darkened visiting booth and press the note against the tinted glass separating him from his visitor.

**44.** Both Mr. Pierce's mother and Mr. Holder explained the problem to corrections officers and requested that the restraints be removed, however corrections officers refused to do so on at least one of the two occasions.

### Retaliation

45. On information and belief, Mr. Pierce's period of solitary confinement was not actually the result of a mistaken belief that he had requested protective custody, but was retaliation against him for having requested accommodation for his disability.

**Harm to Plaintiff**

46.     Mr. Pierce was unable to benefit from any of the programs and services available at the Correctional Treatment Facility because he could not comprehend the class material and could not participate in group discussions. Without an interpreter, Mr. Pierce was unable to receive the therapeutic and rehabilitative benefits provided by an anger management class or the vocational skills provided by a graphic design course.

47.     Mr. Pierce suffered great emotional distress during his time at the Correctional Treatment Facility, caused by the inability to communicate with the people around him and the refusal of staff to accommodate his disability. He felt depressed, humiliated and isolated. Mr. Pierce's inability to communicate with family and friends in the outside world caused him significant emotional harm and denied him the opportunity to maintain important relationships. Being forced to plead for the opportunity to use a TTY device was humiliating and degrading. Mr. Pierce felt like a second-class citizen when he was unable to communicate with his mother and partner during visitation. The possibility that an important notification or emergency alarm would sound and he would be unaware also caused Mr. Pierce emotional distress. The two weeks that he spent in solitary confinement, on 23-hour lockdown, were especially harmful to him.

48.     He continues to suffer from emotional distress and has nightmares about his time in solitary confinement. Mr. Pierce sought the treatment of a mental health specialist when he was released from the jail and continues to receive treatment.

**CLAIMS FOR RELIEF**

**Claim I: Disability-Based Discrimination in Violation of Title II
of the Americans with Disabilities Act (42 U.S.C. § 12131 *et seq.*)**

49.     Defendant's failure to provide Mr. Pierce effective means of communication denied him the same access to defendant's programs, services and activities as the access

provided to hearing individuals. Defendant intentionally subjected Mr. Pierce to disability-based discrimination, in violation of his rights under the Americans with Disabilities Act, by failing to provide Mr. Pierce adequate access to a qualified ASL interpreter, telecommunication devices, visual alarms and visitation.

### Claim II: Disability-Based Discrimination in Violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794 *et seq.*)

50.  Defendant's failure to provide Mr. Pierce effective means of communication denied him the same access to Defendant's programs, services and activities as the access provided to hearing individuals. Defendant intentionally subjected Mr. Pierce to disability-based discrimination, in violation of his rights under the Rehabilitation Act, by failing to provide Mr. Pierce adequate access to a qualified ASL interpreter, telecommunication devices, visual alarms and visitation.

### Claim III: Retaliation in Violation of the Americans with Disabilities Act and the Rehabilitation Act (42 U.S.C. § 12203; 29 U.S.C. § 794a(2))

51.  Defendant's retaliation against Mr. Pierce for asserting his rights under the Americans with Disabilities Act and the Rehabilitation Act violated his rights under those Acts.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff requests that this Court:

(a)  DECLARE that the actions of Defendant District of Columbia, as alleged herein, violated William Pierce's rights under the Americans with Disabilities Act and the Rehabilitation Act;

(b)  ENTER JUDGMENT awarding Mr. Pierce damages against Defendant in an amount appropriate to the evidence adduced at trial;

(c)     ENTER JUDGMENT awarding Mr. Pierce his costs and reasonable attorneys' fees in this action;

(d)     GRANT Mr. Pierce such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff requests a trial by jury.

Respectfully submitted,

/s/ *Arthur B. Spitzer*
_____
Arthur B. Spitzer (D.C. Bar No. 235960)
Frederick V. Mulhauser (D.C. Bar No. 455377)
Jennifer Wedekind[*]
American Civil Liberties Union of the Nation's Capital
4301 Connecticut Avenue, N.W., Suite 434
Washington, D.C. 20008
Tel. 202-457-0800
Fax 202-457-0805
artspitzer@aclu-nca.org
fmulhauser@aol.com

Counsel for Plaintiff

February 1, 2013

---

[*] Ms. Wedekind is a member of the New York Bar; her application for admission to the D.C. Bar is pending. She is practicing under the supervision of Mr. Spitzer and Mr. Mulhauser.