**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WILLIAM PIERCE,** **Plaintiff,** | |
| | **No. 13-cv-0134 (KBJ)** |
| **v.** | |
| | **ORAL ARGUMENT REQUESTED** |
| **DISTRICT OF COLUMBIA,** **Defendant.** | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY**
**JUDGMENT AS TO CLAIMS I AND II OF THE COMPLAINT**

Plaintiff William Pierce ("Plaintiff" or "Mr. Pierce") hereby submits this statement of the undisputed facts that support entry of partial summary judgment in Plaintiff's favor on Claims I and II of the Complaint. Exhibits referenced below are attached to the Declaration of James E. Rocap, III In Support Of Plaintiff's Motion For Partial Summary Judgment As To Claims I And II Of The Complaint.

**Background on Mr. Pierce**

1. Mr. Pierce is profoundly deaf. *See* Ex. 1, Oct. 10, 2013 Deposition of William Pierce at 12:13-17.

2. Mr. Pierce can make audible sounds, but cannot speak words. *See id.* at 13:21-14:4.

3. Mr. Pierce's native language is American Sign Language ("ASL"). *See id.* at 15:20-16:20, 20:13-21:15; Ex. 2, Feb. 25, 2013 Deposition of William Pierce at 521:4-19. He relies on ASL to communicate. *See* Ex. 3, Expert Report of Professor Martina J. Bienvenu (Bienvenu Rep.) at 10.

4. ASL is a complex language that is not derived from English. It has its own syntax and grammar and utilizes signs made by hand motions, facial expressions, eye gazes, and body postures. *See id.* at 5.

5. Written English is a second language for Mr. Pierce. *See* Ex. 1, Oct. 10, 2013 Deposition of William Pierce at 15:20-16:20.

6. The vast majority of deaf people lack the ability to communicate effectively in written English. *See* Ex. 3, Bienvenu Rep. at 6-8.

7. Mr. Pierce's proficiency in reading and writing English is far below that of a hearing person. In 1986, his senior year at the Kansas School for the Deaf, Mr. Pierce took the Stanford-7 Achievement Test. His score indicated that his reading comprehension skills were below the level of a fifth grader, and language skills below the level of a fourth grader. *See* Ex. 1, Oct. 10, 2013 Deposition of William Pierce at 27:20-29:22; Ex. 4, Stanford-7 Achievement Test Score Report. Mr. Pierce briefly attended the National Technical Institute for the Deaf, but dropped out because he struggled in his classes. *See* Ex. 1, Oct. 10, 2013 Deposition of William Pierce at 32:21-35:2.

8. Mr. Pierce primarily communicates using ASL, which is the only way that he can effectively communicate with friends or family, even if they are not themselves fluent in ASL. *See* Ex. 1, Oct. 10, 2013 Deposition of William Pierce at 99:16-106:20; Ex. 3, Bienvenu Rep. at 10. As he is unable to use a traditional phone, Mr. Pierce uses a videophone to communicate with friends and family in ASL, with a remote interpreter when needed. *See* Ex. 1, Oct. 10, 2013 Deposition of William Pierce at 102:2-106:20.

9. For example, even though his partner at the time of his incarceration, David Holder, did not know ASL, *see* Ex. 1, Oct. 10, 2013 Deposition of William Pierce at 81:7-82:9, Mr.

Pierce only used text messages for short, simple communications and rarely used written notes because Mr. Holder's command of English was so much stronger than his own. Mr. Pierce instead relied on a videophone and interpreter on a daily basis for communication, even while he and Mr. Holder lived in the same home. *See id.* at 119:11-121:20.

10. Most deaf individuals have very limited lip-reading ability. *See* Ex. 5, Expert Report of Richard Lorenzo Ray (Ray Rep.) at 4. Less than 30% of the sounds in English words are clearly visible on the mouth; as a result, many distinct spoken words and phrases look the same on the lips. In addition, the ability to lip read can be obstructed by external factors such as lighting or the speaker's facial structure. *See* Ex. 3, Bienvenu Rep. at 8.

11. Lip reading is not an effective form of communication for Mr. Pierce. He has difficulty understanding full sentences by lip reading. *See* Ex. 1, Oct. 10, 2013 Deposition of William Pierce at 12:18-13:20.

12. At a minimum, Mr. Pierce requires quality ASL interpretation in order to effectively communicate with others. *See* Ex. 3, Bienvenu Rep. at 10.

**<u>Background on the Correctional Treatment Facility, Corrections Corporation of America, and Unity Health Care</u>**

13. The Correctional Treatment Facility ("CTF") is a minimum and medium security facility in the District of Columbia operated by the Corrections Corporation of America ("CCA"), a private prison company. *See* Ex. 6, District of Columbia and CCA Operations and Management Agreement at 1; Answer ¶ 8, Mar. 20, 2013, ECF No. 8.

14. CCA operates CTF pursuant to a contract with the District of Columbia. Answer ¶ 8, Mar. 20, 2013, ECF No. 8. Pursuant to that contract, CCA is obligated to operate,

maintain, and manage the CTF in compliance with the Constitution and the laws of the United States. *See* Ex. 6, District of Columbia and CCA Operations and Management Agreement at 10.

15. Unity Health Care, Inc. ("Unity") provides comprehensive health care services at the Central Detention Facility and CTF pursuant to its contract with the District of Columbia. *See* Ex. 7, District of Columbia and Unity Contract; Ex. 8, Addendum to District of Columbia and Unity Contract.

