EXHIBIT 7

| AWARD/CONTRACT | 1. Reserved for later use | | Page of Pages | |
|---|---|---|---|---|
| | | | 1 | 81 |

| 2. Contract Number | 3. Effective Date | 4. Requisition/Purchase Request/Project No. |
|---|---|---|
| DCFL-2006-D-6001 | See block 20c | |

| 5. Issued By: | Code | 07SRC | 6. Administered by (If other than line 5) |
|---|---|---|---|

**5. Issued By:**
Office of Contracting and Procurement
Group vii
441 4th Street, NW, Suite 700 South
Washington, D.C. 20001

**6. Administered by (If other than line 5)**
Department of Corrections
1923 Vermont Avenue, N.W.
Washington, DC 20001

**7. Name and Address of Contractor** (No. street, city, county, state and Zip Code)
Unity Heath Care, Inc.
3020 14th Street, NW
Washington, DC 20009
Attn: Vincent A. Keane
Phone: (202) 518-6409

| Duns No. | 18-714-4019 | TIN | 52-1572431 |
|---|---|---|---|

**8. Delivery**
☐ FOB Origin   ☒ Other

**9. Discount for prompt payment:**

**10. Submit invoices to the Address shown in Section G.2** (2 copies unless otherwise specified)

| 11. Ship to/Mark For | Code |
|---|---|
| N/A | |

**12. Payment will be made by** | Code |
Office of the Controller
300 Indiana Avenue, NW, Room 4106
Washington, DC 20001

**13. Remit Address:**

**14. Accounting and Appropriation Data**
ENCUMBRANCE CODE:

| 15A. Item | 15B. Supplies/Services | 15C. Qty. | 15D. Unit | 15E. Unit Price | 15F. Amount |
|---|---|---|---|---|---|
| 0001 | Transition Cost | Fixed Price | | | |
| 0002 | Comprehensive Health Care Services | 12 | Month | | |
| 0003 | Comprehensive Health Care Services | 12 | Month | Redacted | |
| 0004 | Comprehensive Health Care Services | 12 | Month | | |
| | | | | Total Amount of Contract ☞ | Redacted |

### 16. Table of Contents

| (X) | Section | Description | Page | (X) | Section | Description | Pa |
|---|---|---|---|---|---|---|---|
| | | **PART I – THE SCHEDULE** | | | | **PART II – CONTRACT CLAUSES** | |
| X | A | Contract Form | 1 | X | I | Contract Clauses | 70 |
| X | B | Supplies or Services & Cost/Price | 2 | | | **PART III – LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS** | |
| X | C | Services | 3 | X | J | List of Attachments | 77 |
| X | D | Packing and Marking | 33 | | | **PART IV – REPRESENTATIONS AND INSTRUCTIONS** | |
| X | E | Inspection and Acceptance | 34 | X | K | Representations, Certifications and Other Statements of Offerors | 78 |
| X | F | Contract Term | 35 | | | | |
| X | G | Contract Administration data | 38 | | L | Instructions, conditions & notices to offerors | N/ |
| X | H | Special Contract Requirements | 43 | | M | Evaluation factors for award | N/ |

Contracting Officer will complete Item 17 or 18 as applicable

**17.** ☒ **CONTRACTOR'S NEGOTIATED AGREEMENT** (Contractor is required to sign this document and return __(2)__ copies to issuing office.) Contractor agrees to furnish and deliver all items, perform all the services set forth or otherwise identified above and on any continuation sheets, for the consideration stated herein. The rights and obligations of the parties to this Agreement shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, as amended, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

**18.** ☐ **AWARD** (Contractor is not required to sign this docume Your offer on Solicitation Number _____ including additions or changes made by which additions or changes are forth in full above, is hereby accepted as to the items listed abc and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary

| 19A. Name and Title of Signer (Type or print) | 20A. Name of Contracting Officer |
|---|---|
| Vincent A. Keane, Chief Executive Officer | John Soderberg |

| 19B. | 19C. Date Signed | 20B. District of Columbia | 20C. Date Sig |
|---|---|---|---|
| *Vincent A. Keane* (Signature of person authorized to sign) | 7/10/06 | *John Soderberg* (Signature of Contracting Officer) | 7/19/0 |

DC OCP 201 (7-

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

## SECTION B – SUPPLIES OR SERVICE AND PRICE

**B.1   SUMMARY OF SUPPLIES OR SERVICE**

The District of Columbia Office of Contracting and Procurement on behalf of the Department of Corrections (the District) seeks an experienced Contractor to provide Comprehensive Health Care Services at the District's Central Detention Facility (CDF), the Correctional Treatment Facility (CTF) and Community Correctional Centers (Halfway Houses).

**B.2   PRICE SCHEDULE – FIRM FIXED PRICE**

**B.2.1   BASE PERIOD (Date of award through September 30, 2006 for transition period, October 1, 2006 through September 30, 2009 for operational period)**

| CLIN | ITEM DESCRIPTION | UNIT PRICE | UNIT | QUANTITY | TOTAL ANNUAL PRICE |
|---|---|---|---|---|---|
| 0001 | Provide Comprehensive Health Care Services for the Department of Corrections Inmates population in accordance with Section C.3 (Base Year) | | | | |
| 0001AA | Transition Cost in accordance with Section C.3.32 | | | FIXED PRICE | |
| 0001AB | Provide Comprehensive Health Care Services for the Department of Corrections Inmates population in accordance with Section C.3 (Base Period Year 1) | Redacted | Month | 12 | Redacted |
| 0001AC | Provide Comprehensive Health Care Services for the Department of Corrections Inmates population in accordance with Section C.3 (Base Period – Year 2) | | Month | 12 | |
| 0001AD | Provide Comprehensive Health Care Services for the Department of Corrections Inmates population in accordance with Section C.3 (Base Period – Year 3) | | Month | 12 | |
| **Total for Base Period** | | | | | |

**B.2.2   OPTION YEAR ONE**

| CLIN | ITEM DESCRIPTION | UNIT PRICE | UNIT | QUANTITY | TOTAL ANNUAL PRICE |
|---|---|---|---|---|---|
| 1001AA | Provide Comprehensive Health Care Services for the Department of Corrections Inmates population in accordance with Section C.3 (Option Year 1) | Redacted | Month | 12 | Redacted |
| **Total for Option Year One** | | | | | |

**B.2.3   OPTION YEAR TWO**

| CLIN | ITEM DESCRIPTION | UNIT PRICE | UNIT | QUANTITY | TOTAL ANNUAL PRICE |
|---|---|---|---|---|---|
| 2001AA | Provide Comprehensive Health Care Services for the Department of Corrections Inmates population in accordance with Section C.3 (Option Year 2) | Redacted | Month | 12 | Redacted |
| **Total for Option Year Two** | | | | | |

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

## SECTION C – DESCRIPTIONS/SPECIFICATIONS

### C.1    SCOPE

The District of Columbia Office of Contracting and Procurement, on behalf of the Department of Corrections (the District), requires an experienced Contractor to provide Comprehensive Health Care Services for persons in the custody of the District and housed at the Central Detention Facility (CDF), the Correctional Treatment Facility (CTF) and Community Correctional Centers (Halfway Houses).

The primary purpose of the contract is to provide health care services which will include, but are not limited to: intake medical evaluation and screening, primary care, specialty care, diagnostic testing, surgical services, emergency and urgent care, inpatient care, rehabilitation/step down, dialysis, dental services, mental health services, substance abuse services and hospice.

Correctional health care provided shall be based on the five elements of the Public Health Care Model:

1. Early detection and assessment
2. Prompt and effective treatment at a community standard of care
3. Prevention measures
4. Comprehensive health education
5. Discharge Planning to encourage, continuity of care in the community upon release

### C.1.1    APPLICABLE DOCUMENTS

The Contractor shall provide Comprehensive Health Care Services in accordance with the applicable documents listed below:

| Item No. | Document Type | Title | Date |
|---|---|---|---|
| 1 | Industry Standards | American Correctional Association (ACA) – Standards for Health Services http://www.aca.org/standards/healthcare/Standards.asp | 4th Edition |
| 2 | Industry Standards | National Commission on Correctional Health Care (NCCHC) Standards for Health Services In Jails http://www.ncchc.org/ | 2003 |
| 3 | Industry Standards | National Academy of Sciences – Food and Nutrition Board Dietary Reference Intakes-Applications in Dietary Planning http://www.nap.edu/books/0309085373/html/ | 2002 |
| 4 | District Licensing and Registration | Department of Health Licensing Administration - http://doh.dc.gov/doh/cwp/view,a,1371,q,600673,dohNav_GID,1879,dohNav,|34440|34445|.asp | 2005 |
| 5 | DOC Program Statement | Medical Management, 6000.1B | 3/9/04 |
| 6 | DOC Program Statement | Key Control, 5320.1A | 5/8/00 |

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

| Item No. | Document Type | Title | Date |
|---|---|---|---|
| 7 | DOC Program Statement | Tool Control, 5022.1B | 6/16/00 |
| 8 | DOC Program Statement | Suicide Prevention, 6080.2B | 9/15/03 |
| 9 | DOC Program Statement | Psychiatric Evaluation, 6014.6A | 8/25/87 |
| 10 | DOC Program Statement | Drug/Alcohol Testing (MEDAT) Mandatory Employee, 6050.4A | 2/1/00 |
| 11 | DOC Program Statement | Record Retention, 2000.2 | 4/6/01 |
| 12 | DOC Program Statement | Health Information Privacy, HIPAA, 1300.3 | 12/15/03 |
| 13 | DOC Program Statement | Technical Reference Manual (Health Privacy Information Operations), 1300.3 | 12/15/03 |
| 14 | DOC Program Statement | "ADA: Communications for Deaf & Hearing Impaired," 3800.3 | 9/30/03 |
| 15 | DOC Program Statement | Environmental Safety and Sanitation, 2920.4 | 4/12/02 |
| 16 | DOC Program Statement | Accountability for Inmates, 5010.2B | 7/1/04 |
| 17 | DOC Program Statement | Contraband Control, 5010.3B | 10/31/03 |
| 18 | DOC Policy | Information Security, 2420.2 | 12/15/03 |

**C.1.2      DEFINITIONS/ACRONYMS**

C.1.2.1    "ACA" shall mean the American Correctional Association.

C.1.2.2    "AMA" shall mean the American Medical Association.

C.1.2.3    "Business Day" shall mean any day on which offices of the government of the District of Columbia are open for business.

C.1.2.4    "CCA" shall mean the Corrections Corporation of America.

C.1.2.5    "CDF" shall mean the Central Detention Facility.

C.1.2.6    "Comprehensive Health Care Services" shall refer to medically necessary health services required by Inmates delivered both inside and outside CDF, CTF and CCCs including primary and specialty physician and other health professional services, hospital services (inpatient and outpatient), nursing or other step-down care, hospice, pharmaceutical dispensing, laboratory and diagnostics, and other ancillary services.

C.1.2.7    "CTF" shall mean the Correctional Treatment Facility.

C.1.2.8    "DOC" shall mean the District of Columbia Department of Corrections.

C.1.2.9    "FTE" shall mean Full Time Equivalent personnel, stated in terms of individuals working a regularly scheduled 40-hour week, or 2,080 hours worked per annum.

C.1.2.10   "JCAHO" shall mean the Joint Commission on Accreditation of Healthcare Organizations.

C.1.2.11   "NCCHC" shall mean the National Commission on Correctional Health Care.

C.1.2.12   "PPD" shall mean the Purified Protein Derivative/Mantoux skin test used to

DC-WAP 000364

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

**C.1.2.13**   "R&D" shall mean the Receiving and Discharge area or the Receiving and Discharge process for the Central Detention Facility.

**C.1.2.14**   "Sick Call" shall mean non-emergency care rendered to Inmates.

**C.2**   **BACKGROUND**

The District of Columbia Department of Corrections (DOC) is responsible for managing the detention of pre-sentenced and sentenced male, female, and juvenile offenders in the District of Columbia.  This population shall hereafter be referred to as "Inmates." The DOC manages two facilities, the Central Detention Facility (CDF) and the Correctional Treatment Facility (CTF), to house this population, in addition to contracting for community correctional center beds and a secure ward at the Greater Southeast Community Hospital (GSCH Locked Ward). The official capacities of the CDF and CTF are currently 2,498 and 1,206 respectively. The Inmate population at the CDF and the CTF is highly transient and exhibits a wide array of serious health problems, including tuberculosis, HIV/AIDS, sexually transmitted disease, and mental illness.

The Correctional Treatment Facility is currently operated by Correctional Corporation of America on behalf of the Department of Corrections.

A summary of the services currently offered by the incumbent are shown below.

| Facility/Address | Service Summary Description | Population |
|---|---|---|
| Central Detention Facility (DC Jail) 1901 D Street, S.E. Washington, DC 20003<br><br>Correctional Treatment Facility 1901 E Street, S.E. Washington, D.C. 20003 | ▪ On-site Comprehensive Medical and Mental Health Services | All populations assigned to the CDF and CTF.  The average population for period January 2005 – December 2005 was 3,499. |
| Pre-Release Community Correctional Centers (Contract Beds) See C.3.16.1 | ▪ Provision of Nurse Practitioner to provide evaluation and coordination for Medical and Mental Health Services.<br>▪ Management of the medication continuum<br>▪ Provision of pharmaceuticals | Contracted facilities only.  126 beds |
| Greater Southeast Community Hospital (GSCH) Locked Ward 1310 Southern Avenue S.E. Washington, DC 20032 | ▪ Utilization Review and oversight of all GSCH admissions to the Locked Ward (Excludes in-patient costs) and all other medical outposts. | Inpatient populations of GSCH Locked Ward, who are referred by:<br>▪ Central Detention Facility<br>▪ Correctional Treatment Facility<br>▪ Court ordered assignment |

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

## C.3 REQUIREMENTS

a) The Contractor shall provide Comprehensive Health Care Services in accordance with legal requirements imposed by Federal and District of Columbia laws, District Licensing or Professional Boards, Court Orders, and DOC Administrative Directives/Policy Statements, including compliance with aspects of the Health Insurance Portability and Accountability Act of 1996.

b) The Contractor's duties and obligations regarding the provision of Comprehensive Health Care Services hereunder shall be subject to Contractor's ability to perform such duties and obligations at the CTF and CDF. To the extent that the Contractor is prevented from performing its duties and obligations under this contract because it does not have necessary, timely access to Inmates, whether because of security reasons or the District's failure to provide appropriate facilities and/or equipment, the Contractor shall be relieved from any associated duties and obligations provided for hereunder.

c) The Contractor shall begin transition activities no later than ten (10) days after contract award. The Contractor shall submit to the COTR a transition plan, including milestones, in accordance with section C.3.32, within sixty (60) days of contract award. During the transition period, the Contractor shall become familiar with all aspects of the medical units and services provided in the CDF, CTF, and Community Correctional Centers (Halfway Houses). The Contractor shall provide an Operations Manual that includes procedures, protocols, and methodologies for treatment; description of treatment programs; performance measures and reporting; final staffing plan, including job descriptions; training plan; and quality management program to the COTR for approval within thirty (30) days of contract award.

d) The Contractor shall provide the Comprehensive Health Care Services described herein.

## C.3.1 CONTRACTOR EXPERIENCE AND ACCREDITATION

C.3.1.1 The Contractor shall provide a Principal Leadership staff, all of whom have had significant experience in administering or providing Comprehensive Health Care Services for correctional and/or community health care programs. Principal Leadership staff shall include the Medical Director, Mental Health Director, Health Care Administrator and Director of Nursing.

C.3.1.2 The Contractor shall provide Comprehensive Health Care Services in accordance with the standards of the American Medical Association (AMA), applicable American Correctional Association (ACA) Health Care Standards, the Health Resources and Services Administration (HRSA) of the United States Department of Health and Human Services (DHHS), and other relevant standards defined in the policy and procedures of DOC.

C.3.1.3 The Contractor shall cooperate with the District to maintain ACA health care accreditation at CTF. Contractor shall cooperate with the District to

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

obtain health care accreditation by the American Correctional Association (ACA) for the CDF during the term of the contract. The Contractor shall be subject to the provisions of the Defaults clause in the Standard Contract Provisions (Attachment J.2) for failure to maintain ACA health care accreditation. The Contractor shall cooperate with the District to maintain NCCHC health care accreditation at CDF and CTF.

C.3.1.4   The Contractor must be a Federally Qualified Health Center (FQHC) and submit proof that the CDF and the CTF have been listed on Exhibit B of Contractor's federal grant and therefore that they are eligible sites for Federal Tort Claims Act coverage. The Contractor shall submit a copy of FQHC with CDF and CTF listed in Exhibit B to the COTR within 30 days of contract award.

C.3.1.5   The Contractor shall be a District based community health care provider with demonstrated experience caring for low income, uninsured, and underinsured patients. The Contractor shall operate community-based health centers that are geographically, culturally, and linguistically accessible to all major ethnic groups and high-risk populations across the District.

C.3.1.6   The Contractor shall have the capacity to provide Comprehensive Health Care Services, as outlined in this Scope of Work, to District Inmates either directly or through medical sub-contractors. If some Comprehensive Health Care Services are provided through sub-contract, the Contractor must be capable of developing and managing a provider network and processing claims.

## C.3.2   INTAKE HEALTH SERVICES

The Contractor shall conduct a health assessment and provide intake health services for all incoming Inmates at CDF. The intake services shall be performed by licensed health care personnel within 24 hours of notification of arrival at the CDF, unless otherwise medically necessary.

### C.3.2.1   ASSESSMENT

C.3.2.1.1   The Contractor shall conduct a health assessment of all Inmates arriving at CDF in accordance with the ACA and National Commission on Correctional Health Care (NCCHC) standards and the following program statements: Medical Management, 6000.1B, Key Control 5320.1A and Tool Control, 5022.1B.

C.3.2.1.2   The Contractor shall conduct an abridged health assessment for all Inmates transferring between facilities within 24 hours of notice of arrival to include but not be limited to, medical record review, medication evaluation and necessary intervention. The Contractor shall document the abridged health assessment in the medical record.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

## C.3.2.2  HEALTH CARE INTAKE

The Contractor shall provide or arrange for the provision of the following health care intake services except as may otherwise be set forth below:

C.3.2.2.1   Review of demographic information, triage data and noting of any psychiatric and/or medical alerts.

C.3.2.2.2   Complete set of vital signs, including measured weight.

C.3.2.2.3   A finger sticks blood sugar for all known diabetics and peak expiratory flow rate for all known patients with a history of asthma or emphysema.

C.3.2.2.4   A medical history, health assessment including oral examination, review of systems and substance abuse history performed by a licensed physician, licensed and certified physician assistant, licensed nurse practitioner or registered nurse.

C.3.2.2.5   A complete gynecological exam for female Inmates within 14 days of intake, including a Papanicolaou smear, for Inmates who evidence specific problems, or a history suggestive of a need, unless refused.

C.3.2.2.6   Urine pregnancy test for all female Inmates.

C.3.2.2.7   A syphilis serology for all Inmates.  Any Inmates reentering the facility from the community shall have these tests regardless of the date of last such exam. Additional laboratory tests shall be performed as directed by the examining physician.

C.3.2.2.8   Urine based testing of gonorrhea and Chlamydia on all intakes.

C.3.2.2.9   HIV counseling and testing will be provided by the District. The Contractor cooperates with the District to ensure that all Inmates receive such testing.

C.3.2.2.10   The Mantoux TB skin test shall be applied unless the Inmate has received a TB skin test at a DOC facility within six months prior to the current intake or has history of a positive skin test in the past.

C.3.2.2.11   A posterior-anterior chest x-ray using teleradiology to screen for all males, and females after evidence of a negative pregnancy test. All x-ray shall be performed in accordance with the Centers for Disease Control (CDC) Guidelines for Control and Management for TB in Correctional Facilities.

C.3.2.2.12   Medical personnel review of chest x-ray within 24 hours, laboratory and tuberculosis skin test results within 72 hours of intake. Medical personnel shall review laboratory results

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

within 72 hours of receipt.  Appropriate referrals for follow-up or further evaluation if required shall be made within 24 hours of the review.

**C.3.2.2.13** Urgent care, as assessed, provided immediately with a referral to the physician, physician assistant or nurse practitioner for follow-up as medically indicated.

**C.3.2.2.14** First dose medications shall be administered as prescribed by the examining health care provider before leaving the medical unit.

**C.3.2.2.15** Other tests and examinations as required and/or medically indicated.

**C.3.2.2.16** Perform medical clearances screening for all intakes for consideration of placement in off unit or in unit work detail squads.

**C.3.2.2.17** Provide information describing the process and procedure for accessing internal and external health care.

### C.3.2.3  MENTAL HEALTH INTAKE

**C.3.2.3.1** The Contractor shall conduct an initial mental health screening for all intakes regardless of their projected length of incarceration.  The initial screening shall include, but shall not be limited to, the following factors:

**C.3.2.3.1.1** Past or current mental health treatment.

**C.3.2.3.1.2** Major problems other than legal situation.

**C.3.2.3.1.3** Prior suicide attempts.

**C.3.2.3.1.4** Suicide by a family member or close associate.

**C.3.2.3.1.5** A position of prominence in the community.

**C.3.2.3.1.6** An absence of a support network.

**C.3.2.3.1.7** First incarceration.

**C.3.2.3.1.8** A recent major loss.

**C.3.2.3.1.9** A current suicidal ideation.

**C.3.2.3.1.10** Court ordered forensic evaluation.

**C.3.2.3.1.11** Return from John Howard Pavilion or other inpatient psychiatric facility.

**C.3.2.3.1.12** History of violent behavior.

**C.3.2.3.1.13** History of drug or alcohol use.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

C.3.2.3.1.14 Intellectual functioning.

C.3.2.3.1.15 History of victimization.

C.3.2.3.2   The Contractor shall conduct a comprehensive mental health evaluation for Inmates who present with one or more of the items identified in the initial screening in the event that Contractor, in its professional medical judgment, determines that such screening is medically necessary. The comprehensive mental health evaluation shall include additional questioning and testing in order to determine a diagnosis and appropriate treatment.

## C.3.3   DAILY TRIAGING OF COMPLAINTS

The Contractor shall collect and triage all health complaints from Inmates daily. All triage activities shall be under the direction of a registered nurse. The Contractor shall see all non-lock-down Inmates requesting assessment within one Business Day of the receipt of request. The Contractor shall conduct daily triage in the Lock Down Units 7 days a week. The Contractor shall collect requests in accordance with ACA and NCCHC standards and DOC procedures.

## C.3.4   SICK CALL SERVICES

C.3.4.1   The Contractor shall provide sick call services for Inmates requesting routine or non-emergency medical care within one Business Day. The Contractor shall see all Inmates in lock-down requesting a Sick Call within 24 hours of the request. Sick call services shall be provided Monday through Friday (excluding holidays) by a register nurse for all housing units except those considered "Lock-Down Units". The Contractor shall provide sick call services for "Lock-Down Units" seven (7) days per week, including District holidays.

C.3.4.2   The Contractor shall provide a nurse to initially evaluate presenting Inmates in accordance with the Contractor's sick call protocols and shall either treat the Inmate or make a referral to the physician. The Contractor shall include its sick call protocols in its Operations Manual.

## C.3.5   PRIMARY, ACUTE, AND CHRONIC CARE SERVICES

C.3.5.1   The Contractor shall provide Inmates, with chronic illnesses, continuous and appropriate health care services to prevent or reduce complications of chronic illnesses and promote health maintenance. Primary, acute, and chronic care services shall be provided by a physician or physician assistant or nurse practitioner (under the direction of a physician). The Contractor shall refer any Inmates with evidence of a chronic illness in to a Primary Care Health Service.

C.3.5.2   The Contractor shall provide chronic care clinics and sick call services concurrently. Chronic Care services shall be provided Monday through

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

Friday (excluding holidays) for all housing units including "Lock-Down Units."

**C.3.5.3**   The Contractor shall develop a treatment plan for all Inmates diagnosed with a chronic condition. Upon notice of discharge to the Contractor, this treatment plan shall be incorporated into a discharge plan and transferred to a Contractor community health center or affiliated community health center upon Inmate's release into the community for follow-up and continuity of care.

## C.3.6   SPECIALTY SERVICES

**C.3.6.1**   The Contractor shall provide the management and referral of medically necessary specialty services (i.e., specialty consultations/clinics, and all diagnostic services and procedures). The Contractor shall conduct "Specialty Services" either on-site, off-site, or via telemedicine equipment as indicated. "Specialty Services" shall be defined as those services provided for patients with needs beyond routine care, which are provided by a licensed practitioner with specialized knowledge and experience. These Specialty Services involve evaluation and treatment. Among the Specialty Services that shall be provided under this contract are: Cardiology, Ophthalmology, Dermatology, Gynecology, Orthopedics, Neurology, Podiatry, and Infectious Disease.

**C.3.6.2**   The Contractor shall provide or arrange for the provision of Specialty Services for Inmates referred by the examining practitioner at its own cost.

**C.3.6.3**   The Contractor shall use its reasonable efforts to provide such Specialty Services within thirty (30) days of the referral by the examining practitioner. The thirty day threshold shall not relieve the Contractor of responsibility to appropriately manage and refer Inmates presenting with acute or urgent conditions, in accordance with clinical indications and accepted medical practices.

**C.3.6.4**   The Contractor shall not be responsible for the cost of any Specialty Services provided to any Federal Inmates who are housed at CDF or CTF or the CCC's through an arrangement with the Federal Bureau of Prisons or the U.S. Marshall Service. DOC will identify all such Inmates that qualify for federal billing and inform the Contractor of the same.

**C.3.6.5**   Except as otherwise provided in Section C.3.9 of this Contract, the District will bear the full cost of transporting any Inmates to an off-site location for specialty services.

## C.3.7   HOSPITAL SERVICES

**C.3.7.1**   The Contractor shall provide a referral to subcontract hospital (s) for Inmates who require care exceeding the resources available at the CTF or CDF. The Contractor shall make timely referrals based upon the

severity of the problem. The Contractor shall ensure that a physician prior to transfer of an Inmate approves all referrals.

C.3.7.2   The Contractor shall provide inpatient and outpatient hospital services via subcontract, preferably at a hospital with a dedicated secure unit (Locked Ward).  The subcontract hospital (s) shall be licensed and fully accredited by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) and in compliance with applicable District and Federal laws and regulations.

C.3.7.3   The Contractor shall be responsible for all hospital costs including hospital outpatient and inpatient negotiated costs per stay and ambulatory care costs.

C.3.7.4   The Contractor shall hire a licensed Practitioner with experience in the correctional and/or community setting as the primary on-site liaison and coordinator of care between the internal and external care providers at the hospital. In the event that the Practitioner in unable to practice on-site at a subcontracted hospital, the Contractor shall make arrangements for a member of the subcontracted hospital's staff to serve as the primary liaison and coordinator of care between the subcontracted hospital and the District.

C.3.7.5   The Contractor shall enter a progress note in the Inmate's medical record within 12 hours of any off-site service except during weekends and holidays.  In instances where the Contractor is unable to obtain the report or discharge summary within the required 12 hours, the Contractor shall notify the DOC Medical Director who will assist with obtaining said report or summary. The Contractor shall obtain a report or discharge summary for patients returning from an off-site facility, which at a minimum contains:

(a) Reason for the consultation (Subjective)
(b) Appropriate exam/lab findings (Objective)
(c) Diagnosis (Assessment)
(d) Evaluation (Plan)
(e) Follow-up requirements or appointment if necessary

C.3.7.6   Except as otherwise provided in Section C.3.9 of this Contract, the District will bear the full cost of transporting any Inmates to an off-site location for hospital services.

C.3.7.7   The Contractor shall not be responsible for the cost of any hospital services provided to any Federal Inmates who are housed at CDF or CTF or the CCCs, not withstanding anything contained herein to the contrary. DOC will identify all such Inmates that qualify for federal billing and inform the Contractor of the same.

## C.3.8   UTILIZATION MANAGEMENT

C.3.8.1   The Contractor shall review the health care status of Inmates referred off-site for in-patient and out-patient care to ensure that number of such

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

referrals and the duration of care is medically appropriate. The Contractor shall station a licensed Practitioner on-site at the subcontracted hospital (s) to oversee, direct, manage, track, and document inpatient/outpatient activity within the community-oriented health care network. The Contractor shall submit a monthly report to the COTR on off-site care that details the number of referrals, date of care, duration of care, appropriateness of care, payment rates and diagnostic category of care.

**C.3.8.2**    The Contractor shall perform monthly and quarterly quality performance and improvement reviews/audits utilizing the Performance Metrics and Measurement Tools developed by DOC.

**C.3.8.3**    The Contractor and DOC shall meet at least once every three months to review issues surrounding Comprehensive Health Care Services, including utilization, projections, and other components to coordinate the care. The Contractor and DOC may elect to have representatives from subcontract hospital(s) present at these meetings.  Issues to be addressed at the quarterly meetings include the following:

   i.    Utilization of Comprehensive Health Care Services;
   ii.   Access to Comprehensive Health Care Services;
   iii.  Quality of Comprehensive Health Care Services;
   iv.   Formulating and/or revising appropriate projection plans for Comprehensive Health Care Services;
   v.    Review the appropriateness of current funding and future funding;
   vi.   Review utilization of high-cost services, average length of stays, and one-day admissions; and,
   vii.  Any other issues raised by the Contractor or DOC.

## C.3.9   EMERGENCY SERVICES

**C.3.9.1**    The Contractor shall provide emergency services in an area located in the medical unit of the CDF and CTF.  The Contractor shall be responsible for providing emergency medical assessment and stabilization services, including first-aid and cardiopulmonary resuscitation, and arranging ambulance services for Inmates, DOC staff, contractors, and visitors, 24 hours per day, seven days a week. Transportation cost for these populations shall not be the responsibility of the Contractor.

**C.3.9.2**    The Contractor shall contact emergency medical personnel for emergency hospital transfers to transport patients to outside hospital facilities for emergency services that cannot be adequately treated in the Urgent Care Center within the Medical Clinic, Sick Call or Chronic Care Clinics.

**C.3.9.2.1**    The District of Columbia Fire and Emergency Medical Services (EMS) will provide emergency transport services.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

The Contractor shall notify the appropriate correctional staff that an escort is necessary when EMS personnel are brought into the facility.

**C.3.9.2.2**   The Contractor shall be financially responsible for all 911 emergency ambulance costs for the Inmate population.

**C.3.9.2.3**   The Contractor shall be financially responsible for all intra-hospital ambulance transfers from the Inmate population.

## C.3.10 INFIRMARY/SHORT STAY CARE

**C.3.10.1** The Contractor shall operate the infirmary at CTF.  Infirmary care shall be available for Inmates requiring nursing care, chronic illness care, convalescent care, and all acute and chronic conditions which can be managed on-site.  At a minimum the operation of the infirmary shall include:

**C.3.10.1.1**   A physician, physician assistant or nurse practitioner shall be on duty 24 hours a day.  A progress note shall be entered in the chart at least every 24 hours for all patients admitted.

**C.3.10.1.2**   Daily on-site supervision of the infirmary by a registered nurse.  If intravenous medications are being administered, a licensed nurse must be physically present in the infirmary at all times.

**C.3.10.1.3**   Nursing staff on duty within sight and sound of Inmate-patients 24 hours a day.

**C.3.10.1.4**   A manual of nursing care procedures for infirmary care.  The Contractor shall provide a copy of the manual within thirty (30) days to COTR after contract award.

**C.3.10.1.5**   A complete inpatient record for each patient admitted to the infirmary, including an admission work-up and discharge planning.

**C.3.10.2** The Contractor shall utilize the medical and mental health infirmaries to the fullest capacity to reduce off-site hospitalization when medically feasible.

## C.3.11 DENTAL SERVICES

**C.3.11.1** The Contractor shall provide routine and emergency dental services to Inmates consistent with local and Federal guidelines and community standards. The Contractor shall ensure that the dentist and qualified staff be available for the treatment of dental emergencies, and respond within twenty-four (24) hours of notification of emergency.  Treatment based upon assessed needs shall include, but not be limited to, the following services:

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

**C.3.11.1.1**   Prophylactic, Oral Hygiene

**C.3.11.1.2**   Periodontal screening, evaluation and limited early treatment

**C.3.11.1.3**   Routine and simple surgical extractions and tooth restoration with fillings

**C.3.11.1.4**   Prosthetics

**C.3.11.1.5**   Patient Education with nutritional/dietary counseling

**C.3.11.2** The Contractor shall provide:  a) all staffing, instrumentation and supplies, including prosthetic cost; and b) maintenance or replacement of equipment.  The Contractor shall provide a copy of equipment maintenance or supply agreements to the COTR for review upon request.

**C.3.11.2.1**   The Contractor shall provide monthly radiology testing for detection of dental staff exposure to radiation.

## C.3.12 MENTAL HEALTH SERVICES

**C.3.12.1** The Contractor shall provide mental health services to Inmates including, but not limited to:

**C.3.12.1.1**   Mental health assessments, lab and diagnostic testing

**C.3.12.1.2**   Control, dispensation, and administration of all psychotropic and mental health medication

**C.3.12.1.3**   Monitoring of medication to ensure Inmate compliance and evaluate effectiveness in alleviation of symptoms

**C.3.12.1.4**   Supplying all mental health staffing, including mental health specialists

**C.3.12.1.5**   Suicide prevention intervention and treatment for psychiatric emergencies

**C.3.12.1.6**   Treatment of Inmates with the most severe forms of mental illness

**C.3.12.1.7**   Basic services for the general population as described in DOC policies, specifically 6014.6A Psychiatric Evaluation and Hospitalization of Department Residents; and 6080.2B Suicide Prevention.

**C.3.12.1.8**   Close collaboration with the Department of Mental Health to ensure continuity of care/discharge planning.

**C.3.12.2** The Contractor shall conduct an initial mental health screening of all Inmates entering the CDF as described in C.3.2.3.1.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

**C.3.12.3** The Contractor shall conduct a comprehensive mental health evaluation as required in accordance with C.3.2.3.2.