16. Pursuant to that contract, Unity is obligated to provide services in compliance with federal and District of Columbia law, as well as DOC Administrative Directives and Policy Statements. *See* Ex. 7, District of Columbia and Unity Contract § C.3(a).

17. The Department of Corrections ("DOC") is an agency of the District of Columbia, the functions of which include overseeing the compliance of its contractors with the Americans with Disabilities Act. *See* Ex. 9, DOC Program Statement 3800.3 § 5(b).

18. The District of Columbia's DOC receives federal financial assistance. *See* Ex. 10, General Ledger Reports; Ex. 11, Defendant District of Columbia's Response to Plaintiff's First Set of Requests for Production of Documents at 16-17.

**<u>The District of Columbia's Lack of Oversight over CCA</u>**

19. The District of Columbia is supposed to monitor CCA's compliance with the Americans with Disabilities Act as part of its evaluation of CCA's compliance with its contract. *See* Ex. 12, Oct. 2, 2013 30(b)(6) Deposition of James Riddick at 15:7-16:1.

20. Oversight functions are meant to be performed by a Contract Monitor appointed by the District of Columbia. *See* Ex. 6, District of Columbia and CCA Operations and Management Agreement at 37.

21. The primary process for ensuring CCA's compliance with its contract with the District of Columbia is the presence of the Contract Monitor at the CTF. *See* Ex. 12, Oct. 2, 2013 30(b)(6) Deposition of James Riddick at 15:14-19:19.

22. The Contract Monitor does not consider or consult existing DOC, CCA, or CTF policies on a regular basis in determining CCA's compliance with the contract. He primarily relies on his "sense of what should occur in a prison" and "how they should run." *See id.* at 12:20-13:20, 24:8-26:9.

23. At the policy level, the Contract Monitor stated that he focuses mainly on "the fact that they have a policy that accommodates individuals with disabilities," even though the CCA policy lacks "a lot of the directives" in the DOC policy and is "not as in-depth." *See id.* at 27:20-30:5.

24. The Contract Monitor stated that he does not know CCA's process for updating CCA/CTF policies. *See id.* at 34:8-36:8.

25. The Contract Monitor typically addresses non-compliance issues that "flow[] to the surface" and are repeatedly brought to his attention by inmates and CCA staff. *See id.* at 18:14-19:19, 24:21-26:9.

26. The Contract Monitor reviews CCA's compliance with the ADA and DOC policies only when particular situations arise, as through inmate grievances, and are communicated to him. If an inmate complains of lack of access to a program or service, the actual investigation conducted is only to determine "if those services that they would have received at DOC are being provided at CTF in one form or another." *See id.* at 15:14-19:19; 31:13-32:8.

27. There are no regular reports prepared by CTF for the DOC or CCA's corporate office on accommodations provided to disabled inmates. *See* Ex. 13, Oct. 1, 2013 30(b)(6) Deposition of W. Fulton[1] at 69:9-22.

28. The DOC's Risk Manager also serves as its ADA Coordinator. *See* Ex. 14, Oct. 2, 2013 30(b)(6) Deposition of Craig Swaisgood at 6:1-7; 28:1-5.

29. The ADA Coordinator does not review CCA or CTF policies that apply to deaf or hard of hearing inmates. *See id.* at 32:19-33:7; Ex. 13, Oct. 1, 2013 30(b)(6) Deposition of W. Fulton at 36:2-37:1.

30. The ADA Coordinator did not regularly report on issues relating to deaf or hard of hearing inmates. *See* Ex. 14, Oct. 2, 2013 30(b)(6) Deposition of Craig Swaisgood at 31:8-32:17.

31. The District of Columbia Office of Disability Rights does not oversee, advise, implement, train, supervise, or monitor ADA compliance activities at or by the DOC. The same is true for facilities operated by CCA, such as the CTF. *See* Ex. 15, Defendants' Answers to Plaintiff's Third Set of Interrogatories at 3-6.

32. CCA is required to follow DOC policies. *See* Ex. 13, Oct. 1, 2013 30(b)(6) Deposition of W. Fulton at 32:1-11. This includes policies requiring CTF to provide auxiliary aids and services to individuals with disabilities for equal participation in services, programs, and activities and for effective communication. *See id.* at 38:21-40:9.

---

[1] Defendant has requested that the first names of CCA employees be redacted for security and confidentiality purposes.

33. CCA staff receives no training on DOC policies except for certain areas such as sexual misconduct, the Prison Rape Elimination Act, and disciplinary policies. *See id.* at 32:13-18.

34. At the time of Mr. Pierce's incarceration, CTF employees had not received any training related to working with deaf or hard of hearing inmates. *See* Ex. 16, Sept. 9, 2013 Deposition of B. Tutwiler at 25:10-16; Ex. 17, Sept. 10, 2013 Deposition of M. Allen at 14:22-15:8; Ex. 18, Sept. 10, 2013 Deposition of K. Kornegay at 22:20-23:1; Ex. 19, Sept. 11, 2013 Deposition of P. McNeal at 10:5-17; Ex. 20, Sept. 24, 2013 Deposition of M. Griffin at 13:2-4; Ex. 21, Oct. 1, 2013 Individual Deposition of W. Fulton at 12:14-16.

**<u>The District of Columbia's Lack of Oversight over Unity's Provision of Health Services</u>**

35. Unity is required to comply with DOC policy and program statements relating to persons with disabilities. *See* Ex. 22, Oct. 11, 2013 30(b)(6) Deposition of Vali Zabiheian at 46:8-13.