**C.3.12.4** The Contractor shall provide all aspects of in-patient and out-patient On-Site mental health care.

**C.3.12.5** The Contractor shall be responsible for treatment and staffing of the mental health special units and safe cells in the CDF. These special bed resources are provided for Inmates requiring a higher level of care for serious and persistent mental illnesses, arrestees at high risk for suicide and individuals who are clinically depressed.

**C.3.12.6** The Contractor shall develop a program plan for mental health, including staffing deployment and call coverage. The mental health program plan shall include provisions for:

**C.3.12.6.1** Treatment and Staffing of Special Units and Beds:

(1) Mental Health
(2) Two (2) Safe-Cells for Observation

**C.3.12.6.2** Management, Arrangement and Coordination of Outside Admissions

**C.3.12.6.3** Required Mental Health Programs:

(1) Open Population/Outpatient Management / Clinics
(2) Mental Health Sick Call
(3) Management of High Acute Observations
(4) Use of Restraints
(5) Behavior Management and Individual Treatment Plans
(6) Management of Consultations (Routine and Emergency)
(7) Individual Counseling and Psychotherapy
(8) Discharge Planning
(9) Psychotropic Medication Management/Clinics

**C.3.12.6.4** Multidisciplinary approaches to promote integration between Mental Health and Medical treatment.

## C.3.13 SUBSTANCE ABUSE

**C.3.13.1** The Contractor shall develop and provide a medical detoxification policy for drug and alcohol addicted Inmates. The Contractor shall include the description of the medical detoxification policy in its Operations Manual.

**C.3.13.2** The Contractor shall coordinate its program with local and regional alcohol and drug treatment programs identified by the COTR. The Contractor's program shall include provisions for substance abuse education, either in-house or off-site with a narrative description of program structure and specifications for staffing.

DCFL-2006-D-6001
Community Oriented Correctional H..  ..h Care for Department of Corrections

## C.3.14 ANCILLARY SERVICES

The Contractor shall either through itself or subcontracts to provide radiology, laboratory, pharmacy, durable medical equipment, and other ancillary services and supplies, except as detailed below.

## C.3.15 PHARMACY SERVICES

The Contractor shall provide Pharmacy Services, including but not limited to pharmaceutical operations with licensed pharmaceutical staff, inventory control, dispensing, distribution and disposal of all pharmaceuticals. The pharmacy shall be on site at the CDF.

**C.3.15.1** The Contractor, upon DOC's notification of Inmate's release, shall follow the following protocols for Inmates on medication: Inmates sent to the Federal Bureau of Prisons shall receive a seven (7) day supply of medications, upon transfer. All Inmates sent to the Community Correctional Centers (CCC) shall receive a seven (7) day supply of medications upon transfer. All Inmates released to the community shall receive a seven (7) day supply of medications upon release.

**C.3.15.2** All pharmaceuticals will be procured by the Department of Corrections with the exception of those covered by the Department of Health under the AIDS Drug Assistance Program (ADAP). The Contractor shall utilize a formulary approved by the DOC. Dispensing of pharmaceuticals shall be in accordance with District of Columbia and Federal laws, and pharmacy regulatory boards. The Contractor shall utilize an automated pharmacy system for dispensing pharmaceuticals in collaboration with DOC.

**C.3.15.3** All prescription medications shall be prescribed by the responsible practitioner compounded and dispensed by a licensed pharmacist and shall be delivered to the Inmates in conformance with District law. The Pharmacy on-site shall be licensed to provide all pharmacy services for medication distribution at DOC. The Contractor shall provide on-call coverage by a licensed pharmacist 24 hours/day, 7 days/week for emergency and stat needs.

**C.3.15.4** The Contractor shall develop and maintain a quality management program including management controls, staffing plan, and expected quality improvement indicators. The Contractor shall include its quality management program in its Operations Manual.

**C.3.15.5** A DOC licensed pharmacist will provide oversight, internal controls, audit procedures and overall accountability to receive, segregate, distribute, secure, account for and monitor use of the pharmaceuticals at the DOC service sites.

**C.3.15.6** The Contractor shall provide all forms necessary for ordering controlled drugs, and maintaining prescription logs, inventory, medication administration records, patient profiles, and prescriptions. The Contractor shall maintain appropriate documentation including, but not

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

limited to, inventory records, controlled drug perpetual inventory, and patient profiles.

## C.3.16 RADIOLOGY

**C.3.16.1** The Contractor shall be responsible for all X-ray services including maintenance and supplies.

**C.3.16.2** The Contractor shall perform routine X-ray services during the day and evening shifts, Monday through Saturday and on an emergency basis twenty-four hours per day. The Contractor shall ensure that all X-rays are read by a Board Certified Radiologist within twenty four (24) hours of the films being taken.

## C.3.17 LABORATORY

**C.3.17.1** The Contractor shall identify the need, schedule and coordinate all laboratory services.

**C.3.17.2** The Contractor shall provide routine laboratory services to the DOC under a sub-contract relationship. The Contractor shall work with an appropriately licensed laboratory facility to provide specified services, subject to the approval of the COTR.

**C.3.17.3** The Contractor shall develop a laboratory services program, including but not limited to phlebotomy, specimen prep, stat results, expected turn-around times, panic values and any quality improvement indicators. Lab results shall be reported using an electronic interface. The Contractor shall provide monthly statistical reports to the COTR, when and if requested. The Contractor shall define its laboratory service program in its Operations Manual.

## C.3.18 MEDICAL RECORDS

**C.3.18.1** The Contractor shall provide maintenance, retention and timely transfer of a complete, standardized problem-oriented medical record for all Inmates in accordance with prevailing medical regulations for confidentiality, retention and access. All health care encounters with an Inmates, whether for medical, dental or mental health the Contractor in the Inmate's medical record shall document concerns. The Contractor shall utilize the current medical record forms and checklists provided by DOC. The Contractor shall submit for approval, by the COTR, any proposed changes in medical record forms used currently. The Contractor shall organize and maintain medical records in the format outlined in DOC policies and procedures.

**C.3.18.2** The Contractor shall utilize Centricity, the electronic medical record (EMR) system.

**C.3.18.3** The Contractor shall comply with local and federal law, rules and regulations, including without limitation the Health Insurance Portability

DCFL-2006-D-6001
Community Oriented Correctional H... .a Care for Department of Corrections

and Accountability Act and relevant DOC Program Statements (P.S.), regarding confidentiality of health information. The Contractor shall comply with DOC Policy Statement #1300.3 and District HIPAA policies regarding the transfer, information safeguards, access, amendment, authorization, minimum necessary determinations, identity and authority verification, restricted use, disclosure and accounting of personally identifiable health information. The Contractor shall obtain signed consent forms from Inmates as required. The signed consent form shall be placed in the Inmate's medical record.

**C.3.18.4** All Inmates medical records are the property of the District. The Contractor, upon reasonable notice to the District and consistent with applicable federal and District laws and regulations and DOC policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to Inmates records to inspect and/or duplicate at Contractor's expense, any individual chart or record produced and/or maintained by the Contractor personnel to the extent necessary to (i) meet responsibilities to Inmates for whom Contractor has provided services; (ii) respond to any Government or payor audits; (iii) assist in the defense of any malpractice or other claims to which chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with Inmates confidentiality and to the extent permitted by law.

## C.3.19 NUTRITION SERVICES

**C.3.19.1** The Contractor shall assess nutritional requirements and management of medically necessary special diet orders, and provide routine nutrition education. The Contractor shall notify the appropriate food services manager of any medically necessary special diets.

**C.3.19.2** The Contractor dietician shall ensure that all diets are evaluated for nutritional adequacy by a Registered or Licensed Dietitian every six months or whenever the menu is changed substantially.

## C.3.20 CLINICAL AND ADMINISTRATIVE SUPPLIES

**C.3.20.1** The Contractor shall provide all material and supplies, including but not limited to: medical and mental health supplies, health education supplies, dental supplies, x-ray supplies, forms, office supplies, medical and mental health record supplies, books, periodicals, dentures, eye glasses, prosthetic devices and administrative supplies necessary to carry out the program and performance specifications of this contract. Specifically for dentures, eyeglasses and reference materials the Contractor shall be responsible for providing the following:

**C.3.20.1.1** Glasses - bifocals and single vision glasses.

**C.3.20.1.2** Dentures - Partial and full.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

**C.3.20.1.3** <u>Reference Materials</u> - The Contractor shall establish within thirty (30) days of contract award and maintain throughout the term of the contract a well –developed medical reference library on-site for use by health care staff.  The library shall minimally include current publications, medical dictionary, Physician's Desk Reference, pharmacology reference, ACA and NCCHC standards manuals.  At the termination or expiration of the contract this library shall become the property of DOC.

## C.3.21 SUPPORT SERVICES

### C.3.21.1 INFECTION CONTROL, SANITATION AND BIO-HAZARDOUS WASTE COLLECTION AND DISPOSAL

**C.3.21.1.1** The Contractor shall establish an infection control program for DOC in conjunction with federal and local public health laws and regulations within 30 days after contract award.

**C.3.21.1.2** The Contractor shall collect, securely store and dispose of all bio-hazardous waste generated in all medical areas of the correctional facilities in a manner conforming to federal, state and local requirements.

**C.3.21.1.3** The Contractor shall provide on going training on handling and disposal of bio-hazardous waste for staff and Inmates. The Contractor shall provide bio-hazardous spill kits for cleaning and decontamination of blood spills.

**C.3.21.1.4** The Contractor's staff shall have evidence of annual TB screening and initial hepatitis B vaccinations.  The Contractor shall comply with Occupational Health and Safety Administration (OSHA) requirements related to employee TB screening and hepatitis vaccinations.

### C.3.21.2 CLEANING

**C.3.21.2.1** The Contractor shall provide all environmental friendly, consumable medical cleaning supplies in accordance with Section H.16. The District will provide Inmate labor supervised by the DOC for all cleaning in medical areas.

### C.3.21.3 TELEPHONE

**C.3.21.3.1** The Contractor shall be responsible for all telephone services in the medical services area.

**C.3.21.3.2** The Contractor shall provide all cellular telephone and pager services for its employees and subcontractors.

DCFL-2006-D-6001
Community Oriented Correctional h.... a Care for Department of Corrections

## C.3.22 MEDICAL EQUIPMENT

C.3.22.1 The Contractor shall validate operability of current equipment inventory within thirty (30) days after contract award. The Medical Equipment Inventory List of current equipment and the Medical Analytic and Technical Support Inventory List will be provided to the Contractor by the COTR at the time of contract award to document equipment available and location.

C.3.22.2 The Contractor shall provide maintenance, repair or replacement of government-furnished medical, dental, and mental health equipment, including maintaining service contracts. Such equipment includes, but is not limited to electrical tables, X-ray machines, electrocardiogram equipment and equipment utilized in administrative functions, such as photocopiers and typewriters.

C.3.22.3 Upon contract expiration or termination, all equipment used or provided by the Contractor will become the property of the DOC. The Contractor shall surrender all equipment to the DOC in the same condition in which it was initially provided, except for ordinary wear and tear, and loss or damage by flood, fire or other perils covered by extended coverage insurance. All equipment being removed from the facility for disposal shall be inventoried by security and handled by DOC warehouse property manager at CDF.

C.3.22.4 The Contractor shall not use, loan, or rent to a third party any government-furnished equipment, except with prior, written permission of the COTR. The Contractor shall not, without consent of the COTR move equipment outside the "facilities" specified in this contract.

C.3.22.5 The Contractor shall not produce, store or use DOC facilities, equipment or inventories for other company-owned or contract operations, or for other individuals, groups or organizations without the prior, written consent of the COTR.

## C.3.23 MEDICAID/MEDICARE

C.3.23.1 The Contractor shall file for Medicaid/Medicare reimbursement for eligible Inmates.

C.3.23.2 If Medicaid, Medicare or other reimbursement is received from an external source, such as insurance or other benefit the Contractor shall credit such monies to the District on a monthly basis.

## C.3.24 COMMUNITY CORRECTIONAL CENTERS

C.3.24.1 The Contractor shall provide access to primary health care and referrals for secondary care at the District of Columbia Community Correctional Centers (Halfway Houses) at the following locations:

DCFL-2006-D-6001
Community Oriented Correctional h... ...i Care for Department of Corrections

(1) Efforts for Ex Convicts' House
1514 8th Street, NW
Washington, DC 20001
Capacity: 16 / Males

(2) Hope Village
2840 - 2912 Langston Place, SE
Washington, DC 20020
Capacity: 40 / Males

(3) Extended House
810 & 812 14th Street, NE
Washington, DC 20002
Capacity: 35 / Males

(4) Reynolds & Associates (Fairview)
1430 G Street, NE
Washington, DC 20002
Capacity: 35 / Females

**C.3.24.2** The Contractor shall coordinate with Community Correctional Center (Halfway Houses) staff or clinical consultants to assess Inmates with medical or mental health needs.

**C.3.24.3** The Contractor shall evaluate medication status, manage the prescription refill system and monitor medication compliance

**C.3.24.4** The Contractor shall provide Clinic Follow-Up for Comprehensive Health Care Services.

**C.3.24.5** The Contractor shall coordinate with the Department of Mental Health Core Service Agencies and Support Systems

**C.3.24.6** The Contractor shall coordinate discharge planning.

**C.3.24.7** The Contractor shall conduct quality assurance monitoring studies for the DOC, as needed.

## C.3.25 MEDICAL PERSONNEL, TRAINING AND STAFFING PLAN

**C.3.25.1** The Contractor shall recruit, interview, hire, train and supervise all health care and administrative staff. The Contractor shall start operation of Community Oriented Correctional Health Care Services by October 1, 2006. The Contractor shall maintain a minimum of 202 FTEs to provide all services required in the contract. All health care staff provided by the Contractor to render services under the contract shall be licensed, certified or registered, as appropriate, in their respective areas of expertise, as required by applicable District law and accepted standard of medical, dental and mental health practices. Any and all personnel of the Contractor shall be subject to a background investigation conducted by DOC as a requisite for initial and continued

DCFL-2006-D-6001
Community Oriented Correctional h.  .n Care for Department of Corrections

employment. The final selection of all subcontractors may be subject to the approval of the COTR.

**C.3.25.2**  The Contractor shall prepare a written job description for each member of the health care staff, which clearly delineates their assigned responsibilities and submit for approval by the COTR within thirty (30) days after contract award.  The Contractor, with the COTR, shall monitor the performance of health care staff to ensure adequate job performance in accordance with the requirements of the contract.

**C.3.25.3**  The Contractor shall develop a staffing plan including number of FTEs per labor category, staff deployment schedule, functional assignments, proposed distribution of hours worked by regular hours, overtime hours, nursing per diem hours or other hours, with a staff development plan.  The plan shall be submitted to the COTR for review and approval within 30 days after contract award.  All Contractor staff shall comply with all current and future State, Federal, and Local Laws and Regulations, Court Orders, Department Rules, Policies, and Procedures..

**C.3.25.4**  The Contractor shall provide a minimum staffing complement of 202 FTEs by the end of the transition period and throughout the term of the contract.  Should the Contractor's personnel normally assigned to provide Comprehensive Health Care Services not be available, the Contractor shall provide appropriate replacement personnel to cover these services as scheduled.  Replacement of principal leadership staff shall require advance written approval of the COTR.

**C.3.25.5**  The Contractor shall provide all Comprehensive Health Care Services at the locations specified in the contract. The District retains the right to review and approve locations and staffing identified. A full-time contractual staff person shall be on-site for at least 40 hours per week. The Contractor shall ensure staff coverage during periods of vacations, holidays, continuing education and unscheduled absences.  The Contractor's personnel may be mandated or required to work overtime to meet DOC operational needs.

**C.3.25.6**  The Contractor shall provide coverage for all staff positions in the event of unplanned absence, leave or in the event of resignation or termination.

**C.3.25.7**  The Contractor shall not bind any of its employees, or those under contract with the Contractor, to any agreement, which would inhibit, impede, prohibit, restrain, or in any manner restrict employees or independent contractors, in or from accepting employment with any subsequent medical care provider in the District of Columbia.

**C.3.25.8**  The Contractor shall be responsible for ensuring that all new health care personnel are provided with orientation regarding on-site security and medical practices.

DCFL-2006-D-6001
Community Oriented Correctional h. .n Care for Department of Corrections

**C.3.25.8.1** The Contractor shall ensure that all individuals who have regular or daily inmate contact, hired for positions under the proposed contract shall attend forty (40) hours of initial pre-service training after having been cleared through a background check and drug testing, and forty hours (40) hours of in-service training, provided by the DOC, annually thereafter. The Contractor is responsible that all direct patient care personnel shall maintain current Cardiopulmonary Resuscitation (CPR) certification. The Contractor's employees shall be subject to random drug testing conducted by DOC. Random drug testing of all Contractors' employees will be performed at the Contractor's expense. Any expense required for off-site training shall be the responsibility of the Contractor.

**C.3.25.8.2** The Contractor shall ensure that Clerical/Support staff that have minimal inmate contact receive sixteen (16) hours initial pre-service training after having been cleared through a background check and drug testing, and sixteen (16) hours of in-service training, provided by the DOC, annually thereafter.

**C.3.25.8.3** The Contractor shall provide to all new full-time health are providers forty (40) hours orientation training before undertaking their assignments.

**C.3.25.8.4** The Contractor shall provide suicide prevention education to DOC staff and contract staff as specified by DOC regulations. Suicide prevention training shall be concentrated in two (2) hour and four hour (4) blocks.

**C.3.25.8.5** The Contractor shall provide to the Correctional Officers assigned to mental health units forty (40) hours of specialized mental health training.

**C.3.25.9** The COTR reserves the right to remove any personnel from DOC facilities upon written notice to the Contractor from the Contracting Officer.

**C.3.25.10** The Contractor shall not perform any of its corporate functions and tasks at the expense of the DOC by using mandated positions or budgeted direct service positions approved by the COTR to satisfy health care program administrative responsibilities. The Contractor shall provide for necessary corporate responsibilities such as submission of payroll documents and timekeeping, corporate personnel functions, and any accounts payable tasks to be performed through sources outside of direct service hours defined in the approved staffing plan.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

**C.3.25.11** The Contractor shall be responsible for credentialing and certification of its staff. The Contractor shall maintain valid and current licenses and certifications as required for all health care providers.

**C.3.25.12** Medical Professional Staff: The Contractor shall utilize the standards of all applicable District regulations, ACA and NCCHC standard for Medical Professional Staff appointments. The credentials of all Medical Professional Staff (physicians) appointed at the DOC shall be validated by the Contractor, through either a primary or secondary source. The Contractor shall reconfirm credentials annually and a record of the credentialing activity shall be maintained as part of each employee's personnel file. Credentialing is defined as the process by which an applicant's training, degrees conferred, certification by specialty societies, state and other licenses, teaching positions, appointments and other professional experience is confirmed or reconfirmed.

**C.3.25.13** Non-Medical Professional Staff: The Contractor shall use a process whereby applicants carry the burden to produce information for proper evaluation of competence, character, health status, ethics and other qualifications. The Contractor shall review the validity of licenses or certifications of non-medical professional staff at least annually.

**C.3.25.14** The Contractor shall assure the fulfillment of any and all Medical Staff privilege requirements at participating hospital(s).

**C.3.25.15** The Contractor shall maintain personnel files on all contract employees. Limited portions of such personnel files may be made available to the COTR upon the written approval of Contractor provided that appropriate steps are taken to maintain the confidentiality of the contents of such files and that the District has a valid reason to review such file. These records shall be made available to the COTR upon request. These files shall include but not be limited to copies of current professional licenses, privileges and/or proof of professional certification, evaluations and salary/payroll records.

**C.3.25.16** The Contractor shall warrant that all persons assigned by it to perform the Work requirements herein will be employees of the Contractor or authorized subcontractors, and will hold all required licenses to perform the Work required herein. The Contractor shall include an identical provision, covering required licenses and full qualification for work assigned, in any contract with any approved subcontractor selected to perform Work hereunder. Any personnel commitments required per this contract shall not be changed unless approved, in advance, by the Contracting Officer in writing. Staffing will include any individuals named in the Contractor's Proposal at the level of effort proposed, except in cases whereby the Contracting Officer has approved a change.

**C.3.25.17** The District has the absolute right to require the immediate removal of any of Contractor's employees from the contract. In the event the COTR, with verifiable justifiable documentation, in his sole discretion,

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

is dissatisfied with the performance of any of the persons assigned to perform any of the Services under the awarded Contract, the COTR give written notice to Contractor and Contracting Officer of such dissatisfaction and the reasons therefore. In the event of removal of any of Contractor's employees, the Contractor shall cover the duties of removed employees with appropriate personnel until a replacement is found.

**C.3.25.18** The Contractor shall verbally notify the COTR of any actual or impending administrator or medical director vacancy by the close of the next calendar day after Contractor receives written notice of the vacancy. Within five (5) calendar days of the verbal notification, the Contractor shall also notify the COTR in writing regarding the impending or anticipated vacancy.

**C.3.25.19** The Contractor shall not use any Inmates in positions related to the delivery of any services for any reasons whatsoever. The DOC restricts the use of Inmates to housekeeping and maintenance functions.

## C.3.26 PEER REVIEW

The Contractor shall provide a practitioner peer review program consisting of at least four (4) hours of on-site practitioner time every four (4) months to conduct chart reviews of the practitioner staff in the areas listed below. The Contractor shall review each of the areas listed below at least once annually. The Contractor shall provide a copy of the peer review reports to the COTR within 15 days after completion.

(1) Sick call;
(2) Infirmary admissions;
(3) Hospitalization referrals;
(4) Specialty referrals;
(5) Prescribing patterns;
(6) Ancillary service utilization;
(7) Infectious Disease;
(8) Chronic Care Clinic; and
(9) Mortality & morbidity.

## C.3.27 REPORTING

**C.3.27.1** The District will provide a management information system capable of providing statistical data necessary for the evaluation and monitoring of Comprehensive Health Care Services. The Contractor shall, using Centricity, submit a Monthly Statistical Report, Monthly Health Care Performance Monitoring Report and Annual Report to include at a minimum hospital discharges, surgical procedures, surgical ambulatory visits, a summary of milestones, accomplishments, and major quality improvement issues and planned corrective actions.

**C.3.27.2** All data collected and managed by the Contractor on behalf of the DOC shall be the property of the District. The Contractor shall apply accepted

DC-WAP 000386

DCFL-2006-D-6001
Community Oriented Correctional H.    .n Care for Department of Corrections

best practice for database management and data quality assurance to ensure the validity of data collected.

**C.3.27.3** The Contractor shall maintain all records in electronic form using modern databases and data quality maintenance and support, as well as standard off-the- shelf software for final reporting such as Microsoft Office or a comparable product. Facilities and agencies external to DOC will require both electronic and paper printouts of Inmate medical records. The Contractor shall make available such records to external facilities when authorized to do so by the COTR, maintaining compliance with Section H.10, HIPAA.

**C.3.27.4** The Contractor shall provide written documentation in its Operations Manual, regarding procedures that will be followed to assure the quality of medical data. This documentation shall include the rationale related to each data element captured, complete data dictionary, data maps and formats, data integrity constraints, the methodology for measuring each data element, data transformations applied, and formulas used. The Contractor shall provide documentation of a continuous data quality improvement program, and monthly reports detailing analysis of data errors, frequency and source thereof, and error remediation actions. The District may conduct, or ask a DOC authorized third party to conduct, a data quality audit of the Contractor's databases containing Inmate records at-will and unannounced.

**C.3.27.5** The Contractor shall provide Metrics (statistical) Reporting periodically, monthly, quarterly, and annually regarding performance measures defined in Section C.3.27.6. The Contractor shall report monthly performance data to DOC in a Microsoft Office compatible format. These reports shall include monthly and YTD performance, and monthly and YTD trends. For each metric the Contractor shall define the metric, methodology used to compute the metric, the source data elements, data maps, and data transformations or subsetting logic used to report the data. The Contractor shall propose and submit for approval annual performance targets. The Contractor shall be required to submit documentation methodology used to propose annual targets for each metric. The Contractor shall provide performance benchmarks in relation to industry standards as provided by DOC within 90 days after award of contract. In the event performance falls to more than 10% outside the range of target, the Contractor shall submit a substantive root cause analysis and corrective action plan for approval by the COTR. The Contractor shall provide all raw data and computation methodology allowing verification of metric computation with each performance metric for all monthly reports. Performance metrics will be reviewed monthly and may be added or dropped by the COTR.

**C.3.27.6** The Contractor shall provide metric reports as part of the Medical Analytics and Technology Support (MATS) system on the following

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

Comprehensive Health Care Services Performance Measures at a minimum or such other measures that shall be mutually negotiated:

| | |
|---|---|
| (1) | Number of Sick Calls |
| (2) | Number of Sick Calls Not Serviced within 72 Hours |
| (3) | Total # of Medical Grievances By Category:<br>    a.  Staff Conduct<br>    b.  Medications<br>    c.  Psych (non-medication)<br>    d.  Dental<br>    e.  Access (timeliness)<br>    f.  Disagreement with Treatment<br>    g.  Other |
| (4) | Average Response Time to Resolve Medical Grievances (upon Contractor receipt) |
| (5) | Total Inmates Treated |
| (6) | Number of hospital days at partnering hospital(s) |
| (7) | Number of Emergent/Urgent Medical Visits |
| (8) | Number of Specialty Clinic Visits |
| (9) | Number of Inmates Treated Per Physician |
| (10) | Number of Inmates Treated Per Physicians' Assistant /Nurse Practitioner |
| (11) | Number of Inmates Treated Per Nursing Professional |
| (12) | Number of Inmates Treated Per Dental Care Professional |
| (13) | Number of Inmates Treated Per Psychiatric Care Professional |
| (14) | Total Inmates-Days at CTF Infirmary |
| (15) | Total Discharges by Facility |
| (16) | Number Medical Screenings Completed Within 36 Hours of Intake |
| (17) | Number of Comprehensive Psychiatric Evaluations are completed within 36 hours of Referral |
| (18) | Number of Prescriptions Filled Within 1 Business-Day of Order |
| (19) | Number of Inmates Rejected by Federal Bureau of Prisons Due To Absence of Current PPD |
| (20) | Number of Inmates Rejected by the FBOP Due To Absence of Current PPD where 4 Days Advance Notice Was Not Given to Contractor |
| (21) | Total # of Inmates Transported by 911 per month |
| (22) | # of Employees Transported by 911 per month |
| (23) | Number of Chest X-rays per month |
| (24) | Total Expenditures Incurred |
| (25) | Ratio of Hospital Days to Total Inmates Days |
| (26) | Average Length of Stay (e.g., partnering hospital(s)) |
| (27) | Total Inpatient Cost |
| (28) | Cost per Outpatient Clinic Visit |
| (29) | Number of Trauma Cases by category : Major, Moderate, Minor |
| (30) | Average Cost per Prescription |
| (31) | Cost of Chest X-Rays per month |

C.3.27.6.1 In the event that the Contractor, using Centricity, is unable to capture or report agreed to performance metrics, the DC Department of Corrections, Office of Management Information and Technology Services (OMITS) will work with the Contractor to specify and establish protocol, methodology, and

DCFL-2006-D-6001
Community Oriented Correctional H.  .n Care for Department of Corrections

electronic means (e.g. spreadsheets or other means of recording and storing information) so that agreed to metrics may be reported and validated.

**C.3.27.7** The Contractor shall provide reports to the COTR, in a form prescribed by the DOC, both on a monthly basis and as may otherwise be requested in support of research, analysis, program development and ACA and NCCHC. The Reports shall be submitted to the COTR on the third Business Day of each month. These reports include but are not limited to, conditions diagnosed by severity and frequency, conditions pre-existing, and conditions contracted while incarcerated, by age, race, sex, and illness.

**C.3.27.8** The Contractor shall provide reports, as required, in accordance with American Society of Correctional Administrators (ASCA) and DOC, established incident-reporting guidelines, in particular those related to Inmate assault incidents on other Inmates and staff, fights, physical altercations, sexual misconduct, sexual abuse incidents, and use of force incidents.

**C.3.27.8.1** The Contractor shall enter all medical data related to incidents directly into the DOC electronic incident database including but not limited to certain incidents, such as assault, sexual assault, Inmate injury and other incidents. The Contractor shall capture and record all examination results including photographs of injuries taken by DOC staff within 30 minutes of examination. The Contractor shall provide silhouettes in electronic form with injuries clearly marked and noted. This shall involve complete examination of Inmates, as well as occasional record keeping related to staff injuries (emergency care/stabilization or first-aid with a record of referral to private physician).

## C.3.28 SAFETY AND SECURITY

**C.3.28.1** The Contractor shall initiate, maintain and supervise safety precautions and programs in connection with services provided under the contract. The Contractor shall take all necessary precautions for the safety of its employees and other persons who may be affected thereby. The Contractor shall remedy all damage, injury or loss to any property caused, directly or indirectly in whole or in part, by the Contractor, any subcontractor or anyone directly or indirectly employed by the Contractor or subcontractors.

**C.3.28.2** The Contractor and its personnel shall be subject to and shall comply with all security regulations and procedures of the DOC. Violation of these regulations may result in the employee being denied access to the CDF and CTF.

DCFL-2006-D-6001
Community Oriented Correctional H...n Care for Department of Corrections

## C.3.29 MEDICAL DISASTER PLAN

**C.3.29.1** The Contractor shall participate in, and assist in planning, the followin procedures pertaining to the delivery of Comprehensive Health Care Services in the event of a disaster such as fire, storm, epidemic, riot, strike, or mass arrests. Such procedures shall be developed in conjunction with the COTR twice a year. The Medical Disaster Plan shall include the following:

    (1)   Communications system;
    (2)   Recall of key staff;
    (3)   Assignment of health care staff;
    (4)   Establishment of command post;
    (5)   Safety and security of patient and staff areas;
    (6)   Use of emergency equipment and supplies;
    (7)   Establishment of a triage area;
    (8)   Triage procedures;
    (9)   Use of ambulance services;
    (10) Transfer of injured to outside hospitals;
    (11) Evacuation procedures; and
    (12) Practice drills.

## C.30   DISCHARGE PLANNING UPON RELEASE

**C.3.30.1** The Contractor shall provide medical case management services for Inmates housed at CDF and CTF and upon release.

**C.3.30.2** The Contractor shall provide linkages to the community for continuit; care.

**C.3.30.3** Upon release, all Inmates who are District residents must receive a discharge plan and, if applicable, an initial appointment to an assignee health care center in the Inmate's neighborhood ideally with the same health care team that provided services while the Inmates was in custody. The Contractor shall make every effort to provide an assign health care provider to Inmates who are non-district residents.

## C.3.31 MEDICAL ANALYTICS AND TECHNOLOGY SUPPORT (MATS)

### C.3.31.1 D.C. Department of Corrections Obligations

The D.C. Department of Corrections (DOC) will own and maintain a hardware, software and communications infrastructure associated wit the delivery of Comprehensive Health Care Services at the Central Detention Facility (CDF) and the Correctional Treatment Facility (C' In addition, DOC will own and administer all databases residing on DOC platforms, and will have unabridged access to these data within legal confines of HIPPA requirements. In providing analytical and technology support to the Contactor, DOC will:

DCFL-2006-D-6001
Community Oriented Correctional H.    .h Care for Department of Corrections

a) Install computer workstations. Workstations will have appropriate warranties and service level agreements.
b) Replace computer workstations at the end of useful life cycles.
c) Install and maintain cabling, as well as other communications infrastructure.
d) Install and maintain required servers.
e) Maintain version control of all software and associated licenses.
f) Develop and implement a disaster recovery program.
g) Develop and maintain industry standard procedures for back-up, data storage, and security.
h) Maintain updated virus protection software.
i) Develop and maintain system documentation.
j) Utilize industry standard procedures to test and accept new applications and databases.
k) Operate a Help Desk during regular business hours, Monday thru Friday, 8:30 am – 5:00 pm, and provide 24x7 emergencies IT supports.
l) Develop and/or activate reports for administrative reporting, clinical evaluation, and the monitoring of Comprehensive Health Care Services.
m) Develop metrics for measuring the efficiency and quality of Contractor provided Comprehensive Health Care Services.
n) Conduct statistical studies of cost trends, productivity, Inmate health profiles, and treatment outcomes.
o) Prepare forecasts of costs and caseloads by morbidity group.
p) Conduct studies of data quality and integrity.
q) Provide Contractor a controlled access to JACCS and other essential DOC systems.
r) Administer password access to the medical information system, specialized health databases, and relevant DOC systems.
s) Prepare specifications for all new or replacement hardware and software technologies.
t) Prepare annual budget estimates for new and ongoing MATS initiatives.
u) Purchase initial infrastructure for both Telemedicine System and Picture Archiving and Communication System (PACS).

**C.3.31.2 Access Control**

The Contractor shall ensure that DOC in-house and contract technical staff have access to all areas of the CDF and CTF Medical Units.

DOC will control access to all systems and applications housed within DOC's jurisdiction. In addition, DOC reserves the right to restrict access rights of any Contractor staff found or suspected to be in violation of DOC's and the District's e-mail and internet policies. All Contractor staff must sign policy statements in these areas before being granted access privileges.

C.3.31.3 The DOC's provision of IT services to support Contractor health service

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

operations is contingent upon availability of sufficient appropriations to meet requirements set forth in this section.

### C.3.32 Transition Plan

The Contractor shall complete following tasks before ending the transition period.

| | Transition Task | Section | Due Date |
|---|---|---|---|
| 1 | Transition plan | C.3.c | 30 days after contract award |
| 2 | Operational Manual | C.3.c | 30 days after contract award |
| 3 | Radiology | C.3.16 | By end of transition period |
| 3 | Infection control program | C.3.21.1.1 | 30 days after contract award |
| 4 | Validate current equipment inventory | C.3.22.1 | 30 days after contract award |
| 5 | Recruit, interview, hire, train staff | C.3.25.1 | By September 30, 2006 |
| 6 | Job description | C.3.25.2 | 30 days after contract award |
| 7 | staffing plan per labor category | C.3.25.3 | 30 days after contract award |
| 8 | Minimum staffing complement of 202 FTE's | C.3.25.4 | By end of transition period |
| 9 | Orientation regarding on-site security and medical practices | C.3.25.8 | By end of transition period |
| 10 | 40 hours per-service training | C.3.25.8.1 | By end of transition period |
| 11 | 16 hours per-service training | C.3.25.8.2 | By end of transition period |
| 12 | Background check and drug testing | C.3.25.8.1 C.3.25.8.2 | By end of transition period |
| 13 | Notarized statement detailing its subcontracting plan | H.19 | |

DCFL-2006-D-6001
Community Oriented Correctional H. .h Care for Department of Corrections

## SECTION D - PACKAGING AND MARKING

Not Applicable to this contract.