36. Unity does not provide training on communication with or treatment of deaf or hard of hearing inmates. *See id.* at 58:20-59:18; Ex. 23, Ex. 23, Oct. 9, 2013 Deposition of C. Chapman, M.D. at 26:15-27:2; Ex. 24, Sept. 12, 2013 Deposition of Fidelis F. Doh, M.D. at 29:1-9.

37. Unity currently has a contract with Gallaudet to provide interpreter services. However, Unity was unable to state whether this contract existed during Mr. Pierce's incarceration, or whether a process was in place at that time for Unity employees to request an interpreter. Unity does not have a written policy that informs its employees that the

contract exists or that describes how to request an interpreter. *See* Ex. 22, Oct. 11, 2013 30(b)(6) Deposition of Vali Zabiheian at 56:9-58:12.

38. The Unity doctors who treated Mr. Pierce were unaware of the nature of Unity's access to and use of interpreter services at the time of Mr. Pierce's incarceration. *See* Ex. 23, Oct. 9, 2013 Deposition of C. Chapman, M.D. at 37:4-38:10; Ex. 24, Sept. 12, 2013 Deposition of Fidelis F. Doh, M.D. at 32:5-33:22.

39. Unity's contract specifically states that services are to be provided in compliance with DOC Program Statements 3800.3, entitled "ADA: Communications for Deaf and Hearing Impaired"[2] and 6000.1B, entitled "Medical Management." *See* Ex. 7, District of Columbia and Unity Contract § C.1.1.

40. DOC Program Statement 3800.3 states that "Written communication cannot be used as a substitute where the individual has expressed a preference for a sign language interpreter." *See* Ex. 9, DOC Program Statement 3800.3 § 12(a)(2).

41. DOC Program Statement 6000.1B was superseded several times, with 6000.1G in place at the time of Mr. Pierce's incarceration. It states that "Sign language interpreter services shall be made available to deaf and hearing-impaired individuals." *See* Ex. 25, DOC Program Statement 6000.1G § 2(f).

42. The Unity doctors who treated Mr. Pierce were unaware of this provision in DOC Program Statement 6000.1G. *See* Ex. 23, Oct. 9, 2013 Deposition of C. Chapman, M.D. at 31:11-32:7; Ex. 24, Sept. 12, 2013 Deposition of Fidelis F. Doh, M.D. at 35:7-36:11.

---

[2] DOC Program Statement 3800.3 was effective from September 30, 2003 until July 16, 2013. *See* Ex. 14, Oct. 2, 2013 30(b)(6) Deposition of Craig Swaisgood at 9:19-10:3.

43. The DOC reviews Unity's policies to ensure that they are consistent with the applicable standards and DOC's Program Statements, and Unity reviews its own policies annually for compliance with the same standards. *See* Ex. 22, Oct. 11, 2013 30(b)(6) Deposition of Vali Zabiheian at 26:20-28:7.

44. Despite the presence of numerous specific provisions in DOC's program statements relating to deaf and hard of hearing inmates and their medical care, Unity's Special Needs Policy contains no provisions specific to deaf and hard of hearing inmates. *See* Ex. 9, DOC Program Statement 3800.3; Ex. 25, DOC Program Statement 6000.1G; Ex. 26, Unity Special Needs Patients Treatment Plan; Ex. 22, Oct. 11, 2013 30(b)(6) Deposition of Vali Zabiheian at 40:5-42:10.

45. The District of Columbia Office of Disability Rights does not oversee, advise, implement, train, supervise, or monitor ADA compliance activities at or by Unity. *See* Ex. 15, Defendants' Answers to Plaintiff's Third Set of Interrogatories at 6-7.

**Overview of Mr. Pierce's Incarceration at CTF**

46. On February 1, 2012, following his guilty plea, Mr. Pierce was sentenced to 60 days in jail and supervised probation for 18 months, for simple assault arising from a domestic dispute with his then-partner, David Holder. *See* Ex. 27, Plea Agreement; Ex. 28, Superior Court Order.

47. On or around February 1, 2012, Mr. Pierce was admitted to the Central Detention Facility. On February 2, 2012, he was transferred to the CTF. *See* Ex. 29, Inmate Transfer History Report; Ex. 30, Standard Inter-Institutional Transfer Order.

48. As a condition of probation, the court ordered Mr. Pierce to enter and complete a domestic violence intervention program, and to submit to mental health and substance abuse assessments every six months. *See* Ex. 28, Superior Court Order.

49. At CTF, CCA assigned Mr. Pierce to an anger management/substance abuse class. Mr. Pierce also signed up for a graphic design class. *See* Ex. 2, Feb. 25, 2013 Deposition of William Pierce at 425:14-427:5.

50. Mr. Pierce resided in three different units during his incarceration at CTF. He was initially placed in Medical 96. When he was assigned to protective custody, he was transferred to Medical 82. *See* Ex. 31, Feb. 24, 2013 Deposition of William Pierce at 214:10-20. Later, while still assigned to protective custody, Mr. Pierce was transferred into the Special Management Unit. *Id.* at 235:11-236:11.

51. Mr. Pierce was incarcerated at the CTF for 51 days. He was released on March 22, 2012. *See* Ex. 32, Pierce CCA chart.

**Overview of Interpretive Services Readily Available to the District of Columbia**

52. Qualified sign language interpreters provide real-time translations in ASL. Interpreters certified by the National Registry of Interpreters for the Deaf adhere to a code of professional conduct and are able to interpret effectively, accurately, and impartially using any necessary specialized vocabulary. *See* Ex. 5, Ray Rep. at 5.