**DC-WAP 000393**

DCFL-2006-D-6001
Community Oriented Correctional F.    .n Care for Department of Corrections

## SECTION E - INSPECTION AND ACCEPTANCE

### E.1     INSPECTION AND ACCEPTANCE

The inspection and acceptance requirements for the resultant contract shall be governed by clause number six (6), Inspection of Services, of the Government of the District of Columbia's Standard Contract Provisions for use with Supplies and Services Contracts, dated November 2004 (Attachment J.2).

DCFL-2006-D-6001
Community Oriented Correctional H.    .n Care for Department of Corrections

## SECTION F - DELIVERIES OR PERFORMANCE

### F.1    TERM OF CONTRACT

The term of the contract shall be from the date of award through September 30, 2006 as transition period and from October 1, 2006 through September 30, 2009 as operational period.

### F.2    OPTION TO EXTEND THE TERM OF THE CONTRACT

**F.2.1**    The District may extend the term of this contract for a period of two (2) one-year option periods, or successive fractions thereof, by written notice to the Contractor before the expiration of the contract; provided that the District will give the Contractor a preliminary written notice of its intent to extend at least one hundred eighty (180) days before the contract expires. The preliminary notice does not commit the District to an extension. The exercise of this option is subject to the availability of funds at the time of the exercise of this option.

**F.2.2**    If the District exercises this option, the extended contract shall be considered to include this option provision.

**F.2.3**    The price for the option period shall be negotiated with the District.

**F.2.4**    The total duration of this contract, including the exercise of any options under this clause, shall not exceed five years and three months.

### F.3    DELIVERABLES

**F.3.1**    The Contractor shall submit the following deliverables:

| Deliverable | Quantity | Format/Method of Delivery | Due Date/ Frequency |
|---|---|---|---|
| Final Transition Plan as described in Section C.3.c | 1 copy | Electronic and hard copy to COTR | Within 30 days after contract award |
| Operations Manual as described in Section C.3.c | 1 copy | Electronic and hard copy to COTR | Within 30 days after contract award. |
| FQHC with CDF and CTF listed in Exhibit B as described in Section C.3.1.4 | 1 copy | Hard copy to COTR | Within 30 days after contract award |
| Report on off-site-care as described in Section C.3.8.1 | 1 copy | Electronic and hard copy to COTR | Monthly |
| A manual of nursing care procedures for infirmary care as described in Section C.3.10.1.4 | 1 copy | Electronic and hard copy to COTR | Within 30 days after contract award. |
| Equipment Maintenance and Supply Agreements as stated in Section C.3.11.2 | 1 copy | Hard copy to COTR | Upon Request |
| Monthly laboratory statistical | 1 copy | Electronic  and hard | Monthly, when and if |

DCFL-2006-D-6001
Community Oriented Correctional h     l Care for Department of Corrections

| Deliverable | Quantity | Format/Method of Delivery | Due Date/ Frequency |
|---|---|---|---|
| reports as described in Section C.3.17.3 | | copy to COTR | requested |
| All Inmate medical records as stated in Section C.3.18.1 | All electronic and hard copy records | To COTR | Upon contract expiration or termination |
| Medical Reference Library as stated in Section C.3.20.1.3 | 1 | On-site for use of health care staff | Within 30 days after contract award |
| Staffing plan with written job descriptions as described in Sections C.3.25.2 | 1 copy | Electronic and hard copy to COTR | Within 30 days after contract award |
| Staffing plan per labor category as described in Sections C.3.25.3 | 1 copy | Electronic and hard copy to COTR | Within 30 days after contract award |
| Maintain personnel files on all employees as described in Sections C.3.25.15 | One file per employee | Hard copy | Upon request |
| Impending administrator or medical director vacancy as described in Section C.3.25.18 | 1 | Verbally | Next calendar day |
| Impending administrator or medical director vacancy as described in Section C.3.25.18 | 1 copy | Electronic and hard copy to COTR | Within 5 calendar days of the verbal notification |
| Peer Review Results as described in Section C.3.26 | 1 copy | Electronic and hard copy to COTR | At minimum every 4 months |
| Monthly statistical reports as described in Section C.3.27.5 | 1 copy | Electronic and hard copy to COTR | Monthly |
| Monthly Health Care Performance Monitoring Report as described in Section C.3.27.5 | 1 copy | Electronic and hard copy to COTR | Monthly |
| Annual Report as described in Section C.3.27.5 | 1 copy | Electronic and hard copy to COTR | Within 20 days after the end of each contract year |
| Quality Improvement Data Reports as described in Section C.3.27.6 | 1 copy | Electronic and hard copy to COTR | Monthly |
| Benchmark Reporting as described in Section C.3.27.5 | 1 copy | Electronic and hard copy to COTR | Within 90 days after contract award |
| Metrics Reporting as described in Sections C.3.27.6 | 1 copy | Electronic and hard copy to COTR | Monthly |
| ASCA Reports as described in Section C.3.27.8 | 1 copy | Hard copy to COTR | Per incidence requiring reporting |
| Notarized statement detailing its subcontracting plan as described in Section H.19 | 1 copy | Electronic and hard copy to Contracting Officer | within 60 days after contract award |

DC-WAP 000396

DCFL-2006-D-6001
Community Oriented Correctional H____ ___ Care for Department of Corrections

**F.3.2**   The Contractor shall submit to the District as a deliverable any reports that are required pursuant to H.5 of the 51% District Residents New Hires Requirements and First Source Employment Agreement.  If the report is not submitted as part of the deliverables, the District will not make final payment to the Contractor.

DC-WAP 000397

DCFL-2006-D-6001
Community Oriented Correctional h    .l Care for Department of Corrections

## SECTION G - CONTRACT ADMINISTRATION DATA

**G.1     INVOICE SUBMITTAL**

**G.1.1**   The Contractor shall submit proper invoices, on a monthly basis by the 5th day of the month following the month for which the services were provided. The Contractor may submit invoices every two weeks, at its option, during the period of October 1, 2006 through March 31, 2007. The Contractor shall submit three (3) proper invoices, in the amount of [ Redacted ] each, during the transitional period, on August 1, 2006, September 1, 2006 and October 1, 2006. Invoices shall be prepared in duplicate and shall be submitted to the agency's Chief Financial Officer (CFO) at the address below with concurrent copies to the Contracting Officer's Technical Representative (COTR) at the address specified in Section G.9.1:

Department of Corrections
Office of the Controller/Agency CFO
300 Indiana Avenue, NW, Room 4106
Washington, DC 20001
Attention: Accounts Payable
Telephone: 202-727-4854
Fax: 202-724-7518

**G.1.2**   To constitute a proper invoice, the Contractor shall submit the following information:

    a.   Contractor's name and invoice date (contractors are encouraged to date invoices as close to the date of mailing or transmittal as possible);

    b.   Contract number (assignment of an invoice number by the contractor is also recommended);

    c.   Description, price, and quantity of services actually delivered and performed;

    d.   Name, title, telephone number, and complete mailing address of responsible official to whom payment is to be sent;

    e.   Name, title, phone number, and mailing address of person preparing the invoice;

    f.   Name, title, phone number and mailing address of person [if different from (f)] to be notified in event of a defective invoice; and

    g.   Authorized signature

**G.2     INVOICE PAYMENT**

**G.2.1**   The District will make payments to the Contractor, upon the submission of proper invoices, at the prices stipulated in this contract, for supplies delivered and accepted or services performed and accepted, less any discounts, allowances or adjustments provided for in the contract.

**G.2.2**   The District will pay the Contractor on or before the 30th day after receiving a proper invoice from the Contractor.

DCFL-2006-D-6001
Community Oriented Correctional H    ı Care for Department of Corrections

### G.3    FIRST SOURCE AGREEMENT REQUEST FOR FINAL PAYMENT

**G.3.1**    For contracts subject to the 51% District Residents New Hires Requirements and First Source Employment Agreement, final request for payment must be accompanied by the report or a waiver of compliance discussed in H.5.6.

**G.3.2**    No final payment shall be made to the Contractor until the CFO has received the CO's final determination or approval of waiver of the Contractor's compliance with 51% District Residents New Hires Requirements and First Source Employment Agreement.

### G.4    PAYMENT SCHEDULE

The District will pay the Contractor in accordance with the payment schedule described in Section B.2 after:

    a.   Acceptance of the work; and
    b.   Presentation of a properly executed invoice.

### G.5    ASSIGNMENT OF CONTRACT PAYMENTS

**G.5.1**    In accordance with 27 DCMR 3250, the Contractor may assign funds due or to become due as a result of the performance of this contract to a bank, trust company, or other financing institution.

**G.5.2**    Any assignment shall cover all unpaid amounts payable under this contract, and shall not be made to more than one party.

**G.5.3**    Notwithstanding an assignment of contract payments, the Contractor, not the assignee, is required to prepare invoices. Where such an assignment has been made, the original copy of the invoice must refer to the assignment and must show that payment of the invoice is to be made directly to the assignee as follows:

Pursuant to the instrument of assignment dated _____,
make payment of this invoice to _____
(name and address of assignee).

### G.6    THE QUICK PAYMENT CLAUSE

#### G.6.1    Interest Penalties to Contractors

**G.6.1.1**    The District will pay interest penalties on amounts due to the Contractor under the Quick Payment Act, D.C. Official Code §2-221.01 et seq., for the period beginning on the day after the required payment date and ending on the date on which payment of the amount is made. Interest shall be calculated at the rate of 1% per month. No interest penalty shall be paid if payment for the completed delivery of the item of property or service is made on or before:

DCFL-2006-D-6001
Community Oriented Correctional h. ..i Care for Department of Corrections

a) the 3rd day after the required payment date for meat or a meat product;
b) the 5th day after the required payment date for an agricultural commodity; or
c) the 15th day after the required payment date for any other item.

**G.6.1.2** Any amount of an interest penalty which remains unpaid at the end of any 30-day period shall be added to the principal amount of the debt and thereafter interest penalties shall accrue on the added amount.

**G.6.2   Payments to Subcontractors**

**G.6.2.1** The Contractor must take one of the following actions within 7 days of receipt of any amount paid to the Contractor by the District for work performed by any subcontractor under a contract:

a) Pay the subcontractor for the proportionate share of the total payment received from the District that is attributable to the subcontractor for work performed under the contract; or
b) Notify the District and the subcontractor, in writing, of the Contractor's intention to withhold all or part of the subcontractor's payment and state the reason for the nonpayment.

**G.6.2.2** The Contractor must pay any lower-tier subcontractor or supplier interest penalties on amounts due to the subcontractor or supplier beginning on the day after the payment is due and ending on the date on which the payment is made.  Interest shall be calculated at the rate of 1% per month.  No interest penalty shall be paid on the following if payment for the completed delivery of the item of property or service is made on or before:

a) the 3rd day after the required payment date for meat or a meat product;
b) the 5th day after the required payment date for an agricultural commodity; or
c) the 15th day after the required payment date for any other item.

**G.6.2.3** Any amount of an interest penalty which remains unpaid by the Contractor at the end of any 30-day period shall be added to the principal amount of the debt to the subcontractor and thereafter interest penalties shall accrue on the added amount.

**G.6.2.4** A dispute between the Contractor and subcontractor relating to the amounts or entitlement of a subcontractor to a payment or a late payment interest penalty under the Quick Payment Act does not constitute a dispute to which the District of Columbia is a party.  The District of Columbia may not be interpleaded in any judicial or administrative proceeding involving such a dispute.

DCFL-2006-D-6001
Community Oriented Correctional h    .l Care for Department of Corrections

### G.7    CONTRACTING OFFICER (CO)

Contracts will be entered into and signed on behalf of the District only by contracting officers.  The name, address and telephone number of the Contracting Officer is:

> John Soderberg
> Contracting Officer
> Office of Contracting and Procurement
> 441 4th Street, N.W., Suite 700 South
> Washington, DC 20001
> Telephone:    (202) 724-4233
> Fax:             (202) 727-0245

### G.8    AUTHORIZED CHANGES BY THE CONTRACTING OFFICER

G.8.1    The Contracting Officer is the **only** person authorized to approve changes in any of the requirements of this contract.

G.8.2    The Contractor shall not comply with any order, directive or request that changes or modifies the requirements of this contract, unless issued in writing and signed by the Contracting Officer.

G.8.3    In the event the Contractor effects any change at the direction or request of any person other than the Contracting Officer, the change will be considered to have been made without authority and no adjustment will be made in the contract price to cover any cost increase incurred as a result thereof.

### G.9    CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE (COTR)

G.9.1    The COTR is responsible for general administration of the contract and advising the Contracting Officer as to the Contractor's compliance or noncompliance with the contract.  In addition, the COTR is responsible for the day-to-day monitoring and supervision of the contract, of ensuring that the work conforms to the requirements of this contract and such other responsibilities and authorities as may be specified in the contract.  The COTR for this contract is:

> Henry R. Lesansky, Ph.D.
> Health Services Administrator
> DC Department of Corrections
> 1923 Vermont Avenue, N.W.
> Washington DC 20001
> Phone: (202) 671-2069
> Fax:    (202) 673-2311
> Henry.Lesansky@dc.gov

G.9.2    The COTR shall not have the authority to make changes in the specifications/scope of work or terms and conditions of the contract.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

**G.9.3** The Contractor may be held fully responsible for any changes not authorized in advance, in writing, by the Contracting Officer, may be denied compensation or other relief for any additional work performed that is not so authorized, and may also be required, at no additional cost to the District, to take all corrective action necessitated by reason of the unauthorized changes.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

**H.1**   **HIRING OF DISTRICT RESIDENTS AS APPRENTICES AND TRAINEES**

**H.1.1**   For all new employment resulting from this contract or subcontracts hereto, as defined in Mayor's Order 83-265 and implementing instructions, the Contractor shall use its best efforts to comply with the following basic goal and objectives for utilization of bona fide residents of the District of Columbia in each project's labor force:

**H.1.1.1**   at least fifty-one (51) percent of apprentices and trainees employed shall be residents of the District of Columbia registered in programs approved by the District of Columbia Apprenticeship Council.

**H.1.2**   The Contractor shall negotiate an Employment Agreement with the DOES for jobs created as a result of this contract. The DOES shall be the Contractor's first source of referral for qualified applicants, trainees, and other workers in the implementation of employment goals contained in this clause.

**H.2**   **DEPARTMENT OF LABOR WAGE DETERMINATIONS**

The Contractor shall be bound by Wage Determination No. 94-2103, Revision No. 35, dated May 23, 2006 by the Department of Labor, incorporated herein as Attachment J.1, issued by the U.S. Department of Labor in accordance with the Service Contract Act of 1965, as amended (41 U.S.C. 351). The Contractor shall be bound by the applicable wage rates for each year of the base term of the contract. If DOL revises the applicable wage rates for year two or year three of the base term, the Contractor may be entitled to an equitable price adjustment. If an option is exercised, the Contractor shall be bound by the applicable wage rate at the time of the option. If the option is exercised and the Contracting Officer for the option obtains a revised wage determination, that determination is applicable for the option periods; the Contractor may be entitled to an equitable adjustment.

**H.3**   **PUBLICITY**

The Contractor shall at all times obtain the prior written approval from the Contracting Officer before it, any of its officers, agents, employees or subcontractors, either during or after expiration or termination of the contract, make any statement, or issue any material, for publication through any medium of communication, bearing on the work performed or data collected under this contract.

**H.4**   **FREEDOM OF INFORMATION ACT**

The District of Columbia Freedom of Information Act, at D.C. Official Code § 2-532 (a-3), requires the District to make available for inspection and copying any record produced or collected pursuant to a District contract with a private contractor to perform a public function, to the same extent as if the record were maintained by the agency on whose behalf the contract is made. If the Contractor receives a request for such information, the

DC-WAP 000403

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

G.10 who will provide the request to the FOIA Officer for the agency with programmatic responsibility in accordance with the D.C. Freedom of Information Act. If the agency with programmatic responsibility receives a request for a record maintained by the Contractor pursuant to the contract, the COTR will forward a copy to the Contractor. In either event, the Contractor is required by law to provide all responsive records to the COTR within the timeframe designated by the COTR. The FOIA Officer for the agency with programmatic responsibility will determine the releasability of the records. The District will reimburse the Contractor for the costs of searching and copying the records in accordance with D.C. Official Code § 2-532 and Chapter 4 of Title 1 of the *D.C. Municipal Regulations*.

## H.5  51% DISTRICT RESIDENTS NEW HIRES REQUIREMENTS AND FIRST SOURCE EMPLOYMENT AGREEMENT

**H.5.1**  The Contractor shall comply with the First Source Employment Agreement Act of 1984, as amended, D.C. Official Code, sec. 2-219.01 et seq. ("First Source Act").

**H.5.2**  The Contractor shall enter into and maintain, during the term of the contract, a First Source Employment Agreement, in which the Contractor shall agree that:

(1) The first source for finding employees to fill all jobs created in order to perform this contract shall be the Department of Employment Services ("DOES"); and

(2) The first source for finding employees to fill any vacancy occurring in all jobs covered by the First Source Employment Agreement shall be the First Source Register.

**H.5.3**  The Contractor shall submit to DOES, no later than the 10th each month following execution of the contract, a First Source Agreement Contract Compliance Report ("contract compliance report") that verifies its compliance with the First Source Agreement for the preceding month. The contract compliance report for the contract shall include the:

(1) Number of employees needed;
(2) Number of current employees transferred;
(3) Number of new job openings created;
(4) Number of job openings listed with DOES;
(5) Total number of all District residents hired for the reporting period and the cumulative total number of District residents hired; and
(6) Total number of all employees hired for the reporting period and the cumulative total number of employees hired, including:
   (a) Name;
   (b) Social Security number;
   (c) Job title;
   (d) Hire date;
   (e) Residence; and
   (f) Referral source for all new hires.

**H.5.4**  If the contract amount is equal to or greater than $100,000, the Contractor agrees

DCFL-2006-D-6001 ·
Community Oriented Correctional Health Care for Department of Corrections

**H.5.5**   With the submission of the Contractor's final request for payment from the District, the Contractor shall:

(1) Document in a report to the Contracting Officer its compliance with the section H.5.4 of this clause; or

(2) Submit a request to the Contracting Officer for a waiver of compliance with section H.5.4 and include the following documentation:

    (a) Material supporting a good faith effort to comply;

    (b) Referrals provided by DOES and other referral sources;

    (c) Advertisement of job openings listed with DOES and other referral sources; and

    (d) Any documentation supporting the waiver request pursuant to section H.5.6.

**H.5.6**   The Contracting Officer may waive the provisions of section H.5.4 if the Contracting Officer finds that:

(1) A good faith effort to comply is demonstrated by the Contractor;

(2) The Contractor is located outside the Washington Standard Metropolitan Statistical Area and none of the contract work is performed inside the Washington Standard Metropolitan Statistical Area which includes the District of Columbia; the Virginia Cities of Alexandria, Falls Church, Manassas, Manassas Park, Fairfax, and Fredericksburg, the Virginia Counties of Fairfax, Arlington, Prince William, Loudoun, Stafford, Clarke, Warren, Fauquier, Culpeper, Spotsylvania, and King George; the Maryland Counties of Montgomery, Prince Georges, Charles, Frederick, and Calvert; and the West Virginia Counties of Berkeley and Jefferson.

(3) The Contractor enters into a special workforce development training or placement arrangement with DOES; or

(4) DOES certify that there are insufficient numbers of District residents in the labor market possessing the skills required by the positions created as a result of the contract.

**H.5.7**   Upon receipt of the contractor's final payment request and related documentation pursuant to sections H.5.5 and H.5.6, the Contracting Officer shall determine whether the Contractor is in compliance with section H.5.4 or whether a waiver of compliance pursuant to section H.5.6 is justified. If the Contracting Officer determines that the Contractor is in compliance, or that a waiver of compliance is justified, the Contracting Officer shall, within two Business Days of making the determination forward a copy of the determination to the Agency Chief Financial Officer and the COTR.

**H.5.8**   Willful breach of the First Source Employment Agreement, or failure to submit the report pursuant to section H.5.5, or deliberate submission of falsified data, may be enforced by the Contracting Officer through imposition of penalties, including monetary fines of 5% of the total amount of the direct and indirect labor costs of the contract. The Contractor shall make payment to DOES. The Contractor may appeal to the D.C. Contract Appeals Board as provided in the contract any decision of the Contracting Officer pursuant to this section H.5.8.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

**H.5.9**  The provisions of sections H.5.4 through H.5.8 do not apply to nonprofit organizations.

**H.6    PROTECTION OF PROPERTY:**

The Contractor shall be responsible for any damage to the building, interior, or their approaches in delivering equipment covered by this contract in accordance with 27 DCMR §4113.1.

**H.7    AMERICANS WITH DISABILITIES ACT OF 1990 (ADA)**

During the performance of the contract, the Contractor and any of its subcontractors shall comply with the ADA.  The ADA makes it unlawful to discriminate in employment against a qualified individual with a disability.
See 42 U.S.C. 12101 et seq.

**H.8    SECTION 504 OF THE REHABILITATION ACT OF 1973, as amended.**

During the performance of the contract, the Contractor and any of its subcontractors shall comply with Section 504 of the Rehabilitation Act of 1973, as amended.  This Act prohibits discrimination against disabled people in federally funded program and activities. See 29 U.S.C. 794 et seq.

**H.9    ADVISORY AND ASSISTANCE SERVICES**

This contract is a "non-personal services contract".  It is therefore, understood and agreed that the Contractor and the Contractor's employees: (1) shall perform the services specified herein as independent contractors, not as employees of the government; (2) shall be responsible for their own management and administration of the work required and bear sole responsibility for complying with any and all technical, schedule, financial requirements or constraints attendant to the performance of this contract; (3) shall be free from supervision or control by any government employee with respect to the manner or method of performance of the service specified; but (4) shall, pursuant to the government's right and obligation to inspect, accept or reject work, comply with such general direction of the CO, or the duly authorized representative of the CO as is necessary to ensure accomplishment of the contract objectives.

**H.10   DIVERSION, REASSIGNMENT AND REPLACEMENT OF KEY PERSONNEL**

The Contractor's staff listed in Section H.10.1 is considered to be essential to the work being performed hereunder.  The Contractor shall notify the COTR, as identified in Section G.9, and the Contracting Officer as identified in Section G.7 in writing of the removal of any key personnel in thirty (30) days in advance of the scheduled removals and within 24 hours for unscheduled removals.  The written justification shall provide explanations and justification of the removal as well as the Contractor's plan to temporarily and permanently fill the position.  The Contractor shall not reassign these key personnel or appoint replacements, without prior, express written permission from the Contracting Officer.  The Contractor shall promptly provide an equally qualified

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

replacement satisfactory to the District for any person so removed. The District shall not be required to pay for training such replacement.

The District reserves the right to remove or request removal of any and all personnel who are considered unqualified. No payment will be made to the Contractor for the services of any personnel removed by the District. No personnel so removed may be returned to duty without the prior written approval of the Contracting Officer.

**H.10.1 Key Personnel:**

(1)    Medical Director
(2)    Mental Health Director
(3)    Heath Services Administrator
(4)    Executive Administrator
(5)    Director of Nursing
(6)    Lead Dentist
(7)    Radiology Director
(8)    Pharmacy Director
(9)    Medical Records Director
(10)   Senior Staff Physician(s)
(11)   Chief Psychiatrist
(12)   Nurse Practitioner
(13)   Quality Improvement Coordinator
(14)   Intake Coordinator
(15)   Infection Control Coordinator
(16)   Utilization Management Nurse
(17)   Dietician
(18)   Computer Analyst

## H.11   GOVERNMENT FURNISHED PROPERTY

### H.11.1 SPACE, EQUIPMENT, SUPPLIES

The District will provide the space, equipment and furniture currently in place as indicated on the equipment inventory list to be provided to the Contractor for validation. The District will provide trash collection (except biohazardous waste), building maintenance and building access for telephone services. The District will provide all current pharmaceuticals and standardized DOC forms to Contractor at the commencement of the contract period. The District will provide the Association of State Correctional Administrator's reporting guidelines. All medical and administrative equipment and supplies at end of the contract period will become the property of the DOC.

## H.12   DISTRICT RESPONSIBILITIES

### H.12.1 MEDICAL ANALYTICS AND TECNOLOGY SUPPORT (MATS)

The District will comply with provisions described in C.3.31.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

### H.12.2    TRANSPORTATION

The District will provide all non-emergency, scheduled medical transportation and security escort services for health services delivery functions, in accordance with prevailing DOC program statements.

### H.12.3 CLEANING

The District will provide inmate labor for cleaning in the medical unit.

### H.12.4 PEST CONTROL

The District will be responsible for an integrated pest management program.

### H.12.5 INCIDENT REPORTING SOFTWARE

The District will provide proprietary incident reporting software to the Contractor, and training regarding record keeping requirements and software use. The District will also supply the Contractor with all external standards and regulations applicable to medical records keeping with which the Contractor must comply.

### H.12.6 MEDICAL PRIVILEGES

The District will facilitate the medical privilege process with participating hospitals on behalf of the Contractor.

## H.13    CONTRACTOR RESPONSIBILITIES

**H.13.1** Medical Analytics: The Contractor shall provide metric reports for the elements detailed in Section C.3.27.6.

**H.13.2** The Contractor data quality error rates, including those of omission and commission, shall not exceed one percent, and all documented errors must be corrected within 48 hours.

**H.13.3** The Contractor shall develop interfaces between its own systems and JACCS and other essential DOC operating systems.

## H.14    DEBARRED PROVIDER RESTRICTION

The Contractor certifies, by signing this contract, that the Contractor, its principals, subcontractors, and all providers or suppliers rendering medical or dental services or supplies pursuant to this contract are not presently excluded from participation in Medicare and State health care programs by the United States Department of Health and Human Services.  Furthermore, the Contractor certifies that no services or supplies rendered during the course of this contract shall be provided or supplied by any individual or entity that has been excluded in said manner.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

### H.15   HIPAA BUSINESS ASSOCIATE CLAUSE

DOC is a "Covered Entity" as that term is defined in the Privacy Rule and the Contractor, as a recipient of Protected Health Information from DOC, is a "Business Associate" as that term is defined in the Privacy Rule.

1.   Definitions

a.   *Business Associate* means a person or entity, who performs, or assists in the performance of a function or activity on behalf of a covered entity or an organized health care organization in which the covered entity participates, involving the use or disclosure of individually identifiable health information, other than in the capacity of a workforce member of such covered entity or organization.  A business associate is also any person or organization that provides, other than in the capacity of a workforce member of such covered entity, legal, actuarial, accounting, consulting, data aggregation, management, administration, accreditation, or financial services to or for the covered entity and receives individually identifiable health information from a covered entity or another business associate on behalf of a covered entity.  In some instances, a covered entity may be a business associate of another covered entity.

b.   *Covered Entity* means a health plan, a health care clearinghouse, or a health care provider who transmits any health information in electronic form in connection with a transaction covered by 45 C.F.R. Parts 160 and 164 of the Privacy Rule.  With respect to this HIPAA Compliance Clause, *Covered Entity* shall also include the designated health care components-of a hybrid entity.

c.   *Data Aggregation* means, with respect to Protected Health Information created or received by a business associate in its capacity as the business associate of a covered entity, the combining of such Protected Health Information by the business associate with the Protected Health Information received by the business associate in its capacity as a business associate of another covered entity, to permit data analyses that relate to the health care operations of the respective covered entities.

d.   *Designated Record Set* means a group of records maintained by or for the Covered Entity that is:

   i.   The medical records and billing records about individuals maintained by or for a covered health care provider;

   ii.   The enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or

   iii.   Used, in whole or in part, by or for the Covered Entity to make decisions about individuals.

DC-WAP 000409

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

    e. *Health Care* means care services, or services, or supplies related to the health of an individual. Health care includes, but is not limited to, the following:

        i.    Preventive, diagnostic, therapeutic, rehabilitative, maintenance, or palliative care, and counseling, service, assessment, or procedure with respect to the physical or mental condition, or functional status, of an individual or that affects the structure or function of the body; and

        ii.    Sale or dispensing of a drug, device, equipment, or other item in accordance with the prescription.

    f. *Health Care Components* means a component or a combination of components of a hybrid entity designated by a hybrid entity in accordance with 45 C.F.R. § 164.105(a)(2)(iii)(C). *Health Care Components* must include non-covered functions that provide services to the covered functions for the purpose of facilitating the sharing of Protected Health Information with such functions of the hybrid entity without business associate agreements or individual authorizations.

    g. *Health Care Operations* shall have the same meaning as the term "health care operations" in 45 C.F.R. § 164.501.

    h. *Hybrid Entity* means a single legal entity that is a covered entity and whose business activities include both covered and non-covered functions, and that designates health care components in accordance with 45 C.F.R. § 164.105(a)(2)(iii)(C). A *Hybrid Entity* is required to designate as a health care component, any other components of the entity that provide services to the covered functions for the purpose of facilitating the sharing of Protected Health Information with such functions of the hybrid entity without business associate agreements or individual authorizations.

    i. *Record* shall mean any item, collection, or grouping of information that includes Protected Health Information and is maintained, collected, used, or disseminated by or for the Covered Entity.

    j. *Individual* shall have the same meaning as the term "individual" in 45 C.F.R. § 164.501 and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. § 164.502(g).

    k. *Individually Identifiable Health Information* is information that is a subset of health information, including demographic information collected from an individual, and;

        i.    Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

    ii.    Relates to the past, present, or future physical or mental health or condition of an individual; or the past, present, or future payment for the provision of health care to an individual; and

    iii.    That identifies the individual; or

    iv.    With respect to which there is a reasonable basis to believe the information can be used to identify the individual.

l.  *Privacy Official.* The person designated by the District of Columbia, a *Hybrid Entity*, who is responsible for developing, maintaining, implementing and enforcing the District-wide Privacy Policies and Procedures, and for overseeing full compliance with this Manual, the Privacy Rules, and other applicable federal and state privacy law.

m.  *Privacy Officer.* The person designated by the Privacy Official or one of the District of Columbia's designated health care components, who is responsible for enforcing the provisions of this Manual as well as overseeing full compliance with the Covered Agency's Privacy Policies and Procedures, the Privacy Rules, and other applicable federal and state privacy law(s). The Covered Agency's privacy officer will follow the guidance of the District's Privacy Official, and shall be responsive to and report to the District's Privacy Official.

n.  *Privacy Rule.* "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. part 160 and part 164, subparts A and E.

o.  *Protected Health Information.* "Protected Health Information" means individually identifiable health information that is:

    i.    Transmitted by electronic media;

    ii.    Maintained in electronic media; or

    iii.    Transmitted or maintained in any other form or medium;

    iv.    Limited to the information created or received by the Business Associate from or on behalf of the Covered Entity; and

    v.    Excluding information in the records listed in subsection (2) of the definition in 45 C.F.R. §160.103.

p.  *Required By Law.* "Required By Law" shall have the same meaning as the term "required by law" in 45 C.F.R. § 164.103.

q.  *Secretary.* "Secretary" shall mean the Secretary of the United States Department of Health and Human Services or his or her designee.

r.  *Workforce.* "Workforce" shall mean employees, volunteers, trainees, and

CONFIDENTIAL/ATTORNEYS' EYES ONLY

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

or business associate, is under the direct control of such entity, whether or not they are paid by the covered entity or business associate.