53. Sign language interpreters who are not qualified often provide inaccurate interpretations. They may not have the requisite ASL skills or be able to keep up with their translation. As a result, the original message can get lost. *See* Ex. 3, Bienvenu Rep. at 8-9; Ex. 5, Ray Rep. at 5.

54. The District of Columbia has a contract for the provision of qualified ASL interpreters through its Office of Disability Rights. DOC contractors can obtain interpreters at the negotiated rates specified in this contract, either by contacting the DOC ADA Coordinator or by contacting the vendor directly. *See* Ex. 14, Oct. 2, 2013 30(b)(6) Deposition of Craig Swaisgood at 21:16-26:2.

55. Interpretive services are also readily available remotely, through the use of video remote interpreting (VRI). VRI uses high-speed Internet services to provide an off-site interpreter who can translate via video monitor. This enables deaf and hearing individuals in the same location to communicate. *See* Ex. 5, Ray Rep. at 8.

56. VRI has been widely available in the U.S. since at least the mid-2000s. It is commonly used in hospitals, doctors' offices, mental health care settings, police stations, and other instances where immediate access to an interpreter is necessary. Prisons can contract with a vendor such as Purple Communications VRI Services or ZVRS to enable VRI communications. *See id.* at 8-9.

57. In the area of telecommunications, videophones have been available at either no cost or modest cost since at least the mid-2000s. A videophone uses high-speed Internet to enable real-time video communication. It allows deaf individuals to communicate with one another in ASL. *See id.* at 6-7.

58. Videophones also enable communication between deaf and hearing individuals through the use of a video relay service (VRS). The deaf individual signs via video monitor to a remote sign language interpreter, and the interpreter communicates the deaf person's message to the hearing individual in spoken English and vice versa. *See id.* at 7.

59. VRS is free to all users and has been widely available since at least the mid-2000s. *See id.*

**<u>Defendant's Failure to Provide Interpretive Services for Mr. Pierce's Classes</u>**

60. Throughout his incarceration, Mr. Pierce made multiple requests for interpreters for his anger management/substance abuse classes and for his graphic arts class, starting on or about February 3, 2012. *See* Ex. 2, Feb. 25, 2013 Deposition of William Pierce at 427:7-428:1; Ex. 16, Sept. 9, 2013 Deposition of B. Tutwiler at 63:4-19; Ex. 17, Sept. 10, 2013 Deposition of M. Allen at 48:16-49:7; Ex. 19, Sept. 11, 2013 Deposition of P. McNeal at 30:20-33:16; Ex. 33, Feb. 27, 2012 Informal Resolution form; Ex. 34, Mar. 6, 2012 Memorandum from P. McNeal to W. Fulton; Ex. 35, CCA logbook entries; Ex. 36, Handwritten Notes between William Pierce and B. Tutwiler.

61. Mr. Pierce made multiple requests for an interpreter to Case Manager Tutwiler. On February 17, 2012, she noted that Mr. Pierce "continues to write request for an interpret [sic] for anger management and drug education." *See* Ex. 35, CCA logbook entries; Ex. 36, Handwritten Notes between William Pierce and B. Tutwiler.

62. In a February 27, 2012 informal resolution form, Mr. Pierce states that he "wrote about 8 request forms" for an interpreter and that Case Manager Tutwiler told him to stop. *See* Ex. 33, Feb. 27, 2012 Informal Resolution form.

63. Mr. Pierce also told Facilities Grievance Coordinator Allen that he needed an interpreter. *See* Ex. 17, Sept. 10, 2013 Deposition of M. Allen at 48:16-49:7.

64. At the first group session Mr. Pierce attended, he became agitated and upset when he could not understand the lecture and left the session. After the session, he gestured for CCA Treatment Specialist McNeal, *see* Ex. 19, Sept. 11, 2013 Deposition of P. McNeal

at 8:10-18, to come down to his cell. Mr. Pierce wrote Mr. McNeal that he was frustrated because he could not understand the lecture and needed an interpreter. *See id.* at 30:20-33:16.

65. Lectures and class participation were key components of the anger management/substance abuse class. *See id.* at 21:13-22:8.

66. In order to complete the graphic arts class, students had to follow detailed written instructions with technical vocabulary and be able to ask the instructor questions. *See* Ex. 2, Feb. 25, 2014 Deposition of William Pierce at 520:7-522:14.

67. CCA Treatment Specialist McNeal and Case Manager Tutwiler told Assistant Warden Fulton that Mr. Pierce had requested an interpreter. *See* Ex. 16, Sept. 9, 2013 Deposition of B. Tutwiler at 63:4-19; Ex. 21, Oct. 1, 2013 Individual Deposition of W. Fulton at 14:9-15:12, 28:1-29:2; Ex. 37, Feb. 28, 2012 Memorandum by P. McNeal to W. Fulton; Ex. 38, Sept. 23, 2013 Deposition of A. Points at 37:13-38:3.

68. Mr. Pierce's then-partner, David Holder, also communicated with Assistant Warden Fulton about Mr. Pierce's need for an interpreter. Mr. Holder told Assistant Warden Fulton that Mr. Pierce was unable to participate in his classes. *See* Ex. 21, Oct. 1, 2013 Individual Deposition of W. Fulton at 6:15-7:22; Answer ¶ 22, Mar. 20, 2013, ECF No. 8.