2. <u>Obligations and Activities of Business Associate</u>

a. The Business Associate agrees not to use or disclose Protected Health Information other than as permitted or required by this HIPAA Compliance Clause or as Required by Law.

b. The Business Associate agrees to use commercially reasonable efforts and appropriate safeguards to maintain the security of the Protected Health Information and to prevent use or disclosure of such Protected Health Information other than as provided for by this Clause.

c. The Business Associate agrees to establish procedures for mitigating, and to mitigate to the extent practicable, any deleterious effect that is known to the Business Associate of a use or disclosure of Protected Health Information by the Business Associate in violation of the requirements of this Clause.

d. The Business Associate agrees to report to Covered Entity, in writing, any use or disclosure of the Protected Health Information not permitted or required by this HIPAA Compliance Clause to the District Privacy Official or agency Privacy Officer within ten (10) days from the time the Business Associate becomes aware of such unauthorized use or disclosure.

e. The Business Associate agrees to ensure that any workforce member or any agent, including a subcontractor, agrees to the same restrictions and conditions that apply through this <u>Clause</u> with respect to Protected Health Information received from the Business Associate, Protected Health Information created by the Business Associate, or Protected Health Information received by the Business Associate on behalf of the Covered Entity.

f. The Business Associate agrees to provide access, at the request of the Covered Entity or an Individual, at a mutually agreed upon location, during normal business hours, and in a format as directed by the District Privacy Official or agency Privacy Officer, or as otherwise mandated by the Privacy Rule or applicable District of Columbia laws, rules and regulations, to Protected Health Information in a Designated Record Set, to the Covered Entity or an Individual, in compliance with applicable portions of the applicable documents #8 and 9 cited in Section C.1.1, attached hereto as Attachment J.10 and incorporated by reference, and within five (5) Business Days of the request to facilitate the District's compliance with the requirements under 45 C.F.R. §164.524.

g. The Business Associate agrees to make any amendment(s) to the Protected Health Information in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 CFR 164.526 in a format or as directed by the District Privacy Official or agency Privacy Officer, or as otherwise mandated by the Privacy Rule or applicable District of Columbia laws, in compliance with applicable portions of the applicable documents #8 and 9 cited in Section

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

C.1.1., attached hereto as Attachment J.10 and incorporated by reference, and within five (5) Business Days of the directive in order to facilitate the District's compliance with the requirements under 45 C.F.R. §164.526.

h.   The Business Associate agrees to use the standard practices of the Covered Entity to verify the identification and authority of an Individual who requests the Protected Health Information in a Designated Record Set of a recipient of services from or through the Covered Entity. The Business Associate agrees to comply with the applicable portions of the applicable documents #8 and 9 cited in Section C.1.1, attached hereto as Attachment J.10 and incorporated by reference.

i.   The Business Associate agrees to record authorizations and log such disclosures of Protected Health Information and information related to such disclosures as would be required for the Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. § 164.528 and applicable District of Columbia laws, rules and regulations. The Business Associate agrees to comply with the applicable portions of the applicable documents #8 and 9 cited in Section C.1.1 attached hereto as Attachment J.10 and incorporated by reference.

j.   The Business Associate agrees to provide to the Covered Entity or an Individual, within five (5) Business Days of a request at a mutually agreed upon location, during normal business hours, and in a format designated by the District Privacy Official or agency Privacy Officer and the duly authorized Business Associate workforce member, information collected in accordance with Paragraph (i) of this Section above, to permit the Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. § 164.528, and applicable District of Columbia laws, rules and regulations. The Business Associate agrees to comply with the applicable portions of the applicable documents #8 and 9 cited in Section C.1.1 attached hereto as Attachment J.10 and incorporated by reference.

k.   The Business Associate agrees to make internal practices, books, and records, including policies and procedures, and Protected Health Information, relating to the use and disclosure of Protected Health Information received from the Business Associate, or created, or received by the Business Associate on behalf of the Covered Entity, available to the Covered Entity, or to the Secretary, within five (5) Business Days of their request and at a mutually agreed upon location, during normal business hours, and in a format designated by the District Privacy Official or agency Privacy Officer and the duly authorized Business Associate workforce member, or in a time and manner designated by the Secretary, for purposes of the Secretary in determining compliance of the Covered Entity with the Privacy Rule.

l.   The Business Associate may aggregate Protected Health Information in its possession with the Protected Health Information of other Covered Entities that Business Associate has in its possession through its capacity as a Business

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

Associate to said other Covered Entities provided that the purpose of such aggregation is to provide the Covered Entity with data analyses to the Health Care Operations of the Covered Entity. Under no circumstances may the Business Associate disclose Protected Health Information of one Covered Entity to another Covered Entity absent the explicit written authorization and consent of the Privacy Officer or a duly authorized workforce member of the Covered Entity.

m. Business Associate may de-identify any and all Protected Health Information provided that the de-identification conforms to the requirements of 45 C.F.R. § 164.514(b). Pursuant to 45 C.F.R. § 164.502(d)(2), de-identified information does not constitute Protected Health Information and is not subject to the terms of this HIPAA Compliance Clause.

3. <u>Permitted Uses and Disclosures by the Business Associate</u>

a. Except as otherwise limited in this HIPAA Compliance Clause, the Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, the Covered Entity as specified in the Contract, provided that such use or disclosure would not violate the Privacy Rule if same activity were performed by the Covered Entity or would not violate the minimum necessary policies and procedures of the Covered Entity.

b. Except as otherwise limited in this HIPAA Compliance Clause, the Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

c. Except as otherwise limited in this HIPAA Compliance Clause, the Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate, provided that the disclosures are Required By Law, or the Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used, or further disclosed, only as Required By Law, or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it has knowledge that the confidentiality of the information has been breached.

d. Except as otherwise limited in this HIPAA Compliance Clause, the Business Associate may use Protected Health Information to provide Data Aggregation services to the Covered Entity as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B).

e. Business Associate may use Protected Health Information to report violations of the Law to the appropriate federal and District of Columbia authorities, consistent with 45 C.F.R. § 164.502(j)(1).

DC-WAP 000414

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

4.      Additional Obligations of the Business Associate

    a.   Business Associate shall submit a written report to the Covered Entity that identifies the files and reports that constitute the Designated Record Set of the Covered Entity.  Business Associate shall submit said written report to the Privacy Officer no later than thirty (30) days after the commencement of the HIPAA Compliance Clause.  In the event that Business Associate utilizes new files or reports which constitute the Designated Record Set, Business Associate shall notify the Covered Entity of said event within thirty (30) days of the commencement of the file's or report's usage.   The Designated Record Set file shall include, but not be limited to the identity of the following:

       i.      Name of the Business Associate of the Covered Entity;

       ii.     Title of the Report/File;

       iii.    Confirmation that the Report/File contains Protected Health Information (Yes or No);

       iv.    Description of the basic content of the Report/File;

       v.     Format of the Report/File (Electronic or Paper);

       vi.    Physical location of Report/File;

       vii.   Name and telephone number of current member(s) of the workforce of the Covered Entity or other District of Columbia Government agency responsible for receiving and processing requests for Protected Health Information; and

       viii.  Supporting documents if the recipient/personal representative has access to the Report/File.

5.      Sanctions

Business Associate agrees that its workforce members, agents and subcontractors who violate the provisions of the Privacy Rules or other applicable federal or state privacy law will be subject to discipline in accordance with Business Associate's personnel policies and procedures and applicable collective bargaining agreements.  Business Associate agrees to impose sanctions consistent with Business Associate's personnel policies and procedures and applicable collective bargaining agreements with respect to its workforce members, agents and subcontractors.  In the event Business Associate imposes sanctions against any member of its workforce, agents and subcontractors for violation of the provisions of the Privacy Rules or other applicable federal or state privacy laws, the Business Associate shall inform the District Privacy Official or the agency Privacy Officer of the imposition of sanctions.

6.      Obligations of the Covered Entity

    a.      The Covered Entity shall notify the Business Associate of any limitation(s) in its Notice of Privacy Practices of the Covered Entity in accordance with 45 C.F.R. § 164.520, to the extent that such limitation may affect the use or disclosure of Protected Health Information by the Business Associate.

DC-WAP 000415

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

b.   The Covered Entity shall notify the Business Associate of any changes in, or revocation of, permission by the Individual to the use or disclosure of Protected Health Information, to the extent that such changes may affect the use or disclosure of Protected Health Information by the Business Associate.

c.   The Covered Entity shall notify the Business Associate of any restriction to the use or disclosure of Protected Health Information that the Covered Entity has agreed to in accordance with 45 C.F.R. § 164.522, to the extent that such restriction may affect the use or disclosure of Protected Health Information by the Business Associate.

7.   <u>Permissible Requests by Covered Entity</u>

Covered Entity shall not request the Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Rule if done by the Covered Entity.

8.   <u>Representations and Warranties.</u>

The Business Associate represents and warrants to the Covered Entity:

a.   That it is duly organized, validly existing, and in good standing under the laws of the jurisdiction in which it is organized or licensed, it has the full power to enter into this HIPAA Compliance Clause and it, its employees, agents, subcontractors, representatives and members of its workforce are licensed and in good standing with the applicable agency, board, or governing body to perform its obligations hereunder, and that the performance by it of its obligations under this HIPAA Compliance Clause has been duly authorized by all necessary corporate or other actions and will not violate any provision of any license, corporate charter or bylaws;

b.   That it, its employees, agents, subcontractors, representatives and members of its workforce are in good standing with the District of Columbia, that it, its employees, agents, subcontractors, representatives and members of its workforce will submit a letter of good standing from the District of Columbia, and that it, its employees, agents, subcontractors, representatives and members of its workforce have not been de-barred from being employed as a contractor by the federal government or District of Columbia;

c.   That neither the execution of this HIPAA Compliance Clause, nor its performance hereunder, will directly or indirectly violate or interfere with the terms of another agreement to which it is a party, or give any governmental entity the right to suspend, terminate, or modify any of its governmental authorizations or assets required for its performance hereunder. The Business Associate represents and warrants to the Covered Entity that it will not enter into any agreement the execution or performance of which would violate or interfere with this HIPAA Compliance Clause;

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

d. That it is not currently the subject of a voluntary or involuntary petition in bankruptcy, does not currently contemplate filing any such voluntary petition, and is not aware of any claim for the filing of an involuntary petition;

e. That all of its employees, agents, subcontractors, representatives and members of its workforce, whose services may be used to fulfill obligations under this HIPAA Compliance Clause are or shall be appropriately informed of the terms of this HIPAA Compliance Clause and are under legal obligation to the Business Associate, by contract or otherwise, sufficient to enable the Business Associate to fully comply with all provisions of this HIPAA Compliance Clause; provided that modifications or limitations that the Covered Entity has agreed to adhere to with regard to the use and disclosure of Protected Health Information of any individual that materially affects or limits the uses and disclosures that are otherwise permitted under the Privacy Rule will be communicated to the Business Associate, in writing, and in a timely fashion;

f. That it will reasonably cooperate with the Covered Entity in the performance of the mutual obligations under this Agreement;

g. That neither the Business Associate, nor its shareholders, members, directors, officers, agents, subcontractors, employees or members of its workforce have been excluded or served a notice of exclusion or have been served with a notice of proposed exclusion, or have committed any acts which are cause for exclusion, from participation in, or had any sanctions, or civil or criminal penalties imposed under, any federal or District healthcare program, including but not limited to Medicare or Medicaid, or have been convicted, under federal or District law (including without limitation following a plea of *nolo contendere* or participation in a first offender deferred adjudication or other arrangement whereby a judgment of conviction has been withheld), of a criminal offense related to (a) the neglect or abuse of a patient, (b) the delivery of an item or service, including the performance of management or administrative services related to the delivery of an item or service, under a federal or District healthcare program, (c) fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct in connection with the delivery of a healthcare item or service or with respect to any act or omission in any program operated by or financed in whole or in part by any federal, District or local government agency, (d) the unlawful, manufacture, distribution, prescription or dispensing of a controlled substance, or (e) interference with or obstruction of any investigation into any criminal offense described in (a) through (d) above. The Business Associate further agrees to notify the Covered Entity immediately after the Business Associate becomes aware that any of the foregoing representations and warranties may be inaccurate or may become incorrect.

9. <u>Term and Termination</u>

a. *Term.* The requirements of this HIPAA Compliance Clause shall be effective as of the date of the contract award, and shall terminate when all of the Protected Health Information provided by the Covered Entity to the Business Associate, or created or received by the Business Associate on behalf of the

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

Covered Entity, is confidentially destroyed or returned to the Covered Entity within five (5) Business Days of its request, with the Protected Health Information returned in a format mutually agreed upon by and between the Privacy Official and/or Privacy Officer or his or her designee and the appropriate and duly authorized workforce member of the Business Associate; or, if it is infeasible to return or confidentially destroy the Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section and communicated to the Privacy Official or Privacy Officer or his or her designee.

b.  *Termination for Cause.*  Upon the Covered Entity's knowledge of a material breach of this HIPAA Compliance Clause by the Business Associate, the Covered Entity shall either:

    i.  Provide an opportunity for the Business Associate to cure the breach or end the violation and terminate the Contract if the Business Associate does not cure the breach or end the violation within the time specified by the Covered Entity;

    ii.  Immediately terminate the Contract if the Business Associate breaches a material term of this HIPAA Compliance Clause and a cure is not possible; or

    iii.  If neither termination nor cure is feasible, the Covered Entity shall report the violation to the Secretary.

c.  *Effect of Termination.*

    i.  Except as provided in paragraph (ii) of this section, upon termination of the Contract, for any reason, the Business Associate shall return in a mutually agreed upon format or confidentially destroy all Protected Health Information received from the Covered Entity, or created or received by the Business Associate on behalf of the Covered Entity within five (5) Business Days of termination. This provision shall apply to Protected Health Information that is in the possession of ALL subcontractors, agents or workforce members of the Business Associate. The Business Associate shall retain no copies of Protected Health Information in any media form.

    ii.  In the event that the Business Associate determines that returning or destroying the Protected Health Information is infeasible, the Business Associate shall provide to the Covered Entity notification of the conditions that make the return or confidential destruction infeasible. Upon determination by the agency Privacy Officer that the return or confidential destruction of the Protected Health Information is infeasible, the Business Associate shall extend the protections of this HIPAA Compliance Clause to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or confidential destruction infeasible, for so long as the Business Associate maintains such Protected Health Information. The obligations outlined in Section 2. Obligations and Activities of Business Associate will remain in force to the extent applicable.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

10. Miscellaneous

a. *Regulatory References.* A reference in this HIPAA Compliance Clause to a section in the Privacy Rule means the section as in effect or as amended.

b. *Amendment.* The Parties agree to take such action as is necessary to amend this HIPAA Compliance Clause from time to time as is necessary for the Covered Entity to comply with the requirements of the Privacy Rule and HIPAA. Except for provisions required by law as defined herein, no provision hereof shall be deemed waived unless in writing and signed by duly authorized representatives of the Parties. A waiver with respect to one event shall not be construed as continuing, or as a bar to or waiver of any other right or remedy under this HIPAA Compliance Clause.

c. *Survival.* The respective rights and obligations of the Business Associate under Section 9. Term and Termination of this HIPAA Compliance Clause and Sections 9 and 20 of the Standard Contract Provisions for use with the District of Columbia Government Supply and Services Contracts, effective April 2003, shall survive termination of the Contract.

d. *Interpretation.* Any ambiguity in this HIPAA Compliance Clause shall be resolved to permit the Covered Entity to comply with applicable federal and District of Columbia laws, rules and regulations, and the Privacy Rule, and any requirements, rulings, interpretations, procedures, or other actions related thereto that are promulgated, issued or taken by or on behalf of the Secretary; provided that applicable federal and District of Columbia laws, rules and regulations shall supersede the Privacy Rule if, and to the extent that they impose additional requirements, have requirements that are more stringent than or provide greater protection of patient privacy or the security or safeguarding of Protected Health Information than those of HIPAA and its Privacy Rule.

The terms of this HIPAA Compliance Clause amend and supplement the terms of the Contract, and whenever possible, all terms and conditions in this HIPAA Compliance Clause are to be harmonized. In the event of a conflict between the terms of the HIPAA Compliance Clause and the terms of the Contract, the terms of this HIPAA Compliance Clause shall control; provided, however, that this HIPAA Compliance Clause shall not supersede any other federal or District of Columbia law or regulation governing the legal relationship of the Parties, or the confidentiality of records or information, except to the extent that the Privacy Rule preempts those laws or regulations. In the event of any conflict between the provisions of the Contract (as amended by this HIPAA Compliance Clause) and the Privacy Rule, the Privacy Rule shall control.

e. *No Third-Party Beneficiaries.* The Covered Entity and the Business Associate are the only parties to this HIPAA Compliance Clause and are the only parties entitled to enforce its terms. Except for the rights of Individuals, as defined herein, to access to and amendment of their Protected Health Information, and

DC-WAP 000419

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

Paragraphs (2)(f), (g) and (j), nothing in the HIPAA Compliance Clause gives, is intended to give, or shall be construed to give, or shall be construed to give or provide any benefit or right, whether directly, indirectly, or otherwise, to third persons unless such third persons are individually identified by name herein and expressly described as intended beneficiaries of the terms of this HIPAA Compliance Clause.

f.   *Compliance with Applicable Law.*  The Business Associate shall comply with all federal, District of Columbia laws, regulations, executive orders and ordinances, as they may be amended from time to time during the term of this HIPAA Compliance Clause and the Contract; to the extent they are applicable to this HIPAA Compliance Clause and the Contract.

g.   *Governing Law and Forum Selection.*   This Contract shall be construed broadly to implement and comply with the requirements relating to the Privacy Rule, and other applicable laws and regulations.  All other aspects of this Contract shall be governed under the laws of the District of Columbia. The Covered Entity and the Business Associate agree that all disputes which cannot be amicably resolved by the Covered Entity and the Business Associate regarding this HIPAA Compliance Clause shall be litigated by and before the District of Columbia Contract Appeals Board, the District of Columbia Court of Appeals, or the United States District Court for the District of Columbia having jurisdiction, as the case may be.   The Covered Entity and the Business Associate expressly waive any and all rights to initiate litigation, arbitration, mediation, negotiations and/or similar proceedings outside the physical boundaries of the District of Columbia and expressly consent to the jurisdiction of the above tribunals.

h.   *Indemnification.*  The Business Associate shall indemnify, hold harmless and defend the Covered Entity from and against any and all claims, losses, liabilities, costs, and other expenses incurred as a result or arising directly or indirectly out of or in connection with (a) any misrepresentation, breach of warranty or non-fulfillment of any undertaking of the Business Associate under this HIPAA Compliance Clause; and (b) any claims, demands, awards, judgments, actions and proceedings made by any person or organization, arising out of or in any way connected with the performance of the Business Associate under this HIPAA Compliance Clause.

i.   *Injunctive Relief.*  Notwithstanding any rights or remedies under this HIPAA Compliance Clause or provided by law, the Covered Entity retains all rights to seek injunctive relief to prevent or stop the unauthorized use or disclosure of Protected Health Information by the Business Associate, its workforce, any of its subcontractors, agents, or any third party who has received Protected Health Information from the Business Associate.

j.   *Assistance in litigation or administrative proceedings.*  The Business Associate shall make itself and any agents, affiliates, subsidiaries, subcontractors or its workforce assisting the Business Associate in the fulfillment of its obligations under this HIPAA Compliance Clause and the

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

in the event of litigation or administrative proceedings being commenced against the Covered Entity, its directors, officers or employees based upon claimed violation of HIPAA, the Privacy Rule or other laws relating to security and privacy, except where the Business Associate or its agents, affiliates, subsidiaries, subcontractors or its workforce are a named adverse party.

k.  *Notices.* Any notices between the Parties or notices to be given under this HIPAA Compliance Clause shall be given in writing and delivered by personal courier delivery or overnight courier delivery, or by certified mail with return receipt requested, to the Business Associate or to the Covered Entity, to the addresses given for each Party below or to the address either Party hereafter gives to the other Party. Any notice, being addressed and mailed in the foregoing manner, shall be deemed given five (5) Business Days after mailing. Any notice delivered by personal courier delivery or overnight courier delivery shall be deemed given upon notice upon receipt.

If to the Business Associate, to | If to the Covered Entity, to

_____     _____

_____     _____

_____     _____

Attention:_____     Attention:_____

Fax: _____     Fax: _____

l.  *Headings.* Headings are for convenience only and form no part of this HIPAA Compliance Clause and shall not affect its interpretation.

m.  *Counterparts; Facsimiles.* This HIPAA Compliance Clause may be executed in any number of counterparts, each of which shall be deemed an original. Facsimile copies hereof shall be deemed to be originals.

n.  *Successors and Assigns.* The provisions of this HIPAA Compliance Clause shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns, if any.

o.  *Severance.* In the event that any provision of this HIPAA Compliance Clause is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this HIPAA Compliance Clause will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this HIPAA Compliance Clause fails to comply with the then-current requirements of the Privacy Rule, such party shall notify the other Party in writing, in the manner set forth in <u>Section 10. Miscellaneous, Paragraph k. Notices</u>. Within ten (10) Business Days from receipt of notice, the Parties shall address in good faith such concern and amend the terms of this HIPAA Compliance Clause, if necessary to bring it into compliance. If, after thirty (30) days, the HIPAA Compliance Clause fails to comply with the Privacy Rule, then either Party has the right to terminate this HIPAA

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

p. *Independent Contractor.* The Business Associate will function as an independent contractor and shall not be considered an employee of the Covered Entity for any purpose. Nothing in this HIPAA Compliance Clause shall be interpreted as authorizing the Business Associate workforce, its subcontractor(s) or its agent(s) or employee(s) to act as an agent or representative for or on behalf of the Covered Entity.

q. *Entire Agreement.* This HIPAA Compliance Clause, as may be amended from time to time pursuant to Section 10. Miscellaneous, Paragraph b. Amendment, which incorporates by reference the Contract, and specific procedures from the District of Columbia Department of Health Privacy Policy Operations Manual, constitutes the entire agreement and understanding between the Parties and supersedes all prior oral and written agreements and understandings between them with respect to applicable District of Columbia and federal laws, rules and regulations, HIPAA and the Privacy Rule, and any rules, regulations, requirements, rulings, interpretations, procedures, or other actions related thereto that are promulgated, issued or taken by or on behalf of the Secretary.

## H.16    ENVIRONMENTALLY PREFERABLE JANITORIAL PRODUCTS

### H.16.1 Environmentally Preferable Product Goals

H.16.1.1  The District is seeking contractors to provide environmentally preferable and effective janitorial products that support the District's environmentally preferable purchasing (EPP) contracting initiative.

H.16.1.2  Environmentally preferable products are products and services that have a lesser or reduced effect on human health and the environment when compared with competing products or services that serve the same purpose. This comparison considers the life cycle of the product from raw material acquisition, production, manufacturing, packaging, distribution, re-use, operation, maintenance and disposal.

### H.16.2 Environmentally Preferable Janitorial Products

Janitorial products subject to the requirements of this clause include the following:

| | |
|---|---|
| All-purpose cleaner | General degreaser |
| Bathroom cleaner | General disinfectant |
| Bathroom deodorizers | Glass/window cleaner |
| Bathroom disinfectant | Graffiti remover |
| Bathroom hand cleanser/soap | Gum remover |
| Carpet cleaner | Lime and scale remover |
| Chrome and brass cleaner/polish | Solvent spotter |
| Floor stripper/finish | Urinal deodorizers/cleaner |
| Furniture polish | Wood floor (wax/cleaner/finish) |

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

### H.16.3 Prohibited Cleaning Products

Janitorial products with the following ingredients shall not be used because they pose an unacceptable risk to the person using the product, building occupants and the environment:

| | |
|---|---|
| Alkylphenol Ethoxylates | Naphthalene |
| Benzyl Alcohol | Nitrilotriacetic Acid |
| CFC-22; Chlorodifluoro Methan | Paradichloro benzene |
| Coconut Oil; Diethanolamine | Perchloroethylene |
| Diethanolamine | Tetrachloroethylene |
| HCFC-142b | Toluene |
| Lauric Acid Diethanolamine | Tributyl Tin |
| Methyl Chloroform;  1,1,1,-TCE | Trichlorethylene |
| Methyl Ethyl Ketone | |

### H.16.4 Janitorial Product Health and Environmental Requirements

The Contractor shall only provide janitorial products during the performance of this contract that meet the following requirements:

**H.16.4.1** Skin and Eye Irritation
   a)   This attribute refers to janitorial cleaning supplies containing chemicals that are either mildly or strongly irritating to the skin or eyes.  These substances are either highly alkalinic or acidic.

   b)   The Contractor shall use products with a pH between 7.2 and 7.8 which are acceptable alkaline levels.

**H.16.4.2** Food Chain Exposure
   a)   This attribute refers to ready-to-use cleaning products containing ingredients that are consumed by smaller aquatic plants and animals that increase in concentration through the food chain.
   b)   The Contractor shall use products when the bio-concentration factor (BCF) measured are less than 1,000.

**H.16.4.3** Air Pollution Potential
   a)   This attribute refers to janitorial products containing volatile organic compounds (VOC) that could form smog once in the atmosphere, thereby causing irritation of the eyes, nose, throat, lungs and asthma attacks.
   b)   The Contractor shall not use products containing volatile organic compounds (VOC) in concentrations that exceed 10% of the weight of the product.

**H.16.4.4** Fragrances
   a)   This attribute refers to products containing fragrances that are added to the formulation to improve an odor or to mask an offensive odor.  This attribute does not include natural odors associated with cleaning agents (e.g. a lemon odor).

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

b) The Contractor shall not use products containing fragrances that are added to the formulation to improve an odor or to mask an offensive odor.

### H.16.4.5 Dyes

a) This attribute refers to dyes that have been added to a formulation to enhance or change the product's color.

b) The Contractor shall use products without dyes.

### H.16.4.6 Minimizing Exposure to Concentrates

a) This attribute refers to the possibility that an end-user of a product could be exposed to a concentrated form of the product, thereby exposing the end-user to a greater health risk than that caused by exposure to the ready-to-use product.

b) If possible, the Contractor shall use products that are not in a concentrated form.

c) If the Contractor uses products in a concentrated form, it must be a part of a system by which chemicals are only transferred between closed containers, thereby reducing the risk of harm to the end-user.

### H.16.5  Packaging Reduced/Recyclable

**H.16.5.1** If possible, the Contractor shall use products that are in   reusable, refillable, or recyclable containers or are otherwise made from recycled content products.

**H.16.5.2** No products shall be delivered in aerosol cans.

**H.16.5.3** All products must be available in non-aerosol containers such as ready-to-use pump action sprays, air-charged refillable containers or spray bottles.

### H.16.6 Product Safety

**H.16.6.1** The Contractor shall be responsible for:

a) Any damage to personnel, buildings, furniture or   equipment directly traceable to their use or transportation of prohibited products.

b) Any spills or leaks that occur during the use or transportation of their products.

c) Evacuating and warning individuals that might be affected by any spills or leaks that occur when their products are being used or transported.

d) Paying the clean up cost for any spills or leaks that occur while they are using or transporting their products.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

## H.17   Price Adjustments

**H.17.1** In the event of technological enhancements, business process improvements, commodity substitutions or changes in service requirements, DOC reserves the right to re-negotiate the contractual price agreement.

## H.18   LIQUIDATED DAMAGES

### H.18.1 NON-PERFORMANCE CONSEQUENCES

For failure to meet the performance standards listed in Section C.3, the Contractor shall be subject to a corrective action plan or liquidated damages as outlined below, unless the failure to perform arises out of causes beyond the control and without the fault of the contractor as set forth in the Default provision, Section 8 of the Standard Contract Provisions (Attachment J.2).

### H.18.2 Liquidated Damages

In instances where the Contractor has failed to meet the performance standards listed below which have liquidated damages assigned, the liquidated damages will be imposed against the Contractor's monthly invoices.

The liquidated damages shall be applied from January 1, 2007. The DOC and Contractor will establish Acceptable Quality level during the transition period. The Contracting Officer will issue Contract Modification if necessary for the establish Acceptable Quality level. If the Contractor and the DOC cannot reach an agreement to establish Acceptable Quality level, the Contractor will have right to pursue with this issue to the Contracting Officer under the Disputes provision, Section 14 of the Standard Contract Provisions (Attachment J.2). The Liquidated Damages provisions included in the Contract shall apply until Acceptable Quality level is established between the Contractor and the DOC.

### H.18.3 Corrective Action Plans

In instances where the Contractor's failure to meet the performance standard(s) listed below are not retrospectively subject to corrective action, the liquidated damages specified will be imposed and the Contractor will be notified of the adjustment on the appropriate invoice. In instances where the failure to meet the specified performance standard(s) is retrospectively subject to corrective action, DOC will notify the Contractor not later than five (5) business days after the failure to perform has been identified.  The Contractor shall develop and submit a plan for DOC approval within three (3) business days of notification of failure to perform. The COTR will approve/disapprove/modify the plan within two (2) business days of receipt. Once approved, if the Contractor implements the plan within the specified timeframes, liquidated damages will not be imposed for the identified deficiency.  If corrective action is not implemented in accordance with the specified timeframes, liquidated damages will be imposed.  Notwithstanding the provisions of this section

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

the DOC may assess direct damages for services not provided or performance standards not met for requirements under this contract not included in this schedule.

## H.18.4 LIQUIDATED DAMAGES TABLE

| | Reference | Performance Requirement | Acceptable Quality Level | Surveillance Method and Frequency | Liquidated Damages ($/Occurrence unless otherwise stated)) |
|---|---|---|---|---|---|
| 1 | C.3.2 | Physical health assessment within 24 hours of receiving by a qualified health care provider (QHCP) | 100% | Independent and Joint Monthly and Quarterly Audits | $100.00 |
| 2 | C.3.2.2 | Place and read PPD within prescribed timeframes | 100% | Independent and Joint Monthly and Quarterly Audits | $300/Inmate |
| 3 | C.3.2.2 | Provide timely follow-up of positive PPD/RPR | 100% | Independent and Joint Monthly and Quarterly Audits | $500/Inmate |
| 4 | C.3.2.2 | Provide documented intervention and treatment plan for Inmates with abnormal BP or Hgb-A-1C (diabetic) | 100% | Independent and Joint Monthly and Quarterly Audits | $200/Inmate |
| 5 | C.3.2.2 | Provide PCP prophylaxis for known HIV Inmates when clinically indicated | 100% | Independent and Joint Monthly and Quarterly Audits | $500/day |
| 6 | C.3.2.2 | Medical Scratches of sentenced felons by reason of failure to have a current PPD or Chest X-ray | 100% | Independent and Joint Monthly and Quarterly Audits | $200 |
| 7 | C.3.2.2.7 | RPR completed at the time of screening by QHCP | 100% | Independent and Joint Monthly and Quarterly Audits | $100.00 |
| 8 | C.3.2.2.14 | First dose medication orders transcribed and administered before leaving the medical unit. | 100% | Independent and Joint Monthly and Quarterly Audits | $500.00 |
| 9 | C.3.3 | Triage of medical record request within 24 hrs | 100% | Independent and Joint Monthly and Quarterly Audits | $50.00 |
| 10 | C.3.5.1 | Medical orders transcribed and administered as prescribed | 100% | Independent and Joint Monthly and Quarterly Audits | $100.00 |
| 11 | C.3.5.1 | Annual physical performed within 7 days of the anniversary to promote health maintenance | 100% | Independent and Joint Monthly and Quarterly Audits | $200.00 |
| 12 | C.3.5.1 | Perform clinical follow-up of chronically ill Inmates including being seen at least every 90 days when incarcerated | 100% | Independent and Joint Monthly and Quarterly Audits | $100/day |
| 13 | C.3.5.1 | Orders verified and countersigned within 24 hours | 100% | Independent and Joint Monthly and Quarterly Audits | $100.00 |
| 14 | C.3.5.3 | Copy of medical record or summary sent to appropriate | 100% | Independent and Joint Monthly and Quarterly | $50.00 |

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

| | Reference | Performance Requirement | Acceptable Quality Level | Surveillance Method and Frequency | Liquidated Damages ($/Occurrence unless otherwise stated)) |
|---|---|---|---|---|---|
| 15 | C.3.8.2 | Failure to meet clinical/quality assurance performance standards detailed in the DOC Performance Measurement Tool | 100% | Independent and Joint Monthly and Quarterly Audits | $100 or as otherwise listed in Liquidated Damages schedule, whichever is greater |
| 16 | C.3.13 | Methadone count and log | 100% | Independent and Joint Monthly and Quarterly Audits | $100.00 |
| 17 | C.3.15.6 | Sharps and narcotics not inventoried on each shift | 100% | Independent and Joint Monthly and Quarterly Audits | $50.00 |
| 18 | C.3.15.6 | Out of balance sharps and narcotics not reported to shift commander | 100% | Independent and Joint Monthly and Quarterly Audits | $75.00 |
| 19 | C.3.18 | All health care encounter information entered into EMR | 100% | Independent and Joint Monthly and Quarterly Audits | $75.00 |
| 20 | C.3.18 | SOAP note on progress note endued into Centricity for each health care encounter | 100% | Independent and Joint Monthly and Quarterly Audits | $75.00 |
| 21 | C.3.21.1.1 | Implement approved Infection Control Plan | 100% | Independent and Joint Monthly and Quarterly Audits | $500/day |
| 22 | C.3.22.2 | Monthly inventory of 1st AID Kits and Defibrillator | 100% | Independent and Joint Monthly and Quarterly Audits | $75.00 |
| 23 | C.3.25 | Staffing complement falls below the institutional level as provided in the approved Staffing Plan, resulting in the compromise of the delivery of health care, (e.g., lack of sick call or dispensing of medications), | 100% | Independent and Joint Monthly and Quarterly Audits | The amount of the hourly rate plus fringe that the provider earns for each shift or part thereof that the staff position is left vacant or uncovered by comparable personnel. |
| 24 | C.3.25.11 | Maintain current credentials/licenses/ certifications for all providers | 100% | Independent and Joint Monthly and Quarterly Audits | $500/day |
| 25 | C.3.30.3 | Treatment plan completed and copy provided to Inmate at time of release | 100% | Independent and Joint Monthly and Quarterly Audits | $75.00 |
| 26 | H.10.1 | Principal Leadership positions and/or Key Personnel become vacant | 100% | Independent and Joint Monthly and Quarterly Audits | The amount of the hourly rate plus fringe that the provider earns for each shift or part thereof that the staff position is left vacant or uncovered by comparable personnel. |

**CONFIDENTIAL/ATTORNEYS' EYES ONLY**

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

**H.19    Required Subcontracting Set-Aside**

20% of the total dollar value of this contract has been set-aside for performance through subcontracting with businesses certified by the Small and Local Business Opportunity Commission (SLBOC) or the Department of Small and Local Business Development (DSLBD), as applicable, as local business enterprises, disadvantaged business enterprises, resident-owned businesses, local business enterprises with their principal offices located in an enterprise zone, small business enterprises, or longtime resident businesses.  Any prime contractor responding to this solicitation shall submit within 5 days of the contracting officer's request, a notarized statement detailing its subcontracting plan.  Once the plan is approved by the contracting officer, changes will only occur with the prior written approval of the contracting officer and the Director of DSLBD.

**H.20**    Subcontracting Plan

Any prime contractor responding to a solicitation in which there is an LBE, DBE, SBE, DZE, LRB, or ROB subcontracting set-aside, shall submit, within 5 days of the contracting officer's request, a notarized statement detailing its subcontracting plan. Each subcontracting plan shall include the following:

**H.20.1** A description of the goods and services to be provided by the LBEs, DBEs, SBEs, DZEs, LRBs, or ROBs;

**H.20.2** A statement of the dollar value, by type of business enterprise, of the bid or proposal that pertains to the subcontracts to be performed by the LBEs, DBEs, SBEs, DZEs, LRBs, or ROBs;

**H.20.3** The names and addresses of all proposed subcontractors who are LBEs, DBEs, SBEs, DZEs, LRBs, or ROBs;

**H.20.4** The name of the individual employed by the prime contractor who will administer the subcontracting plan, and a description of the duties of the individual;

**H.20.5** A description of the efforts the prime contractor will make to ensure that LBEs, DBEs, ROBs, SBEs, LRBs, or DZEs will have an equitable opportunity to compete for subcontracts;

**H.20.6** In all subcontracts that offer further subcontracting opportunities, assurances that the prime contractor will include a statement, approved by the contracting officer, that the subcontractor will adopt a subcontracting plan similar to the subcontracting plan required by the contract;

**H.20.7** Assurances that the prime contractor will cooperate in any studies or surveys that may be required by the contracting officer, and submit periodic reports, as requested by the contracting officer, to allow the District to determine the extent of compliance by the prime contractor with the subcontracting plan;

**H.20.8** List the type of records the prime contractor will maintain to demonstrate

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

subcontracting plan, and include assurances that the prime contractor will make such records available for review upon the District's request; and

**H.20.9** A description of the prime contractor's recent effort to locate LBEs, DBEs, SBEs, DZEs, LRBs, and ROBs, and to award subcontracts to them.