69. Assistant Warden Fulton spoke to a number of the staff that were in direct contact with Mr. Pierce because Fulton was not in direct contact with Mr. Pierce, "to heighten the staff's sensitivity, to make them aware of the fact that [Mr. Pierce] did have special needs and that we're going to do everything to the best of our ability to accommodate those needs." *See* Ex. 13, Oct. 1, 2013 30(b)(6) Deposition of W. Fulton at 65:4-10.

70. Assistant Warden Fulton understood that pursuant to DOC policies, a sign language interpreter needed to be qualified. *See id.* at 41:21-42:18.

71. Assistant Warden Fulton reached out to Gallaudet University, but was told that their interpreters would need to be paid. *See* Ex. 21, Oct. 1, 2013 Individual Deposition of W. Fulton at 8:9-9:6.

72. Assistant Warden Fulton did not follow up with the Gallaudet service for Mr. Pierce because CCA would have to pay for the interpreters. Assistant Warden Fulton told the warden about the Gallaudet fee schedule, and the warden advised him to look for other options. *See id.* at 9:22-10:7; 44:18-45:5. There were no particular budget constraints in February or March 2012 that impacted the provision of interpreting services. *See* Ex. 13, Oct. 1, 2013 30(b)(6) Deposition of W. Fulton at 77:12-80:9.

73. Assistant Warden Fulton did not reach out to any interpreting services or agencies, or anyone else outside of CTF, CCA, and the DOC, in order to find interpreters to accommodate Mr. Pierce. *See* Ex. 21, Oct. 1, 2013 Individual Deposition of W. Fulton at 12:17-13:15.

74. Assistant Warden Fulton explained to Rev. Napper, CCA's volunteer coordinator, that CCA's previous attempts to accommodate Mr. Pierce had been *unsuccessful* and that CCA continued to look for someone who could effectively sign for him during the classes so that he could get the benefit of group input, group conversation. *Id.* at 41:11-16.

75. Starting on March 12, 2012, Rev. Friedrich, a chaplain, interpreted for Mr. Pierce solely on a volunteer basis in his last three or four anger management/substance abuse classes. *See* Ex. 2, Feb. 25, 2014 Deposition of William Pierce at 431:2-435:12, 455:4-458:10;

Ex. 21, Oct. 1, 2013 Individual Deposition of W. Fulton at 10:8-16; Ex. 39, Mar. 12, 2012 Memorandum from I. Johnson to W. Fulton attaching Inmate/Resident Grievance.

76. Assistant Warden Fulton was not told and did not seek to determine if Rev. Friedrich was a qualified interpreter. He simply assumed that since Rev. Friedrich knew ASL, and that he could interpret from English to ASL. *See* Ex. 21, Oct. 1, 2013 Individual Deposition of W. Fulton at 41:17-42:20.

77. As a result of the delay in providing an interpreter, Mr. Pierce feels he learned nothing from the anger management/substance abuse program. He wanted to learn how to improve his behavior after his release from CTF, but it was too difficult for him to follow the communication in the classes. *See* Ex. 2, Feb. 25, 2014 Deposition of William Pierce at 469:20-474:10.

78. CCA personnel provided Mr. Pierce with a "Certificate of Completion" for this class, after having denied him an interpreter for all but his last three or four classes. *See* Ex. 2, Feb. 25, 2014 Deposition of William Pierce at 431:2-435:12; 455:4-458:10; Ex. 40, Certificate of Completion.

79. On March 20, 2012, a severely hard of hearing inmate, [redacted] attempted to sign for Mr. Pierce in one anger management/substance abuse class. [redacted] also was asked to sign for Mr. Pierce in approximately two or three graphic arts classes. *See* Ex. 2, Feb. 25, 2014 Deposition of William Pierce at 435:13-445:15, 457:17-458:10; Ex. 34, Mar. 6, 2012 Memorandum from P. McNeal to W. Fulton.

80. [redacted] was not a certified interpreter and could not effectively interpret the written or oral statements made in the graphic design class. He signed in "words here and there scattered about," rather than in complete sentences, so the thoughts expressed were

incomplete. Mr. Pierce had to repeatedly ask for clarification because he could not understand what [redacted] was signing to him. *See* Ex. 2, Feb. 25, 2014 Deposition of William Pierce at 441:1-13.

81. It was also difficult for [redacted] to sufficiently interpret for Mr. Pierce because [redacted] was a student in the class. [redacted] had missed some classes and was therefore working on a different step in the sequence of class assignments. *See id.* at 476:9-478:16. When working on class assignments with written instructions, Mr. Pierce needed a qualified interpreter in order to ask the teacher questions about the vocabulary used in the directions, but [redacted] also needed the teacher's assistance for his own work. *See id.* at 520:21-523:1.

82. [redacted] faulty interpretation caused Mr. Pierce to miss a considerable amount of the communication in the class. *See id.* at 439:11-20.

83. Mr. Pierce told CCA Treatment Specialist McNeal that [redacted] was not an effective interpreter, and CCA Treatment Specialist McNeal then informed Assistant Warden Fulton. *See* Ex. 13, Oct. 1, 2013 30(b)(6) Deposition of W. Fulton at 62:9-18; Ex. 19, Sept. 11, 2013 Deposition of P. McNeal at 67:9-68:7; Ex. 21, Oct. 1, 2013 Individual Deposition of W. Fulton at 14:9-15:12.

84. As a result of the absence of a qualified interpreter, Mr. Pierce did not complete the graphic design lessons. *See* Ex. 2, Feb. 25, 2014 Deposition of William Pierce at 524:8-13. Fewer than half of the listed tasks are marked as completed on his Progress Report. *See* Ex. 41, Graphic Arts Vocational Progress Report.