## H.21    Enforcement and Penalties for Willful Breach of Subcontracting Plan

The willful breach by a contractor of a subcontracting plan for utilization of local, small, or disadvantaged businesses in the performance of a contract, the failure to submit any required subcontracting plan monitoring or compliance report, or the deliberate submission of falsified data may be enforced by the DSLBD through the imposition of penalties, including monetary fines of $15,000 or 5% of the total amount of the work that the contractor was to subcontract to local, small, or disadvantaged businesses, whichever is greater, for each such breach, failure, or falsified submission.

DC-WAP 000429

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

## SECTION I – CONTRACT CLAUSES

### I.1    APPLICABILITY OF STANDARD CONTRACT PROVISIONS

The Standard Contract Provisions for use with District of Columbia Government
Supplies and Services Contracts dated November 2004 ("SCP"), are incorporated as part
of the contract resulting from this solicitation.   To obtain a copy of the SCP go to
www.ocp.dc.gov, click on OCP Policies under the heading "Information", then click on
"Standard Contract Provisions – Supplies and Services Contracts".

### I.2    CONTRACTS CROSSING FISCAL YEARS

Continuation of this contract beyond the current fiscal year is contingent upon future
fiscal appropriations.

### I.3    CONFIDENTIALITY OF INFORMATION

All information obtained by the Contractor relating to any employee or customer of the
District shall be kept in absolute confidence and shall not be used by the Contractor in
connection with any other matters, nor shall any such information be disclosed to any
other person, firm or corporation in accordance with District and Federal laws governing
the confidentiality of records.

### I.4    TIME

Time, if stated in a number of days, will include Saturdays, Sundays, and holidays, unless
otherwise stated herein.

### I.5    OTHER CONTRACTORS

The Contractor shall not commit or permit any act that will interfere with the
performance of work by another District Contractor or by any District employee.

### I.6    RIGHTS IN DATA

**I.6.1**    "Data," as used herein, means recorded information, regardless of the form or
media on which it may be recorded.  The term includes technical data and
computer software.  The term does not include information incidental to contract
administration, such as financial, administrative, cost or pricing, or management
information.

**I.6.1.1**    The term "technical data", as used herein, means recorded information,
regardless of form or characteristic, of a scientific or medical nature.  It
may, for example, document research, experimental, developmental or
medical work, or be usable or used to define a design or process or to
procure, produce, support, maintain, or operate.  The data may be
graphic or pictorial delineations in media such as drawings or
photographs, text in specifications or related performance or design type
documents, or computer files, databases, reports or printouts.  Examples

DC-WAP 000430

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

of technical data include research and medical data, drawings and associated notes, medical documentation, medical standards, flow sheets, progress notes, charts, manuals, reports, laboratory and radiology tests and results and related information. Technical data does not include computer software or financial, administrative, cost and pricing, and management data or other information incidental to contract administration.

I.6.1.2    The term "computer software", as used herein, means computer programs, records, reports, and electronic databases. "Computer programs", as used herein means a series of instructions or statements in a form acceptable to a computer, designed to cause the computer to execute an operation or operations. "Computer programs" include operating systems, assemblers, compilers, interpreters, data management systems, utility programs, sort/merge programs, and automated data processing equipment maintenance diagnostic programs, as well as applications programs such as inventory control and medical or scientific analysis programs. Computer programs may be either machine-dependent or machine-independent, and may be general-purpose in nature or designed to satisfy the requirements of a particular user.

I.6.1.3    The term "computer databases", as used herein, means a collection of data in a form capable of being processed and operated on by a computer.

I.6.2    All data first produced in the performance of this contract shall be the sole property of the District. Contractor hereby acknowledges that all data including, without limitation, computer program codes produced by Contractor for the District under this contract are works made for hire and are the sole property of the District; but, to the extent any such data may not, by operation of law, be works made for hire, Contractor hereby transfers and assigns to the District the ownership of copyright in such works, whether published or unpublished. The Contractor agrees to give the District all assistance reasonably necessary to perfect such rights including, but not limited to, the works and supporting documentation and the execution of any instrument required to register copyrights. The Contractor agrees not to assert any rights at common law or in equity in such data. The Contractor shall not publish or reproduce such data in whole or in part or in any manner or form, or authorize others to do so, without written consent of the District until such time as the District may have released such data to the public.

I.6.3    The District shall have restricted rights in data, including computer software and all accompanying documentation, manuals and instructional materials listed or described in a license or agreement made a part of the contract, which the parties have agreed will be furnished with restricted rights, provided however, notwithstanding any contrary provision in any such license or agreement, such restricted rights shall include, as a minimum, the right to:

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

**I.6.3.1**   Use the computer software and all accompanying documentation and manuals or instructional materials with the computer for which or with which it was acquired, including use at any District installation to which the District may transfer the computer;

**I.6.3.2**   Use the computer software and all accompanying documentation and manuals or instructional materials with a backup computer if the computer for which or with which it was acquired are inoperative;

**I.6.3.3**   Copy computer programs for safekeeping (archives) or backup purposes; and

**I.6.3.4**   Modify the computer software and all accompanying documentation and manuals or instructional materials, or combine it with other software, subject to the provision that the modified portions shall remain subject to these restrictions.

**I.6.4**   The restricted rights set forth in Section I.6.3 are of no effect unless:

a. The Contractor with the following legend marks the computer software:

**RESTRICTED RIGHTS LEGEND**
Use, duplication, or disclosure is subject to restrictions stated in
Contract No._____
With _____(Contractor's Name) and

b. If the data is computer software, the related computer software documentation includes a prominent statement of the restrictions applicable to the computer software. The Contractor may not place any legend on the computer software indicating restrictions on the District's rights in such software unless the restrictions are set forth in a license or agreement made a part of the contract prior to the delivery date of the software. Failure of the Contractor to apply a restricted rights legend to such computer software shall relieve the District of liability with respect to such unmarked software.

**I.6.5**   In addition to the rights granted in Section I.6.3 above, the Contractor hereby grants to the District a nonexclusive, paid-up license throughout the world, of the same scope as restricted rights set forth in Section I.6.3 above, under any copyright owned by the Contractor, in any work of authorship prepared for or acquired by the District under this contract. Unless written approval of the contracting Officer is obtained, the Contractor shall not include in technical data or computer software prepared for or acquired by the District under this contract any works of authorship in which copyright is not owned by the Contractor without acquiring for the District any rights necessary to perfect a copyright license of the scope specified in the first sentence of this paragraph.

**I.6.6**   Whenever any data, including computer software, are to be obtained from a subcontractor under this contract, the Contractor shall use Section I.6 in the

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

diminish the District's or the Contractor's rights in that subcontractor data or computer software which is required for the District.

I.6.7   For all computer software furnished to the District with the rights specified in Section I.6.2, the Contractor shall furnish to the District, a copy of the source code with such rights of the scope specified in Section I.6.2. For all computer software furnished to the District with the restricted rights specified in Section I.6.3, the District, if the Contractor, either directly or through a successor or affiliate shall cease to provide the maintenance or warranty services provided the District under this contract or any paid-up maintenance agreement, or if Contractor should be declared bankrupt or insolvent by the court if competent jurisdiction, shall have the right to obtain, for its own and sole use only, a single copy of the then current version of the source code supplied under this contract, and a single copy of the documentation associated therewith, upon payment to the person in control of the source code the reasonable cost of making each copy.

I.6.8   The Contractor shall indemnify and save and hold harmless the District, its officers, agents and employees acting within the scope of their official duties against any liability, including costs and expenses, (i) for violation of proprietary rights, copyrights, or rights of privacy, arising out of the publication, translation, reproduction, delivery, performance, use or disposition of any data furnished under this contract, or (ii) based upon any data furnished under this contract, or based upon libelous or other unlawful matter contained in such data.

I.6.9   Nothing contained in this clause shall imply a license to the District under any patent, or be construed as affecting the scope of any license or other right otherwise granted to the District under any patent.

I.6.10  Paragraphs I.6.3, I.6.4, I.6.5, I.6.8 and I.6.9 above are not applicable to material furnished to the Contractor by the District and incorporated in the work furnished under contract, provided that the Contractor identifies such incorporated material at the time of delivery of such work

## I.7    SUBCONTRACTS

The Contractor hereunder shall not subcontract any of the Contractor's work or services to any subcontractor without the prior written consent of the Contracting Officer. The District encourages the use of certified local, small, disadvantaged, resident-owned, enterprise zoned or minority subcontractors to the maximum extent practicable with the efficient performance of the contract. Any work or service so subcontracted shall be performed pursuant to a subcontract agreement, which the District shall have the right to review and approve prior to its execution by the Contractor. Any such subcontract shall specify that the Contractor and the subcontractor shall be subject to every provision of this contract. Notwithstanding any such subcontract approved by the District, the Contractor shall remain liable to the District for all Contractor's work and services required hereunder.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

## I.8     EQUAL EMPLOYMENT OPPORTUNITY

In accordance with the District of Columbia Administrative Issuance System, Mayor's Order 85-85 dated June 10, 1985, the forms for completion of the Equal Employment Opportunity Information Report are incorporated herein as Attachment J.3. An award cannot be made to an Offeror who has not satisfied the equal employment requirements as set forth by the Office of Local Business Development.

## I.9     CONTINUITY OF SERVICES

I.9.1     The Contractor recognizes that the services provided under this contract are vital to the District of Columbia and must be continued without interruption and that, upon contract expiration or termination, a successor, either the District Government or another contractor, at the District's option, may continue to provide these services. To that end, the Contractor agrees to:

a.   Furnish phase-out, phase-in (transition) training; and
b.   Exercise its best efforts and cooperation to effect an orderly and efficient transition to a successor.

I.9.2     The Contractor shall, upon the Contracting Officer's written notice, perform the end of contract transition services within 45 days prior to the time that the contract expires. Once the contract expires, the contractor is not be bound to furnish transition services.

a.   This plan shall specify a training program for the successor's personnel and dates for transferring responsibilities for each division of work described in the plan, and shall be subject to the Contracting Officer's written approval;
b.   The Contractor shall provide, during the said transition period, sufficient experienced personnel to ensure that the services provided under this contract are maintained at the same level of effectiveness and efficiency;
c.   To facilitate a smooth transition, the Contractor shall allow as many personnel as may be needed to remain on the job to help the successor maintain the continuity and consistency of the services required by this contract. The Contractor also shall disclose, with the consent of the employees, necessary personnel records and allow the successor to conduct onsite interviews with those employees. For those personnel who are interested in accepting a position with the successor and are selected by the successor, the Contractor shall release them at a mutually agreeable date and negotiate transfer of their earned fringe benefits to the successor; and
d.   The Contractor shall not be reimbursed for transition costs (i.e., costs incurred within the agreed period after contract expiration/termination that result from transition operations) unless the Contracting Officer executes a modification to the contract. The modification will specify the amount to be paid for transition costs.

I.9.3     Upon termination or expiration of this contract, the Contractor shall deliver all Inmate medical records to the COTR.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

I.9.4   Upon termination or expiration of this contract, all software licenses for MATS utilized for this contract shall be transferred to the District.

## I.10   INSURANCE

The Contractor shall obtain the minimum insurance coverage set forth below and provide the District with Certificates of insurance naming the District of Columbia as an additional insured, unless otherwise stated, and delivered to the District's Contracting Officer at the address provided in Section G.7 of the contract. Certificates shall be presented on a standard ACORD form for the below coverage within ten (10) calendar days after being called upon by the District to do so and such insurance shall be maintained throughout the contract period. The policies of insurance shall provide for at least thirty (30) days written notice to the District prior to their termination or material alteration. The Contractor shall provide Certificates of Insurance indicating renewal or extension of the period of coverage within ten (10) Business Days of the effective date of the renewal. Any deductibles or self-insured retentions shall be declared in writing to OCP; OCP approval is required for any amounts over $25,000.

All insurance shall be written with responsible companies licensed by the District of Columbia's Department of Insurance and Securities Regulation, 810 1st St. N.E. #701, Washington, DC 20002. Insurance shall be placed with District of Columbia admitted insurers with a current A.M. Best's rating no less than A-, unless otherwise approved.

For any claims related to the Services, the Contractor's insurance coverage shall be primary insurance as respects the District, its subsidiaries, officials, employees. Any insurance of self-insurance maintained by the District of Columbia, its subsidiaries, officials, employees shall be in excess of the Contractor's insurance and shall not contribute with it.

I.10.1   **Comprehensive General Liability:** Coverage with $1,000,000 limits per occurrence for personal injury and property damage, which will include products/completed operations, personal injury and advertising, and abuse/sexual molestation for all of Contractor's employees or subcontractors. Abuse/sexual molestation may be covered under the healthcare professional policy provided it applies to all of the Contractor's employees and subcontractors. This coverage is required to extend to services performed at the CDF or at any other sites where services will be provided under the Contract.

I.10.2   **Automobile Liability Insurance:** Coverage for all owned, non-owned, and hired vehicles used in connection with the performance of the contract. The policy shall provide a combined single limit of $1,000,000 per occurrence, and $200,000 per person, for bodily injury, and $20,000 for property damage, uninsured motorist coverage not less than 1,000,000, with deductibles not to exceed $5,000.

I.10.3   **Healthcare Professional Liability (Medical Malpractice Insurance):** The Contractor (or providers) must carry healthcare professional liability insurance in the amount of $1,000,000 per occurrence and $3,000,000 in aggregate. Should the Contractor carry "claims made" insurance; the Contractor must purchase a "tail coverage" for five years following the end of the contract to cover all

DC-WAP 000435

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

Federal Tort Claims Act pursuant to Section 224(g) of the Public Health Service Act shall satisfy this requirement.

**I.10.4  Employer's Liability**: The Contractor shall carry employer's liability of at least one million dollars ($1,000,000.00).

**I.10.5  Workers' Compensation**: The Contractor shall carry statutory workers' compensation insurance covering all of its employees employed upon the premises and in connection with its other operations pertaining to this contract, and the Contractor agrees to comply at all times with the provisions of the workers' compensation laws of the District of Columbia.

**I.11    CONTRACTS IN EXCESS OF $1 MILLION DOLLARS**

Any contract in excess of $1,000,000 shall not be binding or give rise to any claim or demand against the District until approved by the Council of the District of Columbia and signed by the Contracting Officer.

**I.12    MULTIYEAR CONTRACT TERMS**

This is a multi-year (three-years) contract for services for which some of the funds would otherwise be available for obligation only within the fiscal year for which appropriated. If these funds are not made available for the continuation of the contract into a subsequent fiscal year, the contract shall be canceled or terminated in accordance with D.C. Official Code §2-303.13(c). In accordance with D.C. Official Code §1-301.05a and 1-204.51(c), the Council of the District of Columbia must approve award of any contract that has obligations that extend beyond the fiscal year for which appropriated.

**I.13    Order of Precedence and Documents Incorporated into the Contract by Reference.**

The following documents have been incorporated into this contract and made a part thereof in the following order of priority. Any inconsistency in the contract shall be resolved by giving precedence in the following order of priority:

1. The contract sections B through I.
2. The Standard Contract Provisions for use with the District of Columbia Supply and Services Contracts dated November 2004.
3. The Request for Proposals No. DCFL-2006-R-6001, including amendments.
4. The Contractor's Response to DOC Review Committee Comments dated June 1, 2006 and other papers and documents referred to in any of the foregoing shall constitute the formal contract between the Offeror and the District.
5. The Contractor's Technical Proposals dated May 12, 2006, excluding page numbers 4 through 8.
6. The Contractor's Price Proposal dated May 18, 2006.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

# SECTION J - LIST OF ATTACHMENTS

The following documents are attached to the contract.

| Attachment | Title |
|---|---|
| J.1 | U. S. Department of Labor Wage Determination No. 94-2103, Revision No. 35, dated May 23, 2006 |
| J.2 | Government of the District of Columbia Standard Contract Provisions for Use with the Supply and Service Contract, dated November 2004 |
| J.3 | Required Staffing |
| J.4 | DOC Program Statements as listed in Section C.1.1 |
| J.4.1 | DOC Program Statement Medical Management, 6000.1B |
| J.4.2 | DOC Program Statement Key Control, 5320.1A |
| J.4.3 | DOC Program Statement Tool Control, 5022.1B |
| J.4.4 | DOC Program Statement Suicide Prevention, 6080.2B |
| J.4.5 | DOC Program Statement Psychiatric Evaluation, 6014.6A |
| J.4.6 | DOC Program Statement Drug/Alcohol Testing (MEDAT) Mandatory Employee, 6050.4A |
| J.4.7 | DOC Program Statement Record Retention, 2000.2 |
| J.4.8 | DOC Program Statement Health Information Privacy, HIPAA, 1300.3 |
| J.4.9 | DOC Program Statement Technical Reference Manual (Health Privacy Information Operations), 1300.3 |
| J.4.10 | DOC Program Statement "ADA: Communications for Deaf & Hearing Impaired," 3800.3 |
| J.4.11 | DOC Program Statement Environmental Safety and Sanitation, 2920.4 |
| J.4.12 | DOC Program Statement Accountability for Inmates, 5010.2B |
| J.4.13 | DOC Program Statement Contraband Control, 5010.3B |
| J.4.14 | DOC Policy Information Security, 2420.2 |

DCFL-2006-D-6001
Community Oriented Correctional 1.. .h Care for Department of Corrections

# SECTION K: REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS

## K.1   AUTHORIZED NEGOTIATORS

The offeror represents that the following persons are authorized to negotiate on its behalf with the District in connection with this request for proposals:  (list names, titles, and telephone numbers of the authorized negotiators).

Vincent A. Keane, Chief Executive Officer, (202) 518-6409

## K.2   TYPE OF BUSINESS ORGANIZATION

**K.2.1**   The offeror, by checking the applicable box, represents that
(a)   It operates as:

___ a corporation incorporated under the laws of the State of: _____
___ an individual,
___ a partnership,
_X_ a nonprofit organization, or
___ a joint venture.

(b)   If the offeror is a foreign entity, it operates as:

___ an individual,
___ a joint venture, or
___ a corporation registered for business in _____
(Country)

## K.3   CERTIFICATION AS TO COMPLIANCE WITH EQUAL OPPORTUNITY OBLIGATIONS

Mayor's Order 85-85, "Compliance with Equal Opportunity Obligations in Contracts", dated June 10, 1985 and the Office of Human Rights' regulations, Chapter 11, "Equal Employment Opportunity Requirements in Contracts", promulgated August 15, 1986 (4 DCMR Chapter 11, 33 DCR 4952) are included as a part of this solicitation and require the following certification for contracts subject to the order. Failure to complete the certification may result in rejection of the offeror for a contract subject to the order. I hereby certify that I am fully aware of the content of the Mayor's Order 85-85 and the Office of Human Rights' regulations, Chapter 11, and agree to comply with them in performance of this contract.

Date   7/10/06

Offeror  Unity Health Care, Inc.

Name  Vincent A. Keane                          Title   Chief Executive Officer

Signature  Vincent A. Keane

Y      has not participated in a previous contract or subcontract subject

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

reports, and representations indicating submission of required reports signed by proposed suboffelors. (The above representations need not be submitted in connection with contracts or subcontracts, which are exempt from the Mayor's Order.)

## K.4   BUY AMERICAN CERTIFICATION

The offeror hereby certifies that each end product, except the end products listed below, is a domestic end product (See Clause 23 of the SCP, "Buy American Act"), and that components of unknown origin are considered to have been mined, produced, or manufactured outside the United States.

EXCLUDED END PRODUCTS
COUNTRY OF ORIGIN

## K.5   DISTRICT EMPLOYEES NOT TO BENEFIT CERTIFICATION

Each offeror shall check one of the following:

___X___   No person listed in Clause 13 of the SCP, "District Employees Not To Benefit" will benefit from this contract.

_____   The following person(s) listed in Clause 13 may benefit from this contract. For each person listed, attach the affidavit required by Clause13 of the SCP.

## K.6   CERTIFICATION OF INDEPENDENT PRICE DETERMINATION

(a) Each signature of the offeror is considered to be a certification by the signatory that:

1) The prices in this contract have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any offeror or competitor relating to:

    (i)   those prices
    (ii)   the intention to submit a contract, or
    (iii)   the methods or factors used to calculate the prices in the contract.

2) The prices in this contract have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before contract opening unless otherwise required by law; and

3) No attempt has been made or will be made by the offeror to induce any other concern to submit or not to submit a contract for the purpose of restricting competition.

(b) Each signature on the offer is considered to be a certification by the signatory that the signatory;

DCFL-2006-D-6001
Community Oriented Correctional ł. .n Care for Department of Corrections

1) Is the person in the offeror's organization responsible for determining the prices being offered in this contract, and that the signatory has not participated and will not participate in any action contrary to subparagraphs (a)(1) through (a)(3) above; or

2) Has been authorized, in writing, to act as agent for the following principals in certifying that those principals have not participated, and will not participate in any action contrary to subparagraphs (a)(1) through (a)(3) above:

**Vincent A. Keane, Chief Executive Officer**
*(insert full name of person(s) in the organization responsible for determining the prices offered in this Contract and the title of his or her position in the offeror's organization);*

As an authorized agent, does certify that the principals named in subdivision (b)(2) have not participated, and will not participate, in any action contrary to subparagraphs (a)(1) through (a)(3) above; and

As an agent, has not participated, and will not participate, in any action contrary to subparagraphs (a)(1) through (a)(3) above.

(c)  If the offeror deletes or modifies subparagraph (a)(2) above, the offeror must furnish with its offer a signed statement setting forth in detail the circumstances of the disclosure.

## K.7 TAX CERTIFICATION

Each offeror must submit with its offer, a sworn Tax Certification Affidavit, incorporated herein as Attachment J.4.

## K.8 METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS RIDER CLAUSE

USE OF CONTRACT(S) BY MEMBERS COMPRISING THE METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS PURCHASING OFFICERS' COMMITTEE.

If authorized by the bidder(s) resultant contract(s) will be extended to any or all of the listed members as designated by the bidder to purchase at contract prices in accordance with contract terms.

A.  Any member utilizing such contract(s) will place its own order(s) with the successful contractor. There shall be no obligation on the part of any participating member to utilize the contract(s).

B.  A negative reply will not adversely affect consideration of your bid/proposal.

C.  It is the awarded vendor's responsibility to notify the members shown below of the availability of the Contractor(s).

DCFL-2006-D-6001
Community Oriented Correctional l.  ..n Care for Department of Corrections

D.  Each participating jurisdiction has the option of executing a separate contract with the awardees. Contracts entered into with a participating jurisdiction may contain general terms and conditions unique to that jurisdiction including, by way of illustration and not limitation, clauses covering minority participation, non-discrimination, indemnification, naming the jurisdiction as an additional insured under any required Comprehensive General Liability policies, and venue. If, when preparing such a contract, the general terms and conditions of a jurisdiction are unacceptable to the awardee(s), the awardee(s) may withdraw its extension of the award to that jurisdiction.

E.  The issuing jurisdiction shall not be held liable for any costs or damages incurred by another jurisdiction as a result of any award extended to that jurisdiction by the awardees.

## OFFEROR'S AUTHORIZATION TO EXTEND CONTRACT:

| YES | NO | JURISDICTION | YES | NO | JURISDICTION |
|---|---|---|---|---|---|
| ___ | ___ | Alexandria, Virginia | ___ | ___ | Met. Wash. Airports Authority |
| ___ | ___ | Alexandria Public School | ___ | ___ | Met. Wash. Council of Government |
| ___ | ___ | Arlington County, Virginia | ___ | ___ | Montgomery College |
| ___ | ___ | Arlington County Public School | ___ | ___ | Montgomery County, Maryland |
| ___ | ___ | Bowie, Maryland | ___ | ___ | Mont. County Public Schools |
| ___ | ___ | Charles County Public Schools | | | |
| ___ | ___ | College Park, Maryland | ___ | ___ | Prince George's County, Maryland |
| ___ | ___ | Culpeper County, Virginia | ___ | ___ | Prince George's Public Schools |
| ___ | ___ | District of Columbia | ___ | ___ | Prince William County, Virginia |
| ___ | ___ | District of Columbia Courts | | | |
| ___ | ___ | District of Columbia Public Schools | ___ | ___ | Prince William Public Schools |
| ___ | ___ | D.C. Water & Sewer Authority. | ___ | ___ | Prince William County Service |
| | | Authority | | | Rockville, Maryland |
| ___ | ___ | Fairfax, Virginia | ___ | ___ | Spotsylvania County Schools |
| | | | ___ | ___ | Stafford County, Virginia |
| ___ | ___ | Fairfax County, Virginia | ___ | ___ | Takoma Park, Maryland |
| ___ | ___ | Fairfax County Water Authority | ___ | ___ | Vienna, Virginia |
| ___ | ___ | Falls Church, Virginia | ___ | ___ | Wash. Metro. Area Transit Authority |
| ___ | ___ | Fauquier City. Sch. & Govt., VA | ___ | ___ | Wash. Suburban Sanitary Comm. |
| ___ | ___ | Frederick County, Maryland | ___ | ___ | Winchester Public Schools |
| ___ | ___ | Manassas Public Schools | ___ | ___ | Herndon, Virginia |
| ___ | ___ | Gaithersburg, Maryland | ___ | ___ | Loudoun County, Virginia |
| ___ | ___ | Greenbelt, Maryland | | | |
| ___ | ___ | Manassas, Virginia | | | |
| ___ | ___ | MD-Nat. Cap. Park & Plng. Comm. | | | |

_____
Vendor Name

EXHIBIT 8

| AMENDMENT OF SOLICITATION / MODIFICATION OF CONTRACT | | 1. Contract Number DCFL-2006-D-6001 | Page of Pages |
|---|---|---|---|
| | | | 1    2 |

| 2. Modification Number M0018 | 3. Effective Date October 1, 2011 | 4. Requisition/Purchase Request No. | 5. Solicitation Caption Comprehensive Health Care Services |
|---|---|---|---|

| 6. Issued by: | Code | LT | 7. Administered by (If other than line 6) |
|---|---|---|---|
| Office of Contracting and Procurement Financial Legal Consulting Group 441 4th Street, NW, Suite 700S Washington, DC 20001 | | | Department of Corrections 1923 Vermont Avenue, N.W. Washington, DC 20001 |

| 8. Name and Address of Contractor (No. street, city, county, state and zip code) | | 9A. Amendment of Solicitation No. |
|---|---|---|
| Unity Health Care, Inc. 3020 14th Street, N.W. Washington, D.C. 20009 Attn: Vincent A. Keane | | 9B. Dated (See Item 11) |
| | X | 10A. Modification of Contract/Order No. DCFL-2006-D-6001 |

| Code | DUNS: 18-714-4019 | TIN: | FEIN: 52-1572431 | 10B. Dated (See Item 13) July 19, 2006 |
|---|---|---|---|---|

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in item 14. The hour and date specified for receipt of Offers ☐ is extended ☐ is not extended. Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) BY separate letter or fax which includes a reference to the solicitation and amendment number. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such may be made by letter or fax, provided each letter or telegram makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. Accounting and Appropriation Data (If Required)  To be cited on individual orders issued on behalf of participating agencies

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS ,**
**IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14**

| | A. This change order is issued pursuant to (Specify Authority): The changes set forth in Item 14 are made in the contract/order no. in item 10A. |
|---|---|
| | B. The above numbered contract/order is modified to reflect the administrative changes (such as changes in paying office, appropriation data etc.) set forth in item 14, pursuant to the authority of 27 DCMR, Chapter 36, Section 3601.2. |
| | C. This supplemental agreement is entered into pursuant to authority of: |
| X | D. Other (Specify type of modification and authority) 27 DCMR, Chapter 20, Section 2005.6(b) |

**E. IMPORTANT:**    Contractor ☐ is not ☒ is required to sign this document and return 1 copy to the issuing office.

14. Description of Amendment/Modification (Organized by UCF Section headings, including solicitation/contract subject matter where feasible.)

In accordance with 27 DCMR, Section 2005.6(b), the District hereby extends the Contract for the period of October 1, 2011 through September 30, 2012.

1. The term of the Contract is hereby extended from October 1, 2011 through September 30, 2012.
2. The Contract value is ⬚Redacted⬚ for the period of October 1, 2011 through September 30, 2012.
3. The cumulative Contract value is hereby increased from ⬚Redacted⬚ by ⬚Redacted⬚ to ⬚Redacted⬚
4. Wage Determination No. 2005-2103, Revision No. 11, dated June 13, 2011, is made part of this Contract.
5. Insert B.2.4

Except as provided herein, all terms and conditions of the document is referenced in Item 9A or 10A remain unchanged and in full force and effect.

| 15A. Name and Title of Signer (Type or print) Vincent A. Keane, President and CEO | 16A. Name of Contracting Officer Courtney Lattimore | |
|---|---|---|
| 15B. Name of Contractor (Signature of person authorized to sign) | 15C. Date Signed 9/22/11 | 16B. District of Columbia (Signature of Contracting Officer) | 16C. Date Signed 9/29/11 |

DCFL-2006-D-6001-M0018

**B.2.4**        **CONTRACT EXTENSION (October 1, 2011 through September 30, 2012)**

| CLIN | ITEM DESCRIPTION | UNIT PRICE | UNIT | QUANTITY | TOTAL ANNUAL PRICE |
|------|-----------------|-----------|------|----------|--------------------|
| 3001AA | Provide Comprehensive Health Care Services for the Department of Corrections Inmates population in accordance with Section C.3. | Redacted | Month | 12 | Redacted |

DC-WAP 000562

EXHIBIT 9



# DISTRICT OF COLUMBIA
# DEPARTMENT OF CORRECTIONS

# PROGRAM STATEMENT

| | |
|---|---|
| **OPI:** | **DIRECTOR** |
| **Number:** | **3800.3** |
| **Date:** | **September 30, 2003** |
| **Subject:** | **ADA:  Communications for Deaf and Hearing Impaired** |

1. **PURPOSE AND SCOPE.**   To establish and implement a program within the DC Department of Corrections (DOC) that provides auxiliary aids and services, whenever necessary, to ensure effective communications with inmates, visitors, and members of the public who are deaf or hearing impaired.

2. **POLICY.**  It is the policy of DOC to take appropriate steps to ensure that communications with the hearing disabled are as effective as communications with others.

3. **APPLICABILITY.**  This policy applies to services, programs, and activities provided or operated by the DOC and to contractors who provide services, programs and activities to DOC inmates, visitors and members of the public.

4. **NOTICE OF NON-DISCRIMINATION.**  In accordance with the D.C. Human Rights Act of 1977, as amended, D.C. Code section 2.1401.01 et seq., ("the Act") the District of Columbia does not discriminate on the basis of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, familial status, family responsibilities, matriculation, political affiliation, disability, source of income, or place of residence or business.  Sexual harassment is a form of sex discrimination which is also prohibited by the Act.  Discrimination in violation of the Act will not be tolerated.  Violators will be subject to disciplinary action.

5. **OBJECTIVES**

   a. DOC will furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, services, programs or activities conducted by DOC.

   b. DOC shall ensure by contract or other arrangements that all services, programs, or activities provided or operated by contractors are in compliance with the Americans with Disabilities Act. Contracts with those entities that fail or refuse to comply with the ADA shall be subjected to formal termination proceedings.

6.   **DIRECTIVES AFFECTED**

   a.   **Rescinded.**  None

   b.   **Referenced**

|   |   |   |
|---|---|---|
| 1) | PS 1220.1B | Customer Service (5/30/02) |
| 2) | PS 2920.1B | Fire Safety Program (3/9/01) |
| 3) | DO 3800.2 | Handicapped Americans with Disabilities Act Accommodations, Section 504 (8/10/92) |
| 4) | DO 4030.1E | Grievance Procedures, Inmate (IGP) (5/4/92) |
| 5) | DO 4070.1A | Telephone Access, Inmate (4/8/94) |
| 6) | PS 4080.1B | Visiting Regulations, Inmates (3/7/00) |

7.   **AUTHORITY**

   a.   Title 2 Americans with Disabilities Act (ADA) of 1990, USC §§ 12131-12134 and 28 C.F.R. § 35.104.

   b.   DC Code 2-1901 DC Interpreters for Hearing Impaired and Non-English Speaking Persons Act.

   c.   Section 504 of the Rehabilitation Act of 1973.

   d.   DC Code § 24-211.02 Powers; Promulgation of Rules (formerly § 24-442).

8.   **STANDARDS**

   a.   American Correctional Association 3rd Edition, Standards for Adult Local Detention Facilities: 3-ALDF-1D-04, 3-ALDF-1D-05, 3-ALDF-2F-03, 3-ALDF-3C-14, 3-ALDF-3E-06, 3-ALDF-3D-21, 3-ALDF-3E-04, 3-ALDF-3E-11, 3-ALDF-4B-03 and 3-ALDF-5D-09.

   b.   American Correctional Association 4th Edition, Standards for Adult Correctional Institutions:  4-4079, 4-4142, 4-4169, 4-4243, 4-4277, 4-4284, 4-4288, 4-4303, 4-4344, 4-4394, 4-4399, 4-4429, 4-4475, 4-4497 and 4-5599.

   c.   National Commission on Correctional Health Care Standards for Health Services in Prisons 1997:  P-08, P-31, P-34, P-51 and P-59.