85. Apparently recognizing CTF's risk of non-compliance with the ADA, Mr. Fulton contacted General Counsel Marie Amano,[3] seeking guidance in regards to accommodating hearing-impaired individuals. *See* Ex. 13, Oct. 1, 2013 30(b)(6) Deposition of W. Fulton at 73:16-74:2. Ms. Amano referred Assistant Warden Fulton to the ADA compliance monitor, who in turn provided Assistant Warden Fulton information pertaining to the Graham Agency, which provides certified sign language interpreters. *See id.* at 73:16-74:7.

86. However, CCA was not able to secure a contract with the Graham Agency for certified sign language interpreters until the end of Mr. Pierce's incarceration or soon after. *See id.* at 74:8-11.

**<u>Defendant's Failure to Provide Interpretive Services for Mr. Pierce's Medical Treatment</u>**

87. [redacted]

88. At his initial intake at the Central Detention Facility, Mr. Pierce wrote to the doctor that he needed an interpreter [redacted] The doctor wrote back that they could use written communication. Mr. Pierce continued to write that he needed an interpreter, but the doctor did not ask that one be provided or use VRI to obtain interpretive services remotely. *See* Ex. 2, Feb. 25, 2014 Deposition of William Pierce at 480:5-483:15.

---

[3] Plaintiff believes that Assistant Warden Fulton was referring to DOC General Counsel, Maria Amato.

89. Instead, the intake doctor, Dr. Doh, turned his computer screen toward Mr. Pierce to show him the questions. Mr. Pierce wrote to Dr. Doh that he could not understand the vocabulary and medical jargon on the screen, but Dr. Doh wrote that he should not worry about it. *See id.* at 482:8-483:15.

90. Dr. Doh continued to point at words on the screen, ask questions verbally on the assumption that Mr. Pierce could read his lips, and write notes to Mr. Pierce. Mr. Pierce did not respond in writing to all of Dr. Doh's spoken questions. *See* Ex. 24, Sept. 12, 2013 Deposition of Fidelis F. Doh, M.D. at 41:16-43:9.

91. [redacted]

92. [redacted]

93. [redacted]

94. [redacted]

95. [redacted]

96. [redacted]

97. [redacted]

98. As with the initial intake, no ASL interpreter was present at any of Mr. Pierce's medical appointments. *See* Ex. 2, Feb. 25, 2014 Deposition of William Pierce at 483:4-488:5; Ex. 24, Sept. 12, 2013 Deposition of Fidelis F. Doh, M.D. at 40:13-43:9; Ex. 42, Medical Records.

99. The medical personnel primarily attempted to communicate with Mr. Pierce through brief written notes. *See* Ex. 2, Feb. 25, 2014 Deposition of William Pierce at 490:12-20; Ex. 24, Sept. 12, 2013 Deposition of Fidelis F. Doh, M.D. at 40:13-43:9; Ex. 31, Feb. 24, 2014 Deposition of William Pierce at 242:20-243:9; Ex. 42, Medical Records.

100. [redacted]

101. [redacted]

**<u>Defendant's Failure to Provide Interpretive Services for Mr. Pierce's Grievance Interviews</u>**

102. On February 23, 2012, Mr. Pierce was shoved to the floor by another inmate in the TV room and went to Case Manager Tutwiler. When she asked him by a written note if he would like to be placed in protective custody, Mr. Pierce wrote back "If necessary." *See* Ex. 16, Sept. 9, 2013 Deposition of B. Tutwiler at 79:16-80:14; Ex. 31, Feb. 24, 2014 Deposition of William Pierce at 195:17-207:18; Ex. 44, Feb. 23, 2012 Memorandum from A. Points to I. Johnston; Ex. 45, Feb. 27, 2012 Incident Statement.

103. Case Manager Tutwiler did not recall if she described to Mr. Pierce what protective custody was, or if he was aware that protective custody meant that he would be segregated from the general population, or why she believed it was necessary. *See* Ex. 16, Sept. 9, 2013 Deposition of B. Tutwiler at 79:16-81:9; 88:3-89:13.

104. As a result, Mr. Pierce did not understand what protective custody meant. *See* Ex. 46, Handwritten Notes between Mr. Pierce and M. Allen.

105. Mr. Pierce was taken to protective custody in Medical 82. Unit Manager Points went to Mr. Pierce's new cell and wrote a note to him that he needed to write on a form "I fear for my safety." Mr. Pierce was confused by the request and initially refused, but Ms. Points kept standing there and insisting that he write those words on the form. Finally, Mr. Pierce gave up and copied onto the form the words Unit Manager Points had written down. Ex. 31, Feb. 24, 2014 Deposition of William Pierce at 217:8-219:21; 236:21-237:16; Ex. 38, Sept. 23, 2013 Deposition of A. Points at 23:4-25:20; Ex. 48, Feb. 23, 2012 Protective Custody Request/Waiver Form.

106. The guard and correctional officers did not use an interpreter or VRI services to communicate with Mr. Pierce about what protective custody was, why it was used, how

long it would last and how to request release from protective custody. Ex. 16, Sept. 9, 2013 Deposition of B. Tutwiler at 79:16-81:9; Ex. 31, Feb. 24, 2014 Deposition of William Pierce at 195:17-207:18, 217:8-219:21, 236:21-237:16; Ex. 38, Sept. 23, 2013 Deposition of A. Points at 23:4-25:20; Ex. 44, Feb. 23, 2012 Memorandum from A. Points to I. Johnston; Ex. 45, Feb. 27, 2012 Incident Statement; Ex. 48, Feb. 23, 2012 Protective Custody Request/Waiver Form.