9.  **DEFINITIONS**

   a.  **Communication-Impaired Person.**   A person whose hearing is impaired or who does not speak English.

   b.  **Hearing-Impaired Person.**   A person who, because of a hearing impairment, cannot readily understand oral communications or who cannot communicate effectively through speech.

   c.  **Non-English Speaking Person.**   A person who is unable to understand oral and written communications in the English language or who cannot communicate effectively in the *spoken* English language.

   d.  **Qualified Interpreter**.   An individual who is able to interpret effectively, accurately, and impartially both receptively and expressively, using any necessary specialized vocabulary.

   e.  **Intermediary Interpreter.**   Any person, including any hearing-impaired person, who is able to assist in providing an accurate interpretation between spoken English and sign language or between variants of sign language (ex: American Sign Language vs. Signed English) by acting as an intermediary between a hearing-impaired person and a qualified interpreter.

   f.  **Telecommunications Relay Services (TRS).**  TRS allows an individual who is deaf, hard of hearing, or speech disabled to communicate with a hearing person who does not have a TTY system.  A Communications Assistant (CA) will place the call from the inmate who is typing the message using the DOC TTY phone, and speak the words to the individual receiving the call.  The CA will then type the spoken words from that individual so the inmate can read the returned message.

   g.  **Videoconferencing.**  Videoconferencing allows two or more people at different locations to see and hear each other at the same time.   This is the service that will primarily be used for DOC contracted interpreting services.

10.  **REQUIREMENTS**

   a.  **Contracts for the Provision of Interpreting Services**

       1)   DOC has contracted with an interpreter service to provide an effective means to ensure that qualified interpreters are available, when required, without delay.

       2)   DOC may, but shall have no obligation to, hire or otherwise contract with

qualified interpreters in a staff position.

3) Staff interpreters must be qualified as set forth in § 10, "Procedures, subsection "e" of this directive.

b. **Policies and Security Concerns.** Nothing in this policy shall require that an electronic device or piece of equipment used as an appropriate auxiliary aid be used when or where its use may be inconsistent with DOC policies or pose security concerns.

For instance, closed-captioned televisions are provided consistently for inmates with hearing disabilities with the same duration and frequency as televisions are provided to the other inmates classified in the same status within DOC. No inmate is provided a television if his/her status would not otherwise permit him/her access to one.

c. **Equal Service Provisions.** Inmates and visitors who are provided with staff interpreters must have the same level of coverage (for both duration and frequency) as DOC is otherwise obligated to provide under this Policy. DOC may assign other duties as appropriate to staff interpreters.

## 11. RESPONSIBILITIES

a. **Director.** The Director shall ensure the following:

1) The Auxiliary Aids and Services (AAS) Program is conducted in accordance with requirements and procedures in accordance with this directive.

2) The Director designates operational compliance of the AAS Program to the Deputy Director. This responsibility may be further delegated.

b. **Deputy Director.** The Deputy Director shall ensure that:

1) The *DOC AAS Coordinator(s)* shall provide program oversight. The Coordinator(s) shall work with the Central Detention Facility (CDF) Warden and the DOC Office of Contract Services to determine the appropriate auxiliary aids and services that are necessary, and the timing, duration and frequency with which they will be provided. Auxiliary aids and services include qualified interpreters, note takers, transcription services, written materials, assistive listening devices, assistive listening systems, or other effective methods of making aurally delivered materials available to individuals who are deaf or hard of hearing.

2) The *Office of Contract Services* ensures contract facility compliance with

the AAS program outlined in Section "c" below, and shall ensure that contractors develop and issue similar operational procedures.

c. **CDF Warden.**  The Warden shall ensure the following requirements are accomplished:

   1) The Warden shall within 45 days of the issuance of this directive, develop a CDF Institutional Supplement (IS) that defines specific procedures and personnel assignments for operational implementation and compliance as outlined in this directive.

   2) The Warden shall forward the IS to the Office of Internal Controls, Compliance and Accreditation for policy, program, operational, and legal sufficiency prior to issuance.

d. **AAS Coordinator(s).**  AAS Coordinator(s) shall:

   1) Maintain all necessary information about access to the AAS program to include a system of documentation for inquiries regarding the provision of auxiliary aids and services and responses.

   2) Maintain all necessary information about the operation of the AAS program to include knowing where the appropriate auxiliary aids are stored, how to obtain services, how to operate them, and shall be responsible for their maintenance, repair, replacement, and distribution.

   3) Publicize its purpose and telephone number broadly within DOC and to the public.

   4) Provide appropriate assistance regarding immediate access to and proper use of the appropriate auxiliary aids and services available under the Program.

e. **Employee.**  Employees shall:

   1) An employee, who is made aware of or who has any reason to believe that an inmate or visitor is deaf or hard of hearing, shall advise the person that appropriate auxiliary aids and services will be provided.

   2) The employee shall direct that person to the appropriate Auxiliary Aids and Services Program Coordinator(s).

   3) Likewise such information must be forthcoming in response to any overt request for appropriate auxiliary aids or services.

12. **PROCEDURES**

a. **Initial Communication Assessment**

1)   When the employee has reason to believe or is informed that a newly admitted inmate or a visitor, with whom the employee is communicating or attempting to communicate with, has a hearing impairment, the employee shall immediately take the following steps:

a)   Ascertain, through the exchange of written notes or by other means, whether the individual has a hearing impairment.

b)   Notify the individual through the exchange of a written note or standardized notice (Attachment A) that a free, qualified sign language interpreter will be provided if the inmate desires via videoconferencing.

c)   If the individual expresses a preference for the use of written communication, the employee shall provide a pad and pen or pencil and shall communicate with the individual in writing; permitting the individual to communicate back to the employee in writing.

d)   If the individual expresses a belief, through the exchange of written notes or otherwise, that a qualified sign language interpreter is necessary for effective communication, the employee shall ascertain whether the individual uses American Sign Language or Signed English to communicate.

e)   The AAS Coordinator or designee shall contact appropriate interpreter services to provide assistance.

2)   Written communication cannot be used as a substitute where the individual has expressed a preference for a sign language interpreter.

3)   If the individual appears to be unable to express a preference or to otherwise communicate without a qualified sign language interpreter, a qualified sign language interpreter shall be contacted by means of videoconferencing as outlined in Section e. 4 below.

b. **Determination of Auxiliary Aid or Service**

1)   DOC shall provide to inmates and visitors who are deaf or hard of hearing, an appropriate auxiliary aid or service that may be necessary for effective communication as soon as practicable after determining that the

aid or service is necessary.

2)   When an auxiliary aid or service is required to ensure effective communication, DOC shall provide an opportunity for an individual with a disability to request the auxiliary aid or service of his or her choice and DOC shall give primary consideration to the choice expressed by the individual. DOC shall honor the expressed choice, unless it can show that another equally effective means of communication is available, or that use of the means chosen would result in a fundamental alteration in the nature of its service, program, or activity or in undue financial and administrative burdens.

c.   **Individual Notice in Absence of Request.**  If an inmate or a visitor who is deaf or hard of hearing does not request appropriate auxiliary aids or services, but DOC personnel have reason to believe that the person would benefit from appropriate auxiliary aids or services for effective communication, DOC shall inform the individual, through the exchange of a written note, standardized, posted notice that appropriate auxiliary aids and services are available free of charge.

d.   **Communication with Inmates and Visitors.**  DOC shall take appropriate steps to ensure that all employees having contact with an inmate or visitor who is deaf or hard of hearing are made aware of the person's disability so that effective communication with the person will be achieved.

e.   **Provision of Qualified Interpreters**

1)   DOC shall provide or ensure provision of qualified interpreters when necessary for effective communication with, or effective participation in, DOC programs and activities by inmates and visitors who are deaf or hard of hearing.   Procedures for providing qualified interpreter service via videoconferencing is outlined in Section 4 below.

2)   A qualified interpreter means an interpreter who is able to interpret effectively, accurately, and impartially both receptively and expressively, using any necessary specialized vocabulary.

a)   Someone who has only a rudimentary familiarity with sign language or finger spelling is not a "qualified interpreter" under this policy.

b)   Likewise, someone who is fluent in sign language but who does not possess the ability to process spoken communication into the proper signs or to observe someone else signing and change their signed or finger spelled communication into spoken words is not a qualified sign language interpreter.

c)    An employee who signs "pretty well" should not be considered an interpreter until he or she possesses the proper skills to observe someone signing and change their signed or finger spelled communication into spoken words and vice versa.

d)    A DOC employee should not be allowed to interpret if his or her presence poses a conflict of interest or raises confidentiality and privacy concerns.

e)    On occasion, an inmate may possess the skill level necessary to provide interpreting services; however, the impartiality concerns remain, and in many--if not most--situations, inmate interpreters should not be used due to confidentiality, privacy, and security reasons.

3)   The following list of circumstances where interpreters may be required is neither exhaustive nor mandatory, and shall not imply that there are not other circumstances when it may be appropriate to provide interpreters for effective communication.  Except in the case of the initial intake and initial medical encounter, emergency medical encounters, sick call, or other emergent encounters, the responsible employee shall request interpreter videoconferencing service via the AAS Coordinator three (3) business days in advance of the below activities:

a)    Initial intake

b)    Classification processing;

c)    Regularly scheduled health care appointments and programs (medical, dental, visual, mental health, and drug and alcohol recovery services);

d)    Treatment and other formal programming;

e)    Educational classes and activities;

f)    Parole board hearings (USPB);

g)    Disciplinary board hearings;

h)    Criminal investigations (to the extent controlled by DOC);

i)    Classification review interviews;

j)    Grievance interviews; and

k)    Formal investigations conducted by DOC staff.

4)   The following information shall be maintained in the offices of the AAS Coordinator(s), Command Center, Receiving and Discharge, Visitor's

Control, Staff Entrance, Housing Unit Control Bubble, Unit Manager, Case Manager, Chaplain and the health services contractor:

a) A list of employees who are qualified interpreters, along with their work locations and phone numbers.

b) The phone number and information for the contract interpreting service that provides videoconferencing or in-person assistance:

Sign Language Associates, Inc.
11160 Veirs Mill Road, Suite 506
Silver Spring, MD  20902
Contact:  Mary Capold Carr
(301) 946-9710
Direct (301) 962-3066
TTY (301) 946-9710
Fax (301) 946-9685
E-mail: mcarr@signlanguage.com

c) Telecommunications Relay Services provider telephone number or the national TRS number of *711*.

5) The AAS Coordinator(s) may request the interpreter to provide in-person services at the Central Detention Facility (CDF) when deemed appropriate.

f. **Other Means of Communication for Unscheduled Circumstances**. Between the time that an interpreter is requested and the interpreter is contacted by means of videoconferencing service, DOC personnel shall continue to try to communicate with the inmate or visitor who is deaf or hard of hearing for such purposes and to the same extent as they would have communicated with the person but for the hearing impairment, using all available methods of communication.

1) For instance, seeking the services of an interpreter shall not mean that medical treatment will be delayed until an appropriate interpreter service is available.

2) In addition, upon connection of the videoconference or arrival of the interpreter, personnel shall review and confirm with the inmate all information that was communicated prior to the interpreter's intervention.

3) This provision in no way lessens DOC's obligation to provide qualified interpreter videoconferencing or interpreters in a timely manner as required by this Policy.

g.  **Ongoing Communication Assessment.**  The AAS Coordinator(s) shall conduct a minimum of two (2) monthly routine assessments of each inmate with hearing or speech disability regarding the provision of appropriate auxiliary aids and services.  The AAS Coordinator(s) shall keep appropriate records that reflect the ongoing assessments.

h.  **Complaint Resolution**

   1)  Inmates shall be informed in writing at initial classification that he or she can file complaints regarding the provision of auxiliary aids and services through the Inmate Grievance Program.

   2)  DOC shall provide notice to other individuals who access facilities of complaint and resolution procedures.

13.  **HEARING AIDS AND BATTERIES**

a.  **Replacement Batteries.**  The AAS Coordinator(s) shall purchase and keep appropriate types of hearing aid batteries in stock in the medical supply room during the length of time an inmate(s) who wears a hearing aid is in the custody of DOC.  AAS Coordinator(s) shall provide replacement hearing aid batteries to inmates requesting them as soon as possible but no later than 24 hours after such request.

b.  **Hearing Aid Repairs.**  The AAS Coordinator(s) shall send inmate hearing aids to a hearing aid repair company as soon as possible but no later than 24 hours (excluding weekends and holidays) following a request by an inmate for repair of his or her hearing aid. The AAS Coordinator(s) shall inform the inmate as soon as possible when the hearing aid was sent for repair and when it is expected to be returned by the repair company. The AAS Coordinator(s) shall provide the inmate with written documentation of all hearing aid repairs, including detailed information regarding the vendor used, the date of the repair, and the specific repairs performed.

14.  **TELEPHONES**

a.  **Telecommunications Typewriters (TTY)** also known as Telecommunications Device for the Deaf (TDD).  The Warden shall ensure that written procedures are developed and implemented to provide telecommunication devices ("TTYs") for inmates who are deaf or hard of hearing in a manner that ensures effective access to telephone services. These procedures shall also provide that inmates have access to TTYs to communicate with family members or friends who are deaf or hard of hearing.

b.   **TTYs in Visiting Areas**

1) DOC shall make at least one TTY device available in each of the visiting areas.

2) DOC can either permanently install the required TTYs or make available a sufficient number of portable TTYs. Wherever portable TTYs are made available as an alternative to installed TTYs, and wherever there is a bank of three or more pay telephones, DOC shall provide a shelf and an electrical outlet.

3) Wherever pay telephones are available but TTYs are not permanently installed, DOC shall post permanent signs to indicate the location of the nearest portable or permanently installed TTY.

c.   **TTYs in Housing Units and Other Areas.**

1) DOC shall promptly provide TTY units to all deaf and hard of hearing inmates residing in housing units to the extent that pay telephones are available to other inmates.

2) In those situations where DOC provides portable TTYs, the housing staff shall promptly provide the units upon the inmate's request, unless precluded due to emergency circumstances such as a facility lock-down.

3) DOC shall also make a TTY unit(s) available whenever a pay telephone is made available to inmates in other areas than housing units.

d.   **Telecommunications Relay Services.** TRS calls from payphones are free of charge for local calls.  TRS calls are available by dialing *711*.  Notice shall be posted near all pay telephones.

e.   **Time limits on TTY calls.** In light of the fact that telephone calls placed via a TTY unit take three to five times longer than telephone calls placed using standard voice telephone equipment, DOC shall not impose on TTY calls a time limit of less than four times the time allowed for voice telephone calls.

f.   **Volume Control and Hearing Aid Compatible Telephones.**  DOC shall ensure that no less than twenty-five *(25)* percent of all of its pay telephones are equipped with volume control mechanisms. DOC shall ensure that volume control phones are dispersed among all pay telephones throughout DOC. DOC shall ensure that appropriate universal signs are displayed at each volume control telephone.

15. **VISUAL AND TACTILE ALARMS**

a. DOC shall ensure that in areas where there are audible emergency alarms and it is anticipated that individuals who are deaf or hard of hearing have access, visual alarms are also provided.

b. To the extent that the present capabilities of an existing audible alarm system are not sufficient to handle an electrical load that would allow a retrofit to include visual alarms without extensive re-wiring, such visual alarms shall be added within two (2) years of the effective date of this Policy.

c. DOC shall place visual emergency alarms in rooms where inmates who are deaf may reside alone or work alone to ensure that they will always be alerted when an emergency alarm is activated. To be effective, such devices must be located and oriented so that they will spread signals and reflections throughout a space or raise the overall light level sharply. Note: Activation of a building alarm system can be accomplished either by a separate circuit activating an auditory alarm, which would, in turn, triggers the visual alarm or by a signal transmitting through an ordinary 110-volt outlet.

d. DOC shall ensure that housing units that have audible alarms shall also have visual signal devices and bed vibrators, whenever necessary, to alert inmates who are deaf or hard of hearing to announcements (e.g., security checks). Note: To be effective, visual alarms more than seven times brighter (110 candela v. 15 candela, at the same distance) are required to awaken sleepers in a normal daytime illuminated room.

16. **TELEVISIONS**

DOC shall provide and maintain closed captioned television decoders (or built-in decoder televisions) in television rooms to enable inmates who are deaf or hard of hearing to enjoy the same opportunity for television viewing as that afforded to other inmates.

17. **NOTICE**

a. **Signs.** DOC shall post and maintain signs of conspicuous size and print at all facilities, and wherever other posters or flyers are required by law to be posted. Such signs shall be to the following effect:

1) Sign language and oral interpreters, TTYs, and other auxiliary aids and services are available free of charge to people who are deaf or hard of hearing.

    2)    For assistance, please contact any DOC personnel or the Auxiliary Aids and Services Coordinator at _____ (voice/TTY), Room _____.

    3)    These signs will include the international symbols for "interpreters" and "TTYs." An example is attached hereto as Exhibit ___.

  b.  **Verbal Notification.**  An employee, who is made aware of or who has any reason to believe that an inmate or visitor is deaf or hard of hearing, shall advise the person that appropriate auxiliary aids and services will be provided.

18.  **Inmate Handbook.**  DOC will include in all future printings of its Inmate Handbook (or equivalent) and all similar publications a statement to the following effect:

  a.  To ensure effective communication with inmates and their visitors who are deaf or hard of hearing, we provide appropriate auxiliary aids and services free of charge, such as: sign language and oral interpreters, TTY's, note takers, computer-assisted real time transcription services, written materials, telephone handset amplifiers, assistive listening devices and systems, telephones compatible with hearing aids, closed caption decoders, and open and closed captioning of DOC programs.

  b.  Please ask your case manager for assistance, or contact the Auxiliary Aids and Service Coordinator at _____ (voice or TTY), room _____

19.  **TRAINING**

  a.  **Comprehensive Training.** DOC shall provide training sessions for all DOC personnel having contact with deaf or hard of hearing inmates and all management or administration staff regarding all relevant policies and procedures implementing this Policy.

  b.  **Content**

    1)    Such training shall be sufficient in duration and content to train a reasonable number of DOC personnel in access to the Program, use of the Program, and sensitivity to the needs of the deaf and hard of hearing inmate population.

    2)    Such training shall include topics relevant to the health care needs of the deaf and hard of hearing inmates, such as:

        a)    The various degrees of hearing impairment, language and cultural diversity in the deaf community,

b)   Dispelling myths and misconceptions about persons who are deaf or hard of hearing,

c)   Identification of communication requirements of persons who are deaf or hard of hearing,

d)   The unique needs and problems encountered by late-deafened individuals,

e)   Psychological implications of hearing loss and its relationship to interaction with hearing health care professionals,

f)   Types of auxiliary aids and services as required under this Policy,

g)   The proper use and role of qualified sign language interpreters,

h)   Procedures and methods for accessing the AAS Program for providing interpreters, making and receiving calls through TTY's and the Maryland Relay or other relay service providers,

i)   Third party resources that can provide additional information about people who are deaf or hard of hearing, the existence of DOC's complaint resolution process.

## 20.  TERMINATION OF CONTRACT WITH NONCOMPLYING ENTITIES

DOC shall ensure by contract or other arrangements that all services, programs, or activities provided or operated by contractors are in compliance with the Americans with Disabilities Act. Contracts with those entities that fail or refuse to comply with the ADA shall be subjected to formal termination proceedings.

**Illustration:** DOC has a contract with a State university for providing post secondary education to inmates, and the university refuses to provide a qualified interpreter to ensure effective participation in the program by an inmate who is deaf. DOC shall 1) offer to provide for the services as required, or 2) terminate the contract or shall itself provide the necessary auxiliary aids and services for individuals with who are deaf or hard of hearing.

Odie Washington
Director

EXHIBIT 10

## General Ledger Report By Agency Fund (compares to DAFRD540)

## FL0 - DEPARTMENT OF CORRECTIONS

Fiscal Year:  2012

Fiscal Month:  13

| Agency Fund | Agy Fund Title | YTD Cash ACCD Rev | YTD Cash ACCD Exp | Net FY Activity |
|---|---|---|---|---|
| Appropriated Fund: 0600 - SPECIAL PURPOSE REVENUE FUNDS | | | | |
| 0600 | CORRECTIONS TRUSTEE REIMBURSEMENT | $   17,197,426.13 | $   16,127,994.34 | $      1,069,431.79 |

*The information contained in this report*
*is unaudited and unadjusted.*
  *Source: SOAR/CFOSolve*

Page: 1
*Prepared by Office of the Chief Financial*
*Officer*

- Attachment 1 -

WP0000004

## General Ledger Report By Agency Fund (c<

## FL0 - DEPARTMENT OF CORRECTIONS

Fiscal Year:  2011

Fiscal Month:  13

| Agency Fund | Agy Fund Title | YTD Cash ACCD Rev |
|---|---|---|
| Appropriated Fund:  0600  -  SPECIAL PURPOSE REVENUE FUNDS | | |
| 0600 | CORRECTIONS TRUSTEE REIMBURSEMENT | $   24,463,818.37 |

*The information contained in this report*
*is unaudited and unadjusted.*
        Source:  SOAR/CFO$olve

Page:   1
*Prepared by Office of the Chief Financial*
*Officer*

WP0000005

**ompares to DAFRD540)**

| YTD Cash ACCD Exp | Net FY Activity |
|---|---|
| $ 22,985,795.39 | $ 1,478,022.98 |

WP0000006

EXHIBIT 11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILLIAM PIERCE, | |
| Plaintiff, | |
| v. | No. 1:13-cv-00134 KBJ |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

### DEFENDANT DISTRICT OF COLUMBIA'S RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

Defendant District of Columbia ("Defendant"), through counsel and pursuant to FED. R. CIV. P. 34, hereby submits its Responses to Plaintiff's First Set of Requests for Production of Documents, served by e-mail and U.S. mail on June 21, 2013.

This response is made without prejudice to an objection that any of the information requested is immaterial or otherwise inadmissible. Defendant District of Columbia will supplement these answers, if necessary, in accordance with the Federal Rules of Civil Procedure.

### GENERAL OBJECTIONS

1.     Defendant District of Columbia objects to these Requests for Production to the extent that Plaintiff's instructions—including, but not necessarily limited to Instruction Nos. 4, 5, 8, and 9—or the requests themselves, seek to impose any burden or obligation greater than the requirements of Rules 26 and 34 of the Federal Rules of Civil Procedure.

-1-

2780604.1

2.      Defendant District of Columbia objects to these Requests for Production to the extent that the time limit sought includes dates after the filing of the Complaint, such that they are construed to seek confidential and privileged attorney-client communications and the mental impressions of counsel for the District of Columbia, which constitute attorney work product and would be unduly burdensome to identify in a privilege log, without necessarily disclosing counsel's mental impressions regarding the claims and potential defenses at issue.

3.      Defendant District of Columbia objects to these Requests for Production to the extent they use a definition or instruction supplied by Plaintiff which is inconsistent with the usual usage and meaning of the words, as used by the Department of Corrections, CCA, and/or Unity Health Care.

4.      Defendant District of Columbia objects that it is unduly burdensome for it to produce "all documents" which consist of multiple identical duplicates as well as near-duplicate documents, where the difference may simply be stray marginalia, or an alternate formatting, without any material difference to the substance of the document.

5.      Defendant District of Columbia objects that is unduly burdensome to conduct separate searches for and produce identical electronically stored information from file servers reflecting communications between it and its contractors.

6.      Defendant District of Columbia objects that these requests are unduly burdensome and propounded solely to harass the Defendant and its contractors to the extent that these requests seeks documents which exist in both paper and electronic form, and can be construed to require the production of a document in multiple forms.

7.      Defendant District of Columbia objects that Instruction No. 7 is unduly burdensome to the extent it seeks a log of redacted information which is readily apparent from the face of the redacted document(s).

8.      Defendant District of Columbia objects that Instruction No. 8 is unduly

-2-

burdensome to the extent it requires production of multiple copies of identical documents. In the following responses, Defendant District of Columbia will identify the production numbers of document responsive thereto.

9.      Defendant District of Columbia objects that it is unduly burdensome to produce original records of Department of Corrections or CCA for inspection and copying. Defendant District of Columbia agrees to provide electronic images of those documents with this response and any supplement, and if a genuine dispute arises as to authenticity, will endeavor to make the original document available for inspection prior to or at trial.


## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

Current organizational charts of DOC and CTF, meaning any Document that identifies the reporting hierarchy for either organization as a whole or for any subunit within either organization.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is vague and ambiguous and is not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving and subject to these objections, please see documents produced herewith bearing production numbers DC-WAP 000155 through DC-WAP 000166.


### REQUEST FOR PRODUCTION NO. 2:

All Documents supporting Your contention in Paragraph 7 of Your Answer that Plaintiff was admitted to CTF on February 2, 2012.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request calls for the production of documents which Plaintiff has already obtained from this Defendant.

Without waiving these objections, please see documents bearing production numbers DC-WAP 000032; DC-WAP 000070 through DC-WAP 000103; DC-WAP 000110 through DC-WAP 000112; and DC-WAP 000132, which were produced and disclosed to Plaintiff on July 10, 2013, and the documents produced herewith bearing production numbers DC-WAP 000167 through DC-WAP 000168.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents related to Plaintiff, including but not limited to his intake; medical and mental health records; visitation; grievances; case worker files; handwritten or other Communications; disciplinary, classification, housing, and program assignment records; records concerning Plaintiff's placement in protective custody; and/or any other documents contained in Plaintiff's institutional file.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is vague and ambiguous as to what constitutes a document "related" to Plaintiff; overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, to the extent that it seeks operational records of the Central Detention Facility and CTF during the time of Plaintiff's incarceration which have no bearing on any of the allegations of the Complaint; duplicative of Request No. 2; calls for the disclosure of documents which may be subject to the attorney-client privilege; and calls for the production of documents which Plaintiff has already obtained from this Defendant.

-4-

Without waiving and subject to these objections, please see documents bearing production numbers WP0000030 through WP0000307 which were previously produced and disclosed by Plaintiff on July 10, 2013; documents bearing production numbers DC-WAP 000001 through DC-WAP 000154, which were disclosed and produced to Plaintiff on July 10, 2013, and the documents produced herewith bearing production number DC-WAP 000169. Defendant District of Columbia will supplement if additional responsive, non-privileged documents are identified or located.

**REQUEST FOR PRODUCTION NO. 4:**

All Documents reflecting Your policies, procedures, training materials, materials given to inmates, contracts, studies, and/or reports concerning the provision of Auxiliary Aids for deaf and hard of hearing inmates, including but not limited to interpreter services, telecommunications devices (e.g., computer aided transcription services, teletypewriter devices, and/or videophones), and/or prison-wide announcements and alerts at CTF. This Request encompasses any and all such policies and procedures in effect at any time from February 1, 2010, to the present. In Your response, please include any Documents supporting Your contention in paragraph 21 of Your Answer that D.C. Department of Corrections Directive 3800.3 § 12(e)(2)(a) (2003) has been rescinded and was not in effect at the time of Plaintiff's incarceration at CTF.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is compound; overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of non-privileged admissible evidence to the extent it seeks drafts, and other documents related to privileged pre-decisional discussions, rather than final implementation of policies and training materials; seeks documents which are in the public domain, and have already been disclosed and produced by Plaintiff's

-5-

counsel; is duplicative of Request Nos. 5, 9, 10, 12, 13, 14, 17, and 18;  overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent that "documents reflecting" is construed to include any inmate request for auxiliary aids; calls for the production of documents which may be subject to the attorney-client privilege; overbroad and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks documents relating to any DOC facility other than those where Plaintiff was physically present between February 1, 2012 and his release on March 22, 2012; unduly burdensome to the extent it imposes an ongoing obligation to inquire as to hearing status as to each inmate assigned to CTF during the future course of this litigation; unduly burdensome to the extent it seeks information regarding requests for auxiliary aids by any hearing impaired inmate detained at CTF to the extent production of document pertaining to any inmate other than Plaintiff would constitute disclosure of "protected health information" by a covered entity or a business associate in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), P.L. 104-191, and related regulations at 45 C.F.R., Part 160, *et. seq.*, the release of which in the absence of consent of the third parties whose information is sought or a Qualified Protective Order authorizing the release of the same subjects Defendant to potential civil liability and penalties.

Without waiving these objections, DOC Program Statement 3800.2A, effective February 29, 2008, previously disclosed and produced by Plaintiff's counsel bearing production numbers WP0000061 through WP0000074, indicates (at WP0000063) that PS 3800.A, ADA: Communications for Death and Hearing Impaired (6/30/03) is rescinded. In addition to those documents produced or identified in response to Request Nos. 5, 9, 10, 12, 13, 14, 17, please see the documents produced herewith bearing production numbers DC-WAP 000170 through DC-WAP 000259.  Defendant District of Columbia

will supplement if additional responsive, non-privileged documents are identified or located.

## REQUEST FOR PRODUCTION NO. 5:

All Documents supporting Your contentions in Paragraphs 15 and 27 of Your Answer that CCA provided Plaintiff with reasonable accommodations during his educational and therapeutic programming offered at CTF.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 5:

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is improper to the extent it calls for a legal conclusion; mischaracterized Paragraph 27 of the Answer; calls for information which has previously been obtained by Plaintiff from this Defendant; and is premature as discovery is ongoing, and the deadline to disclose expert reports has not yet passed.

Without waiving and subject to these objections, please see documents bearing production numbers WP0000166 and WP0000272, which were produced and disclosed by Plaintiff on July 10, 2013, as well as documents bearing production numbers DC-WAP 000029; DC-WAP 000047 through DC-WAP 000048; DC-WAP 000053 through DC-WAP 000054; DC-WAP 000141 through DC-WAP 000142; and DC-WAP 00145 through DC-WAP 00154, which were produced and disclosed to Plaintiff on July 10, 2013. Defendant District of Columbia will seasonably supplement if additional documents are obtained from third parties and will make any disclosure of relevant expert opinions on or before November 15, 2013, unless the Scheduling Order is modified prior to that date.

**REQUEST FOR PRODUCTION NO. 6:**

All Communications between You and Rev. Ron Friedrich and all Documents related to such Communications.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is overbroad as to time and nature of communications; and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks communications other than those relating to Plaintiff's incarceration at CTF.

Without waiving and subject to these objections, see the documents produced herewith bearing production numbers DC-WAP 000260 through DC-WAP 000261. Defendant District of Columbia does not believe it has any other relevant, non-privileged documents in its possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 7:**

All Documents reflecting Your policies and procedures concerning protective custody, including but not limited to any risk assessment instruments, screening instruments, or other instruments used to determine the need for placement of Your inmates in protective custody at CTF, training materials for staff, or materials given to inmates. This Request encompasses any and all such policies and procedures in effect at any time from February 1, 2010, to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is duplicative, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent that "[d]ocuments reflecting [Defendant's] policies and procedures concerning protective custody" constitute any request submitted by any inmate relating to requesting placement in

-8-

Protective Custody, or confidential information and decisions relating to the placement of any inmate in involuntary protective custody; overbroad as to subject matter; unduly burdensome to the extent it imposes an ongoing obligation to inquire as to hearing status as to each inmate assigned to CTF during the future course of this litigation; and unduly burdensome to the extent production of documents pertaining to any inmate other than Plaintiff would constitute disclosure of "protected health information" by a covered entity or a business associate in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), P.L. 104-191, and related regulations at 45 C.F.R., Part 160, *et. seq.*, the release of which in the absence of consent of the third parties whose information is sought or a Qualified Protective Order authorizing the release of the same subjects Defendant to potential civil liability and penalties.

Without waiving these objections, please see the documents bearing production numbers DC-WAP 000123 through DC-WAP 000144 which were previously produced and disclosed to Plaintiff on July 10, 2013, and the documents produced herewith bearing production numbers DC-WAP 000262 through DC-WAP 000283.


**REQUEST FOR PRODUCTION NO. 8:**

All Documents supporting Your contention in Paragraph 30 of Your Answer that Plaintiff requested to be placed in protective custody and was released after he requested to return to general population and signed the Protective Custody Waiver and Non-Animosity Statement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is duplicative of Request No. 7 and calls for the production of documents which Plaintiff has already obtained from this Defendant.

Without waiving those objections, please see the documents bearing production

numbers DC-WAP 000123 through DC-WAP 000144, which were previously produced and disclosed to Plaintiff on July 10, 2013.

**REQUEST FOR PRODUCTION NO. 9:**

All Documents reflecting Your policies and procedures concerning inmate access to telephones. This Request encompasses any and all such policies and procedures in effect at any time from February 1, 2010, to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is vague and ambiguous; calls for the production of documents which Plaintiff has already obtained from this Defendant; duplicative of Request Nos. 4 and 17; overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent that "documents reflecting" is construed to include any record of any inmate telephone call; overbroad and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks documents relating to any DOC facility other than those where Plaintiff was physically present between February 1, 2012 and his release on March 22, 2012; unduly burdensome to the extent it imposes an ongoing obligation to inquire as to hearing status as to each inmate assigned to CTF during the future course of this litigation; unduly burdensome to the extent it seeks information regarding telephonic communications by any hearing impaired inmate detained at CTF to the extent production of documents pertaining to any inmate other than Plaintiff would constitute disclosure of "protected health information" by a covered entity or a business associate in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), P.L. 104-191, and related regulations at 45 C.F.R., Part 160, *et. seq.*, the release of which in the absence of consent of the third parties whose information is sought or a Qualified Protective Order authorizing the

-10-

release of the same subjects Defendant to potential civil liability and penalties.

Without waiving and subject to these objections, please see the documents bearing production numbers WP0000033 through WP0000034, which were produced and disclosed by Plaintiff on July 10, 2013, the documents bearing production numbers DC-WAP 000146 through DC-WAP 000147, which were previously produced and disclosed to Plaintiff on July 10, 2013, and the documents produced herewith bearing production numbers DC-WAP 000284 through DC-WAP 000294 and DC-WAP 000577 through DC-WAP 000579.

**REQUEST FOR PRODUCTION NO. 10:**

All records of telephone calls made or received by Plaintiff while at CTF, including but not limited to information about the duration of such telephone calls.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is duplicative of Request No. 9 and calls for the production of documents which Plaintiff has already obtained from this Defendant.