107. On February 27, 2012, Mr. Pierce notified Facilities Grievance Coordinator Allen in a note that he had not understood what protective custody meant and that his case manager should have discussed it with him. Allen responded in writing: “You should have read it before you signed it.” Mr. Pierce responded in writing, “I had no choice because they told me to sign.” *See* Ex. 46, Handwritten Notes between Mr. Pierce and M. Allen; Ex. 17, Sept. 10, 2013 Deposition of M. Allen at 19:16-22:20.

108. At some point, Mr. Pierce told Case Manager Griffin that he wanted to leave protective custody and return to the general population. Griffin passed Mr. Pierce’s request on to the segregation staff. *See* Ex. 20, Sept. 24, 2013 Deposition of M. Griffin at 35:21-37:5; Ex. 35, CCA logbook entries at 2.

109. On March 1, 2012, upon reading Mr. Pierce’s administrative segregation review, Assistant Warden Fulton learned that Mr. Pierce wanted to leave protective custody but had asked to have a lawyer present before signing a protective custody waiver. Fulton thought that this was unusual, but did not seek to understand why Mr. Pierce felt he needed a lawyer in order to sign the waiver. Instead, he advised the staff to review Mr. Pierce again in one week. *See* Ex. 21, Oct. 1, 2013 Individual Deposition of W. Fulton at 22:12-24:13; Ex. 48, Mar. 1, 2012 Administrative Segregation Review.

110. On March 4, 2012, CCA officials moved Mr. Pierce to a cell in the Special Management Unit, still in segregation. *See* Ex. 18, Sept. 10, 2013 Deposition of K. Kornegay at 41:5-17; Ex. 49, Administrative Segregation Review.

111. SMU was much worse than the other units where Mr. Pierce had been housed. He was still on 23-hour lockdown, did not have a roommate, and could only see out from his cell through a window in the metal door. *See* Ex. 18, Sept. 10, 2013 Deposition of K. Kornegay at 18:9-20:30; Ex. 31, Feb. 24, 2014 Deposition of W. Pierce at 235:20-236:5.

112. Mr. Pierce was released from segregation on March 7, 2012. *See* Ex. 49, Administrative Segregation Review.

113. The inmate who shoved Mr. Pierce remained unrestricted. *See* Ex. 31, Feb. 24, 2014 Deposition of W. Pierce at 225:1-8.

**<u>Defendant's Failure to Provide Mr. Pierce Adequate Access to Telecommunications</u>**

114. During Mr. Pierce's incarceration at CTF when he was in Medical 96, hearing inmates had access to pay telephones seven days a week whenever they were not locked down in their cells. Hearing inmates did not need to request permission in advance to use the telephones during these hours, and calls could last up to 10 minutes. *See* Ex.51, CTF Policy 16-100, Inmate Access to Telephones; Answer ¶¶ 31-32, Mar. 20, 2013, ECF No. 8.

115. In order to place a call, CTF required Mr. Pierce to request an appointment in advance to use a teletypewriter ("TTY"). *See* Ex. 16, Sept. 9, 2013 Deposition of B. Tutwiler at 25:17-26:17, 44:9-45:20, 106:20-107:6; Ex.51, CTF Policy 16-100, Inmate Access to Telephones.

116. A TTY consists of a keyboard, display screen, and telephone. Both parties must have a TTY to have a direct (uninterpreted) conversation. Typed messages are sent over the telephone lines and appear on the screen of the other party. *See* Ex. 5, Ray Rep. at 5-6.

117. In a conversation between a deaf and hearing individual, the deaf party uses the TTY while the hearing party uses a standard phone. The parties communicate through the assistance of a third-party relay operator who types spoken words to be read by the deaf party and reads the typed responses to a hearing person. This makes communications slow and difficult. *See id.*

118. Two deaf individuals cannot communicate directly via TTY unless both parties have a TTY device and can type in English effectively. *See id.*

119. Since the TTY requires the deaf individual to type and read in English, it can only enable communication to the extent of the user's reading and writing skills. *See id.*

120. In addition, most TTYs can only transmit 25-30 words per minute. *See id.* at 6.

121. As a result, time limits for conversations using the TTY should be at least four times the limit for standard phone conversations in order to be equivalent. *See id.*

122. DOC policy required that deaf inmates be afforded no less than four times the amount of time for TTY calls as hearing inmates were allotted for voice phone calls. *See* Ex. 9, DOC Program Statement 3800.3 § 14(e).

123. CCA recognized that it needed to abide by the DOC policy regarding TTY time limits. *See* Ex. 13, Oct. 1, 2013 30(b)(6) Deposition of W. Fulton at 44:2.14.

124. The TTY was used with the telephone in Mr. Pierce's case manager's office. In order to use the device, his case manager or one other CTF employee had to be present. Case Manager Tutwiler's hours were typically Monday through Friday from 8:00 a.m. to 5:00

p.m. *See* Ex. 16, Sept. 9, 2013 Deposition of B. Tutwiler at 25:17-26:17, 44:9-45:20, 106:20-107:6; Ex.51, CTF Policy 16-100, Inmate Access to Telephones.

125. Case Manager Tutwiler would consider Mr. Pierce's requests based on when she could be in her office to supervise the call. Her schedule depended on the inmates she needed to meet with each day and thus was not predictable in advance. *See* Ex. 16, Sept. 9, 2013 Deposition of B. Tutwiler at 40:17-41:19, 43:2-44:8.