Without waiving and subject to these objections, please see the documents bearing production numbers DC-WAP 000146 through DC-WAP 000147, which were previously produced and disclosed to Plaintiff on July 10, 2013.

**REQUEST FOR PRODUCTION NO. 11:**

All Documents reflecting Your policies and procedures concerning processing and responding to inmate requests for accommodations, including policies and procedures concerning training of Staff to handle interactions with deaf and hard of hearing inmates and consequences to Staff of any failure to follow such policies and procedures. This Request encompasses any and all such policies and procedures in effect at any time from

-11-

February 1, 2010, to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is duplicative of Request Nos. 4, 7, 9, 12, 14, 15, 17, and 18; vague and ambiguous; calls for the production of documents which Plaintiff has already obtained from this Defendant; overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent that "[d]ocuments reflecting [Defendant's] policies and procedures" including "inmate requests for accommodations" constitute any request submitted by any inmate relating to accommodations for any disability other than hearing impairment; overbroad as to time and subject matter of the requested accommodation; unduly burdensome to the extent it imposes an ongoing obligation to inquire as to hearing status as to each inmate assigned to CTF during the future course of this litigation; and unduly burdensome to the extent production of documents pertaining to any inmate other than Plaintiff would constitute disclosure of "protected health information" by a covered entity or a business associate in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), P.L. 104-191, and related regulations at 45 C.F.R., Part 160, *et. seq.*, the release of which in the absence of consent of the third parties whose information is sought or a Qualified Protective Order authorizing the release of the same subjects Defendant to potential civil liability and penalties.

Without waiving and subject to these objections, see Defendant's response to Request Nos. 4, 7, 9, 12, 14, 15, 17, and 18.

-12-

**REQUEST FOR PRODUCTION NO. 12:**

All Documents reflecting Your policies and procedures concerning processing of inmate grievances. This Request encompasses any and all such policies and procedures in effect at any time from February 1, 2010, to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is overbroad and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks documents relating to any DOC facility other than those where Plaintiff was physically present between February 1, 2012 and his release on March 22, 2012 and calls for the production of documents which Plaintiff has already obtained from this Defendant.

Without waiving these objections, on July 10, 2010, Defendant District of Columbia disclosed and produced copies of all Informal Resolutions and the complete Facility Grievance Officer's file for all Formal Grievances submitted by Plaintiff at CTF, identified by production numbers DC-WAP 000148 through DC-WAP 000154. Additionally, Plaintiff has previously disclosed and produced identical documents to Defendant on July 10, 2013 bearing production numbers WP0000035 through WP0000038 and WP0000278 through WP0000287, as well as documents bearing production numbers WP0000061 through WP0000074, which relate to the role of the Facility Grievance Officer. Additionally, see the documents produced herewith bearing production numbers DC-WAP 000295 through DC-WAP 000342.

**REQUEST FOR PRODUCTION NO. 13:**

All Documents reflecting grievances filed or requests for accommodation at CTF made by Plaintiff or on Plaintiff's behalf during Plaintiff's time as an inmate at CTF.

2780604.1

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is vague and ambiguous; duplicative of Request Nos. 12, 15, 17, and 18; calls for the production of documents which Plaintiff has already obtained from this Defendant; and unduly burdensome to the extent that the request does not indicate who may have made requests "on Plaintiff's behalf" or the manner in which such requests were submitted.

Without waiving these objections, on July 10, 2010, Defendant District of Columbia disclosed and produced copies of all Informal Resolutions and the complete Facility Grievance Officer's file for all Formal Grievances submitted by Plaintiff at CTF, identified by production numbers DC-WAP 000148 through DC-WAP 000154. Additionally, Plaintiff has previously disclosed and produced identical documents to Defendant on July 10, 2013 bearing production numbers WP0000035 through WP0000038 and WP0000278 through WP0000287, as well as e-mail communications involving David Holder, bearing production numbers WP0000154 through WP0000157; WP0000289 through WP 0000291; and WP0000297 through WP0000307. Additionally, see the documents produced herewith bearing production numbers DC-WAP 000343 through DC-WAP 000358.

**REQUEST FOR PRODUCTION NO. 14:**

All contracts and any other Documents reflecting agreements between Defendant or CCA and any medical vendor regarding provision of medical care to inmates at CTF in effect at any time from February 1, 2010, to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this Request calls for production of documents which Plaintiff has already

-14-

obtained from this Defendant; overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, to the extent it seeks discovery related to any inmate detained or incarcerated at CTF which is not under the legal custody of the D.C. Department of Corrections; calls for the production of documents which may be subject to the attorney-client and/or deliberative process privilege; and duplicative of Request No. 17.

Without waiving and subject to these objections, please see the documents bearing production numbers WP0000077 through WP0000154, which were previously produced and disclosed by Plaintiff on July 10, 2013 and reflect the state of agreement between the District and CCA relating to CCA's duty and role in the provision of medical care to District inmates detained or incarcerated at CTF. Additionally, see the documents produced herewith bearing production numbers DC-WAP 000359 through DC-WAP 000562.

**REQUEST FOR PRODUCTION NO. 15:**

All Documents reflecting Plaintiff's Communications with or attempts to communicate with You.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks documents relating to any communication with any District Agency, office, or official not pertaining to the provision of direct services or interaction with any inmate at CTF; overbroad as to subject matter of communication; calls for the production of documents which may be subject to the attorney-client and/or deliberative process privilege; duplicative of Request Nos. 13 and 18; and calls for production of documents which Plaintiff has already obtained from

-15-

this Defendant.

Without waiving these objections, please see the documents bearing production numbers WP0000030 through WP0000038, WP0000154 through WP0000158, WP0000160 through WP0000162; WP0000166 through WP0000169; WP0000180 through WP0000202;   WP0000206; WP0000208 through WP0000209; WP0000212 through WP0000259; WP0000270 through WP0000276; WP0000278 through WP0000281; WP0000283 through WP0000284; WP0000286 through WP0000287; WP0000289 through WP0000291; and WP0000294 through WP0000307, previously produced and disclosed by Plaintiff on July 10, 2013.  Please also see the documents bearing production numbers DC-WAP 000001 through DC-WAP 000154 previously produced and disclosed to Plaintiff on July 10, 2013.  Defendant District of Columbia does not believe it has any other relevant, non-privileged documents in its possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 16:**

All Documents concerning provision of federal financial assistance to DOC or CCA for the operation of CTF, that is, Documents showing the source, amount, date of receipt, or purpose of federal funds received.  This request encompasses any and all such Documents from February 1, 2010 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is overbroad; unduly burdensome; calls for production of documents which Plaintiff has already obtained from this Defendant; and not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving and subject to those objections, see the documents bearing production numbers WP0000004 through WP0000006, previously produced and

2780604.1

disclosed by Plaintiff on July 10, 2013. Defendant District of Columbia does not dispute that the Department of Corrections receives federal financial assistance as the term is used in 29 U.S.C. § 794(a).

**REQUEST FOR PRODUCTION NO. 17:**

All Communications between Defendant and its contractors concerning accommodations for deaf and hard of hearing inmates, including contractual consequences of any failure to provide accommodations.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is vague and ambiguous as to the term "contractor"; overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks any information pertaining to any contractor not involved in the provision of direct services or interaction with any inmate at CTF; overbroad as to time; and calls for production of documents which Plaintiff has already obtained from this Defendant.

Without waiving and subject to these objections, see the documents bearing production numbers WP0000001 through WP00000038 and WP0000077 through WP0000153, previously disclosed and produced by Plaintiff on July 10, 2013, and documents bearing production numbers DC-WAP 000148 through DC-WAP 000154, previously disclosed and produced to Plaintiff on July 10, 2013. Additionally, see the documents produced herewith bearing production numbers DC-WAP 000563 through DC-WAP 000582. Defendant District of Columbia will supplement if additional responsive, non-privileged documents are identified or located.

-17-

**REQUEST FOR PRODUCTION NO. 18:**

All Documents related to complaints or grievances by deaf or hard of hearing inmates at CTF.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

In addition to the foregoing general objections, Defendant District of Columbia objects that this request is vague and ambiguous as to what constitutes a "complaint"; calls for the production of documents which Plaintiff has already obtained from this Defendant; duplicative of Request Nos. 13 and 15; overbroad as to time and subject matter; unduly burdensome and calls for speculation to the extent that this request presumes that Defendant District of Columbia has certain knowledge as to the state of hearing of each inmate in its custody, rather than relying upon medical history as reported by the inmates themselves to the District's medical contractor during medical intake at either the Central Detention Facility or CTF; is unduly burdensome to the extent it imposes an ongoing obligation to inquire as to hearing status as to each inmate assigned to CTF during the future course of this litigation; and unduly burdensome to the extent production of documents pertaining to any inmate other than Plaintiff would constitute disclosure of "protected health information" by a covered entity or a business associate in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), P.L. 104-191, and related regulations at 45 C.F.R., Part 160, *et. seq.*, the release of which in the absence of consent of the third parties whose information is sought or a Qualified Protective Order authorizing the release of the same subjects Defendant to potential civil liability and penalties.

Without waiving and subject to these objections, on July 10, 2010, Defendant District of Columbia disclosed and produced copies of all Informal Resolutions and the complete Facility Grievance Officer's file for all Formal Grievances submitted by Plaintiff at CTF, identified by production numbers DC-WAP 000148 through

-18-

2780604.1

DC-WAP 000154.   Additionally, Plaintiff has previously disclosed and produced identical documents to Defendant bearing Plaintiff's production numbers WP0000035 through WP0000038 and WP0000278 through WP0000287.

Dated: July 25, 2013

_____
Daniel P. Struck, D.C. Bar No. CO0037
Anne M. Orcutt, D.C. Bar No. OK0011
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone:   (480) 420-1600
Facsimile:   (480) 420-1694

Mariana D. Bravo, D.C. Bar No. 473809
Matthew Berkowitz, Bar No. 974170
CARR MALONEY, P.C.
1615 L Street, N.W., Suite 450
Washington, DC 20036
Telephone:   (202) 310-5500
Facsimile:   (202) 310-5555

*Attorneys for Defendant District of Columbia*

-19-

## CERTIFICATE OF SERVICE

☒    I hereby certify that on July 25, 2013, I caused a true and correct copy of the foregoing to be served by First Class United States mail, postage prepaid, addressed to the following:

        Frederick V. Mulhauser
        Arthur B. Spitzer
        Jennifer A. Wedekind
        AMERICAN CIVIL LIBERTIES UNION
        4301 Connecticut Avenue NW
        Suite 434
        Washington, DC 20008
        (202) 457-0800
        Fax: (202) 457-0805
        Email: fmulhauser@aol.com
        Email: artspitzer@gmail.com
        Email: Jennifer@aclu-nca.org

        Bizunesh Talbot
        Rachel Tennis
        STEPTOE & JOHNSON, LLP
        1330 Connecticut Avenue, NW
        Washington, D.C. 20036
        (202) 429-6475
        Fax: (202) 429-3902
        Email: bscott@steptoe.com
        Email: rtennis@steptoe.com

        *Counsel for Plaintiff William Pierce*
        Gary Feldon
        OFFICE OF THE ATTORNEY GENERAL
        FOR THE DISTRICT OF COLUMBIA
        441 4th Street NW
        Suite 600S
        Washington, D.C. 20001
        (202) 727-3400
        Fax: (202) 347-8922
        Email: gary.feldon@dc.gov

        *Co-Counsel for District of Columbia*

2780604 1

Terence J. O'Connell
O'CONNELL & O'CONNELL
401 East Jefferson Street, Suite 204
Rockville, MD 20850
(301) 424-2300
Fax: (301) 424-2394
Email: toconnell@oconnelllaw.com

*Co-Counsel for Defendant District of Columbia*

-21-

EXHIBIT 12

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
--------------------------------
                              :
WILLIAM PIERCE,               :
                              :
        Plaintiff,            :
                              :
    v.                        :  Case No.
                              :
DISTRICT OF COLUMBIA,         :  1:13-cv-00134 KBJ
                              :
        Defendant.            :
                              :
--------------------------------
```

30(b)(6) Deposition of JAMES RIDDICK, a

witness herein, at the law offices of Steptoe &

Johnson, LLP, 1330 Connecticut Avenue, N.W.,

Washington, D.C., commencing at 10:26 a.m. on

Wednesday, October 2, 2013, and the proceedings being

taken down by stenotype and transcribed by Catherine

B. Crump, a Notary Public in and for the District of

Columbia.

1          MR. STRUCK:  Form.

2          THE WITNESS:  I'm not sure that I know how to

3     answer your question.  I'm not sure I know how to

4     answer your question.

5     BY MS. TALBOT:

6          Q.    So if there was a new legal requirement

7     that came up today --

8          A.    All right.

9          Q.    -- how would you make sure that CCA

10    created the policies that it needed to implement that

11    new legal policy?

12         MR. STRUCK:  Form.

13         THE WITNESS:  In that essence, we would meet

14    with them, this is what we need to do and so you guys

15    need to develop a procedure to cover this new

16    requirement, and they do their policy.  We review it

17    and we determine if it's appropriate and sign off on

18    it and it becomes law.

19    BY MS. TALBOT:

20         Q.    But as to laws that are already in

21    effect or anything that they're already supposed to

22    do, there isn't any kind of regular review to make

1   sure that they have every policy that they're

2   supposed to have?

3          MR. STRUCK:  Form.

4          THE WITNESS:  It depends on your definition

5   of a regular review.

6          MS. TALBOT:  Okay.

7          THE WITNESS:  Because I review policies every

8   day.  I encounter situations every day, and most --

9   many times -- of course, I don't walk around with as

10  you've got a few policies, a stack of policies about

11  like this for us and them.  So it's impossible for

12  you to commit everything to memory.

13         I have some expertise in prisons.  So I have

14  a sense of what should occur in a prison, and so the

15  process that we have in place is when they present a

16  policy, and I presume that people who were there

17  before me did the same thing, they review the policy

18  and they sign off on it, all of their policies.  You

19  know they are presented to DOC for review and they

20  sign off on it.

21         MR. STRUCK:  For the record, the witness

22  indicated a stack, when he was talking about the

1        Q.    Primarily, yes.

2        A.    My chain is to go to the warden.

3        Q.    And the expectation is that if there's

4    anything that CCA Corporate has to handle, the warden

5    would be the interface?

6        A.    Yes.

7        Q.    I want to ask you some general questions

8    related to Question 6 here.  Generally, how does the

9    District of Columbia monitor CCA's compliance with

10   the ADA?  That's basically more specifically ensuring

11   that any disabilities that need to be accommodated

12   for inmates are accommodated for the inmates.

13       A.    Could you repeat that again?

14       Q.    Okay.  This is just Question 6 and it's

15   just, again, a general question, and I will get into

16   some specifics, but I'm just trying to understand

17   your role here.

18       So maybe I should ask does the District of

19   Columbia monitor CCA's compliance with the Americans

20   with Disabilities Act in discharging CCA's contract

21   duties?

22       A.    My answer is yes.  Again, I have to

1  premise my response to it's situational.

2          Q.    Okay.

3          A.    If a matter comes up that deals with an

4  inmate with disabilities and it comes to my office,

5  then I look at the procedure and make a determination

6  as to whether or not it's appropriate.

7          Q.    And how would situations come up to your

8  office?

9          A.    Inmates will write a grievance.

10         Q.    When you say inmates will write a

11 grievance, what's the grievance process that you're

12 referring to?

13         A.    They may file a formal complete.  They

14 may file an informal complaint.  They might just see

15 me in passing and pass me a note.

16         Q.    And these are inmates at the CCA?

17         A.    Yes.

18         Q.    The CTF facility?

19         A.    Yes.

20         Q.    Do you coordinate with Ms. Allen, who we

21 understand is the grievance coordinator?

22         A.    Yes.  Informally, I interact with any

1    CCA employee if there is an issue in their area that

2    concerns me.  That's not my primary contact.  My

3    primary contact is the warden.  If I need some

4    peripheral kind of information or something, I might

5    ask a question and they tell me.

6         Q.    Okay.  Outside of the situational events

7    that come up because of a particular inmate or a

8    particular circumstance, is there any regular either

9    periodic, whether it's annual or through reports or

10   through data, anything like that that that is used to

11   monitor CCA's compliance with the ADA?

12        A.    Well, the process is ongoing with regard

13   to any situation that occurs at CTF, and events

14   dictate many times what area I'll be looking into.

15        Q.    I'm trying to get a context out of maybe

16   specific situations.  For example, and I'm making

17   this up as a hypothetical, you know, do you have a

18   report of some sort that indicates CCA was

19   responsible for "X" number of disabled inmates and

20   here are the "Y" number of accommodations that were

21   provided?

22        A.    No.

1          Q.     Or something that's sort of set on an

2     annual basis, you know, this is the amount of money

3     or effort or time spent on accommodations?

4          A.     No.   No.   The requirement that CCA has

5     is that they remain ACA accredited, American

6     Correctional Association, that they maintain their

7     accreditation with the American Correctional

8     Association.   They have done that and, basically, if

9     they are accredited, that means that they meet the

10    minimum requirements.

11          There might be some other issues that are

12    unique to the District of Columbia that they have to

13    comply with.

14          Q.     Okay.   Maybe more generally, and this

15    gets somewhat into Question 7, what's the process --

16    and again, I'm trying to get out of a particular

17    situation happening, but what's the process generally

18    for monitoring CCA's compliance with the contract,

19    not necessarily the budget, but more the operations

20    and management, the handling of the inmates.

21          In this question, we did relate to specific

22    inmates, but I'm trying to just get a general

1  understanding of what I think would cover this

2  question.

3        A.    Well, the best response I can give you

4  is the presence of the contract administrator on the

5  property, and that is the best response I can give

6  you.  I am the contract administrator.  I'm

7  responsible for ensuring compliance with policies and

8  procedures.

9        There are a thousand and one things that go on

10 every day.  I can't possibly respond to one thousand

11 things from sweeping the floors and cleaning the

12 toilets to classification to housing decisions to

13 visiting to any number of processes that occur during

14 the course of a day.

15       When something flows to the surface, then,

16 obviously, it gets my attention.  In general, my

17 responsibility is to be accessible and be present,

18 visible, in the institution so that the inmates and

19 staff have access to bring matters to my attention.

20       Q.    Okay.  That's helpful, and then if there

21 are matters that come to your attention in these

22 situations that you mentioned where you notice a

1    convenience, I have a green tab marked as relates to

2    Article 5, 5.1.  Take a look and, again, for some

3    convenience, it's really the first sentence there.

4    If you could just take a look at that first sentence

5    and the requirements in 5.1.

6            [Witness peruses exhibit.]

7    BY MS. TALBOT:

8            Q.    My question is what is your

9    understanding of the meaning of that provision and

10   specifically as it relates to DOC policies.

11           MR. STRUCK:  Form.

12           THE WITNESS:  Well, I take it literally,

13   shall operate, maintain, and manage the CTF in

14   compliance with this agreement and all applicable

15   provisions of the Constitution and laws of the United

16   States and the District.  I take that literally.

17   That's what my anticipation is.

18   BY MS. TALBOT:

19           Q.    And the DOC policies?

20           A.    Right.

21           Q.    So as you're monitoring the contract, do

22   you use the Department of Corrections policies to

1    guide you in determining whether the CCA CTF is

2    discharging its duties?

3          MR. STRUCK:  Form.

4          THE WITNESS:  I have been in corrections for

5    a number of years, actually since 1974, and I've

6    served as warden at several institutions, including

7    CTF.  So I'm familiar with how institutions operate

8    and how they should run, and, of course, changes

9    occur on a regular basis.

10         My anticipation is that the institution will

11   operate at standards that I'm accustomed to.  Now,

12   when specific things come up, if I see that there is

13   something that I'm not comfortable with, then I might

14   cite a particular area, say, Well, you know, is this

15   requirement being met in that manner.

16         In terms of most of what happens in an

17   institution, when things go right, there are not very

18   many problems.  When things go wrong, then it becomes

19   a problem and that's when you address the issue.

20   Now, you have policies in place to prevent things

21   from going wrong, but as they say, the best laid

22   plans of mice and men sometimes go awry.

1        So it's a unique situation.  It's always

2   changing.  So I think my major attribute is my

3   background and experience in this area and knowing

4   where to find what I need when I need it if I

5   specifically need to quote a particular area.  Nine

6   times out of ten, 99 times out of a hundred, if I say

7   to the warden I've been on this unit two or three

8   times and I saw this condition and it needs to be

9   abated, they normally do.

10  BY MS. TALBOT:

11       Q.    All right.  One of things that I'm,

12  again, just trying to understand here is what would

13  you say is your sense of CCA CTF's view of D.C.

14  Department of Corrections policy?  Do you have an

15  understanding that they generally understand that

16  they have to follow D.C. Department of Corrections

17  policies or do you have a sense that they have their

18  own policies and they follow their policies?

19       A.    Generally, the policies or the

20  operations that see them engage are very similar to

21  what we do in DOC.  I don't see where -- here and

22  there, there are minor differences, I would imagine,

1  but for the most part the operations are very

2  similar.

3         We conduct shakedowns.  They conduct

4  shakedowns.  We do cell searches.  They do cell

5  searches.  The institutions are different.  The

6  custody levels of inmates are different.  So there

7  are some minor differences.

8         MS. TALBOT:  Okay.  I want to put another

9  document into the record.

10         Can we go off the record for a second.

11         [Discussion held off the record.]

12         MS. TALBOT:  I'm going to mark a document for

13  you, Exhibit Jk which is the D.C. CTF policy as it

14  relates to special management inmates, special needs,

15  and under the definition there, you see it includes

16  disabled inmates.

17                         [Exhibit J was marked

18                          for identification.]

19  BY MS. TALBOT:

20         Q.   What I want to do is compare that policy

21  with the policy already previously marked as Exhibit

22  B, which is the D.C. Department of Corrections

1    program statement relating to accommodating persons

2    with disabilities.  So first a general question:  As

3    it relates to two policies like this, again, one is a

4    D.C. Department of Corrections policy and one is a

5    specific policy by the contractor, what is the role

6    of your office in ensuring that the policy presented

7    by CTF meets the standards under the contract?

8         MR. STRUCK:  Object to the form.

9         THE WITNESS:  What is my role for ensuring?

10   Well, my role focuses on practice.

11   BY MS. TALBOT:

12        Q.   I didn't mean your role.  I just meant

13   your office, because I understand there could be

14   other people that work for you or around you that do

15   something different.

16        A.   Well, my focus is on practice.  I mean

17   the fact that they have a policy that accommodates

18   individuals with disabilities.

19        Now, the format of their policy is different

20   than this format.  We have lot of directives

21   effective that maybe they don't.  They may not

22   include it, but it adds to the length of the

1    document.  When you're talking about authority, you

2    know, you've got two or three pages of authority and

3    DOC response to general issues and a lot of puffery

4    in this policy, which may be required by the

5    standards of the D.C. Department of Corrections; but

6    in terms of the focus on practice, you know,

7    basically -- I'll look at this piece right here,

8    placement of inmates with special needs and how they

9    go about their process of doing it.  That is

10   essentially the piece that I would look at more.  You

11   know, this mirrors our policy.  It's not as in depth

12   as the policy for the District of Columbia, but, I

13   mean, say, for instance, restrooms.  DOC shall ensure

14   it has a restroom for visitors in a wheelchair.  CTF

15   has a restroom for visitors, but it's not in the

16   policy.  So if somebody shows up in the wheelchair

17   and they can't use the restroom, it would affect me

18   because the inmate is entitled to visitors and if the

19   visitor shows up and get into the building, that

20   would be a problem for me.

21        So that would be where I would say, Okay, you

22   guys have to make sure that you have an accommodation

1   for folk who have disabilities.  So I see this one is

2   just a different format.  It's the only thing I see.

3   The substance there is saying the same thing, that

4   you have to have accommodations for individuals with

5   disability.

6           Q.    I want to focus on a specific set that

7   we've been focusing on as it relates to

8   hearing-impaired inmates.  In Exhibit B, that's on

9   page 12.  It starts on page 12 with paragraph 30.  So

10  it talks about auxiliary aids and services, some

11  specific requirements relating to written

12  communications in paragraph 31, a specific paragraph

13  relating to interpreters in paragraph 32, and then if

14  you flip the page.

15          A.    Okay.  Now, what are we looking at?

16          MR. STRUCK:  Starting with here.

17          The witness:  31?

18          MS. TALBOT:  Starting with 30, actually.

19          MR. STRUCK:  Oh, okay.

20          THE WITNESS:  Okay.  Can I write on this?

21          MS. TALBOT:  Okay.

22          THE WITNESS:  Okay.

1        MS. TALBOT:  31 relating to written

2   communications, paragraph 30 relating to

3   interpreters.

4        MR. STRUCK:  32.

5        MS. TALBOT:  32 relating to interpreters.

6   I'm making sure you're awake there.

7        MR. STRUCK:  Yeah.

8        [Witness peruses document.]

9        MR. STRUCK:  Did you have question about it?

10       MS. TALBOT:  I did.  I wanted to make sure he

11  was finished.

12  BY MS. TALBOT:

13       Q.   My question is as it relates to these

14  provisions specifically, how would you ensure either

15  through a policy or practice that CTF is providing

16  the services that are outlined in this program

17  statement?

18       A.   Okay.  Well, if this issue came to my

19  attention, if I have an inmate and I find out that

20  he's in the system and he's not getting or she's not

21  getting access or that they're making a complaint, I

22  would investigate the complaint to see if those

1    services that they would have received at DOC are

2    being provided at CTF in one form or another.  They

3    don't specifically have to duplicate exactly what we

4    do, but they need to provide the service.

5         Q.    Okay.  I think I'm understanding a bit

6    more now.  So this is going to come up in a

7    situation.

8         A.    Yes.

9         Q.    There isn't anyone that would take a

10   look at these two documents and just maybe even

11   prioritize certain policies and say, you know, we're

12   just going to look at the policies and we're going to

13   ask you questions; you know, an issue hasn't come up,

14   but we're just going to ask you questions so that we

15   can --

16        A.    Okay.  Well, I guess my response is that

17   this contract was let in 1997, if I'm not mistaken.

18        MR. STRUCK:  '96.

19        The witness:  '96, and I was actually the

20   warden at CTF when CCA took over and they provided

21   their procedures and all of that at that time.  Since

22   1997 until now, they've been adding to it.  When the

1    throughout the course of time and procedures are

2    updated.

3         Q.    Right.

4         A.    Something might become obsolete, updated

5    it or they reissue it.  It might not need to be just

6    reviewed.  So that's our process.  That is their

7    process.

8         Q.    And I look at the document, for example,

9    and that's a great explanation in terms of Exhibit B

10   seems to have been updated February of 2008.  The

11   last time it had been updated before then -- if you

12   look there, this was updated in 2008 and you can see

13   the last time it had been updated was 1992.

14        So to your point, in 2008, they changed some

15   things.  They put more words in here.  I look at the

16   CTF policy, and this one, the effective date is 1998,

17   and so to your point, I wonder, Well, they haven't

18   maybe gotten around to updating some things.

19        So what I'm trying understand is how you can

20   facilitate and maybe even we can facilitate, how do

21   you sort of make sure that CTF is keeping things up

22   to date.  This is over 10 years old now.

```
 1          MR. STRUCK:  Form.

 2          THE WITNESS:  How do we make sure they're

 3   keeping thing up to date?  Well, One of the basic

 4   barometers of whether or not an institution is

 5   functioning is the inmates.  They will say -- you

 6   know, besides they're ACA accredited -- that's one

 7   way of knowing, because when you go through an ACA

 8   accreditation, you have to provide all of your

 9   policies and they have to be updated.  You can only

10   miss so many points before you fail.

11          Well, they have maintained their

12   accreditation for the past 12 years, I guess, that

13   they've been there.  So I think for us, that's a

14   barometer for how effective this institution is

15   operating and whether or not their policies are

16   current because those are the things you look at when

17   you go through accreditation.  You look at policies

18   and practices.