126. Case Manager Tutwiler would limit Mr. Pierce to approximately 10 minutes for his phone calls. She would gesture to him to indicate when his time was up. *See* Ex. 31, Feb. 24, 2014 Deposition of William Pierce at 384:21-386:2.

127. During the time Mr. Pierce was in protective custody in Medical 82, hearing inmates in Medical 82 could use the phone during their recreation hour or ask to have a telephone brought to their cell at any time during the day by asking the officer on the unit. There were two such phones. *See* Ex. 20, Sept. 24, 2013 Deposition of M. Griffin at 19:4-23:9, 50:3-13.

128. Deaf and hard of hearing inmates in protective custody on Medical 82 had to request to use a TTY in Case Manager Griffin's office. Griffin would obtain the TTY from Assistant Warden Fulton and tell the inmate that he could not be on the phone for a long time. *See* Ex. 20, Sept. 24, 2013 Deposition of M. Griffin at 20:16-22:8.

129. Mr. Pierce's informal resolution form submitted on or around February 27, 2012 expressed his frustration with the TTY limitations. In his review of the form on March 6, 2012, Assistant Warden Fulton did not address this complaint. *See* Ex. 21, Oct. 1, 2013 Individual Deposition of W. Fulton at 29:12-31:10; Ex. 33, Feb. 27, 2012 Informal Resolution.

130. During the time Mr. Pierce was in protective custody in the Special Management Unit, hearing inmates in the Special Management Unit could ask to have a telephone brought to their cell. This phone did not have TTY capability. *See* Ex. 18, Sept. 10, 2013 Deposition of K. Kornegay at 29:1-8, 33:11-21.

131. Deaf and hard of hearing inmates in protective custody in the Special Management Unit had to write a request to use a TTY in the segregation office and give it to an officer during the officer's once daily walk-through. Once a request was granted, the inmate would be brought to the office in handcuffs and would be permitted to use the TTY—with the handcuffs remaining on while the inmate typed. *See id.* at 29:9-30:13, 33:11-34:15.

132. Mr. Pierce submitted another informal resolution form on or around March 2, 2012 regarding the TTY limitations. Assistant Warden Fulton viewed this complaint as "just a matter of expressing his frustration" and did not address the TTY issue in his response. *See* Ex. 21, Oct. 1, 2013 Individual Deposition of W. Fulton at 32:6-33:13; Ex. 52, Mar. 2, 2012 Informal Resolution.

**Defendant's Failure to Provide Mr. Pierce Adequate Access to Visual Notifications**

133. DOC policy requires the CTF to provide access to visual emergency alarms as well as visual signals or bed vibrators to alert deaf inmates to both routine and emergency notifications. *See* Ex. 9, DOC Program Statement 3800.3 § 15.

134. CTF, however, failed to provide Mr. Pierce with access to a visual or tactile alarm in his cell for emergencies or other notifications throughout his incarceration. *See* Ex. 13, Oct. 1, 2013 30(b)(6) Deposition of W. Fulton at 44:16-22; Ex. 20, Sept. 24, 2013 Deposition

of M. Griffin at 28:9-19; Ex. 31, Feb. 24, 2014 Deposition of William Pierce at 366:20-367:7; Ex. 38, Sept. 23, 2013 Deposition of A. Points at 49:1-17.

135. As a result, Mr. Pierce could have missed important announcements and notifications, and been unaware of an emergency situation. For example, while at CTF, Mr. Pierce could not rely on a visual alarm to alert him to an emergency lockdown. If there was an emergency at night or if the door was closed, Mr. Pierce would not have been able to see an emergency visual alarm in the hallway. *See* Ex. 31, Feb. 24, 2014 Deposition of William Pierce at 366:5-369:6.

**Defendant's Failure to Provide Mr. Pierce Adequate Access to Visitation**

136. Mr. Pierce uses ASL to communicate with his mother, and remote ASL interpretive services to communicate with his then-partner, and is unable to communicate effectively with them in any other way on any non-simple matters. *See* Ex. 1, Oct. 10, 2013 Deposition of William Pierce at 20:13-18, 81:7-82:9, 119:11-121:20.

137. During the two weeks Mr. Pierce was in protective custody, he was brought into at least one visit from his partner and his mother in handcuffs. *See* Ex. 2, Feb. 25, 2014 Deposition of William Pierce at 576:9-578:6; Ex. 53, Sept. 23, 2013 Deposition of David Holder at 46:22-47:14, 51:14-52:22; Answer ¶ 43, Mar. 20, 2013, ECF No. 8.

138. Mr. Pierce's mother had to explain the problem to corrections officers in order to have the handcuffs removed. *See* Ex. 2, Feb. 25, 2014 Deposition of William Pierce at 576:9-578:6; Ex. 53, Sept. 23, 2013 Deposition of David Holder at 46:22-47:14; 51:14-52:22.

Respectfully submitted,

_/s/ James E. Rocap III ___________

James E. Rocap III (#912840)
Damon J. Kalt (#996078)
Nina S. Thanawala (#1018413)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-3000

Arthur B. Spitzer (#235960)
Frederick V. Mulhauser (#455377)
Jennifer A. Wedekind (#1012362)
AMERICAN CIVIL LIBERTIES
UNION OF THE NATION’S CAPITAL
4301 Connecticut Avenue NW, Suite 434
Washington, DC 20008
Telephone: (202) 457-0800

**Attorneys for Plaintiff William Pierce**

November 17, 2014