19          So that would be an indicator to DOC that

20   they are and that was why that was one of the

21   stipulations in the contract, because it sort of

22   keeps you current.  Now, you know, I can't speak
```

1    specifically to this policy, if this is the current

2    policy.

3    BY MS. TALBOT:

4          Q.    We can stipulate that it is.

5          A.    Yeah.  As far as I know, you like to

6    review your policies.  I don't know what their -- I

7    really don't know what their process is for updating

8    the policies.

9          MS. TALBOT:  Okay.  We can go off the record

10   for a second.

11         [Recess.]

12   BY MS. TALBOT:

13         Q.    I just want to go through a couple of

14   questions for the record as it relates to the

15   exhibits before you.  Let me order them quickly to

16   make it easier.

17         I just want to go through and confirm for the

18   record just your -- as the contract monitor, whether

19   or not you discussed any of these specific program

20   statements with CCA.  So with respect to Exhibit B,

21   which we were speaking -- we were discussing right

22   before the break as it relates to the accommodations

EXHIBIT 13

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------------
                                 :
WILLIAM PIERCE,                  :
                                 :
        Plaintiff,               :
                                 :
    v.                           :   Case No.
                                 :
DISTRICT OF COLUMBIA,            :   1:13-cv-00134 KBJ
                                 :
        Defendant.               :
                                 :
--------------------------------


    30(b)(6) Deposition of W██████ FULTON████ a

witness herein, at the law offices of Steptoe &

Johnson, LLP, 1330 Connecticut Avenue, N.W.,

Washington, D.C., commencing at 9:10 a.m. on Tuesday,

October 1, 2013, and the proceedings being taken down

by stenotype and transcribed by Catherine B. Crump, a

Notary Public in and for the District of Columbia.

Page 12

1    the area, that kind of thing.  As a matter of fact,

2    today, I'm the acting warden.

3         Q.    Okay.  And has there ever been a time

4    that there hasn't been a warden and so that position

5    has gone unfilled and you served as the acting

6    warden?

7         A.    Not during my tenure.

8         Q.    As the assistant warden, do you have a

9    written job description?

10        A.    Yes.

11        Q.    And I appreciate that it is a big job,

12   but if you could just give us a description,

13   generally, of your job description for the record.

14        A.    I'm responsible for the administration

15   of the budget, all duties and responsibilities to

16   assist the warden.  I participate in the hiring

17   process, but do not normally make the hiring

18   designation.  I help to manage the facility in its

19   many facets.

20        Q.    To whom do you report?

21        A.    I report currently to R███████ Byrd.  He

22   is our warden, B-Y-R-D.

1          Q.    I want to turn back to the language in

2   5.1 which is on page 10 of the contract.  I'll ask a

3   pretty directed question here.

4          Is it CTF's or CCA's position -- is it CCA's

5   position that with respect to the operation and

6   management of CTF, it is required to follow the

7   Department of Corrections policies?

8          MR. STRUCK:  Form.

9          THE WITNESS:  Generally, yes, but I can't

10  tell you I am completely knowledgeable of all D.C.

11  DOC policies.

12  BY MS. TALBOT:

13         Q.    Is your staff trained on D.C. Department

14  of Corrections policies?

15         A.    Are they trained on them?  Generally

16  speaking, with the exception of certain areas, again,

17  sexual misconduct, PREA, and to some degree

18  disciplinary policies, no.

19         MS. TALBOT:  I want to turn to discussing some

20  specific DOC policies.  For ease, I will go ahead and

21  mark them all now.

22         MR. STRUCK:  Just so I can make a record, one

1    CTF.

2         Q.    So is it your testimony that the ADA

3    coordinator does not oversee the application of this

4    policy to CTF?

5         MR. STRUCK:  Form and foundation, beyond the

6    scope of the 30(b)(6) areas.

7         THE WITNESS:  Yes.  That's my statement.

8    BY MS. TALBOT:

9         Q.    Okay.  And is it your testimony that

10   there isn't an ADA coordinator that is tracking and

11   monitoring inmates with disabilities?

12        A.    At CTF?

13        Q.    At CTF.

14        A.    If there is an individual doing that, it

15   would be from the medical side.

16        Q.    Okay.

17        A.    Okay.

18        Q.    And the ADA coordinator is responsible

19   to investigate complaints.  Does the ADA coordinator

20   investigate any complaints at CCA -- at CTF.  My

21   apologies.

22        MR. STRUCK:  Form and foundation.

1          THE WITNESS:  No.

2    BY MS. TALBOT:

3          Q.    Under 5(C), it indicates that the

4    warden's and contracted CCA's Correctional Treatment

5    Facility, shall specifically provide accommodations

6    for persons with disability consistent with federal

7    law, the contractual agreement, and this directive.

8    Is it your position that CCA's Correctional Treatment

9    Facility is abiding by that particular Provision

10   5(C)?  That's on page 3.

11         MR. STRUCK:  Form.

12         THE WITNESS:  Yes.

13   BY MS. TALBOT:

14         Q.    With respect to on page 4-9, this

15   Section 9 goes through a few specific issues with

16   respect to the CCA CTF facility.  Does CCA at the CTF

17   facility provide staff and inmates with access to

18   trained and qualified individuals specifically

19   relating to hearing-impaired inmates?

20         MR. STRUCK:  Form.

21         THE WITNESS:  Can you repeat the question?

22   BY MS. TALBOT:

1        Q.    Certainly.  Does CCA CTF provide inmates

2   with access to trained individuals, individuals who

3   have trained specifically to deal with issues

4   relating to deaf and hearing-impaired inmates?

5        MR. STRUCK:  Form.

6        THE WITNESS:  Currently, yes.

7   BY MS. TALBOT:

8        Q.    And when did CCA CTF begin providing

9   such access?

10        A.    I can't give you an exact date, but it

11   was toward the end of Mr. Pierce's stay.

12        Q.    And what resource would that have been

13   that you're referring to?

14        A.    We had sought accommodations through a

15   volunteer that we had that was employee of Gallaudet

16   University and, in addition, we have since contracted

17   with the Graham Agency who employs sign language

18   interpreters.

19        Q.    We'll talk about that a bit later.

20        A.    Okay.

21        Q.    With respect to the Provision 9(D)

22   that's on page 5, this is really just a bit more

1   detailed to the one we just went through, but I want

2   to ask it for the record, whether CCA CTF takes the

3   position that it is responsible for furnishing

4   appropriate auxiliaries and services where necessary

5   to afford an individual with a disability an equal

6   opportunity to participate in services, programs, or

7   activities conducted at CTF.

8          MR. STRUCK:  Form.

9          THE WITNESS:  Are you referring to the

10  section on auxiliary aids?  Is that what you're

11  referring to?

12  BY MS. TALBOT:

13         Q.    Yes.

14         A.    Okay.  I would say yes.

15         Q.    Okay.  I want to go here to page 12, and

16  this is just a numbered, a separately number

17  paragraph, paragraph 13.  Is it your position that

18  CCA recognizes that at CTF, it shall provide -- and I

19  recognize this is a bit of an overlap.

20         MR. STRUCK:  I'm sorry.  What page are you

21  on?

22         MS. TALBOT:  I'm on page 12, paragraph 30.

1           MR. STRUCK:   I thought you said 13.

2           THE WITNESS:   You said 13.

3    BY MS. TALBOT:

4           Q.    Okay.  Page 12, paragraph 30.  I

5    misspoke.  Whether it's CCA's position that it is

6    required under its contract to provide at CTF

7    auxiliary aids and services to ensure effective

8    communication with inmates.

9           A.    Again, yes.

10          Q.    And going to paragraph 31 relating to

11   written communications with individuals who are

12   hearing impaired, is it your position that CCA CTF

13   follows the paragraphs A, B, C, and D here relating

14   to notification of the availability of sign language

15   interpreters and video conferencing?

16          A.    No.

17          Q.    If you could explain to me why CCA does

18   not follow paragraph 31 at CTF.

19          If it's easier, let's go through.  Does it

20   follow 31(A)?  If you can explain to me whether it

21   follows 31(A) at CTF.

22          [Witness peruses document.]

1          THE WITNESS:  We will notify during

2    individual counseling that it's available.  Okay.

3    BY MS. TALBOT:

4          Q.    What is the "that" you are referring to

5    for the record?

6          A.    For a sign language interpreter.

7          Q.    And is that provided via video

8    conferencing?

9          A.    Negative.  We have no infrastructure

10   capability for video conferencing at this time.

11         Q.    With respect to 31(C), does CCA CTF

12   follow this directive that written communication

13   cannot be used as a substitute where the individual

14   has expressed a preference for a sign language

15   interpreter?

16         A.    Currently, yes.

17         Q.    When did CTF begin following this

18   directive?

19         A.    Probably after Mr. Pierce's

20   incarceration.

21         Q.    With respect to paragraph 32, is it your

22   position that CCA CTF recognizes that the

1    interpreters have to be qualified?

2         A.    Yes.

3         Q.    And just to follow up on the next page,

4    it has this specific statement about what qualified

5    means.  I just want to make sure you read that for

6    the record, 31(A), which is an interpreter who is

7    able to interpret effectively, accurately, and

8    impartially.

9         MR. STRUCK:  That's 32(A).  You said 31(A).

10        MS. TALBOT:  Thank you.  That's correct.

11   It's 32(A).  I did state on the record my difficulty

12   with both numbers and letters.

13        MR. STRUCK:  That's fine.

14        MS. TALBOT:  So I do appreciate the help.

15   Thank you.

16        MR. STRUCK:  Sure.

17        [Witness peruses document.]

18        THE WITNESS:  I acknowledge.

19   BY MS. TALBOT:

20        Q.    And with respect to 32(C), it indicates

21   a non-exhaustive list here, nine areas where an

22   interpreter may be required.  Does CCA CTF take the

Page 44

1    through them.

2         Q.    With respect to access to

3    telecommunication typewriters or TTY -- this is in

4    paragraph 33 on page 14 -- it's been represented that

5    there are TTY units available at CTF.  So I just want

6    to speak specifically to 33(C) relating to time

7    limits.

8         Are you aware of -- is it CCA's position that

9    CTF must follow the directive as it relates to the

10   time limits on TTY calls?

11        MR. STRUCK:  Form.

12        THE WITNESS:  In those cases where TTY has

13   been utilized, it is my understanding that additional

14   time has been allotted the inmate.

15   BY MS. TALBOT:

16        Q.    With respect to paragraph 34, again,

17   it's been stated that there are visual emergency

18   alarms in certain areas.  With respect to 34(B), are

19   there visual emergency alarms in the rooms that a

20   deaf inmate may specifically reside in, so their

21   individual cell, if you will?

22        A.    No.

1          A.     Okay.

2          Q.     But in the communication you had with

3     him in your office, you didn't write anything down,

4     did you?

5          A.     No.  I think he was able to understand.

6          Q.     Anything else from that time period?

7          A.     No.  That was the initial.  I mean, you

8     want me to go further?

9          Q.     Yes.  Just focused on that time period,

10    yes.

11         A.     I think later on, I received word back

12    from Mr. Pierce that he wasn't happy with the

13    individual's ability to assist him, that he needed

14    further assistance.  So we sought the assistance of

15    one of our volunteers who, to my knowledge, was

16    certified in sign language, worked at Gallaudet

17    University, and he came in and provided some

18    assistance also.

19         Q.     Anything else?

20         A.     Not specifically in that class.  I think

21    this was in the anger management portion that Mr.

22    Pierce was doing in order to be able to shorten his

Page 65

1    provide any specific training or guidance to the

2    staff that worked directly with Mr. Pierce as it

3    related to his hearing impairment?

4           A.    Well, I spoke to a number of the staff

5    that were in direct contact with him, because I was

6    not in direct contact with him, to heighten their

7    sensitivity, to make them aware of the fact that the

8    individual did have special needs and, you know,

9    we're going to do everything to the best of our

10   ability to go ahead and accommodate those needs.

11          Q.    One other thing I'm not sure if you are

12   aware of, was there ever an attempt to accommodate

13   his request as related to his roommate?

14          A.    I don't recall that, to be honest with

15   you, or what his request was.

16          Q.    And just for the record, anything

17   relating to medical and accommodating him with the

18   medical staff would not have been your

19   responsibility.  Correct?

20          A.    That's correct.

21          Q.    And it wouldn't have been the

22   responsibility of CCA.  Correct?

Page 69

1          A.    Correct.

2          Q.    And who would she report to?

3          A.    The warden.

4          Q.    If you know, what would be her

5   interaction with the contract monitor?

6          A.    Usually, only as directed by the warden,

7   because, normally, the contract monitor is going to

8   interact directly with the warden.

9          Q.    You spoke previously of -- I asked you

10  about two sets of reports, reports that you make

11  specifically to the D.C. Department of Corrections

12  and reports that you make specifically to CCA

13  Corporate.  I just want to go back to each set of

14  these.

15         With respect to the reports that you make to

16  the D.C. Department of Corrections, do any of those

17  reports relate to inmates with disabilities?

18         A.    No.

19         Q.    With respect to reports that go to CCA

20  Corporate, do any of those reports relate to inmates

21  with disabilities?

22         A.    No.

1  That's the part I don't understand, what you were

2  doing that was compliant.

3          A.    The way I took the response was that no

4  one else was providing interpreters.  That's the way

5  I took it.

6          Q.    Okay.

7          A.    Okay.

8          Q.    I'm just trying to understand your

9  answer.

10         A.    Whether that was, you know, a valid

11 interpretation or not, I don't know.

12         Q.    Okay.  And which department or

13 individual at CCA Corporate would you have been

14 speaking to?

15         A.    Legal.

16         Q.    Did you ask for any specific guidance,

17 similar guidance, with respect to accommodating

18 hearing-impaired individuals from the D.C. ADA

19 monitor during the period of February 1, 2012 to

20 March 31, 2012?

21         A.    Yeah.  Initially, I spoke with general

22 counsel, Marie Amano.  She provided me with some

Page 74

1    insight into that area and then referred me to their

2    ADA monitor.

3           He, in turn, provided me with information as

4    to a contract that they had set up with -- I think

5    they're using the Graham Agency too, if I'm not

6    mistaken, and therefore we pursued a contract with

7    the Graham Agency.

8           Q.    And when did you enter into a contract

9    with the Graham Agency?

10          A.    It was toward the end of Mr. Pierce's

11   incarceration or soon after.  That's my recollection.

12          Q.    And I'm not familiar with the agency,

13   but what does the contract provide for?

14          A.    They have certified sign interpreters

15   that are available on an hourly basis that once they

16   receive notice that they will line up an interpreter,

17   send them in and we can utilize them.

18          Q.    And is there a retainer for the

19   contract?  So do you pay regardless of if you use the

20   services?

21          A.    No.  It's a per hour basis.

22          Q.    And who was the ADA monitor that you

1    services for accommodations, I want to get a sense or

2    understanding of how those items would be budgeted

3    for.  You mentioned that the Graham Agency contract

4    is on an hourly basis.  Is there a line item in the

5    budget that relates to those types of contingencies?

6         A.    I don't think there is a line item for

7    ADA specifically.  It would probably -- and, again,

8    I'm not the business manager.  So I can't speak

9    directly, but it would probably be charged under

10   contractual services just like legal fees or anything

11   else.

12        Q.    Was there any budget constraints, again,

13   around February or March 2012, that impacted the

14   provision of the interpreting services?

15        MR. STRUCK:  Form.

16        THE WITNESS:  Not out of the ordinary.

17   BY MS. TALBOT:

18        Q.    We understand that there were

19   significant layoffs in April, perhaps, of 2012.  To

20   your knowledge, was that specifically focused on

21   personnel or was that focused on reducing all

22   expenses under the contract between CCA and the

1    District?

2          A.    Oh --

3          MR. STRUCK:  Form and foundation and beyond

4    the scope of the 30(b)(6).

5          THE WITNESS:  The budget layoff was in

6    response to the fact that our heads and beds, the

7    number of inmates that we had was below projection.

8    Our staffing authority was based on the head and beds

9    projection.  So, therefore, it was reduced to mirror,

10   basically, what we had on hand and reduce costs in

11   that area.

12         It really had no bearing on nonpersonal

13   services funding.

14         Q.    Okay.  What's the budget cycle for CCA

15   or specifically for CTF?  Is it a January 1st

16   calendar year?

17         A.    I believe it's January 1st.

18         Q.    And we'll probably get into this a bit

19   after lunch, but what I'm trying to understand, and

20   we can talk more specifically after lunch, was the

21   sense that we understand in your communications with

22   Mr. Holder that you had indicated that there was no

1   money in the budget for an interpreter.

2        A.    Well, that would be correct.  There was

3   no specific line item for an interpreter, nor was

4   there a designated line item in the budget.

5        Q.    Has that changed at all with the Graham

6   Agency contract?

7        A.    I don't think they have identified a

8   specific line item for ADA; however, they may have

9   increased funding under, you know, general contracts.

10       Q.    Okay.  So is the issue that before

11  entering into the Graham Agency contract, there

12  wouldn't have been sufficient money in the general

13  contracts line item for provision of interpreters?

14       MR. STRUCK:  Form, beyond the scope.

15       THE WITNESS:  I wouldn't use the word

16  "sufficient".  I would substitute the word

17  "specific".  There may have been funding available if

18  the determination was made to charge it against, you

19  know, general professional services and contracts.

20  BY MS. TALBOT:

21       Q.    Let me ask it a different way:  Did the

22  cost of the service factor into using the volunteer

1    that you had mentioned earlier in your testimony

2    versus going with an agency as it specifically

3    related to accommodating Mr. Pierce?

4         A.    Expenditures of any nature are always a

5    consideration.

6         Q.    Would those expenditures need to be

7    approved by someone outside of the CTF CCA staff?

8         A.    I don't think so.  I think the warden

9    probably had the authority to do that.

10        MS. TALBOT:  I don't have any other questions

11   before break.  Do you want do rebuttal now or do you

12   want to do it at the end of the day?

13        MR. STRUCK:  I don't have any questions right

14   now and very likely won't have any questions.

15        MS. TALBOT:  Okay.  We can go off the record.

16        MR. STRUCK:  So we're done with the 30(b)(6)

17   portion?

18        MS. TALBOT:  Can we go off the record.

19        [Discussion held off the record.]

20        MR. STRUCK:  Off the record, counsel and I

21   discussed the fact that the plaintiffs are now done

22   asking Mr. Fulton questions with respect to his

EXHIBIT 14

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
--------------------------------
                               :
WILLIAM PIERCE,                :
                               :
        Plaintiff,             :
                               :
    v.                         :   Case No.
                               :
DISTRICT OF COLUMBIA,          :   1:13-cv-00134 KBJ
                               :
        Defendant.             :
                               :
--------------------------------
```

    30(b)(6) Deposition of CRAIG SWAISGOOD, a

witness herein, at the law offices of Steptoe &

Johnson, LLP, 1330 Connecticut Avenue, N.W.,

Washington, D.C., commencing at 10:26 a.m. on

Wednesday, October 2, 2013, and the proceedings being

taken down by stenotype and transcribed by Catherine

B. Crump, a Notary Public in and for the District of

Columbia.

1          Q.    And your current title?

2          A.    Risk manager.

3          Q.    And your employer?

4          A.    My employer?

5          Q.    Um-hum.

6          A.    Washington, D.C. Government, Department

7     of Corrections.

8          Q.    And how long have you been in this

9     position?

10         A.    About 15 months.  It was early July last

11    year.

12         Q.    And what did you do prior to that

13    position?

14         A.    I worked at the Department of Disability

15    Services.

16         Q.    Who was your employer there?

17         A.    The Department of Disability Services,

18    D.C. Government.

19         Q.    D.C. Government.  Thank you.

20         I won't go into your background and such

21    beyond that.  Well, actually, one question:  How long

22    did you work at the D.C. Department of Disability

1   Statement 3800.2.

2        First question:  Is there a difference between

3   program statement and policy and procedure?

4        A.   No.  I don't think so, no.

5        Q.   And I just want to understand the order

6   of these.  So 3800.2B indicates that it supercedes

7   3800.2A, but I have here that 3800.3A supercedes

8   3800.3, and I'm trying to understand.  My

9   understanding, actually, was that .3 had already been

10  superceded.

11       A.   When?  You're talking about the old

12  program statements?

13       Q.   [Gestures.]

14       A.   No.  It's my understanding that that was

15  a typo.

16       MS. TALBOT:  Oh.  Can we go off the record.

17       [Discussion held off the record.]

18  BY MS. TALBOT:

19       Q.   We had an off-the-record conversation

20  and I just want to clarify for the record it is

21  D.C.'s position that D.C. Department of Corrections

22  Program Statement 3800.3 that was effective September

1   30, 2003 remained effective until July 16, 2013.

2   Correct?

3         A.    That's my understanding, yes.

4         Q.    Okay.  With respect to both 3800.3A and

5   3800.2B --

6         A.    The new one?

7         Q.    The new ones, both of which were updated

8   just a few months ago, if you could describe the

9   process involved in updating both of these policies,

10  and you can do them individually if they were updated

11  separately or we can discuss them together.  You let

12  me know.

13        A.    The process is probably better described

14  by Ms. Samuels, but I can tell you my role in the

15  process.

16        Q.    Your role, and by process, I actually

17  was referring more to the substantive changes.

18        A.    Okay.  So a lot of them, the substantive

19  changes that I made, at least, were based on my

20  understanding of the ADA law and the process in which

21  we comply by it, and so I kind of went through line

22  by line, made suggestions, sent that back to our

1    always hit or if they hit it, but I certainly know

2    that we're expected from here on out to hit this

3    every year.

4         Q.    Okay.  I want to switch topics a bit to

5    under the deposition notice, we had indicated that we

6    wanted to talk about policies that were in effect for

7    a specific time, specifically February 2012 to March

8    2012.

9         A.    Right.

10        Q.    Which as that relates to my questions

11   would be Exhibit B and, actually, a document that we

12   don't have here, which would be 3800.3.

13        Can we go off the record for a second.

14        [Discussion held off the record.]

15   BY MS. TALBOT:

16        Q.    Focusing on 3800.2, and there is some

17   duplication in this and the policy that we will put

18   in the record as it relates to interpreters, and I'm

19   going to go here to paragraph 32 of 3800.2.

20        If you know, how did D.C. Department of

21   Corrections ensure that they had qualified

22   interpreters to fulfill this part of their policy?

1        A.    The Office of Disability Rights has a

2    contract.  I think it's for about a hundred thousand

3    dollars a year that everybody piggybacks on,

4    including the Department of Corrections.  Now, it's a

5    hundred thousand dollars, but DOC pays if DOC uses

6    it.

7        So it's just kind of contract that says, Hey,

8    we want to participate with you for sign language

9    interpreters.  To the degree that somebody needs one,

10   whether it's to be involved in a program, whether

11   it's to have a visit, we have certain standards that

12   they have to hit.  In other words, it has to be

13   reasonable.  I can't ask for an interpreter in five

14   minutes.  That's just not reasonable.  There's no way

15   we're going to be able to pull that off.

16       So assuming they do that, they let the

17   warden's office know.  They're going to let their

18   case manager know.  There's a variety of ways they do

19   that, but they let people know.

20       Recently, what happens is they call me and

21   they say, Craig, I need an interpreter from this time

22   to this time; this is the contact person.  So I know

1   now, Okay, I need to get somebody for Friday

2   afternoon, three to five, and they will send somebody

3   out.  They'll say, Hey, I'm here looking for John

4   Doe.  They'll conduct their visit.  They'll do their

5   program.  They'll do their class, whatever they need

6   to do.  We certainly have no problems doing that and

7   that's what we do.

8          Q.    And to the extent that you mentioned if

9   someone at D.C. Department of Corrections needs the

10  service they call you directly, when did that as a

11  process start?

12         A.    For me, as soon as I became the ADA

13  coordinator.  So I think, previously, what would

14  happen is if it's a case manager or whatever, they

15  call the warden's office and then the warden's office

16  facilitates whatever needs to happen.

17         So, presently, what needs to happen is they

18  call me and I set it up.  Previously -- it's a

19  contract.  So everybody's got the contact information

20  for our contractor or vendor.  Anybody can call.

21  They don't need to talk to Craig Swaisgood, but now

22  it just kind of streamlined.  I know the person very

1    well because I call for services several times, but

2    anybody can do it.  So if I'm out of the office and

3    somebody needs it, they know the number.  They know

4    who to call.  So it still happens.

5         Q.    And as it relates to D.C. Department of

6    Corrections services, do the contractors and

7    specifically CCA, CTF, and Unity call you when they

8    need interpreters?

9         A.    No.

10        Q.    Are you aware of how they get their

11   interpreters?

12        A.    I know that CCA has also used our

13   interpretive services.  I don't know whether they use

14   it all the time, but I certainly do know -- in fact,

15   they've even sent an invoice and I've connected them

16   with our person.  So they go to the exact same

17   person.  They order it the exact same way.  They fill

18   out the exact same form.

19        Unity, I'm sure that they have access to

20   plenty of them.  I don't know for sure who they come

21   to.  That would be a question for Unity.

22        Q.    That's fine.

1           A.     But they don't call me.

2           Q.     And why is it the case that the

3     contractors, specifically Unity and CCA, do not call

4     you as in do not take advantage of the D.C.

5     Department of Corrections contract?

6           A.     Well, they do.  Well, I don't know.

7     Again, I don't know about Unity, but I know CCA.

8     It's not that they take advantage of the contract,

9     but I know that they get the same rates as us because

10    I said this is a contract with the District.

11          The reason they don't go through me, frankly,

12    is red tape.  For them to get onto our contract which

13    piggybacks onto ODR's contract would cause a process

14    to be formed in government with us, ODR, the

15    financial agencies, and the legal agencies.

16          So instead of them going directly to the

17    vendor, which the vendor, they run a business.  So, I

18    mean, they do sell their services.  Instead of them

19    going directly to the vendor with the exact same

20    costs, they create a four- to five-agency process of

21    red tape that may or may not affect the hundred

22    thousand dollar original contract.

1        So it just made a lot more sense to say you

2   can contact them directly.

3        Q.   That's helpful, a much better answer

4   than my question would have suggested.  So I don't

5   have to do any follow-up there.  Thank you.

6        MS. TALBOT:  I'm going to go ahead and just

7   put this in the record.  This is the 3800.3 D.C.

8   Department of Corrections Program Statement, and it

9   will be Exhibit H.

10                        [Exhibit H was marked

11                         for identification.]

12  BY MS. TALBOT:

13       Q.   Just for the record, with respect to

14  interpretive services provided under Policy 3800.3 or

15  the current policy, 3800.3A, is it a similar process

16  that you just described?  Is the process similar to

17  the one you just described as far as how you get

18  interpreters to comply with this policy?

19       A.   I'm sorry.  Can you say that again?

20       Q.   Yes.  Sorry.  It was in my head as I was

21  trying to make it.

22       We just discussed how you get interpreters

1          Q.    Could you just explain the ADA

2    coordinator portion of your role?

3          A.    ADA coordinator is a responsibility

4    within risk management.  So we wear a lot of

5    different hats.  ADA coordinator is one of my hats.

6          Q.    And does anyone else have a role for

7    coordinating ADA?

8          A.    I would say our legal team.

9          Q.    Other than legal?

10         A.    I know Sylvia Lane, our public

11   information officer, sometimes gets involved, but I

12   wouldn't say it's really her role.  She communicates

13   services and those type of things, but it's not

14   really her role.

15         Q.    And besides the ADA coordination that's

16   a part of your role, what are, just very generally,

17   your other duties as a risk manager?

18         A.    So continuity of operations, an annual

19   risk management plan.  I also -- you know,

20   traditionally risk management is looked singularly as

21   a financial job, and that's certainly the case.  I

22   facilitate our response or getting incident reports

1    them informally as a reference.

2           Q.    And specifically as it relates to the

3    policies that we've reviewed today, does the Office

4    of Disability rights have any role in the review and

5    change of those policies?

6           A.    Ms. Samuels could answer that more

7    definitively than me, but I do not believe so.

8           Q.    And does your office have any regular

9    reports as it relates to compliance with the ADA by

10   either the D.C. Jail or CTF?

11          A.    Regular reports?

12          Q.    Yes.

13          A.    No.

14          Q.    Any reports since you've been in your

15   position, so over the last 15 months?

16          A.    I wouldn't say formal reports, but

17   people ask me what's the process for this, what's the

18   procedure for this, and I answer mostly informally

19   through E-mail.  If they have additional questions,

20   we may meet, but nothing formal.

21          Q.    By reports, I was probably more

22   referring to reports that may suggest how many

1    inmates have this type of disability or how many

2    inmates have complained about this issue relating to

3    accommodations, that type of report.

4         A.    So you're talking about data?

5         Q.    Yes.

6         A.    We definitely have data on some of those

7    things, probably not every disability ever diagnosed,

8    but yeah.  We do create reports.  We have an Office

9    of -- I think the technical title is Strategic

10   Planning and Analysis or something, but they do our

11   data.

12        Q.    Okay.  Are you aware of any reports

13   specifically relating to deaf or hearing-impaired

14   inmates?

15        A.    Huh-uh.

16        MR. STRUCK:  That's a no.

17        THE WITNESS:  No.  Yeah.  I realized that.

18   BY MS. TALBOT:

19        Q.    I want to focus specifically on

20   accommodations relating to deaf and hearing-impaired

21   inmates just for these next two questions and not

22   disabilities generally.  As a part of your review of

1    the two policies that we discussed, specifically the

2    ones at Exhibit F and G, was there a review of the

3    CTF, so the CCA CTF policies that also would have

4    been applicable to deaf and hearing-inmates?

5         A.    During this?

6         Q.    Yes.

7         A.    No.

8         Q.    Are you aware of any reason why deaf

9    inmates would be regularly transferred to CTF?

10        MR. STRUCK:  I'm sorry.  Object to the form

11   and it's outside the scope of the 30(b)(6) depo.

12        THE WITNESS:  So what was the question again?

13   BY MS. TALBOT:

14        Q.    I'm trying to understand if there's --

15   if you're aware of any reason -- I'm really trying to

16   get to any policy specifically to regularly

17   transferred deaf inmates to the CCA CTF facility as

18   opposed to them staying in the D.C. Jail.

19        A.    I don't know of any exact reason.  I

20   think CTF tends to get our more specialized inmates.

21        Q.    But there's no policy that you are aware

22   of?

EXHIBIT 15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WILLIAM PIERCE,

                Plaintiff,

     v.

DISTRICT OF COLUMBIA,

                Defendant.

No. 1:13-cv-00134 KBJ

## DEFENDANT DISTRICT OF COLUMBIA'S RESPONSE TO PLAINTIFF'S THIRD SET OF INTERROGATORIES AND SECOND SET OF REQUESTS FOR ADMISSION

Defendant District of Columbia ("Defendant"), through counsel and pursuant to FED. R. CIV. P. 33 and 36 and this Court's June 7, 2013 Scheduling Order [ECF 18], hereby submits the following Response to Plaintiff's Third Set of Interrogatories and Second Set of Requests for Admission, served by e-mail on September 19, 2013.

## INTERROGATORIES

### INTERROGATORY NO. 8:

Describe any and all services provided by ODR to correctional institutions, including but without limitation the District of Columbia Department of Corrections, CTF, and facilities operated by CCA.

### RESPONSE TO INTERROGATORY NO. 8:

**Defendant objects that this request is untimely.  Defendant further objects**

-1-

2818860.1

that this request is compound, overly broad, vague, and ambiguous.

Without waiving these objections, Defendant responds that ODR provides technical assistance when requested by District of Columbia agencies, including the Department of Corrections.  ODR is also available to provide technical assistance to contractors of the District of Columbia, such as CCA, but CCA has not requested technical assistance from ODR.

**INTERROGATORY NO. 9:**

Describe any and all services provided by ODR with respect to hearing-impaired individuals.

**RESPONSE TO INTERROGATORY NO. 9:**

Defendant objects that this request is untimely.  Defendant further objects that this request is compound, overly broad, vague, and ambiguous.

Without waiving these objections, Defendant responds that ODR generally does not provide direct services to any hearing-impaired individuals.  If a DC Government video recorded prior to 2012 is not captioned, ODR will provide a written transcript upon request by a hearing impaired individual.  In addition, ODR coordinates the management of the sign language services program for the District, but does not actually provide interpreting services.

**INTERROGATORY NO. 10:**

Describe any and all ODR rules, policies or procedures relating to ADA compliance, including without limitation any rules, policies or procedures relating to

2818860.1

penalties for non-compliance by entities for which ODR provides services, advice, program implementation, training, supervision, monitoring, or oversight.

**RESPONSE TO INTERROGATORY NO. 10:**

**Defendant objects that this request is untimely.  Defendant further objects that this request is compound, overly broad, vague, and ambiguous.**

**Without waiving these objections, Defendant responds that the Disability Rights Protection Act of 2006 (D.C. Code § 2-1431) sets forth the duties of the ODR and the parameters of the DC ADA Compliance Program.**

**INTERROGATORY NO. 11:**

Identify any District of Columbia Department of Corrections Program Statements relating to ODR with respect to disability services, ADA services, or services for hearing impaired individuals.

**RESPONSE TO INTERROGATORY NO. 11:**

**Defendant objects that this request is untimely.  Defendant further objects that this request is compound, overly broad, vague, and ambiguous.**

**Without waiving these objections, Defendant responds that there are no DOC Program Statements that relate to ODR.**

**INTERROGATORY NO. 12:**

To the extent You deny Requests for Admission Nos. 2, 3, 4, or 5, explain the basis for Your denial and the nature of ODR's oversight, advice, implementation, training, supervision, or monitoring of the ADA compliance activities at or by the District

-3-

of Columbia Department of Corrections, CTF, Unity, or facilities operated by CCA.

**RESPONSE TO INTERROGATORY NO. 12:**

Defendant objects that this request is untimely.  Defendant further objects that this request is compound, overly broad, vague, and ambiguous.

Without waiving these objections, see the individual responses to Requests for Admission nos. 2-5 below.

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 2:**

Admit that ODR does not oversee, advise, implement, train, supervise, or monitor the ADA compliance activities at or by the District of Columbia Department of Corrections.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

_____   **Admit**   _____   **Deny**

Defendant objects that this request is untimely.  Defendant further objects that this request is compound, overly broad, vague, and ambiguous.

Without waiving these objections, Defendant is unable to admit or deny this request as written.  Defendant admits in part that ODR does not oversee, advise, implement, supervise, or monitor ADA compliance activities at or by the District of Columbia Department of Corrections.  ODR is available, however, to provide technical assistance regarding ADA compliance upon request by the District of Columbia Department of Corrections.  Defendant denies in part the portion of this

-4-

request relating to training, because ODR offers training relating to the ADA that is open to all District of Columbia employees, contractors, and vendors.

**REQUEST FOR ADMISSION NO. 3:**

Admit that ODR does not oversee, advise, implement, train, supervise, or monitor the ADA compliance activities at or by facilities operated by CCA.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

_____        **Admit**        _____        **Deny**

Defendant objects that this request is untimely. Defendant further objects that this request is compound, overly broad, vague, and ambiguous.

Without waiving these objections, Defendant is unable to admit or deny this request as written. Defendant admits in part that ODR does not oversee, advise, implement, supervise, or monitor ADA compliance activities at or by any facilities operated by CCA. ODR is available, however, to provide technical assistance regarding ADA compliance upon request by contractors of the District of Columbia, including CCA, but CCA has not requested technical assistance from ODR. Defendant denies in part the portion of this request relating to training, because ODR offers training relating to the ADA that is open to all District of Columbia employees, contractors, and vendors.

**REQUEST FOR ADMISSION NO. 4:**

Admit that ODR does not oversee, advise, implement, train, supervise, or monitor the ADA compliance activities at or by CTF.

-5-

2818860.1

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

        _____   **Admit**   _____   **Deny**

       **Defendant objects that this request is untimely.  Defendant further objects that this request is compound, overly broad, vague, and ambiguous.  Defendant additionally objects that this request is duplicative of request no. 3, because CTF is the only CCA facility in the District of Columbia.**

       **Without waiving these objections, Defendant is unable to admit or deny this request as written.  Defendant admits in part that ODR does not oversee, advise, implement, supervise, or monitor ADA compliance activities at or by CTF.  ODR is available, however, to provide technical assistance regarding ADA compliance upon request by contractors of the District of Columbia, including CCA, but CCA has not requested technical assistance from ODR.  Defendant denies in part the portion of this request relating to training, because ODR offers training relating to the ADA that is open to all District of Columbia employees, contractors, and vendors.**

**REQUEST FOR ADMISSION NO. 5:**

     Admit that ODR does not oversee, advise, implement, train, supervise, or monitor the ADA compliance activities at or by Unity.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

        _____   **Admit**   _____   **Deny**

       **Defendant objects that this request is untimely.  Defendant further objects that this request is compound, overly broad, vague, and ambiguous.**

-6-

Without waiving these objections, Defendant is unable to admit or deny this request as written. Defendant admits in part that ODR does not oversee, advise, implement, supervise, or monitor ADA compliance activities at or by Unity. ODR is available, however, to provide technical assistance regarding ADA compliance upon request by contractors of the District of Columbia, including Unity, but Unity has not requested technical assistance from ODR. Defendant denies in part the portion of this request relating to training, because ODR offers training relating to the ADA that is open to all District of Columbia employees, contractors, and vendors.

Dated: October 11, 2013.

_Anne M Orcutt_

Daniel P. Struck, D.C. Bar No. CO0037
Anne M. Orcutt, D.C. Bar No. OK0011
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone:    (480) 420-1600
Facsimile:    (480) 420-1694

Mariana D. Bravo, D.C. Bar No. 473809
Matthew Berkowitz, Bar No. 974170
CARR MALONEY, P.C.
1615 L Street, N.W., Suite 450
Washington, DC 20036
Telephone:    (202) 310-5500
Facsimile:    (202) 310-5555

*Attorneys for Defendant District of Columbia*

-7-

## VERIFICATION

I, DEREK ORR, declare upon penalty of perjury that:

I am the Director of the Office of Disability Rights for the District of Columbia, the Defendant in *Pierce v. District of Columbia*, No 1:13-cv-00134 KBJ, in the United States District Court for the District of Columbia.

I have read Defendant District of Columbia's Response to Plaintiff's Third Set of Interrogatories and Second Set of Requests for Admission and know the contents of the responses to Interrogatory Nos. 8-12 to be true and correct based on my own personal knowledge, except as to those matters identified which are based upon business records of CCA or Unity Health Care, and as to those matters I believe them to be true.

Executed at the City of Washington in the District of Columbia, this 10th day of October, 2013.

Derek Orr

-8-

2818860.1

## CERTIFICATE OF SERVICE

☒   I hereby certify that on October 11, 2013, I caused a true and correct copy of the

foregoing to be served by First Class United States mail, postage prepaid,

addressed to the following:

>   Frederick V. Mulhauser
>   Arthur B. Spitzer
>   Jennifer A. Wedekind
>   AMERICAN CIVIL LIBERTIES UNION
>   4301 Connecticut Avenue NW
>   Suite 434
>   Washington, DC 20008
>   (202) 457-0800
>   Fax: (202) 457-0805
>   Email: fmulhauser@aol.com
>   Email: artspitzer@gmail.com
>   Email: Jennifer@aclu-nca.org
>
>   Bizunesh Talbot
>   Deanna P. Cook
>   STEPTOE & JOHNSON, LLP
>   1330 Connecticut Avenue, NW
>   Washington, D.C. 20036
>   (202) 429-6475
>   Fax: (202) 429-3902
>   Email: bscott@steptoe.com
>   Email: dcook@steptoe.com
>   *Counsel for Plaintiff William Pierce*
>
>   Gary Feldon
>   OFFICE OF THE ATTORNEY GENERAL
>   FOR THE DISTRICT OF COLUMBIA
>   441 4th Street NW
>   Suite 600S
>   Washington, D.C. 20001
>   (202) 727-3400
>   Fax: (202) 347-8922
>   Email: gary.feldon@dc.gov
>   *Co-Counsel for District of Columbia*

-9-

Terence J. O'Connell
O'CONNELL & O'CONNELL
401 East Jefferson Street, Suite 204
Rockville, MD 20850
(301) 424-2300
Fax: (301) 424-2394
Email: toconnell@oconnelllaw.com
*Co-Counsel for Defendant District of Columbia*

-10-

2818860.1