EXHIBIT 16

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - X

WILLIAM PIERCE,                      :

    Plaintiff,                       :

        v.                           :   Case No.

DISTRICT OF COLUMBIA,                :   1:13-cv-00134 KBJ

    Defendant.                       :

- - - - - - - - - - - - - - - X

Washington, D.C.

Monday, September 9, 2013

Deposition of B. TUTWILER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Steptoe & Johnson, 1330 Connecticut Avenue, N.W., Washington, D.C., at 12:00 p.m., Monday, September 9, 2013, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

1    process.   The inmate would let us know that he's

2    hearing-impaired, he or she.

3         Q.    What I'm asking is whether you all have

4    specific either written or not procedures for

5    communicating with a hearing-impaired inmate.

6         A.    I can't recall.

7         Q.    How do you, in your capacity as case

8    manager, communicate with any non-hearing inmates?

9         A.    Writing.

10        Q.    And have you received any training

11   relating to hearing-impaired inmates specifically?

12        A.    No.

13        Q.    And do you recall seeing any program

14   statements or policies specifically relating to

15   hearing-impaired inmates?

16        A.    No, I don't recall.

17        Q.    With respect to telephone access, are you

18   aware of any specific procedures relating to

19   hearing-impaired inmates?

20        A.    The inmate request form where they would

21   request to use the TTY phone.

22        Q.    But is there procedure that guides how the

1    requests are made and what they get when they get to

2    use the TTY, in terms of how much time they get,

3    what's the procedure for monitoring?

4         A.    I'm sitting right there with them.

5         Q.    And is that something that, if you're

6    aware of, that other case managers would do, that

7    they monitor in person?

8         A.    I can't speak on any of that.

9         Q.    So you're not aware if that's a policy?

10        A.    Correct.

11        Q.    And how much time -- if an inmate requests

12   use of the TTY, how much time have you allowed for

13   them to use the TTY phone?

14        A.    As long as I'm sitting in my office and I

15   don't need the phone, if they requested to use it, I

16   would allow them to use it for the time that I was

17   there.

18        Q.    And we understand that the TTY phone is

19   not connected to the inmate telephone system that is

20   used for general population.

21        A.    Correct.

22        Q.    If you could describe how the TTY phone is

Page 40

1    request or decide whether to grant or deny the

2    request?

3         A.    With a TTY, there is no denial.

4         Q.    So you would grant every request?

5         A.    Correct.

6         Q.    And how do you communicate that you are

7    granting the request or that you are allowing the TTY

8    service?

9         A.    I would have the officer go and get the

10   inmate and bring him to my office.

11        Q.    If an inmate made a request daily, would

12   you then have the inmate in your office every day

13   that you are at work or on duty?

14        A.    Available, yes.

15        Q.    What do you mean by available?

16        A.    If I don't have to see any other inmates.

17        Q.    So it is around your schedule of having to

18   meet with other inmates in that office that you are

19   in?

20        A.    Correct.

21        Q.    So is your schedule of meeting other

22   inmates such that it provides you any specific blocks

Page 41

```
 1   of time during the day that you are not meeting with

 2   inmates?

 3        A.    No.

 4        Q.    So you could have a typical week where you

 5   are working four days and, for those four days, if

 6   it's busy on intake or busy -- you could be meeting

 7   with prisoners for the entire time that you are on

 8   duty?

 9        A.    No.

10        Q.    What are the types in a typical day that

11   you would not be meeting with an inmate?

12        A.    There are no specific times.

13        Q.    So are you saying the schedule is such

14   that it just does not make it that packed for your

15   schedule, if you will?  Does it make it that full?

16        A.    No, I'm saying that I don't have a

17   specific time that I meet with inmates.

18        Q.    So there is no schedule?

19        A.    Correct.

20        Q.    So you, when you come in in the day, you

21   just determine which inmates you're going to meet

22   with as you go along the day?
```

1   That's what I'm saying.

2       Q.    And the reason I'm asking the question

3   this way is the original question I asked is if the

4   inmate asks every single day, would they be able to

5   use it every day?  You indicated that that may not be

6   possible.

7       A.    Correct, it may not be possible.

8       Q.    So I was just trying to get to the

9   situations when it would not be possible.

10      A.    It's hard to determine when it would not

11  be possible.

12      Q.    In a typical workweek, are you staffed

13  five days a week?

14      A.    Yes.

15      Q.    So in a typical workweek of five days a

16  week -- and again, I'm getting to typical.  I know

17  things happen, your caseload goes up and down.  If an

18  inmate requested access every day, so if they put in

19  their request slip every day, in a typical week, how

20  many days would they be able to access?

21      A.    I can't answer that question, how many

22  days they would.  I can't give a specific, they'll be

1   able to use it three or four -- I can't give that.

2        Q.    But at the same time, you can't say that

3   they would be able -- if they requested access -- and

4   I just want to say it one more time.  If they

5   requested access every day, it is not automatic or it

6   is not standard that they would in fact get access

7   every day, is that correct?

8        A.    Correct.

9        Q.    Thank you.  If, for whatever reason, your

10  office is unavailable to use TTY either because you

11  are not on duty or because you're busy, is there

12  another TTY phone that an inmate in your unit would

13  have access to?

14       A.    I had a correctional counsel who had

15  access to my office.  In the event that I'm not

16  there, they can let them in to use the TTY phone.

17       Q.    And is this one particular correctional

18  officer?

19       A.    Correctional counselor?

20       Q.    Oh, sorry.  Correctional counselor, I

21  apologize.  One particular correctional officer?

22       A.    Yes.

Page 45

1      Q.    Can you provide the last name of that

2  counselor?

3      A.    I can't recall who it was but there is

4  always one correctional counselor with the case

5  manager.

6      Q.    And typically what are the hours that you

7  would be on duty?

8      A.    8:00 to 5:00.

9      Q.    And typically what would be the hours that

10  the correctional officer would be on duty?

11      A.    Their hours varied.

12      Q.    Is there a span in which they varied in

13  terms of it being between 6:00 or 7:00 a.m. and 6:00

14  or 8:00 p.m.?  I'm just trying to get an outer band

15  of the possible times.

16      A.    They varied.  I can't say at the time,

17  when Mr. Pierce was at the facility, what they were.

18      Q.    Is the correctional counselor ever there

19  past 8:00 p.m.?

20      A.    It all depends on their schedule.

21      Q.    And if you know, what are the duties of

22  the correctional counselor?

1    first date you have on this document in reverse

2    chronological order is February 7th.

3         A.    Correct.

4         Q.    So between February 7th and February 17th,

5    it indicates that Mr. Pierce continues to write

6    requests for an interpreter.  Do you recall how many

7    requests he made before you made that entry?

8         A.    No.

9         Q.    Certainly more than one?

10        A.    Could be.  I'm not going to definitely say

11   how many.

12        Q.    And here it indicates, as you have

13   previously testified, that his requests were

14   forwarded to the assistant warden?

15        A.    Correct.

16        Q.    Did you do any follow-up with the

17   assistant warden personally regarding these requests?

18        A.    No.  He's my supervisor.  I don't follow

19   up with him.

20        Q.    Were any of these requests also forwarded

21   through your supervisor?

22        A.    Repeat the question.

Page 79

1    transfer form that describes the incident if that's

2    something that you would like to refer to.  We would

3    have to go and physically get the document.

4         A.    I think you may want to get that document.

5               MS. TALBOT:  Let's just go off the record

6    and take a break.

7               (Recess.)

8                         (Tutwiler Exhibit No. 5 was

9                         marked for identification.)

10              BY MS. TALBOT:

11        Q.    I want to hand you Tutwiler 5 which is an

12   incident statement.  If you can stipulate for the

13   record that it is your printed name and signature on

14   this statement.

15        A.    That's correct.

16        Q.    I'll give you a moment to review.  With

17   respect to the incident on February 23rd at

18   approximately 1:45 p.m., did Mr. Pierce come into

19   your office to discuss a particular incident?

20        A.    Yes.

21        Q.    And how did he communicate the incident to

22   you?

1       A.      Writing.

2       Q.      What did he write?

3       A.      That he feared for his safety on the unit.

4       Q.      Did you ask him anything about that

5    statement?

6       A.      Uh-huh.  And he told me that somebody

7    pushed him and he didn't want to fight.

8       Q.      And what happened next in that

9    communication?

10      A.      I asked him would he like to be placed on

11   protective custody.  He wrote, "If necessary."  I

12   then had the correctional counselor, Sergeant

13   Kennedy, escort him to Medical 82 to get a body chart

14   to be placed on protective custody.

15      Q.      And during that conversation, I don't see

16   here in your notes any description of what protective

17   custody is.

18      A.      Where he's scared to be around other

19   inmates.

20      Q.      Did you describe to Mr. Pierce what

21   protective custody is?

22      A.      Do you have any notes?

1      Q.      No, I do not have any notes.

2      A.      I can't recall then.

3      Q.      And your notes here indicate that he

4  wrote, "If it is necessary."

5      A.      Uh-huh.

6      Q.      And then it appears here in your notes

7  that the next step was that he was placed into

8  protective custody?

9      A.      Correct.

10     Q.      Why did you believe that it was necessary?

11     A.      He reported that he was pushed and he

12  feared for his safety.  So my job is to protective

13  his safety while he's at the correctional treatment

14  facility.  And in order to protect his safety, I

15  placed him in protective custody.  Well, I

16  recommended that he's placed in protective custody.

17     Q.      And in a situation such as this where an

18  inmate is pushed by another inmate, what are the

19  alternates to protective custody in resolving the

20  situation?

21     A.      If no one witnessed it and the issue

22  wasn't addressed at the time, then this is the

1   protective custody form stating he feared for his

2   safety as credible.  That's why he was placed.

3        Q.    Could you just describe for us what

4   protective custody entails?

5        A.    That he's separated from everyone, the

6   population, because he fears for his safety while in

7   population.

8        Q.    Is he also separated from the population

9   of other inmates that are in protective custody?

10       A.    Correct.

11       Q.    And was he aware of what protective

12  custody means in terms of how he was going to be

13  segregated?

14       A.    I can't recall but he signed the paper

15  saying he feared for his safety.

16       Q.    Is there a paper that describes what

17  protective custody is?

18       A.    Do you have the form so I can look at it?

19       Q.    We can stipulate that the form doesn't say

20  what protective custody is.  Did Mr. Pierce ask you

21  what protective custody was?

22       A.    Can we have the book?

1      Q.    So the last question on the record was,

2  did Mr. Pierce ask you what protective custody was?

3      A.    I can't recall.

4      Q.    And just for purposes of the record, the

5  protective custody request form that we were

6  referring to stipulates -- is Bates numbered DC-WAP

7  000140.  It is not an exhibit in this record.  So

8  with respect to the protective custody suggestion

9  that you had made, you indicated Mr. Pierce wrote,

10 "If it is necessary."  Did you explain to Mr. Pierce

11 that it was necessary?

12     A.    I can't recall.  I mean, what's on the

13 incident statement is what it is, basically.

14     Q.    What did you understand Mr. Pierce or what

15 would you have understood Mr. Pierce to mean by

16 writing, if it is necessary?

17     A.    That if his safety is going to be in

18 jeopardy, then yes, it's necessary.  You tell me you

19 fear for your safety, I'm going to leave you where

20 you don't feel safe?  You just told me you don't feel

21 comfortable around these inmates.

22     Q.    So based on that communication, you

1    medical?

2         A.    I'm not sure if he took it upon himself to

3    forward it or not but I didn't.

4         Q.    And then with respect to the TTY devices,

5    you've clarified that there is more than one TTY

6    device available at the facility?

7         A.    Correct.

8         Q.    But with respect to your unit, there is

9    only one device, correct?

10        A.    In my unit, yes.

11        Q.    And that one device is located in your

12   office?

13        A.    Yes.

14        Q.    And to our understanding, you testified

15   that you have access to your office and a

16   correctional counselor at some periods may have had

17   access to your office in order to provide access to

18   that TTY device?

19        A.    Yes.

20        Q.    Would someone that is housed on your unit

21   be able to access a TTY device other than the one

22   that was in your office, while on your unit?

1      A.     Anyone like who?

2      Q.     An inmate, I'm sorry.  If an inmate wanted

3  to access a TTY device, would they be able to access

4  a TTY device other than the one that was in your

5  office in your unit?

6      A.     No.

7             (Whereupon, at 3:38 p.m., the taking of

8  the instant deposition ceased.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

EXHIBIT 17

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - X

WILLIAM PIERCE,                      :

    Plaintiff,                       :

        v.                       :   Case No.

DISTRICT OF COLUMBIA,                :   1:13-cv-00134 KBJ

    Defendant.                       :

- - - - - - - - - - - - - - - X

Washington, D.C.

Tuesday, September 10, 2013

        Deposition of M. ALLEN, a witness
herein, called for examination by counsel for
Plaintiff in the above-entitled matter, pursuant to
notice, the witness being duly sworn by MARY GRACE
CASTLEBERRY, a Notary Public in and for the District
of Columbia, taken at the offices of Steptoe &
Johnson, 1330 Connecticut Avenue, N.W., Washington,
D.C., at 10:15 a.m., Tuesday, September 10, 2013, and
the proceedings being taken down by Stenotype by MARY
GRACE CASTLEBERRY, RPR, and transcribed under her
direction.

1  complaint process.

2      Q.    Now, we may get back into some of the

3  detail as it relates specifically to our client,

4  Mr. Pierce, but I just want to ask you a few more

5  questions about your job overall.  Who do you report

6  to?

7      A.    Mr. W█████ Fulton.  He's the assistant

8  warden for programs.

9      Q.    And then we already got information about

10 who he reports to so I won't ask that here.  With

11 respect to inmates in protective custody, the process

12 that you just described, how would it differ?

13     A.    Well, it really wouldn't differ unless,

14 when I go to the housing unit, if the inmate observes

15 that I'm on the unit, they may ask to speak with me

16 or they'll let one of the officers know that they

17 need to speak with me.  And if they do, then I will

18 go to their cell and initial off on the form that's

19 on their door indicating any daily contact that you

20 had with inmates who are in the segregation

21 management unit.

22     Q.    And I just want to get your background

1   with hearing-impaired inmates for a second.  Have you

2   been trained to work with hearing-impaired inmates

3   specifically?

4        A.    Not specifically but I took a course in

5   signing.  That was at my church, of course.  And that

6   lasted about a month, just to give me some general

7   idea as to the principles of signing and the gestures

8   and those kinds of things.

9        Q.    And if you recall, when was that course?

10  Just maybe try a year?

11       A.    It was about four years ago at my church,

12  the Mount Ennon Baptist Church in Clinton, Maryland.

13       Q.    And what did you think of that experience?

14       A.    It was interesting, to say the least.  I

15  found it very informative because up until that

16  point, other than dealing with inmates at work, I

17  really hadn't had any direct contact with

18  hearing-impaired people.

19       Q.    Next, I'm actually going to turn

20  specifically to your interactions with Mr. Pierce, if

21  that's okay.  So let me just start broadly.  We don't

22  have Mr. Pierce here this morning.  Are you familiar

1      A.    I think I received a total of three.  I

2  think you may have two, but the third one was one

3  that he submitted and it wasn't really a complaint.

4  He was thanking AW Fulton for assisting him with his

5  concerns.  And that's not a complaint so it wasn't

6  processed and logged like a regular complaint because

7  it wasn't one.  This was in addition to -- it was

8  just a -- he put it on an informal but it was a thank

9  you note.

10      Q.    With respect to the first two, and then

11  even with respect to the first complaint, let me show

12  you a document and we'll mark this Allen Exhibit 1.

13                      (Allen Exhibit No. 1 was

14                      marked for identification.)

15          BY MS. TALBOT:

16      Q.    Before I question you specifically on the

17  document which is an informal resolution dated

18  February 27, 2012, when you met with Mr. Pierce in

19  the medical unit for the first time, did he fill out

20  this form -- which is the first of two, but it's the

21  earlier dated form -- did he fill out this form at

22  that time?

1       A.    Yes, this form had already been filled

2  out, given to Mr. Fulton and then when it came back

3  to me, it didn't have his signature on it.  That's

4  when I met with him.  And he refused to sign it and I

5  proceeded to give him a formal grievance form.

6       Q.    I just want to step back one.

7       A.    Okay.

8       Q.    And I'm trying to determine whether he

9  filled this out or you received this during your

10 first meeting with him or was your first meeting

11 earlier than this form?

12      A.    I don't remember.  I do not remember.  I

13 see so many inmates.

14      Q.    Well, let's try to go with the first

15 meeting and just go with what you recall.

16      A.    Okay.

17      Q.    So where we picked up before I talked

18 about this exhibit, the correction officer had

19 indicated he wanted to see you.  You went and met

20 with him that same day.  If you can recall, how was

21 the communication on that day?

22      A.    It was in writing.

1        Q.    And prior to meeting with Mr. Pierce, did

2    anyone let you know that he was hearing-impaired?

3        A.    Yes, the correctional officer did.

4        Q.    And did the correctional officer give you

5    any information about how to communicate with

6    Mr. Pierce?

7        A.    No.

8        Q.    And when you went and met with Mr. Pierce,

9    how did the communication get initiated?

10        A.    He showed me -- I think it's this note

11    here.  I think it's this note.  Yes, the note, yes.

12        Q.    I'm going to put the note in the record

13    and we can put this in as Allen Exhibit 2.

14                        (Allen Exhibit No. 2 was

15                        marked for identification.)

16            BY MS. TALBOT:

17        Q.    And if we can stipulate for the record

18    that the first paragraph that starts with inmate

19    request and "I didn't understand," that that is

20    Mr. Pierce's handwriting?

21        A.    Yes, it is.

22        Q.    So you met with Mr. Pierce and he handed

Page 22

1    you just this first paragraph?

2         A.    Yes.

3         Q.    But at the time you met with him, he was

4    not in PC?

5         A.    No, he was not.  He was still in general

6    population on medical 96.

7         Q.    And then you provided a response?

8         A.    Yes.

9         Q.    And if you could just read your response

10   for the record.  Well, first, actually let me read

11   the question so that the record is clear.  So

12   Mr. Pierce wrote, "Inmate request.  I didn't

13   understand what PC means at first.  Case manager

14   should have discussed with me first before she threw

15   me in the hole."

16        A.    I stated, "You should have read it before

17   you signed it."  And he stated --

18        Q.    Well, before I get to what he stated --

19   well, he stated, "I had no choice because they told

20   me to sign."  And then you asked him --

21        A.    "Do you have any witnesses?"

22        Q.    And if I could ask you, why did you ask

1   elaborate with him because I didn't make the final

2   decision.

3           In this case, Mr. Fulton would deal with

4   everything pertaining to this inmate.  The ultimate

5   person making the decision would have been him.  But

6   Mr. Fulton and I did discuss this gentleman at length

7   on numerous occasions trying to make sure that we

8   were addressing -- or that his needs were being

9   addressed.

10      Q.    And I just want to ask a couple more

11  questions on this, just to, again for the record

12  confirm what was or was not in your communications

13  with Mr. Pierce.  Did you have any communications

14  with Mr. Pierce regarding the ADA law?

15      A.    No.

16      Q.    Did you have any communications with

17  Mr. Pierce regarding an interpreter?

18      A.    Yes.

19      Q.    If you could describe that communication?

20      A.    I think it might have been at some point

21  when he did the formal grievance.  He was concerned

22  about having an interpreter.  And I told him -- and I

1   don't remember if one of the team members were

2   there -- about Mr. Fulton was working on it and

3   Mr. Fulton had been working on it so it was something

4   to that effect that, you know, it was just in brief.

5   And we didn't exchange anything in writing.

6              And we met at the -- officer's desk so I

7   couldn't just discuss it openly and at length.

8       Q.    I want to show you a memo from Unit

9   Manager Points to Mr. Fulton dated March 6th.  We're

10  going to mark this Exhibit 7.

11                          (Allen Exhibit No. 7 was

12                          marked for identification.)

13             THE WITNESS:  Can I ask you a question?

14  On this item 6, I don't recall having -- addressing

15  this one.  This one didn't come through me, I don't

16  believe.

17             BY MS. TALBOT:

18      Q.    Okay.

19      A.    And you've designated it to me.

20      Q.    Okay.  We can establish for the record

21  that Exhibit 6 does not appear to have gone to

22  through Ms. Allen.

EXHIBIT 18

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - X

WILLIAM PIERCE,                    :

    Plaintiff,                     :

        v.                 :   Case No.

DISTRICT OF COLUMBIA,              :   1:13-cv-00134 KBJ

    Defendant.                     :

- - - - - - - - - - - - - - - X

Washington, D.C.

Tuesday, September 10, 2013

Deposition of K. KORNEGAY, a witness

herein, called for examination by counsel for

Plaintiff in the above-entitled matter, pursuant to

notice, the witness being duly sworn by MARY GRACE

CASTLEBERRY, a Notary Public in and for the District

of Columbia, taken at the offices of Steptoe &

Johnson, 1330 Connecticut Avenue, N.W., Washington,

D.C., at 1:40 p.m., Tuesday, September 10, 2013, and

the proceedings being taken down by Stenotype by MARY

GRACE CASTLEBERRY, RPR, and transcribed under her

direction.

1      Q.     And the correction facility also has a

2    policy relating to special needs inmates.  Are you

3    generally aware of that policy?

4      A.     Yes.

5      Q.     And then finally, the Correction Treatment

6    Facility has a policy relating to inmate access to

7    telephones.  Are you generally aware of that policy?

8      A.     Yes.

9      Q.     With respect to SMU, can you describe the

10   facilities, describe how the inmates are housed

11   specifically, the physical attributes of the space,

12   how it's set up, what it looks like?

13     A.     In the actual cell or the unit?

14     Q.     First inside the cell and then if you go

15   from the door out.

16     A.     Inside the cell, there is a bunk bed on

17   the wall, a sink and a toilet.

18     Q.     Does the bunk bed -- is it two beds?

19     A.     Yes.

20     Q.     Do you have a roommate when you're in SMU?

21     A.     No.

22     Q.     And then coming out of the cell.  So there

1   is a door?

2        A.    There is a door.  Coming out of the cell,

3   it's a tier.  It's set up in two tiers, up and

4   downstairs.  So it's eight cells on each floor.

5        Q.    Can you describe the door?

6        A.    It's a metal door with a window and a

7   slot.

8        Q.    And the inmates are required to stay in

9   the cell while they're on SMU for the majority of the

10  time?

11       A.    Yes.

12       Q.    If you could describe the times that they

13  can be outside of the cell.

14       A.    They could be outside of the -- when you

15  say describe the times, like specific times?

16       Q.    Or specific events or times.

17       A.    Okay.  They come out of the cell for

18  shower, they come out of the cell for recreation,

19  they come out of the cell to go to medical, they come

20  out of the cell for their legal visits and their

21  social visits.

22       Q.    And do they eat in the cells?

1      A.    Yes.

2      Q.    And do they get medication in the cells?

3      A.    Yes.

4      Q.    And recreation, when does that occur

5   generally?

6      A.    It could start as early as 6 o'clock in

7   the morning to as late as 10 o'clock at night so --

8      Q.    And how long does each inmate have?

9      A.    One hour.

10      Q.    And it's one hour a day?

11      A.    Yes.

12      Q.    And that's seven days a week?

13      A.    No.  Five days a week.

14      Q.    And is there any reason that an inmate

15   would not get the one hour a day?

16      A.    No.

17      Q.    And what is the process by which an inmate

18   would go to their one hour of recreation a day?

19      A.    I'm not sure the process you're asking me.

20      Q.    So how do you decide when an inmate goes,

21   how are they transported to rec, how are they

22   transported back from recreation?

1    recreation.

2          Q.    And is this the log the same log as the

3    OMS system?

4          A.    No.

5          Q.    During the time that Mr. Pierce was on

6    your unit, SMU, which we established was March 4th,

7    sometime on March 4th to March 7th, do you recall if

8    he refused his recreation on any of those days?

9          A.    I don't recall.

10         Q.    With respect to him entering the unit on

11   March 4th, and so for any inmate, the day the inmate

12   would enter, would they get their rec on the day that

13   they enter onto the SMU unit?

14         A.    No.

15         Q.    On the day that they are leaving the SMU

16   unit, would they get rec on the day that they're

17   leaving?

18         A.    It depends.  We don't know all the time

19   when they're leaving.

20         Q.    With respect to hearing-impaired inmates,

21   did you get any training relating to communicating

22   with a hearing-impaired inmate?

1        A.    No.

2        Q.    Prior to your interactions with

3    Mr. Pierce, did you have any experience working with

4    hearing-impaired inmates?

5        A.    When you say experience, what do you mean?

6        Q.    Any interaction in your --

7        A.    Yes.

8        Q.    If you recall, how many hearing-impaired

9    inmates do you think that you interacted with during

10   your time since being a case manager so since 2007?

11       A.    A rough number?

12       Q.    A very rough number.

13       A.    Maybe three.

14       Q.    And during that time, for the three

15   inmates, and we ask that you don't mention any inmate

16   names, do you recall any accommodations that were

17   given to any of the three inmates including

18   Mr. Pierce?

19       A.    No.

20       Q.    And by accommodations, I'm referring to

21   anything to assist in communicating with Mr. Pierce

22   or the other inmates.

1        Q.    If you could describe for me the phone

2   facilities that the inmates at SMU have access to.

3        A.    It's like a pay phone and it rolls.  It's

4   on wheels and we roll it to their cells.  That's how

5   they make their calls theirself.

6        Q.    And does that telephone that's on wheels

7   have TTY capability?

8        A.    No.

9        Q.    Is there a phone with TTY capability in

10  the SMU unit?

11       A.    Yeah.  In the unit?

12       Q.    In SMU?

13       A.    Yes.

14       Q.    Not in the cells but in the area.

15       A.    Yes.

16       Q.    Where is the TTY phone located?

17       A.    It would be in the segregation office.

18       Q.    Is that your office?

19       A.    Yes.

20       Q.    Or the case manager's office?

21       A.    Yes.

22       Q.    And how would a hearing-impaired inmate

1   access the TTY phone?

2        A.    He would normally write a request.

3        Q.    And when they write the request, then what

4   would happen to facilitate getting them to the TTY

5   phone?

6        A.    From SMU?  Once he writes the request,

7   they'll handcuff -- I'll let them know to bring him

8   over to me, and they'll handcuff him to the front and

9   bring him over to me and I'll allow him to use the

10  phone that way.

11       Q.    So an inmate would be using the TTY

12  handcuffed?

13       A.    Yes.

14       Q.    With respect to an inmate's social visits,

15  could you explain the process by which they would be

16  able to be on a social visit?

17       A.    How would they get there?

18       Q.    Yes.  How would they know that a visitor

19  is there and then get to the point where they're

20  interacting with a visitor?

21       A.    The officer will notify them to get ready

22  for their social visit.  At that time the escort will

1    call --

2         A.    Another staff.

3         Q.    Another staff, sorry.  How would an inmate

4    be aware that they had to ask another staff member to

5    place the slip in the box?

6         A.    I don't understand how would he be aware.

7    I don't understand.

8         Q.    How would he know to do that?  How would

9    an inmate know that that's the process?

10        A.    I don't know.

11        Q.    And with respect to accessing a telephone,

12   how would an inmate request the telephone, whether

13   it's TTY or the roll-a-phone?

14        A.    If it's the roll-a-phone, they could just

15   ask for the phone and the officer will take it to

16   their cell.  If it's the TTY phone, normally they'll

17   write me a note if I'm doing a walk and tell me they

18   want to use the phone and I'll pull them out that

19   way.  Or they'll use a request slip so when I get to

20   work in the morning, when I check it, I'll see that

21   he needs a phone.

22        Q.    And do you recall any requests from

1    Mr. Pierce?

2         A.    I don't recall.

3         Q.    And do you recall Mr. Pierce asking you on

4    your walk-through that he needed to use the TTY?

5         A.    I don't recall.

6         Q.    And how often do you do your

7    walk-throughs?

8         A.    Once in the morning norm -- well, once a

9    day.

10        Q.    And are there other staff members that do

11   walk-throughs?

12        A.    Yes.

13        Q.    And how often are walk-throughs done

14   typically?

15        A.    Once a day.

16        Q.    At the time that Mr. Pierce was in SMU,

17   were you aware of the fact that he was

18   hearing-impaired?

19        A.    I don't recall when I got the notice.  I

20   don't know.  I don't recall.

21        Q.    But you've got notice at some point while

22   he was in your unit?

1          If you notice on Exhibit 3, at the top it

2    says date of placement, 3/4/2012, just barely, but I

3    think that's what that refers to.

4          A.    Uh-huh.

5          Q.    Does that help then to determine whether

6    this document, Exhibit 3, refers to his placement in

7    SMU?

8          A.    No.  Date of placement will be the date he

9    came down.  That doesn't mean that's the date that

10   this document was done.

11         Q.    Correct.  But this segregation review

12   refers -- does that date mean that it refers to his

13   placement at SMU starting on March 4th?  Does that

14   mean that that was the date he was first placed into

15   segregation review?

16         A.    That's the day the placement was made,

17   yes.

18         Q.    And this document again appears to suggest

19   that he would be released into general population?

20         A.    Yes.

21         Q.    Okay.  Before I go back to Exhibit 2, when

22   someone is initially placed into protective custody,

EXHIBIT 19

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - X

WILLIAM PIERCE,                      :

    Plaintiff,                       :

        v.                        :   Case No.

DISTRICT OF COLUMBIA,                :   1:13-cv-00134 KBJ

    Defendant.                       :

- - - - - - - - - - - - - - - X

Washington, D.C.

Wednesday, September 11, 2013

      Deposition of P. McNEAL, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Steptoe & Johnson, 1330 Connecticut Avenue, N.W., Washington, D.C., at 1:12 p.m., Wednesday, September 11, 2013, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

1      A.    For the last 12 years, I've been working

2   in corrections.

3      Q.    And if you could tell us the employers

4   that you've worked for during your time in

5   corrections.

6      A.    During my time in corrections?

7      Q.    Yes.

8      A.    I've been with Corrections Corporation of

9   America for the past 12 years.

10     Q.    And what positions have you held with CCA?

11     A.    Initially I came in, I believe it was

12  January 2002 as a correctional officer.  Maybe four

13  years later I was promoted to a treatment specialist

14  and then -- I'm sorry, prior to the treatment

15  specialist, that would have been -- I was promoted to

16  sergeant, so that would have been senior officer.

17  And then the past eight years or so, I've been

18  employed there as a treatment specialist.

19     Q.    And as a treatment specialist, do you have

20  a written job description?

21     A.    Yes, ma'am.

22     Q.    And if you could just briefly describe

 1              MS. TALBOT:  If we could just take a quick

 2     break.

 3              (Discussion off the record.)

 4              BY MS. TALBOT:

 5        Q.    In your current employment with CCA, have

 6     you been trained to work with hearing-impaired

 7     inmates?

 8        A.    Not really.

 9        Q.    Other than relating to Mr. Pierce who

10     we'll speak about in a bit, have you had experience

11     working with deaf inmates?

12        A.    Not really.

13        Q.    Do you have any familiarity with American

14     Sign Language or ASL?

15        A.    Only that I've been provided with a single

16     sheet of sign language techniques, or the hand

17     motions.  That's about it.

18        Q.    Who is your supervisor?

19        A.    W█████  Fulton.

20        Q.    And what department are you in?

21        A.    I believe my department falls up under

22     education.

1    as a subject, then I'm sure, as part of the overall

2    curriculum, he would have had at least one group

3    session based on anger management specifically.

4         Q.    And what would be the goal of the anger

5    management course?

6         A.    It would be twofold.  Actually, on the one

7    hand, it's to get the individual to focus on their

8    particular triggers relative to their anger issue and

9    what would necessarily trigger them to become angry,

10   and then secondly, what can be done or what

11   approaches can be taken to develop coping skills to

12   help them better manage their anger.

13        Q.    And how do you achieve those goals or how

14   do you seek to achieve those goals in a group

15   setting?

16        A.    More specifically, it is to get the

17   individual to identify again what the basis of -- the

18   triggers for the anger and then their willingness is

19   very important, that they're willing to work on,

20   first, understanding that they have anger issues, and

21   then, secondly, the willingness to be able to address

22   those issues in terms of developing some specific

1    approaches, techniques and things of that nature to

2    deal with the anger.

3         Q.    And is class participation a part of the

4    class structure?

5         A.    Yes, ma'am, absolutely.

6         Q.    Is there a lecture by the instructor as a

7    part of the anger management program?

8         A.    For the most part.

9         Q.    Are there written assignments as a part of

10   the anger management program?

11        A.    Yes.

12        Q.    And how are students evaluated for the

13   anger management program?

14        A.    Evaluated?

15        Q.    If at all.

16        A.    I don't understand the question.

17        Q.    Do you provide any review or report or

18   class completion for any of these programs?

19        A.    Well, again, I work directly with the

20   individuals who are participating in the program, and

21   so when I identify areas that they want to work on,

22   areas that they need to work on, then that's part of

1  participate, something of that nature.

2      Q.    And did you explain what the application

3  was for during that meeting?

4      A.    Yes.

5      Q.    And how did you explain what the

6  application was for?

7      A.    What I would have explained to him, as

8  I've explained to all individuals wanting to

9  participate in the course, that based on the initial

10  application, that I would be following up with them

11  to test them at a later date and time.

12     Q.    And this application says that it's a

13  60-day program, though you had previously indicated

14  that it was a six-week program.  Did you indicate to

15  Mr. Pierce that it was going to be six weeks and not

16  60 days?

17     A.    Well, six weeks, I'm thinking I'm

18  referencing the initial module but as you can see,

19  the application clearly states 60 days.

20     Q.    I want to focus now on class time that

21  Mr. Pierce participated in.  During the initial group

22  sessions and for purposes of these questions, if we

1    could just focus on the first couple of sessions

2    prior to March 1st.

3              So it appears that he filled out the

4    information on February 21st and we'll provide you

5    with certain documents that indicate that he took at

6    least one class before February 27th, but with

7    respect to at least the first class that he took, how

8    did you communicate with Mr. Pierce during the group

9    session?

10        A.    It's my recollection that after the

11   testing --

12        Q.    If we can stop.  You can go ahead and

13   answer.

14        A.    It's my recollection, ma'am, that after

15   the testing of Mr. Pierce, the very first session

16   that we would have had -- and when I say session, I

17   mean group session, Mr. Pierce became somewhat upset

18   and agitated to some extent, because it seems to me

19   at that point I was lecturing and giving a

20   presentation and he was not able to understand what

21   was going on; and so he abruptly left the session,

22   that I can recall.

1        Q.    And did he indicate to you that he needed

2    an interpreter or other accommodations at that time?

3        A.    After the group, yes.

4             MS. TALBOT:  If I could just take a break

5    and confer with my client.

6             (Recess.)

7             MS. TALBOT:  We're back on the record and

8    we just want to let the record reflect that we have

9    had discussions around the room to clarify that the

10   communications with Mr. Pierce or in the room are

11   supposed to be focused strictly on interpretation

12   services while we're on the record, and we will go

13   off the record for any other conversations.

14            In addition, I would like the record to

15   reflect that as the attorney taking the depositions,

16   that the note that I looked at was not a note written

17   by Mr. Pierce.  I had not realized that Mr. Pierce

18   had written a separate note and that the person whose

19   note I was looking at had had a separate exchange

20   relating to that, and I do apologize that that was

21   not clear, but just wanted to make that clear for the

22   record.

1          MS. ORCUTT:  Okay.

2          BY MS. TALBOT:

3     Q.    After the instance that you indicated that

4  Mr. Pierce left the group session, did Mr. Pierce

5  come back to group session for substance abuse

6  classes?

7     A.    Not that particular day.

8     Q.    Do you recall if he would come back

9  several days later?

10    A.    Well, it is my recollection that after the

11  group ended, Mr. Pierce gestured to me to come down

12  to his cell, where he began to communicate on a piece

13  of paper that he was frustrated with the process and,

14  more specifically, not being able to understand what

15  was going on with regards to me giving my lecture as

16  a part of the presentation.

17    Q.    And did you do anything with that

18  information?

19    A.    Yes, ma'am.

20    Q.    And what did you do?

21    A.    I believe I communicated to Mr. Pierce

22  that I was going to make contact with my supervisor

1    saying and communicate that in sign.

2        Q.    Did you ask ██████████ directly whether he

3    was able to communicate with Mr. Pierce in sign

4    during your class program?

5        A.    I did.

6        Q.    And what did ██████████ say?

7        A.    He said that there was no problem for him

8    signing with Mr. Pierce.

9        Q.    Did he say that there were any problems

10   with Mr. Pierce signing to him?

11       A.    He didn't say that.  But later I found out

12   from Mr. Pierce himself that he was not satisfied

13   with the way in which ██████████ was communicating in

14   sign.

15       Q.    If you could describe for me exactly what

16   Mr. Pierce communicated to you regarding ██████████

17   ability to sign?

18       A.    Based on my recollection, it was, to some

19   extent, that he was not satisfied with it and that I

20   believe he could not understand everything that he

21   was signing or communicating to him and so that in

22   general he was not satisfied with it.

1        Q.    Did you let anyone know that Mr. Pierce

2   was not satisfied with █████████ ability to

3   interpret for him?

4        A.    Yes, ma'am, I communicated that to my

5   supervisor.

6        Q.    And that would be Mr. Fulton?

7        A.    Yes, ma'am.

8        Q.    With respect to the group classes that

9   were interpreted for Mr. Pierce, the ones that we've

10  discussed either specifically by date or the

11  additional one that you mentioned that ████████████

12  may have interpreted for him, with respect to those

13  group classes, did Mr. Pierce participate?

14       A.    Yes.

15       Q.    And how did Mr. Pierce participate in the

16  classes?

17       A.    Well, for the most part, when

18  Mr. Frederick was communicating much of what it was I

19  was saying or the presentation that I was giving,

20  whenever Mr. Pierce had questions or wanted to

21  respond, he did so.

22       Q.    And when ███████████████████, was

EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - - -x
                                 :
WILLIAM PIERCE,                  :
                                 :
            Plaintiff,           :
                                 :          Case No.
vs.                              :
                                 :   1:13-cv-00134 KBJ
DISTRICT OF COLUMBIA,            :
                                 :
            Defendant.           :
- - - - - - - - - - - - - - - - -x


WASHINGTON, DC

TUESDAY, SEPTEMBER 24, 2013


DEPOSITION OF:

M. GRIFFIN

called for examination by counsel for the Plaintiff,

pursuant to notice, at the offices of Steptoe &

Johnson, 1330 Connecticut Avenue, N.W., Washington,

DC, commencing at 10:20 a.m. and concluding at

12:40 p.m., before Kirk A. Sturges, a Notary Public

for the District of Columbia.

1    okay.

2              Have you had any training to work with

3    deaf or hearing-impaired inmates?

4         A    No.

5         Q    What is your experience working with deaf

6    or hearing-impaired inmates?

7         A    If I happen to have one on my caseload, I

8    communicate with them by pen and paper.

9         Q    And what do you do to ensure that they

10   are able to read and write?

11        A    If they come to me with an issue, I would

12   take the pen and paper and ask them what is their

13   issues, what is it I can do for them; and they will

14   write it down.  If it's a phone call, I will use my

15   TTY phone.  If it's any other issue, like clothing, I

16   would make sure they had their clothing or hygiene

17   items.  Whatever the issue is, I would write it down.

18   They would write it.  That's how we would

19   communicate.

20        Q    Okay.  Have you ever used an interpreter

21   to communicate with an inmate?

22        A    Have I ever used an interpreter?

1    just basically general population but their medical

2    conditions limit them to certain things; and then

3    once they get better, they go to general population.

4         Q      If you're on protective custody in

5    Medical 82, what are your restrictions?

6         A      You basically get an hour of rec.

7    Medical come to their cell and give them their

8    medication.  They get their dinner.  They get their

9    shower time, phone time.

10        Q      And by shower time, how often do they get

11   to take a shower, if you're in protective custody for

12   Medical 82?

13        A      They get rec every day; so, when they

14   rec, they can take their showers then.

15        Q      Okay.  And phone time?

16        A      Every day.

17        Q      All right.  Is that also included in the

18   one-hour break?

19        A      Yes.

20        Q      So the phone is limited to an hour, if

21   you're in protective custody on Medical 82?

22        A      Are you talking about the inmate's

1    phones?

2         Q      Yes.

3         A      (Witness nods head.)

4                MS. TALBOT:  You have to give a verbal

5    answer.

6                MS. ORCUTT:  You have to say yes or no.

7                THE WITNESS:  Yes.  I'm sorry.

8                BY MS. TALBOT:

9         Q      If you need to use the TTY phone, is

10   that -- is there the same policy of using the phone

11   during the one hour of rec time?

12        A      No.

13        Q      Okay.  How is the TTY phone --

14        A      How does the inmate get access to a TTY

15   phone?

16        Q      Okay.  Let's go with that question first.

17               How does the inmate get access to a TTY

18   phone?

19        A      If the resident gets my attention -- and

20   most of the time, they do -- like I said, we

21   communicate by pen and paper.

22               If they say they need a phone call, I

1  will get the TTY phone from Mr. Fulton and give them

2  access to make their call in private.

3       Q       All right.  So, where would the phone be

4  connected?

5       A       In my office.

6       Q       You have to physically get the phone from

7  Fulton.  Then put it in your office?

8       A       (Witness nods head.)

9       Q       Okay.  And how much time do you allow,

10  again, for an inmate that is in protective custody?

11  How much time do you allow for use of the TTY?

12       A       Well, I've never, ever really gave them a

13  particular amount of time; but I do tell them that

14  they can't be on the phone a long time.  Because they

15  have to go through so much when they are using a TTY

16  phone, I don't be like -- most legal calls are

17  five minutes.

18            We aren't really supposed to do personal

19  calls; but I've given him, you know, personal calls

20  that may have took maybe 20 minutes, maybe

21  30 minutes.

22       Q       And you said you're not supposed to do

1    personal calls.  Why is that?

2         A     We are not supposed to do personal calls

3    for inmates unless they're coming into the facility.

4    Everybody gets an intake call to notify their family,

5    let their family know where they are; and then they

6    get legal calls after that.  We don't just do

7    personal calls just to be doing it, because we would

8    be doing phone calls all day.

9         Q     And right now, when you're talking about

10   the personal calls and the legal calls, we're talking

11   about on the TTY?

12        A     Uh-huh (affirmative response).

13        Q     Okay.  How do -- inmates that don't need

14   to use the TTY:  What's their access to the phone?

15        A     They just ask the officer on the unit.

16        Q     Okay.  And then what type of access would

17   they get?

18        A     They have the phone on the unit that the

19   inmates have access to.

20        Q     Okay.  Is that access all day?

21        A     Uh-huh (affirmative response).

22        Q     Okay.  Even if they're in protective

1    custody on Medical 82?

2         A      Uh-huh (affirmative response).

3         Q      Okay.  And how are the two phones

4    different in terms of --

5         A      A TTY phone is the phone that staff use

6    to make available to the person that can't hear.

7                The inmate phone is right there on the

8    unit.  And if they're on lock down, you just roll the

9    phone to the door; and they use it.

10        Q      Would this difference have been explained

11   to Mr. Pierce or other deaf inmates?

12        A      I don't understand.

13        Q      The difference in access, between getting

14   the phone rolled to your unit to be able to use it

15   and having to use the TTY phone in a more limited

16   environment.

17        A      I've never had an issue with a deaf

18   person needing access to a TTY phone.  To me, the

19   phone that's used for general population is not the

20   same phone that a deaf person would use because they

21   can't hear.  So that's why I would give them a

22   personal call.  I would make an exception in their

1    they have the thing in their room that they push that

2    rings in the nurse's station; and Medical 96 does not

3    have that.

4         Q     Does Medical 82 have alarm units inside

5    the cells?

6         A     To contact their nurse's station?

7         Q     Yes.  Do they have that?

8         A     Uh-huh (affirmative response).

9         Q     Do they have alarms, let's say, if there

10   was an emergency in the building or a security

11   emergency?

12             Do they have alarms inside the cell that

13   would alert someone that there is an emergency in the

14   building, like a fire alarm, for example?

15        A     Yes.

16        Q     And those are in the cells?

17        A     Those are on the floor.

18        Q     On the floor but not in their cells.

19        A     Huh-uh (negative response).

20        Q     And when someone is transferred into

21   Medical 82, as the case manager, what information

22   would you get regarding why the person was

```
 1        A        Yeah.

 2        Q        Okay.  Was she ever the case manager for

 3   segregation?

 4        A        I'm not sure.

 5                 When I was working on 82, Mr. Sinclair

 6   was.

 7                 MS. ORCUTT:  Can we go off the record for

 8   a second.

 9                 MS. TALBOT:  I was trying to decide

10   whether to do it now or later.

11                 Let's go off the record.

12                     (There was a discussion held off the

13                      record from 10:58 a.m. to 11:50 a.m.)

14                 MS. TALBOT:  Okay.

15                 BY MS. TALBOT:

16        Q        Consistent with the discussion that we

17   have had off the record, I want to focus specifically

18   on your duties as the case manager for Medical Unit

19   82 for a very narrow period of time on or around

20   February 23rd to March --

21                 MS. ORCUTT:  The 3rd is when he was moved

22   to SMU.
```

```
 1              BY MS. TALBOT:

 2      Q       -- 3rd, which would be the period when

 3  Mr. Pierce was on Medical 82.

 4              And do you remember Mr. Pierce being an

 5  inpatient in your custody at that time?

 6      A       Yes.

 7      Q       Okay.  And do you recall that --

 8  Mr. Pierce entering into Medical 82 and the entire

 9  time, up until when he left Medical 82, that you were

10  the case manager on Medical 82?

11      A       When he came to 82, I wasn't there.  I

12  came the next day.  He was there.

13      Q       Okay.  And were you there the day he left

14  Medical 82?

15      A       I'm not sure if I remember being there

16  when he left.

17      Q       But you do recall that you were the case

18  manager for Medical 82 --

19      A       Uh-huh (affirmative response).

20      Q       -- through that time period in March,

21  specifically, up to March 4th or so?

22      A       (Witness nods head.)
```

1    to Mr. Pierce?

2         A     I'm not sure.  But when I seen him the

3    following day, he had stuff written down for me.

4         Q     Okay.  And we can go to the following

5    day.  What did he have written down for you?

6         A     That he needed to make a phone call.

7         Q     Okay.  And how did you respond to that?

8         A     I wrote down on the paper that -- what

9    kind of phone call did he need.

10        Q     And then what did he say in response to

11   that?

12        A     He said he needed to contact a friend.

13        Q     Okay.  And what did you do as a result of

14   that exchange?

15        A     I talked to Mr. Fulton and let Mr. Fulton

16   know that he was requesting the call and that I would

17   need a TTY phone.

18        Q     And when did Mr. Fulton get you the TTY

19   phone?

20        A     The same day that he got the phone call.

21        Q     Okay.  And just so we can have it as an

22   exhibit, I'll go ahead and mark the document that you

1    are referring to, in front of you there, as

2    Exhibit 1.

3                    (The document referred to below was

4                    marked for identification as Griffin

5                    Deposition Exhibit No. 1.)

6              BY MS. TALBOT:

7         Q    If you could, just state for the record

8    what the document is.

9         A    This document here?  (Exhibiting.)

10        Q    Yes.

11        A    This is the information that we put in

12   OMS when we service the inmates --

13        Q    Okay.

14        A    -- when we have time to put it in there.

15        Q    And looking at the record that starts at

16   the end of the page but goes to page two -- and it

17   has you, as the author.  It says, "Received a call to

18   Mr. Dave," with a phone number.  And it said, "The

19   call went well; and according to the inmate, wants to

20   know how he can move to general population."

21        A    Uh-huh (affirmative response).

22        Q    What did you mean by that statement?

1       A       He had wrote on the paper -- he had said

2    on the paper that he didn't want to stay up here.

3              I passed that information on to the

4    segregation person, because I can't move segregation

5    inmates.

6       Q       Okay.  And do you recall who you would

7    have passed that onto?

8       A       I can't remember right now.  I really

9    can't.

10      Q       And what, if anything, did you tell

11   Mr. Pierce you were going to do?

12      A       I told him I was going to talk to

13   Mr. Sinclair, who I thought at the time was his case

14   manager for segregation.

15      Q       Did you ever come back and tell

16   Mr. Pierce what was going to happen next regarding

17   moving him back to general population?

18      A       I told him that I passed this information

19   on to the segregation staff.

20      Q       Did you explain to him what the

21   segregation staff was?

22      A       Yes.

1    should be handled?

2         A     No.

3         Q     Okay.

4         A     They already know.

5         Q     And do you recall speaking directly to,

6    again, a David Holder during one of the visits with

7    Mr. Pierce?

8         A     No.

9         Q     Okay.  Just to try to refresh your

10   recollection, my understanding is Mr. Holder came to

11   visit and there may have been some confusion about

12   the process for the visitation.  And one of the

13   officers went to get you so you could explain to

14   Mr. Holder something about the process.

15             Does that refresh your recollection at

16   all regarding a specific visit?

17        A     I vaguely remember something like that,

18   but it wasn't in the visitation hall.  It was

19   downstairs at the staff entrance.

20        Q     Okay.  Explain what you recall.

21        A     I recall that he was upset.  Something

22   about Mr. Pierce's visit -- I'm not very clear.  It

1    was some time ago.

2        Q      Do you recall the conversation possibly

3    relating to protective custody?

4        A      I think he said something to me about he

5    -- Mr. Pierce had informed him that he didn't want to

6    be in there.

7        Q      Okay.

8        A      Something to that nature.

9        Q      Do you recall that being consistent with

10   what Mr. Pierce said about wanting to go back to the

11   general population?

12       A      Like it says, that Mr. Dave was trying to

13   let us know that Mr. Pierce informed him that he

14   didn't want to be in there.

15       Q      Okay.  And did you provide that

16   information to anyone?

17       A      It was plenty of people out there

18   already:  captains, myself.  The segregation people

19   got the information.

20       Q      But not from you?

21       A      No, not from me.

22       Q      Okay.  And just to clarify, are calls for

1   Mr. Fulton each time?

2        A      No.  I kept it.

3        Q      Okay.  And then how many of the phone

4   units for the hearing inmates, the ones that rolled

5   around to their respective rooms, how many of those

6   phones are on the unit Medical 82 specifically?

7        A      One -- two.

8        Q      Two?

9        A      Uh-huh (affirmative response).

10       Q      And what are the access hours for those

11  phones?

12       A      As long as it's not lockdown, they can

13  use the phone any time.

14       Q      Then I just wanted to ask you how

15  Mr. Pierce was to try to get your attention.

16              You mentioned that you did walk rounds to

17  see whether any of the inmates needed anything.

18       A      I came to Mr. Pierce's door.

19       Q      And what did Mr. Pierce do, if anything?

20       A      I would knock on the door.  If he didn't

21  have anything that he needed me to do, he wouldn't

22  say anything and just -- (Indicating.)

EXHIBIT 21

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
--------------------------------
                               :
WILLIAM PIERCE,                :
                               :
        Plaintiff,             :
                               :
    v.                         :  Case No.
                               :
DISTRICT OF COLUMBIA,          :  1:13-cv-00134 KBJ
                               :
        Defendant.             :
                               :
--------------------------------
```

Individual deposition of W██████  FULTON████████

a witness herein, at the law offices of Steptoe &

Johnson, LLP, 1330 Connecticut Avenue, N.W.,

Washington, D.C., commencing at 1:11 p.m. on Tuesday,

October 1, 2013, and the proceedings being taken down

by stenotype and transcribed by Catherine B. Crump, a

Notary Public in and for the District of Columbia.

1    background questions.   You previously, essentially,

2    have testified to this, but you do recall Mr. Pierce

3    being an inmate in the facility?

4          A.    Yes.

5          Q.    And Mr. Pierce entered the facility

6    around February 1st, but do you recall, and you don't

7    have to give specific dates, when and how you first

8    became aware that Mr. Pierce was an inmate in your

9    facility or at least that you had an additional deaf

10   inmate in your facility?

11         A.    My recollection is that I received a

12   phone call from Mr. Holder, who was a friend of Mr.

13   Pierce or identified himself as such and was

14   concerned for Mr. Pierce.

15         Q.    And what concerns did Mr. Holder state

16   to you?

17         A.    He indicated Mr. Pierce was deaf and

18   needed assistance and wanted to make sure that Mr.

19   Pierce was enrolled in programs that would help him

20   identify and deal with anger issues.

21         Q.    And do you recall if this phone call

22   occurred before or after Mr. Holder tried to reach

1    you by E-mail?

2         A.    I don't recall, to be honest with you.

3         MS. TALBOT:  I'm going to mark as Exhibit H an

4    E-mail that you are identified as one of the

5    individuals in the communication.

6                        [Exhibit H was marked

7                        for identification.]

8    BY MS. TALBOT:

9         Q.    This chain of E-mails all appears to

10   have occurred on February 14th.  If you go to page 2,

11   it indicates in the first E-mail here Mr. Holder

12   E-mailing you.  Does this refresh your recollection

13   at all as to whether you received this E-mail first

14   or if you received a phone call at first?

15        A.    My recollection is that we spoke by

16   phone, but I can't categorically state that.

17        Q.    Okay.  And if you take a look at the

18   E-mail, it indicates that he was representing that

19   Mr. Pierce was not participating in the groups for

20   anger management and alcohol abuse.  This was a

21   complaint that he had made on the phone.  Correct?

22        A.    Right.

1         Q.     What did you indicate to him on the

2    phone that you would be able to do to assist in this

3    matter?

4         A.     Again, my recollection is that I

5    indicated to him that I would intercede, contact my

6    addictions treatment counselor who was doing a class

7    in anger management as part of his presentation and

8    try to get Mr. Pierce involved.

9         Q.     Okay.  And in this E-mail communication

10   -- I'm looking at your E-mail now to Mr. Holder on

11   February 14 -- you speak of identifying a volunteer

12   organization or Gallaudet to assist with

13   interpreting.  Do you recall making that

14   communication?

15        A.     I do recall making a communication to

16   Gallaudet at the suggestion of Mr. Holder, who

17   provided some information as to, perhaps, a contact

18   there or something of that nature.  I spoke to them

19   about possibly providing services.  The individual

20   there told me he would provide me their fee schedule,

21   and I also inquired as to whether or not they might

22   have students there that were studying in the area of

1   criminal justice that might be interested in doing an

2   internship or something of that nature in exchange

3   for some interpretive services.

4           Q.    How did the individual that you spoke to

5   at Gallaudet respond?

6           A.    He said his people needed to be paid.

7           MS. TALBOT:  Okay.  I'm going to provide you

8   with another document.

9                               [Exhibit I was marked

10                               for identification.]

11  BY MS. TALBOT:

12          Q.    If you could identify this document for

13  the record.

14          A.    Okay.  This looks like a response back

15  from Gallaudet.

16          Q.    And it's dated February 14, 2012?

17          A.    Right.

18          Q.    It does appear to be dated in terms of

19  time after the E-mail that you -- the E-mail exchange

20  in the exhibit that we just discussed.

21          A.    Correct.

22          Q.    Did you follow up with Gallaudet with

1    response to the proposal that they sent to you by

2    E-mail?

3           A.    Actually, I think based on their fee

4    schedule, we looked for some alternative measures.

5           Q.    So you did not use Gallaudet's paid

6    services for interpreting?

7           A.    That's correct.

8           Q.    What were the alternatives that you

9    considered?

10          A.    As I mentioned before, initially, there

11   was someone that Mr. Pierce was in class with that

12   agreed to interpret and sign for him.  We tried that.

13   He led us to believe that wasn't satisfactory.

14          So then we sought -- besides written language,

15   we sought help from one of our volunteers who also

16   worked at Gallaudet.

17          Q.    Prior to this time, had you ever

18   requested an interpreter on behalf of an inmate?

19          A.    Prior to this time, no.

20          Q.    Okay.  And after the instances with Mr.

21   Pierce, have you since provided any interpreters to

22   deaf or hearing-impaired inmates?

1    responsible for all things in the facility.

2    BY MS. TALBOT:

3          Q.    Okay.  Is there anyone that is

4    specifically delegated to manage requests for

5    accommodations?

6          A.    No.  We do not have an ADA coordinator.

7          Q.    Is it fair to say that much of this

8    responsibility falls on you?

9          A.    Yes.

10          Q.    At least as it relates to any

11   accommodation that can't be provided by Unity; is

12   that fair?

13          A.    Yes.

14          Q.    And have you attended any training

15   specifically relating to hearing-disabled inmates?

16          A.    No.

17          Q.    Apart from reaching out to Gallaudet,

18   did you reach out to anyone external of CTF, CCA, and

19   D.C. Department of Corrections to identify potential

20   interpreters?

21          MR. STRUCK:  For?  Sorry.

22   BY MS. TALBOT:

Q. For Mr. Pierce.
A. You say exclusive of those individuals?
Q. Yes, because we did discuss those individuals previously. So in addition, really.
A. Yeah. I reached out to my chaplain who had a contact who, as I indicated, was a volunteer at Gallaudet, and we were able to get that individual to come in and do some interpretation.
Q. You previously testified that there currently is in place a contract with a Graham Agency, was it?
A. Correct.
Q. Did you reach out to that agency to provide any interpretive services for Mr. Pierce?
A. No.
Q. Did you do any follow-up with Mr. Holder after this E-mail and phone communication specifically regarding providing an interpreter for Mr. Pierce?
A. I did a number of phone calls to Mr. Holder. I can't remember the content of all of them, but I tried to be responsive to him in returning his

1  calls if he left me a message and receptive to

2  receiving his calls if he called with an issue.

3         I'm often away from my desk throughout the

4  facility or doing other tasks or whatever.  So I may

5  not be there to actually accept the call at the time

6  that it comes in, but I try and get back to concerned

7  citizens and be, you know, open to their point of

8  view.

9         Q.    Okay.  Was Mr. Holder the only person

10  who indicated to you that Mr. Pierce was in need of

11  an interpreter?

12         A.    Besides what Mr. Pierce wrote himself,

13  yes.

14         Q.    Did any of the case managers or unit

15  managers bring it to your attention?

16         A.    Yes.  Yeah.  Mr. McNeil, who was working

17  with him, said that he had requested interpretation.

18         Q.    Do you recall Ms. Tutwiler bringing

19  anything to your attention?

20         A.    It's quite possible.

21         Q.    With respect to Mr. McNeil, what was the

22  conversation that you had with Mr. McNeil regarding

1    Mr. Pierce's request for an interpreter?

2         A.    I think the conversation centered around

3    the fact that Mr. Pierce's reception of the services

4    that were being provided by the other inmate, he

5    didn't believe that that inmate was fluent enough or

6    being clear enough so that he could get the full

7    benefit of what was being delivered in the course;

8    and, again, since the course content and material was

9    written and those things were provided to Mr. Pierce,

10   I'm assuming that that centered more around classroom

11   discussion and comments that that other inmates might

12   have.

13        Q.    Did this conversation occur, if you

14   recall, before or after Mr. Pierce submitted an

15   informal resolution?

16        A.    I don't recall.

17        Q.    How many times would you say that you

18   heard about the requests regarding Mr. Pierce needing

19   an interpreter?

20        MR. STRUCK:  Form.

21        THE WITNESS:  Two, maybe three.

22   BY MS. TALBOT:

1  their situation, why they're in a status.  Inmates

2  can be in the Special Management Unit for a number of

3  reasons to include disciplinary infractions,

4  protective custody.  They might be placed there

5  because they have a high-profile case that may cause

6  them to be a victim of other inmates.

7          So there are a number of reasons so that the

8  inmate understands why they are there.

9          Q.    Who would be responsible for that

10  interview as a general matter?

11          A.    Usually, the Housing Committee.

12          MS. TALBOT:  I want to mark a document as

13  Exhibit J.

14                          [Exhibit J was marked

15                           for identification.]

16  BY MS. TALBOT:

17          Q.    If you could identify this document for

18  us.

19          A.    It's the administrative segregation

20  review.

21          Q.    Okay.  And this is the review for Mr.

22  Pierce; is that correct?

1          A.     Yes.

2          Q.     What's the purpose of this form, this

3    document generally?

4          A.     To document the reason for Mr. Pierce's

5    placement on protective custody and explain to Mr.

6    Pierce why he's there.  Ultimately, the overall

7    intent of the form is to make sure that an individual

8    does not languish in SMU without review or attention

9    from the staff.

10         Q.     And it indicates here, the summary of

11   information presented by the inmate indicates -- I've

12   had a doozy of a time reading most of these.  So if

13   everyone could read along with me.

14         The inmate, Pierce, William, stated he doesn't

15   want P.C., but refused to sign paperwork to release

16   him without his lawyer.

17         Do you recall this?  Do you recall reviewing

18   this document?

19         A.     Yes, and I recall noting at that time

20   that it was unusual that I want out, but I'm not

21   willing to sign to get out.  Most inmates are more

22   than happy to sign to get out of P.C. if and when

1    they feel that they're safe.

2         Q.    Given that this was an unusual

3    statement, what follow-up, if any, did you do?

4         MR. STRUCK:  Form.

5         THE WITNESS:  Advised the staff to review him

6    again in a week.  Until I have signature from the

7    inmate indicating that he no longer feels for his

8    safety, it would be kind of reckless to put him back

9    in a situation where he might be in danger.

10   BY MS. TALBOT:

11        Q.    Did you come to understand why Mr.

12   Pierce was refusing to sign the paperwork?

13        A.    No.

14        MS. TALBOT:  I'm going to focus next on

15   certain informal grievances that were filed by Mr.

16   Pierce.  I'd like to use the documents to go through

17   them.  The next document is Exhibit K.

18                              [Exhibit K was marked

19                               for identification.

20   BY MS. TALBOT:

21        Q.    Actually, just before I get to Exhibit

22   K, just so that I have this on the record -- we could

1   McNeil had with Mr. Pierce?

2           A.    I'm sure there was not.

3           Q.    With respect to the accommodations that

4   were indicated in this memo that would be given to

5   Mr. Pierce, did you believe that these would be

6   satisfactory?

7           A.    Yes.  As I had indicated, the course

8   material that Mr. McNeil was presenting was available

9   in writing.  He was able to convey that to Mr.

10  Pierce.  In addition, the only drawback of the

11  segregation confinement would be a group interaction.

12          Q.    Then going back to the first page of the

13  informal resolution, there's an indication in the

14  description of the issue that Mr. Pierce wrote eight

15  request forms and that he was frustrated regarding

16  the phone limit.

17          Did you specifically address the phone limit

18  or his eight individual requests as a part of

19  responding to the grievance?

20          A.    I think I really was addressing his

21  progress in the class when I indicated that, you

22  know, the atmosphere was not conducive to group

1    participation and that Officer McNeil was working

2    with him one on one.

3          Q.    I'm just trying to understand, and it's

4    just for the record, whether there was any attempt to

5    address his issues relating to the phone limits.

6          A.    No.

7          Q.    So it appears, at least to me and you

8    can correct me, that there were three issues, really,

9    in the statement of the problem:  One, that was no

10   interpreter for anger management and substance abuse;

11   second, that Mr. Pierce had written several requests

12   to Tutwiler; and, third relating to the phone limit

13   and with this, he had also requested an interpreter.

14         What was your reason for focusing just on the

15   one issue, and the one issue being -- you already

16   discussed it -- an interpreter for the anger

17   management and substance abuse?

18         MR. STRUCK:  Form.

19         THE WITNESS:  The reason for focusing on that

20   was that while he was on SMU, that was the main

21   impediment.  If he signed off of SMU or signed off on

22   the necessary documents to be released, the other

1    issues would be dealt with in course.

2    BY MS. TALBOT:

3         Q.    And how would not being on SMU have

4    dealt with the phone limitations?

5         A.    Because of the restrictive nature of

6    SMU, because we have 32 individuals down there that

7    are locked down all competing for the case manager's

8    time with the telephone, it makes it more onerous,

9    more restrictive as far as allocating the case

10   manager's time, flexibility.

11        MS. TALBOT:  We have a second informal

12   resolution from Mr. Pierce.  We'll mark this as

13   Exhibit M.

14                          [Exhibit M was marked

15                          for identification.

16   BY MS. TALBOT:

17        Q.    Just to identify the document for the

18   record, this is an informal resolution from Mr.

19   Pierce on or around March 2nd; is that correct?

20        A.    Yes.

21        Q.    And you are the staff member assigned

22   for completing the informal resolution process on the

1    first page?

2        A.     Correct.

3        Q.     And on the second page, is that your

4    handwriting in the staff response?

5        A.     Yes.

6        Q.     If you could explain how your response

7    addresses the description provided here by Mr.

8    Pierce.

9            MR. STRUCK:  Form.

10           [Witness peruses exhibit.]

11           THE WITNESS:  Again, I assume his frustration

12   stemmed from the fact that he was not able to

13   participate in or make progress in completing his

14   anger management class.

15   BY MS. TALBOT:

16       Q.     And you didn't read this as related to

17   not having an interpreter?

18       A.     No.

19       Q.     What did you understand his reference --

20   there's two references here to violating the ADA law.

21           MR. STRUCK:  Form.  Foundation.

22           THE WITNESS:  I felt he had a way to get out

1  of SMU if he wanted to.  All he had to do is sign

2  out.  It was just a matter of his expressing his

3  frustration.

4  BY MS. TALBOT:

5       Q.    Then he also indicated here that he

6  requested for an interpreter many times and more

7  extra time for a phone.  What was your understanding

8  as to how that would relate specifically to SMU and

9  not to the request for an interpreter and

10  accommodation for time to use the phone?

11       MR. STRUCK:  Form.

12       THE WITNESS:  It was not addressed in my

13  response.

14       MS. TALBOT:  I want to hand you a memo that

15  we will mark as Exhibit N.

16                      [Exhibit N was marked

17                       for identification.]

18  BY MS. TALBOT:

19       Q.    This is dated March 6th, so a few days

20  after the formal resolution was presented.  This memo

21  was presented to you, again, from Mr. McNeil through

22  Ms. Pointes.  If you could indicate why this memo was

1          Q.     Okay.  Did you talk to Mr. Friedrich,

2    Reverend Friedrich, directly?

3          A.     No.

4          Q.     And Chaplain -- what was his name?

5    Excuse me.

6          A.     Napper, N-A-P-P-E-R.

7          Q.     Is he an employee of CCA?

8          A.     Yes, he is.

9          Q.     What did you communicate to Mr. Napper

10   that you needed in terms of a service for Mr. Pierce?

11         A.     Well, I indicated to him that, you know,

12   we had tried some other alternatives that weren't

13   satisfactory to Mr. Pierce and we were looking for a

14   way to, you know, effectively have someone sign for

15   him during the classes so that he could get the

16   benefit of group input, group conversation.

17         Q.     Did Mr. Napper provide you any

18   information about Reverend Friedrich's qualification

19   or certification?

20         A.     He told me that he was a staff member at

21   Gallaudet University.

22         Q.     And did you do any research on your own

1    as it related to what was required for someone to be

2    certified or qualified to --

3         A.    No.

4         Q.    -- be an interpreter?

5         A.    No.

6         Q.    Are you aware of the difference between

7    signing and interpreting?

8         A.    Not clearly, no.

9         Q.    So when Chaplain Napper indicated that

10   Reverend Friedrich could sign, you assumed he could

11   interpret as well?

12        A.    Yes.

13        Q.    And by sign, I mean that he would know

14   American Sign Language.

15        A.    Right.

16        Q.    And by interpreting, meaning that he

17   would know how to interpret English to American Sign

18   Language.

19        A.    I assume he could do all of those

20   things.

21        Q.    Did you pay Reverend Friedrich?

22        A.    No.

1    had were functional and I'm not aware of any request

2    that was made for interpretation.

3         Q.    By functional, what do you mean?

4         A.    They could communicate either by reading

5    lips or effectively in writing and there did not seem

6    to be an issue.

7         Q.    And did you have any conversations with

8    the warden regarding Mr. Pierce?

9         MR. STRUCK:  Form.

10        THE WITNESS:  I made the warden aware.

11   BY MS. TALBOT:

12        Q.    What did you make the warden aware of?

13        A.    The fact that we were trying to work

14   with Mr. Pierce to get him the credit that he sought

15   and to get him the educational abilities that he

16   sought and that he had requested a sign language

17   interpreter.

18        Q.    Did you speak to the warden regarding

19   the options for interpreting services?

20        A.    Yes.

21        Q.    If you could describe that conversation.

22        A.    Basically, I told him that I had spoken

Page 45

1   with Mr. Holder, subsequently with the gentleman at

2   Gallaudet, told him about their fee structure and so

3   forth; and my recollection is he advised me to go

4   ahead and see if we could find a way to accommodate

5   Mr. Pierce without involving Gallaudet.

6          Q.    Did you ever follow up with the warden

7   as to how the issue was resolved, if at all?

8          A.    Well, I'm sure that I relayed to him,

9   you know, what remedies that we had sought and we had

10  tried to put in place, yes.

11         MS. TALBOT:  Those are all the questions we

12  have.

13         MR. STRUCK:  Okay.  We're done?

14         MS. TALBOT:  Yes.

15         MR. STRUCK:  All right.  We'll read and sign.

16         [Whereupon, at 2:49 p.m., the deposition

17  concluded.]

18                        [Signature not waived.]

19

20

21

22

EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - -x
                                  :
WILLIAM PIERCE,                   :
                                  :
            Plaintiff,            :
                                  :
vs.                               :         Case No.
                                  :
DISTRICT OF COLUMBIA,             :   1:13-cv-00134 KBJ
                                  :
            Defendant.            :
                                  :
- - - - - - - - - - - - - - - - -x

WASHINGTON, DC

FRIDAY, OCTOBER 11, 2013

30(B)(6) DEPOSITION OF

UNITY HEALTH CARE

by and through its corporate designee

VALI ZABIHEIAN

called for examination by counsel for the Plaintiff,

pursuant to notice, at the office of Steptoe & Johnson,

1330 Connecticut Avenue, N.W., Second Floor, The Mark

Hulkower Conference Room 2-B, Washington, DC,

commencing at 3:18 p.m. and concluding at 4:44 p.m.,

before Kirk A. Sturges, a Notary Public for the

District of Columbia.

1    the health care policies applicable to inmates at

2    CTF?

3         A     It's only CTF or overall in the

4    Department of Corrections.

5              Let's talk about the Department of

6    Corrections, because we have a contract for

7    Department of Corrections, which it includes CCA and

8    CDF.

9         Q     Okay.  Yes.  That's fine.

10        A     We have a policy, you know, committee.

11   They review the policy annually.  And every year,

12   anything needed, if they want to update it, they do

13   update it.  And they sign it the day the policy is

14   updated.

15        Q     And that committee then issues all of the

16   Unity policies in places at the CTF facility?

17        A     Both facilities -- yes -- CDF and CTF.

18        Q     CDF and CTF?

19        A     Right.

20        Q     Is there any oversight at the Department

21   of Corrections over the policies issued by Unity?

22        A     They review it.  They approve it.  We try

1    to make our policy, you know, based on ACA's and

2    NCCHC's standard.  And, you know, obviously, DOC

3    reviewed our policy and approve it.

4         Q    So you mentioned the policy committee at

5    Unity, and you said that they review the policies

6    annually; is that correct?

7         A    Annually, yes.

8         Q    When they do the review of the policies

9    annually, do they review the policies to ensure that

10   they are consistent with District of Columbia laws?

11        A    Absolutely, and also, ACA and NCCHC.

12   Their policy change every few year -- every year

13   sometimes.  We do review it.

14             And if you look at our policy, you will

15   see the date when, for example, last policy is

16   reviewed by the company.

17        Q    Does the policy committee review the

18   policies to ensure that they are consistent with

19   Department of Corrections' program statements?

20        A    And NCCHC -- that's -- DOC reviewed that

21   and the ACC and NCCHC.

22        Q    So DOC reviews the policies to ensure

1    that they --

2         A       DOC review.  They are --

3         Q       So DOC reviews Unity's policies --

4         A       That's correct.

5         Q       -- to ensure that they are consistent

6    with DOC program statements?

7         A       Yes.

8         Q       The policy committee:  Are they connected

9    to the corporate office of Unity?

10        A       Yes.

11        Q       Or is it located --

12        A       It's like -- it's with combination of the

13   people.  I am in the policy committee, for example.

14   Dr. Lapp is in policy committee.  And if you are --

15   the provider, you know, they are on the policy

16   committee.

17        Q       How many people are on the committee

18   total?

19        A       I cannot really give you the -- probably

20   five.  I don't know exact number.  Five, maybe five,

21   six.

22        Q       Are they all employees who work --

```
 1                    (The document referred to below was

 2                    marked for identification as Unity

 3                    Deposition Exhibit No. 2.)

 4            BY MS. COOK:

 5       Q      Are you familiar with this document?

 6       A      Yes.  I am familiar.

 7       Q      And was this policy in effect in February

 8  and March of 2012?

 9       A      Give me one second.  (Witness reviews

10  document.)  Yes.

11       Q      And I believe you just mentioned that

12  sign language interpreters for hearing-impaired

13  inmates:  That would be covered by this policy; is

14  that correct?

15       A      It's under special need inmate.

16       Q      Under special needs?

17       A      The same policy we are talking about.

18       Q      So it would be covered by this policy?

19       A      Yeah.

20       Q      Can you identify which provision of this

21  policy would apply to the provision of interpreters

22  for hearing-impaired inmates?
```

1      A       You know, this is in general.  You know,

2  in general, this is what is for special need inmate.

3  Deaf, mute, all covered under this policy.

4      Q       So are you saying there is no specific

5  provision relating to sign language interpreters in

6  this policy?

7      A       If we go for each specific provision like

8  pregnancy, then we have to have a policy for all

9  pregnancy.  Blind, you -- blindness, then it's going

10 to be a big -- you know, that's what you are asking?

11     Q       I'm just asking whether there's --

12     A       Right.  We have -- in general, we have a

13 policy which cover all those things you are talking

14 about -- deaf, mute, pregnant, blind -- and so --

15     Q       Which policy are you referring to?

16     A       Special need inmate, this one in this.

17             MR. BERKOWITZ:  I'm not sure he is

18 understanding the question that you are asking.  I

19 don't know if there is another way to ask it.

20             BY MS. COOK:

21     Q       I'm just asking if you can identify --

22 you said that sign language interpreters for

1    hearing-impaired inmates:  That would fall under this

2    special needs policy; is that correct?

3         A     No.  No.

4               You asked if we have a -- if somebody

5    come -- and I just explain to you in very simple

6    language -- come in, he doesn't know how to

7    communicate with provider, what we do.

8         Q     Right.  But I'm asking if that is written

9    in a policy anywhere.

10        A     No.  It's not written in policy.

11        Q     Okay.  I want to refer to page three in

12   this document where it cites relevant standards.  And

13   this lists the National Commission on Correctional

14   Healthcare Standards; is that correct?

15        A     Yes.  It's correct.

16        Q     And the American Correctional

17   Association, Performance-Based Standards; is that

18   correct?

19        A     That's correct.

20        Q     And on page two, letter E, this policy

21   states, "Those individuals with significant

22   communication barriers, such as those unable to speak

Page 46

1   ensure compliance with DOC program statements, is

2   that correct?

3        A      That's correct.

4        Q      Apart from those standards or policies,

5   are there any other policies or standards that Unity

6   is required to follow as DOC's contractor at CTF?

7        A      I don't recall.

8        Q      Is Unity required to follow DOC's

9   policies and program statements relating to persons

10  with disabilities?

11               MR. BERKOWITZ:  Objection.

12               MR. McDERMOTT:  You can answer.

13               THE WITNESS:  Yeah.

14               BY MS. COOK:

15       Q      Now I would like to refer to what we will

16  mark as Unity Exhibit 3, which is program statement

17  6000.1F, medical management.

18                    (The document referred to below was

19                     marked for identification as Unity

20                     Deposition Exhibit No. 3.)

21               MS. COOK:  Can we go off the record for a

22  minute.

1   interpreters for hearing-impaired inmates, is that

2   correct?

3        A       That's correct.

4        Q       So how does Unity address the situation

5   like that, where there is a situation where they

6   don't have a policy -- a Unity policy that addresses

7   that specific situation?

8        A       We don't have it in this policy.

9        Q       So what policy would apply in that

10  situation?

11       A       I mentioned that -- the same thing -- if

12  we have that situation, we have a contract with, you

13  know, Gallaudet University, and we hold the inmate in

14  safe cell until we get that contractor to come and do

15  the sign language.  Maybe it's not written in policy

16  word by word -- which we don't have -- we don't have

17  a specific policy on deaf and mute to say what we

18  did.

19       Q       How would a nurse or doctor know that

20  they can obtain a sign language interpreter under

21  that contract?

22       A       How do they know that if patient

1  transferred to CTF, you mean?

2       Q       If a hearing-impaired inmate comes in and

3  requests an interpreter, how would a nurse or

4  provider know about that contract with Gallaudet?

5       A       We -- I mentioned that we -- what has

6  happened -- let me just go through this process we

7  just added a few months ago.

8               We have notification procedure.  If we

9  get -- maybe it's not in policy.  It's not written

10 anywhere.  We get a mute and deaf inmate.  If they

11 need a translator, like what you are saying, we have

12 to make a notification.

13              What they do -- we have an intake

14 director send the notification to medical director,

15 health service administrator, and nursing director.

16      Q       And when is that notification made?

17      A       The same time, same night they are seen

18 -- the inmate -- on the arrival at the intake.

19      Q       And if an interpreter is provided, how

20 long does it take for the interpreter to get there?

21      A       The following day, less than one day,

22 because intake come to facility in evening.  I just

1  want to let you understand what is the -- they come

2  in the evening.  They see the intake provider.

3           In those cases, they were informed to

4  hold.  If inmate needed translator, they hold them in

5  safe cell until we get somebody to come and do the

6  translation.

7      Q     Was this process in place in February and

8  March of 2012?

9      A     I don't think so.

10     Q     Do you know when this contract was

11 entered into with the interpreting service?

12     A     I don't know.

13           I can get you that, you know, when it --

14 I don't know when they got the contract.  I don't

15 know the answer for that.

16     Q     Is it Unity's understanding that it is

17 required to comply with the Americans with

18 Disabilities Act?

19     A     Yes.

20     Q     What, if anything, does Unity do to

21 ensure that its staff complies with the ADA at CTF?

22     A     Training.

1        Q        What sort --

2        A        Meeting.

3        Q        -- of training?

4        A        Monthly training, manager training,

5   provider training.

6        Q        What does that training involve?

7        A        Usually it's -- one of the agenda is

8   regarding the special need patient -- you know,

9   handicapped, mute and deaf inmate -- inmate, they

10  don't know English, you know.

11       Q        Does any of the training --

12       A        Training meaning, you know, in meeting

13  their supervisor, meet -- for example, nursing

14  director meet with all nurses, and they put an agenda

15  that they talk about.

16       Q        Do any of those meetings pertain to

17  providing interpreters to hearing-impaired inmates?

18       A        No.

19       Q        Who at Unity is responsible for

20  monitoring ADA compliance?

21       A        I don't know.

22       Q        Does Unity have an ADA coordinator?

EXHIBIT 23

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - -x
                                  :
WILLIAM PIERCE,                   :
                                  :
          Plaintiff,              :
                                  :          Case No.
vs.                               :
                                  :  1:13-cv-00134 KBJ
DISTRICT OF COLUMBIA,             :
                                  :
          Defendant.              :
                                  :
- - - - - - - - - - - - - - - - -x


WASHINGTON, DC

WEDNESDAY, OCTOBER 9, 2013


DEPOSITION OF:

C. CHAPMAN, M.D.

called for examination by counsel for the Plaintiff,

pursuant to notice, at the offices of Steptoe &

Johnson, 1330 Connecticut Avenue, N.W., Ninth Floor,

The Stephen Ailes Conference Room, Washington, DC,

commencing at 8:33 a.m. and concluding at 10:03 a.m.,

before Kirk A. Sturges, a Notary Public for the

District of Columbia.

1   sick call, they might do something to treat them

2   acutely and then have a follow-up appointment

3   scheduled the next day in chronic care and then I

4   might see them the next day, or I could see them as

5   part of that urgent care visit from the sick call.

6   But I don't -- I didn't do the actual sick calls on

7   the floor.

8        Q     You mentioned that the sick calls could

9   be initiated by a patient filling out a form.

10       A     I believe that's how it works, or they

11  alert the C.O.  I don't know the details about how it

12  works, no.

13       Q     I want to move on to your interaction

14  with any deaf inmates at CTF.

15             Do you have any training related to

16  examining or interacting with deaf or

17  hearing-impaired inmates, patients, in general?

18       A     There was some education in medical

19  school that -- you know, just sort of examples but

20  nothing formal.  I have had few deaf patients.

21       Q     So, you have not had any training at

22  Unity -- correct -- relating to hearing-impaired --

1      A      I don't believe so.  No.

2      Q      -- inmates?

3             Have you ever examined or interacted with

4      any deaf or hearing-impaired patients apart from

5      Mr. Pierce?

6      A      I believe so in residency a couple of

7      times but very -- not common, not often.

8      Q      Can you estimate the number of times?

9      A      Two.

10     Q      Two times.

11            Where did you do your residency?

12     A      Georgetown.

13     Q      Georgetown.

14            On those -- in those instances where you

15     have interacted with hearing-impaired patients, how

16     did you generally communicate with them?

17     A      Writing.

18     Q      Are you familiar with American sign

19     language?

20     A      As a child, I knew some of it; but I

21     don't know it anymore.

22     Q      Do you have any training in American sign

1          MR. McDERMOTT:  Yes.  That's fine.

2          BY MS. COOK:

3     Q    Are you generally familiar with this

4   policy?

5     A    Yes.  I mean, I haven't read it through

6   but, generally, from doing it.

7     Q    Okay.  Do you want a minute to review it?

8     A    No.

9     Q    On page nine --

10    A    Yes.

11    Q    For the record, this document is Bates

12  labeled DC-WAP 000170 through DC-WAP 000216.

13         BY MS. COOK:

14    Q    Flipping to page nine, there is a section

15  titled "Access to Care."

16         Do you see that?

17    A    Uh-huh (affirmative response).

18    Q    And if you flip over to page 10 --

19    A    Uh-huh (affirmative response).

20    Q    -- letter F --

21    A    Yes.

22    Q    -- the policy reads, "Sign language

1    interpreter services shall be made available to deaf

2    and hearing-impaired individuals."

3              Did I read that correctly?

4       A     Yes.

5       Q     Were you aware of this policy in February

6    and March of 2012?

7       A     No.

8       Q     Now, to switch to page 23 of the same

9    document, which is DC-WAP 000192, under number nine,

10   titled, "Chronic Care," this policy states, "The

11   medical contractor shall ensure that inmates with

12   chronic illnesses receive written treatment plans and

13   continuous and appropriate medical services in order

14   to prevent or reduce complications of chronic

15   illnesses and promote health maintenance in

16   accordance to establish an approved DOC performance

17   improvement measurement tools."

18             Did I read that correctly?

19      A     Yes.

20      Q     Were you aware of this policy in February

21   and March of 2012?

22      A     Except for the written treatment plans.

1              record from 9:05 a.m. to 9:11 a.m.)

2              MS. COOK:  All right.  We can go back on.

3              BY MS. COOK:

4         Q    We've gone through a few policies so far.

5    I just wanted to discuss any policies relating to

6    interpreters.

7              Does the chronic care clinic for the

8    other medical units operated by Unity CTF, do they

9    ever use the service of an interpreter to communicate

10   with hearing-impaired inmates?

11        A    I don't know.  No, I didn't; but I don't

12   know about their instances.

13        Q    Do you know if someone were to request an

14   interpreter, how would that request be processed?

15        A    I would assume you would ask Brian Wells.

16   He would get you an interpreter.  That's what he

17   does.  That's his job.

18        Q    Are you aware of any other health care

19   providers at CTF using the services of an

20   interpreter?

21        A    I don't know of that.  I've never seen

22   it.

1        Q       Are you aware whether the clinic or Unity

2   has any contracts with interpreting services?

3        A       I don't know.

4        Q       Are you aware whether video interpretation

5   services are ever used?

6        A       I don't know.

7        Q       Apart from the use of interpreters, are

8   you aware of any other accommodations made for

9   hearing-impaired patients?

10       A       I'm not.

11       Q       Okay.  I just want to go back and do a

12   little follow-up on some of the things we have talked

13   about so far.

14       A       Sure.

15       Q       And these are not going to be in any

16   particular order.  So, it might not make sense; but

17   we're just going to go through it.

18               You mentioned that you work in the

19   infirmary -- that you worked in the infirmary in

20   addition to the chronic care clinic.

21       A       Yes.

22       Q       What were your general duties in the





[redacted]

EXHIBIT 24

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - X

WILLIAM PIERCE,                         :

    Plaintiff,                         :

        v.                         :   Case No.

DISTRICT OF COLUMBIA,                   :   1:13-cv-00134 KBJ

    Defendant.                        :

- - - - - - - - - - - - - - - X

Washington, D.C.

Thursday, September 12, 2013

Deposition of FIDELIS F. DOH, M.D., a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Steptoe & Johnson, 1330 Connecticut Avenue, N.W., Washington, D.C., at 11:00 a.m., Thursday, September 12, 2013, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

1      Q.    I want to focus now specifically on

2   hearing-impaired inmates, not inmates with

3   disabilities generally but just hearing-impaired

4   inmates.  Do you have any training relating to

5   interacting with or communicating with

6   hearing-impaired inmates?

7      A.    I -- wouldn't -- say training as such but

8   we have interacted with a couple of hearing-impaired

9   inmates.

10     Q.    Are you familiar with American Sign

11  Language or ASL?

12     A.    Yes.

13     Q.    And if you could describe the basis for

14  your familiarity.

15     A.    What I know is that if we have a

16  hearing-impaired inmate and there is need to get a

17  sign language interpreter, then that is done and they

18  would help us with the communication process.

19     Q.    In your personal experience, so not as a

20  supervisor but as performing the intakes, have you

21  examined or interacted with hearing-impaired inmates

22  apart from our client, Mr. Pierce?

1            But it has been brought to my attention

2    that if we needed one, we could get one from the

3    Gallaudet University and they would be able to help

4    us with that.

5        Q.    And I'll just ask you these questions for

6    the record, though I suspect you may not be aware

7    from the last question that you gave me.  Are you

8    aware of whether there is a list of interpreters on

9    call for use to interpret for the medical department?

10       A.    And this is only from a sign language

11   point of view or for the deaf?

12       Q.    Yes.

13       A.    No.

14       Q.    Are you aware of whether the medical

15   department or Unity Health Care has any contracts for

16   interpreting services for the deaf?

17       A.    From what I said before, I'm aware of the

18   Gallaudet, what I heard about, but that's it.

19       Q.    You're not aware of whether they have a

20   contract or not?

21       A.    No.

22       Q.    Are you aware of what the process would be

1    if a hearing-impaired inmate had a medical emergency

2    and needed to quickly communicate through the use of

3    an interpreter?

4         A.    Through the use of an interpreter?

5         Q.    You indicated in your experience that you

6    haven't used an interpreter to provide services for

7    patient inmates, so I'm just trying to establish for

8    the record if you have any knowledge outside of that.

9    And I understand if you may not.

10        A.    No, no.

11        Q.    And I just want to state the question

12   again so that the record is clear.  Are you aware of

13   how quickly an interpreter could be made available if

14   a hearing-impaired inmate needed one and had a

15   medical emergency?

16        A.    No.

17             MR. STRUCK:  Form.

18             BY MS. TALBOT:

19        Q.    Are you aware of whether video

20   interpretation services are used by the medical

21   department?

22        A.    No, I'm not aware.

1    contract between the DC Department of Corrections and

2    Unity Health Care, section C.3.2.1, states that the

3    contractor, which is Unity Health Care, shall conduct

4    a health assessment of all inmates arriving at CTF in

5    accordance with the medical management 6000.1B, among

6    other provisions.

7            I would like to now mark as an exhibit DC

8    Department of Corrections program manual 6000.1G

9    which supersedes 6000.1B and other versions.

10                         (Doh Exhibit No. 1 was

11                         marked for identification.)

12           BY MS. TALBOT:

13       Q.   And for the record, this document is

14   identified with Bates numbers DC-WAP 000170 through

15   000216.  If you could take a moment to review.  And

16   to assist, I've provided some tabs as to where I will

17   refer to, as I recognize this is a large document.

18       A.   Okay.

19       Q.   And I'm going to refer to page 10 of the

20   document which is Bates labeled DC-WAP 000179 as I

21   question.  But first, as a preliminary manner, are

22   you generally aware of this program manual?

1      A.     Broadly.

2      Q.     Turning to page 10, the program manual at

3  section 2 relating to access to care and specifically

4  bullet E and F relate to providing interpreters for

5  deaf and hearing-impaired inmates, specifically F

6  says that the sign language interpreting services

7  shall be made available to deaf and hearing-impaired

8  inmates.

9             Prior to today, were you aware of this

10 specific provision in the medical management manual?

11     A.     No, not this specific provision.

12     Q.     With respect to your previous testimony,

13 you indicated that there is an assessment done first

14 to determine whether in the medical department you

15 can communicate with an inmate without using an

16 interpreter.  That's correct?

17     A.     That is correct.

18     Q.     And if you can, if you could explain how

19 that policy would be consistent with this statement,

20 if you can.

21     A.     Well, the assessment basically consists of

22 trying to communicate with the inmate and sometimes

1    signature again at 1:28.  Then if you go to page 9,

2    there is one more where it says internal

3    correspondence handout printed with your name and

4    your signature there.  I'm going to focus on this

5    portion of the record.

6              MR. STRUCK:  Biz, can you give me a Bates

7    number?

8              MS. TALBOT:  Yes.  The Bates number for

9    the entire document is WP 000214 through 249 and

10   we're going to start on the page Bates numbered 219.

11             MR. STRUCK:  Thank you.

12             BY MS. TALBOT:

13   Q.    This first record -- and by record, I'm

14   using these horizontal lines to distinguish between

15   entries or records.  This first record is titled

16   Comprehensive Intake.  What is comprehensive intake?

17   We referred to the wing card.  What would the

18   comprehensive intake be considered relating to that

19   wing card?

20   A.    It will be considered doing the history,

21   doing an interview and examining the patient and

22   coming out with the working diagnosis.

1        Q.      And we referred to that previously as the

2   history and physical?

3        A.      H&P, yes.

4        Q.      So this record indicates that you were the

5   staff member that completed the history and physical

6   for Mr. Pierce, correct?

7        A.      Correct.

8        Q.      With regard to this statement, you made an

9   entry under Details CC.  What is Details CC?

10       A.      CC is chief complaint.  Details CC is

11  anything relating to the chief complaint, any details

12  that you want to add to the chief complaint.

13       Q.      And you indicated there -- and the notes

14  there are your notes, is that correct?

15       A.      Those are my notes, yes.

16       Q.      And you indicated patient is deaf and mute

17  and you also indicated communicating through writing

18  and reading lips.  How did you come to the

19  understanding that Mr. Pierce could communicate

20  through writing?

21       A.      He did write.  I wrote, when he said --

22  not said.  You know, when he showed that he could not

1    understand what I was saying, I then wrote on a piece

2    of paper and he answered my questions correctly.

3         Q.    And how did you come to the conclusion

4    that Mr. Pierce reads lips?

5         A.    Because when he was watching me, he could

6    answer the questions through writing appropriately.

7         Q.    So you asked the questions verbally?

8         A.    Yes.

9         Q.    And he responded in writing?

10        A.    Not all the time.  Sometimes I would also

11   write, would write back and forth.

12        Q.    Would you have kept a copy of this paper

13   that you wrote back and forth on with Mr. Pierce?

14        A.    No.

15        Q.    Referring back to page 4, the words that

16   are bolded, for example, do you currently have a

17   primary care practitioner, who is your primary care

18   practitioner, are those the question cues that we

19   referred to earlier, the questions that the system

20   produces that you have to get an answer to?

21        A.    Correct.

22        Q.    And is this the order that the questions

1    are asked?

2        A.    That is the order, yes.

3        Q.    And with each question, how did you

4    question Mr. Pierce?

5        A.    With each question, most of the follow-up

6    questions that are not in here, I would write if I

7    wanted more information.  But otherwise the computer

8    is turned towards him and he can actually read along

9    as we go.

EXHIBIT 25



# DISTRICT OF COLUMBIA
# DEPARTMENT OF CORRECTIONS

# Program Manual

| | |
|---|---|
| **OPI** | **HEALTH SERVICES** |
| **Number:** | **6000.1G** |
| **Date:** | **January 25, 2012** |
| **Supersedes:** | **6000.1F (11/16/09)** |
| **Subject:** | **Medical Management** |

1. **PURPOSE AND SCOPE.** To establish procedures for oversight and general operational procedures for health care delivery that is appropriate, necessary, and adequate for inmates housed in the DC Department of Corrections (DOC) and its contract facilities.

2. **POLICY**

   a. It is DOC policy to ensure that inmates have unimpeded access to continuity of health care services from admission to transfer or discharge, including referral to community-based providers when indicated, so that their health care needs, including prevention and health education, are met in a timely and efficient manner.

   b. Health care includes services that are determined to be medically appropriate, necessary and adequate for the diagnosis or treatment of illness or injury, or to improve the functioning of an individual's body. Experimental medical care shall not be conducted on inmates.

   c. Inmates are not required to make medical co-payments while confined at the Central Detention Facility (CDF) and Correctional Treatment Facility (CTF).

3. **APPLICABILITY.** This policy applies to the medical contractor, DOC employees, and DOC contractors and inmates confined at the CDF and CTF.

4. **ANNUAL PROGRAM AND DIRECTIVES CERTIFICATION.** The DOC Health Services Administrator in conjunction with the medical contractor, DOC and CCA managers shall on at least an annual basis review and update or recertify this directive.

5. **REQUIREMENTS.** A health services contractor provides direct medical services to inmates at the Central Detention Facility (CDF) and at the Corrections Corporation of America Correctional Treatment Facility (CCA/CTF) with whom DOC contracts.

a. The DC Office of Contracting and Procurement shall provide contract administration and DOC Health Services Administration shall provide oversight of any contract for medical services provided at DOC operated facilities.

b. The DOC Office of Health Services Administration shall provide oversight and shall monitor the medical contractor's compliance with the contractual agreement, accrediting health care standards and practices, and national and local regulations.

c. The DOC and CCA/CTF Wardens and Administrators shall provide correctional security, custody, other applicable administrative support, space, equipment, furniture, cleaning and pest control.

6. **PROGRAM OBJECTIVES.** The expected results of this program will be:

a. To establish guidelines for the delivery and oversight of health care services.

b. To ensure that DOC inmates receive efficient and effective health care services.

c. To ensure that health care services comply with federal standards, District laws, ACA and NCCHC standards and contract obligations.

7. **NOTICE OF NON-DISCRIMINATION**

a. In accordance with the D.C. Human Rights Act of 1977, as amended, D.C. Official Code §2-1401.01 et seq., (Act) the District of Columbia does not discriminate on the basis of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, matriculation, political affiliation, genetic information, disability, source of income, status as a victim of an intra-family offense, or place of residence or business. Sexual harassment is a form of sex discrimination that is also prohibited by the Act. Discrimination in violation of the Act will not be tolerated. Violators will be subject to disciplinary action.

8. **DIRECTIVES AFFECTED**

a. **Directives Rescinded**

1) PS 6000.1          *Medical Management* (11/16/09)

b. **Directives Referenced**

1) PS 1280.2          *Reporting and Notification Procedures for Significant Incidents and Extraordinary Occurrences*

DC-WAP 000171

2) PS 1300.1     *Freedom of Information Act   (FOIA)*

3) PS 1300.3     *Health Information Privacy*

4) PS 1311.1     *Management Controls Research Activities*

5) PS 2920.3     *Control of Hazardous and Non-Hazardous Chemicals*

6) PS 2920.4     *Inspections and Abatement Program*

7) PS 2920.8     *Environmental Safety and Sanitation Inspections*

8) PS 2921.2     *Reporting Employee Accidents and On-the-Job Injuries*

9) PS 3550.2     *Elimination of Sexual Abuse, Assault and Misconduct Against Inmates*

10) PS 3700.2     *Employee Training and Staff Development*

11) PS 3800.3     *ADA: Communications for Deaf and Hearing Impaired*

12) PS 4352.1     *Inmate/Offender Deaths*

13) PS 4910.1     *Escorted Trips*

14) PS 5031.1     *CDF Emergency Plan*

15) PS 6050.1     *Tuberculosis Control Program*

16) PS 6050.3     *Residential Substance Abuse Treatment Program (RSAT)*

17) PS 6080.2     *Suicide Prevention and Intervention*

18) PS 6060.1     *Smoke/Tobacco Free Environment*

9. **AUTHORITY**

a. D.C. Code § 24-211.02  Powers; Promulgation of Rules

b. D.C. Code § 21-2201, et seq., Health Care Decisions

c. 45 C.F.R. 164.501 et seq., Health Insurance Portability and Accountability Act of 1996 (HIPPA)

d. 5 U.S.C. 552a, Federal Privacy Act

DC-WAP 000172

e.  D.C. Code § 7-101, et seq., *HIV Testing of Certain Criminal Offenders*

f.  D.C. Code § 14-307, *Physicians and Mental Health Professionals*

g.  D.C. Code § 22-3901 et seq., *HIV Testing of Certain Criminal Offenders*

h.  42 C.F.R. 8.12, *Federal Opioid Treatment Standards*

i.  Public Law 108-79, *Prison Rape Elimination Act of 2003*

j.  Memorandum of Understanding between the Department of Corrections and the Patients for Emergency Medical/Surgical Care Purposes dated 12/1/08

k.  D.C. Code § 7-1231.01, et seq., *Mental Health Consumers' Rights Protection*

l.  District of Columbia Superior Court Rules of Procedure for Mental Health Rule 10, Commitment of Prisoners to Mental Institutions.

m.  *Women Prisoners of the District of Columbia Department of Corrections, et al. v. District of Columbia, et al*; 968F. Supp. 744 (D.D.C. 1997)

## 10.  STANDARDS REFERENCED

a.  American Correctional Association (ACA) 4th Edition, Standards For Adult Local Detention Facilities: 4-ALDF-4D-09, 4-ALDF-4D-14, 4-ALDF-4D-15, 4-ALDF-4D-17, 4-ALDF-4D-21, 4-ALDF-4D-22-4, 4-ALDF-4D-25, 4-ALDF-27, 4-ALDF-6A-09, 4-ALDF-7D-18, 4-ALDF-7D-25 and 4-ALDF-7D-26.

b.  National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails.

c.  D.C. Department of Health, Addiction Prevention and Recovery Administration (APRA) DC Municipal Regulations Chapter 23 titled "Certification Standards for Substance Abuse Treatment Facilities and Programs".

**Thomas    Faust**
**Acting Director**

Attachment 1- Sick Call Request Form
Attachment 2- Unity Health Care Policy #CF902, Emergency Psychotropic Medication
Administration

# TABLE OF CONTENTS

|  |  |  |
|---|---|---|
|  | Purpose and Scope | Page 1 |
|  | Policy | Page 1 |
|  | Applicability | Page 1 |
|  | Annual Program Review Certification | Page 1 |
|  | Requirements | Page 1 |
|  | Program Objectives | Page 2 |
|  | Notice of Non-Discrimination | Page 2 |
|  | Directives Affected and Referenced | Page 2 |
|  | Authority | Page 3 |
|  | Standards Referenced | Page 4 |
|  | Table of Contents | Page 5 |
| Chapter 1 | Overview | Page 9 |
|  | Medical Care Delivery System | Page 9 |
|  | Access To Care | Page 9 |
|  | Provision of Treatment | Page 10 |
|  | Confidentiality | Page 11 |
|  | Emergency Response | Page 11 |
|  | Quality Assurance – Contract Administration -DOC | Page 11 |
|  | Quality Assurance – Health Services Provider | Page 12 |
|  | Medical Research | Page 13 |
| Chapter 2 | Department of Corrections – Administrative Responsibilities | Page 14 |
|  | Wardens | Page 14 |
|  | Support Services | Page 14 |
|  | Security | Page 14 |

DC-WAP 000174

|  | Environmental Safety and Sanitation | Page 15 |
|  | DOC Privacy Officer | Page 15 |
|  | DOC Provided Training | Page 15 |
| Chapter 3 | Medical contractor Administrative Responsibility | Page 17 |
|  | Medical contractor | Page 17 |
|  | Accreditation | Page 17 |
|  | Policies and Procedures | Page 17 |
|  | Personnel | Page 17 |
|  | Contractor Provided Training | Page 18 |
|  | Equipment and Supplies | Page 18 |
|  | Bio-hazardous Waste Collection and Disposal | Page 18 |
| Chapter 4 | Procedures--Provision of Continuum of Health Care Services | Page 19 |
|  | Medical Intake Processing | Page 19 |
|  | Medical Hold | Page 19 |
|  | Exclusions from Medical Hold | Page 20 |
|  | Sexual Abuse Screening | Page 20 |
|  | Health Precautions Outreach | Page 20 |
|  | Condom Issuance | Page 21 |
|  | Health Appraisal | Page 21 |
|  | Periodic Examinations | Page 21 |
|  | Mental Health Program | Page 21 |
|  | Information on Health Services | Page 22 |
|  | Medical Transfer | Page 22 |
|  | Sick Call | Page 22 |
|  | First Aid | Page 23 |
|  | Chronic Care | Page 23 |

DC-WAP 000175

Communications About Special Needs Patients — Page 24

Exercise — Page 24

Specialty Services — Page 24

Management of Chemical Dependency — Page 24

Dental Services — Page 25

HIV Counseling and Testing — Page 26

Intra-System Transfers — Page 27

Infirmary — Page 28

Emergency/Urgent Medical Care of Inmates — Page 28

Emergency Transportation To An Outside Hospital — Page 29

Off Site-Inpatient Services — Page 30

Suicide and Suicide Prevention — Page 30

Medical Restraints — Page 30

Involuntary Administration- Psychotropic Medication — Page 30

Psychiatric Evaluation and Hospitalization — Page 31

Treatment for Victims of Sexual Assault — Page 31

Pregnancy Management — Page 31

Abortion — Page 32

Elective Procedures — Page 32

Ancillary Services — Page 32

Pharmaceuticals — Page 32

Non-prescription Medication — Page 32

Prostheses and Orthodontic Devices — Page 32

Nutrition Services/ Therapeutic Diets — Page 32

Communicable Disease and Infection Control Program — Page 33

Tuberculosis — Page 33

DC-WAP 000176

| | Hepatitis A, B, C | Page 33 |
| | HIV/AIDS Management | Page 33 |
| | Health Education | Page 33 |
| | Discharge Planning | Page 34 |
| | Inmate Death | Page 35 |
| Chapter 5 | Inmate Treatment | Page 36 |
| | Fair Treatment | Page 36 |
| | Notification | Page 36 |
| | Privacy | Page 36 |
| | Confidentiality | Page 36 |
| | Informed Consent | Page 36 |
| | Health Care Decisions | Page 36 |
| Chapter 6 | Medical Records | Page 38 |
| | Inmate Medical Record | Page 38 |
| | Confidentiality of Medical Records | Page 38 |
| | Inactive Records | Page 39 |
| | Records Retention and Disposal | Page 39 |
| Chapter 7 | Emergency Medical Treatment for Employees, Contractors and Visitors | Page 40 |
| | Requirement | Page 40 |
| | Procedures | Page 40 |
| | Notification | Page 40 |
| | Medical Response | Page 40 |
| | Medical Referral | Page 40 |
| | Crime Scene | Page 41 |
| | Supervisory Administrative Follow-up | Page 41 |

# CHAPTER 1

# OVERVIEW

1. **MEDICAL CARE DELIVERY SYSTEM**

   a. The provision of health care is a joint effort of DOC Administrators and staff, DOC contracted correctional care providers, and contracted medical providers. The medical contractor arranges for the availability of health care services; the responsible clinician determines what services are needed; and the official responsible for the correctional facilities provides the administrative support for making the services accessible to inmates.

   b. DOC contracts with a private medical contractor for delivery of health care services to include: responsibility for on-site primary and emergency medical, dental and mental health care services, inpatient, outpatient and ambulatory care services, pharmaceuticals, and medical supplies for inmates housed at the CDF and CTF.

   c. Health care shall be provided in accordance with legal requirements imposed by Federal and DC laws, DC licensing or professional boards, court orders, DOC administrative policies and procedures, and guidelines established by the American Medical Association (AMA), the Health Resources and Services Administration (HRSA) of the US Department of Health and Human Services (DHHS), applicable American Correctional Association (ACA) Standards, the National Commission on Correctional Health Care (NCCHC), the Addiction Prevention and Recovery Administration (APRA), and Substance Abuse and Mental Health Services Administration (SAMHSA) .

   d. The medical contractor shall provide and be responsible for all inpatient and outpatient hospital and ambulatory costs for all inmates in the custody of the DOC.

   e. DOC and CCA/CTF provide custody and security for inmates housed within their respective facilities.

   f. DOC provides custody and security in hospitals when inmates from CDF, CTF and community residential programs (CCC) are admitted.

   g. The CDF and CTF have acute mental health housing, safe cells and chronic mental health housing to serve inmates in the DOC.

2. **ACCESS TO CARE**

   a. Inmates shall be informed about how to access health services and the grievance system during the admission/intake process.

   b. Information shall be provided to inmates during the admission/intake process

about sexual abuse and sexual assault to include identification, prevention/intervention, self protection, how to report sexual abuse/assault, and available treatment and counseling.

c.   There is no smoking inside the CDF.  All medical staff and inmates shall follow guidelines set forth in DOC PS 6060.1 *Smoke/Tobacco Free Environment.*

d.   All of the above information is communicated orally and in writing, and is conveyed in a language that is easily understood by each inmate.  The information is translated into those languages spoken by significant numbers of inmates.

e.   Interpretation services via staff, contracted interpreters or use of language line services shall be available to inmates that have limited understanding or who do not speak sufficient English in order to communicate with health care providers.

f.   Sign language interpreter services shall be made available to deaf and hearing-impaired individuals.

g.   Health care professionals shall, on a daily basis, triage inmate requests for health services and schedule clinical services based upon the established priority.  The triage system addresses routine, urgent and emergent complaints and conditions.

h.   Inmates are not precluded from individual treatment based upon their need for a specific medical procedure that is not generally available from the DOC medical contractor. In such situations DOC and the medical contractor shall arrange for such treatment, if medically necessary.

3.   **PROVISION OF TREATMENT**

a.   The DOC Medical Director is the designated Responsible Health Authority for the DC Department of Corrections.

b.   The Medical Director is responsible for the day-to-day delivery of health care services in all departments, and will arrange for and monitor the level of services provided to the inmate population.

c.   Clinical decisions are to be made solely by the medical contractor's of responsible clinicians and can not be countermanded by non-clinicians.

d.   Non-medical staff have no authority to approve or disapprove an inmate's request for health care services.

4.   **CONFIDENTIALITY**

   a.   Information about an inmate's health status is confidential.

   b.   The medical contractor may share with the DOC Health Services Administrator and, when appropriate, with the Warden, information regarding an inmate's medical management.

   c.   DOC and the medical contractor shall both maintain written procedures regarding medical privacy and ensure that staff are notified that:

   1)   Only information necessary to preserve the health and safety of an inmate, other inmates, volunteers, visitors, or the correctional staff is provided.

   2)   Information provided to correctional staff, classification staff, volunteers, and visitors shall address only medical, mental health and related factors that may assist DOC in providing the inmate with appropriate housing, treatment, programs, security and transport.

5.   **EMERGENCY RESPONSE**

   a.   Correctional and health care personnel shall respond to emergency health-related situations within a four-minute response time.  Responsibilities and procedures for such situations are outlined in Chapter 4 Section 18 "Emergency/Urgent Medical Care for Inmates" for of this directive.

   b.   The medical contractor shall participate in, and assist in the development of, procedures pertaining to the delivery of comprehensive health care in the event of a disaster (fire, storm, epidemic, riot, strike or mass arrests).  The medical disaster plan shall include the following: the implementation of a communications system, recall of key staff, health care staff assignments, establishing a command post, safety and security of patient and work areas, use of emergency equipment and supplies, establishing a triage area and triage procedures, ambulance services, transferring the injured to outside hospitals, evacuation procedures and practice CPR and fire drills.

6.   **QUALITY ASSURANCE**

   a.   **Contract Administration—DOC**

   1)   Under the auspices of the DC Office of Contracts and Procurement, the DOC Health Services Administrator has oversight to ensure that the health care contractor provides medical, dental and mental health services at the CDF and CTF in accordance with federal law, local regulations, NCCHC standards, ACA standards, the contractual

agreement and applicable policies and programs of each entity.

2) The DOC Health Services Administrator shall conduct regular program review of the health care delivery system to determine if the provider remains in compliance with the delivery of health care services pursuant to the contractual agreement and this directive.

3) Fiscal review of the delivery of health services shall be conducted at least annually by the DC Office of Contracts and Procurement.

4) The DOC Health Services Administrator, in conjunction with the medical contractor, will participate in a multidisciplinary quality improvement program in order to collect and evaluate data and ensure adequate provision of services.

5) DOC shall maintain a system for facilitating resolution of inmate grievances relating to health care.

6) DOC shall maintain a system for monitoring complaints and inquiries made on behalf of inmates and shall facilitate appropriate resolution.

7) The medical contractor, DOC Health Services Administration, and CDF and CTF Security Officials shall periodically meet to address the effectiveness of the health care system, areas that require improvement and recommendations for corrective action.

8) Should the medical contractor fail to maintain required staffing, refuse or neglect to supply adequate and competent supervision or personnel, fail to provide equipment/drugs of the proper quality or quantity, fail to perform the contracted service requirements with promptness and diligence, or fail to meet contractual requirements, DOC Health Services Administration shall take appropriate measures to ensure continuity of health care and impose appropriate sanctions, in coordination with the Office of Contracts and Procurement.

b. **Health Services Provider**

1) **Quality Assurance**

a) Pursuant to standards for medical care provision and applicable ACA and NCCHC standards, the medical contractor shall develop a quality management program and implement a system of documented monthly and quarterly internal reviews to evaluate the quality of care and performance, investigate complaints, and monitor corrective action plans.

b) The health services provider and DOC shall meet at least once every three months to review issues surrounding comprehensive health care services, including utilization, projections, and other

DC-WAP 000181

components for coordination of quality health care.

2) **Peer Reviews.** The DOC shall provide an external peer review program for physicians, mental health professionals, and dentists. The review shall be conducted at least every 2 years. Management of the medical contractor will determine appropriate action in response to a peer review which may include initiation of an investigation and peer review, using a panel of independent physicians to review the practice patterns of the physician on whom the complaint was made.

7. **MEDICAL RESEARCH**

a. Inmates shall not be used for medical, pharmaceutical, or cosmetic experiments.

b. Inmates are not precluded from individual treatment based on their need for a specific medical procedure that is not generally available from the DOC medical contractor. Rules of informed consent shall apply.

c. All medical research requests shall follow guidelines set forth in DOC PS 1311.1 *Management Controls Research Activities*.

# CHAPTER 2

## DC DEPARTMENT OF CORRECTIONS

## ADMINISTRATIVE RESPONSIBILITIES

1. **WARDENS.** The Wardens of the Central Detention Facility (CDF) and Correctional Treatment Facility (CTF) shall ensure that correctional supervision and appropriate administrative support are provided to health care staff in accordance with this directive.

2. **SUPPORT SERVICES**

   a. DOC shall conduct background checks and drug test on all impending personnel that the medical contractor recruits to provide medical services at the CDF and CTF. The background check and drug testing shall be a prerequisite for initial and continued access/entrance to the CDF and CTF, and the final selection of all personnel may be subject to the approval of the COTR.

   b. DOC and CCA/CTF shall supply and provide maintenance for offices, communications systems, technology systems, and medical equipment pursuant to the contractual agreement and shall provide adequate space for administrative staff, clinic space, and professional and clerical staff.

3. **SECURITY.** DOC and CCA/CTF staff shall provide appropriate custody and supervision of all inmates while they are engaged in receiving health care to include:

   a. Employees shall ensure that inmates have unimpeded access to medical services in accordance with this directive.

   b. Administration and correctional officers shall ensure that health care professionals are not impeded from carrying out their health care responsibilities.

   c. Uniform correctional officers shall provide security supervision or escort for inmates as they travel to or from the medical unit in a timely manner.

   d. DOC shall provide transportation for inmates to non-emergency medical treatment outside of the facilities in accordance with guidelines set forth in DOC PS 4910.1 *Escorted Trips*.

   e. DOC shall provide the security personnel when inmates are admitted to a hospital Locked-Ward or to an "outpost" location for inpatient management.

   f. When ordered by the court, DOC shall provide outpost security and custody when sentenced inmates and pretrial criminal defendants who are housed at

Saint Elizabeth's Hospital (SEH) require admission at a hospital outside of the SEH grounds.

g.   Upon authorization from a qualified medical or mental health professional that less restraining measures are not successful, DOC will provide specialized restraint equipment and required correctional supervision for inmates who are under close observation or intensive monitoring.

4.   **ENVIRONMENTAL SAFETY AND SANITATION.**  The DOC and CCA/CTF shall ensure that facilities comply with federal and local applicable environmental, health, safety, sanitation and fire safety codes and regulations.  In addition, the DOC and CCA/CTF shall:

a.   Provide sufficient services and supplies so that inmates' personal hygiene needs are met.

b.   Ensure that medical housing units and infirmaries shall have sufficient wash basins, bathing facilities and toilets that are accessible 24 hours per day.

c.   Provide for general cleaning to support environmental safety and sanitation through the use of inmate labor.

d.   Clean up infectious spills in accordance with P.S. 2920.8 *"Environmental Safety and Sanitation Inspections"*.

e.   Provide environmental services for pest control.

f.   Ensure kitchen, dining and food storage areas are kept clean and sanitary for preparing and serving meals. Food handlers shall follow hygienic practices.

5.   **DOC PRIVACY OFFICER.** Under the auspices of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and pursuant to DC regulations and DOC policies and procedures, the DOC Privacy Officer has oversight and monitoring responsibility for the use and disclosure of protected health information that is maintained by the medical contractor.

6.   **DOC PROVIDED TRAINING**

a.   The DOC Training Administrator shall ensure that all contracted medical staff and support employees receive correctional orientation and annual refresher training pursuant to PS 3700.2 *Employee Training and Staff Development*.

b.   At a minimum each affected employee will receive training in Health Information Privacy under the Health Information Portability and Accountability Act (HIPAA), Sexual Harassment Against Employees, Sexual Misconduct Against Inmates, Appropriate Employee Attire, Fire Safety, Environmental Safety and Sanitation, Professional Inmate-Employee

Relationships, Inmate Con Games, Key Control, Tool Control, and Inmate Accountability.

c.   The CDF Warden shall provide and document training to inmates who are assigned to the environmental squad in safety precautions and methods for the clean up of infectious waste spills and proper disposal of bio-hazardous materials.

DC-WAP 000185

# CHAPTER 3

## MEDICAL CONTRACTOR
## ADMINISTRATIVE RESPONSIBILITIES

1.  **MEDICAL CONTRACTOR.**  The Contractor's Health Services Administrator shall ensure that health care is administered, managed, coordinated and provided to inmates pursuant to federal and local law(s), AMA, ACA, NCCHC standards, the contractual agreement, the contractor's policies and procedures, this directive and other applicable DOC policies and procedures.

2.  **ACCREDITATION.**   The medical contractor shall maintain ACA and NCCHC accreditation status pursuant to the contractual agreement.

3.  **POLICIES AND PROCEDURES.**  The medical contractor shall maintain a manual of written policies and procedures regarding health care services at each facility that addresses federal and local laws and regulations, contractual requirements and each applicable ACA and NCCHC standard.

4.  **PERSONNEL.**  The Contract Health Services Administrator shall ensure that health services is staffed in accordance with the contractual agreement and scope of services and that all personnel are:

    a.  **Qualified.**  Health care services shall be provided by qualified health care personnel whose duties and responsibilities are governed by written job descriptions that are on file in the facility and are approved by DOC's Health Services Administrator.

    b.  **Credentialed.** All medical staff shall comply with applicable federal and local licensure, certification and registration requirements.  Verification of current credentials and job descriptions shall be kept on file in the facility.

    c.  **Students and or Interns.**  No students, interns or residents shall be used to deliver health care in the facility without the DOC's approval.

    d.  **Inmate Assistants.**  No inmates may perform peer support and education, hospice activities, assist impaired inmates on a one-on-one basis with activities for daily living, or serve as a suicide companion.

    e.  **Security.**  The contractor and its personnel are subject to and shall comply with all security regulations of the DOC and/or CCA/CTF correctional procedures.  Violations of these regulations may result in the employee being denied access to the facilities.  In this event, the medical contractor shall provide alternate personnel to supply contracted services.

f.   **Discipline.**  The DOC Contracting Officer Technical Representative (COTR) reserves the right to remove or require the immediate removal of any health care personnel from DOC facilities upon written notice to the medical contractor of dissatisfaction with the employee's performance.

5.   **CONTRACTOR PROVIDED TRAINING**

a.   The medical contractor shall provide training for its personnel in accordance with the contractual agreement and its personnel manual.

b.   The medical contractor shall provide the following training for DOC employees:

1)   *Suicide Prevention Training* (8 hours) for uniform correctional personnel assigned to the CCA/CTF Mental Health Units.

2)   *Annual mental health training* (40 hours) for uniform correctional personnel assigned to the CCA/CTF Mental Health Units.

3)   *Medical emergency response training,* in cooperation with the Warden, to include instruction on recognizing signs and symptoms of medical and mental health issues, emergency response, suicide prevention/intervention, acute chemical intoxication and withdrawal, administration of basic first aid, patient transport and infection control.

6.   **EQUIPMENT AND SUPPLIES.**  The medical contractor shall provide all material and supplies for health care delivery, office supplies, telephone services for medical staff, and environmentally friendly medical cleaning supplies.  The medical contractor shall provide maintenance, repair or replacement of government-furnished medical, dental and mental health equipment, including maintaining service contracts.  Such equipment includes but is not limited to electrical tables, x-ray machines, electrocardiogram equipment, and equipment utilized in administrative functions, such as photocopiers and typewriters.

7.   **BIOHAZARDOUS WASTE COLLECTION AND DISPOSAL.** The medical contractor shall be responsible for collection and disposal of all biohazardous waste at the CDF/CTF in accordance with Federal, District of Columbia and DOC requirements.

DC-WAP 000187

# CHAPTER 4

## PROCEDURES FOR PROVISION OF A
## CONTINUUM OF HEALTH CARE SERVICES

1.  **MEDICAL INTAKE PROCESSING**

    a.  Medical, dental and mental health intake shall be performed and documented by licensed and credentialed contract health care personnel upon the inmate's commitment.  The medical intake process shall be completed prior to an inmate's placement into the general population, a special housing unit or employment in food services.

    b.  Medical Intake processing shall include:

        1)  A medial history and physical examination  which includes a mental health screening,

        2)  Mental Health Evaluation, if indicated,

        3)  Testing for Communicable Diseases,

        4)  HIV Counseling and Testing,

        5)  Vital Signs, to include Tuberculosis testing if indicated,

        6)  Peak flow- Asthmatics/ Finger Stick- Diabetics,

        7)  Chest X-ray if indicated,

        8)  Pregnancy Testing (for female inmates under age 65),

        9)  Labs: RPR, Gonorrhea, Chlamydia,

        10) Initial Discharge Treatment Plan,

        11) Discharge Planning Intake Visit, and

        12) Issuance of pertinent written materials regarding sexually transmitted diseases.

    c.  *Medical Hold*

        1)  Medical staff shall counsel inmates who refuse the intake chest x-ray for tuberculosis screening, refuse to provide medical history information, or refuse the physical exam for assessment of a contagious disease such as chicken pox, measles or hepatitis regarding the importance of completing all aspects of the medical intake process. Staff shall inform the inmate of

DC-WAP 000188

the possibility of placement on medical hold until the evaluation is completed in order to prevent potential harm to him/herself, other inmates or staff.

2) A physician shall document and issue written notification to the DOC shift supervisor if the inmate continues refusal.

3) The inmate shall be placed in an intake housing unit and contact with other inmates shall be restricted.

4) Medical staff shall provide and document daily counseling with the inmate to encourage compliance with needed testing.

5) Once the inmate consents to completing the intake assessment or the physician determines that the medical hold is no longer warranted, the physician shall provide written notification to the housing unit and document the release of the inmate from medical hold in the medical record.

d. *Exclusions from Medical Hold*

1) Refusal of the HIV Rapid Ora-Quick Counseling and Testing is excluded from the medical hold process.

e. *Sexual Abuse Screening*.  Mental Health staff shall screen inmates during intake for potential vulnerabilities or tendencies for acting out sexually aggressive behavior.

1) Staff shall, when screening the inmate, inquire if the individual has been a victim of or has committed sexual assault in the past.

2) Medical and mental health staff shall be observant of other possible indications or any other information that is contained in the medical record or that is obtained from the inmate that might identify potential sexual vulnerabilities or aggressions.

3) Mental Health staff shall assess the need for continued counseling or other appropriate intervention to include offering counseling to the inmate within ten (10) business days of commitment.

f. *Health Precautions Outreach*.  Inmates shall receive prevention education to include but not limited to:

1) Health Education.  Within 72 hours of commitment inmates shall receive further health precautions education in a group setting.  Education shall include but not be limited to:

a) Information about risk prevention from HIV/AIDS, Hepatitis and

Tuberculosis, and

    b)    How to obtain and properly use male and female condoms and dental dams.

  2)  Condom Issuance.  Inmates may throughout their incarceration obtain condoms from designated staff in the following manner:

    a)    During the intake medical screening and testing process;

    b)    From medical discharge planners during interviews;

    c)    From medical contractors when they are in the housing unit to conduct medical triage or sick call;

    d)    While the inmate is at the infirmary for health care services; and

    e)    At Receiving and Discharge as a part of their release resources package.

  3)  Confidentiality.  Staff shall not record names or other identifying data about inmates who request issuance of condoms.

2.    **HEALTH APPRAISAL.** The medical contractor shall ensure that each new inmate and/or transferred inmate placed in the CDF and/or the CTF has, within 24 hours, a completed and documented medical and mental health evaluation or screening in the inmate's medical record.

3.    **PERIODIC EXAMINATIONS.**  The medical contractor determines the conditions for periodic health examinations.

4.    **MENTAL HEALTH PROGRAM**

  a.  The medical contractor shall ensure that there are an adequate number of qualified staff members to directly deliver mental health services to inmates.

  b.  Mental Health services shall include:

    1)  Initial mental health screening of all inmates entering the CDF;

    2)  A comprehensive mental health evaluation;

    3)  Mental health assessments, labs, and diagnostic testing;

    4)  Control, dispensation, and administration of all psychotropic and mental health medication;

5) Monitoring medication to ensure inmate compliance and evaluate effectiveness in alleviation of symptoms;

6) Suicide prevention intervention and treatment of psychiatric emergencies;

7) Treatment of inmates with the most severe forms of mental illness and use of restraints;

8) Basic services for the general population to include behavior management, individual counseling, counseling for sexually vulnerable and sexually assaultive inmates, psychotherapy and discharge treatment plans;

9) All aspects of in-patient and out-patient on-site mental health care to include sick call, and

10) Close collaboration with the Department of Mental Health to ensure continuity of care/discharge planning.

5. **INFORMATION ON HEALTH SERVICES**.  Information about the availability of, and access to, health care services is communicated orally and in writing to inmates upon their arrival to the CDF in a form and language they understand.

6. **MEDICAL TRANSFER.** The medical contractor shall ensure inmates receive a health screening by qualified health care personnel, and that all necessary forms and required documentation for intra and inter-institutional transfers is completed on all inmates in a timely fashion.

7. **SICK CALL.** Any inmate who requests to be seen by clinical staff for non-emergency medical care shall be scheduled for sick call within one (1) business day from the time the automated telephone request or sick call slip is received.

   a. Inmate sick requests are documented and reviewed for immediacy of need and intervention required.

   b. Contract nursing staff shall conduct sick call five days per week in the general population units and daily in the segregated housing units where inmates are locked down (including weekends and holidays).

   c. When an inmate is transferred to segregation, health care personnel are informed immediately and provide assessment and review as indicated by the protocol established by the medical contractor.

   d. Correctional officers shall document the start and completion times of sick call when it is held in the housing unit.

e.   When the responsible physician determines that an inmate needs health care beyond the resources available in the facility, the inmate shall be  transferred under appropriate security provisions to a facility where such care is on-call or available 24 hours a day.

f.   Inmates in general population and segregation shall request a routine sick call visit by utilizing the automated sick call telephone system located in all housing units or by filing out a sick call form request (Attachment 1). If phone lines are down, or if no phone is available for an inmate to make a request, the inmate will have the ability to fill out a sick call request form.

g.   Inmates have access to the telephone sick call request system during the same hours that phones are operational in the housing units.

h.   Medical staff is responsible for retrieving, triaging and scheduling all requests from the phone system and from sick call request forms. Inmates shall be scheduled for sick call in the DOC Electronic Medical Record (EMR), Centricity.

i.   Medical staff shall continue to hold sick call on each unit, Monday through Friday, and make daily sick call rounds on segregation units.

j.   In the event of a lockdown, the Wardens office shall notify the medical unit. Medical staff shall ensure that manual sick call slips are available to all affected units, and ensure that all sick call slips are collected, triaged and that appointments are scheduled daily until the lockdown is over.

8.   **FIRST AID.**  First Aid kits shall be available in all housing units, the command center, culinary areas, and accessible to staff assigned to those areas. The health care contractor shall approve, maintain and monitor, on a monthly basis, contents of the first aid kits. The correctional officer in each of the designated areas shall, each shift, examine their kit to determine if the seal is compromised and if so, notify medical for the appropriate refill and reseal. The medical contractor shall, each month, examine all kits for a compromised seal and refill with the appropriate contents. The kits shall contain a list of all items inside. The medical contractor shall keep a record of each refill and monthly inspection of kits. The record shall contain no less than a list of contents, refill dates, and dates the seal was replaced. Automated External Defibrillators (AED) are available for use throughout the facility.

9.   **CHRONIC CARE.** The medical contractor shall ensure that inmates with chronic illnesses receive written treatment plans and continuous and appropriate medical services in order to prevent or reduce complications of chronic illnesses and promote health maintenance in accordance to established and approved DOC Performance Improvement measurement tools.

10. **COMMUNICATIONS ABOUT SPECIAL NEEDS PATIENTS.** Communications shall occur between the facility administrator and treating clinician regarding an inmate's significant health needs that must be considered in the classification decision in order to preserve the health and safety of that inmate, other inmates and staff.

11. **EXERCISE.** DOC and the medical contractor shall provide exercise areas and physical therapy when prescribed.

12. **SPECIALTY SERVICES.** The medical contractor shall manage and/or refer inmates to medically necessary secondary services (i.e., specialty consultations/clinics, and all outside diagnostic services and procedures).

13. **MANAGEMENT OF CHEMICAL DEPENDENCY**

   a. Detoxification. The medical contractor shall ensure that inmates have access to a clinically managed chemical dependency program and that the detoxification of inmates is done under medical supervision in accordance with federal and local law(s), the NCCHC Standards for Opioid Treatment Programs in Correctional Facilities, 29 DCMR Chapter 23 titled "Certification Standards for Substance Abuse Treatment Programs and Facilities", Federal Opioid Treatment Standards as identified in 42 C.F.R. 8.12, and ACA standards. Such treatment shall occur at a DOC facility, the D.C. Detoxification Center or an off-site inpatient service facility.

   b. The Chemical Dependency Program provided by the medical contractor shall include clear and concise DOC approved procedures in its Operation Manual to address the following related to patients in the chemical dependency program and/or undergoing detoxification:

      1. Continuous quality improvement;

      2. Identification of appropriate staff to deliver services;

      3. Diversion control plan;

      4. Admission criteria for:

         a) Maintenance and/or short term detoxification,

         b) A process for identifying repeat participants and planning for patients who present with two or more unsuccessful detoxification episodes with a 12-month period,

         c) Education and counseling of patients on admission and obtaining of informed consent,

      d) Initial Treatment Plans with short-term goals and tasks which reflect the identification of needs related to education, vocational rehabilitation, employment, medical, psychosocial, legal and/or other supportive services, and

      e) Initial urine drug test.

   5. During treatment the patient shall receive:

      a) On-going substance abuse counseling and linkage to services internally and upon release,

      b) A periodic assessment and update of the treatment plan,

      c) Counseling on preventing HIV exposure, and

      d) Drug abuse testing in accordance with regulations.

   6. Instructions for treating special populations:

      a) Procedures for treating youth under 18 requiring maintenance or detoxification, and

      b) Special services for pregnant patients.

   7. Procedures submitted should also include:

      1) Clear steps related to documentation, reporting, and monitoring of individual patients in the EMR, and

      2) Clear steps related to medication administration, dispensing, storage, dosage and documentation of such in logbooks and the EMR.

c. Substance Abuse Programs.  DOC may, in conjunction with the health care provider, maintain a residential substance abuse treatment program (RSAT) that provides therapeutic services including treatment, education and/or counseling to individual inmates, needs assessments, activities, treatment plans, planning and linkages. Refer to *PS 6050.3 Residential Substance Abuse Treatment Program (RSAT).*

14. **DENTAL SERVICES.**  The medical contractor is responsible for:

a. Dental screening to be conducted within seven days of admission, unless completed within the last six months.

b. Routine dental care for chronic dental and oral pathosis (disease state).

c.  Care in accordance with a priority schedule that includes immediate access for urgent or painful conditions.

d.  Dental instruments and supplies (including prosthetics).

e.  Maintenance or replacement of dental equipment.

f.  Treatment beyond the scope of services provided at the CDF and CTF Dental Clinic shall be referred to United Medical Center or another Oral Surgery Clinic contracted to provide services to the DOC inmate population.

g.  Monthly radiology testing for detection of dental staff exposure to radiation.

15.  **HIV COUNSELING, TESTING, REFERRAL AND DISCHARGE PLANNING.** The medical contractor shall be responsible for the Counseling, Testing, Referral and Discharge Planning (CTRD) program that serves to increase the number of inmates who know their HIV status, are linked into primary medical health care and case management services, and are referred to HIV prevention services, and mental health care services. The contractor shall develop written procedures for the provision of CTRD services.

a.  Except when there is documentation of refusal on a DOC approved form, the medical contractor shall provide HIV pre and post test counseling and oral HIV rapid testing to all inmates committed to the DOC. This counseling shall occur at the following times:

1)  As part of intake medical screening,

2)  Upon request, via sick call. Upon receipt of the request, the medical staff shall schedule the inmate for counseling and testing on the next business day, and

3)  Prior to release from custody, provided the inmate has been incarcerated within the CDF/CTF for ninety (90) days or more.

b.  The following inmates shall not receive HIV oral rapid testing upon intake:

1)  Inmates with a documented history of HIV reflected in the electronic medical record (EMR),

2)  Weekenders shall only receive the HIV oral rapid test at their initial intake, unless otherwise ordered by a medical provider, and

3)  Inmates with a documented test and results in the EMR within the past thirty (30) days prior to their most recent intake.

c.  All preliminary positive results from the HIV oral rapid test shall be referred to the DOC medical contractor's physician for immediate follow-up. The

physician shall:

1) Conduct an in-person interview, explaining the results, and provide additional counseling,

2) Ensure blood is collected for confirmatory testing, and

3) Evaluate the inmate for the need of mental health intervention.

d. If serology results are confirmed positive, the inmate shall be referred to the chronic care clinic (infectious disease) for medical care.

e. The medical contractor shall provide an appropriate HIV related education plan to ensure that those affected know their status and are aware of the available medical services, case management services and other treatment programs within and outside of the DOC.

f. The medical contractor shall ensure that inmates who test HIV positive receive at the time of release, a discharge plan that includes an appointment with a medical provider in a neighborhood community health center.

g. The medical contractor shall provide HIV positive inmates who require medications a 30-day-supply at the time of release.

h. The medical contractor shall be responsible for ensuring that all staff conducting the HIV oral rapid tests are appropriately trained and have signed confidentiality statements.

i. The medical contractor shall ensure that its quality assurance plan is in compliance with the DOC/ medical provider's contract, the Centers for Disease Control standards and the Department of Health requirements.

j. The medical contractor shall document all results as they relate to the testing, treatment, referral and discharge planning of the inmates in the EMR.

k. All confirmed positive results shall be reported to the Department of Health (DOH). Under the Partner Counseling Referral Services, positive test results of individuals released before the results are known, shall be submitted to DOH for community-based notification and follow-up.

16. **INTRA-SYSTEM TRANSFERS.** The medical contractor shall document certain medical information in the  transfer summary form in the inmate's electronic medical record after a transfer between the CDF and CTF.  This information shall include, but not be limited to: vital signs, diagnosis, medications, reason for transfer (if for medical reasons), etc. The DOC will make every effort to make the proper notification to the medical contractor when inmates are transferred between the two facilities.

DC-WAP 000196

17. **INFIRMARY.** At a minimum the operation of the infirmary at the Correctional Treatment Facility shall include:

   a.   A facility set up to provide medical observation and/or monitoring for inmates who do not require hospitalization, but require twenty-four hour a day care.

   b.   Health Care staffing twenty-four hours per day. Inpatient care is provided under the supervision of a licensed practitioner (Nurse Practitioner, Physician Assistant, or Physician). The treatments of inmates housed in the infirmary for illnesses or diagnoses requiring observation and monitoring but not admission to a licensed hospital or nursing facility shall be managed by a Registered Nurse. Sufficient and appropriate on-duty contract nursing staff must be available to inmate patients 24 hours a day.

   c.   A complete inpatient record for each patient admitted to the infirmary, including an admission work-up and discharge summary. A physician shall at admission document the inmates' level of care. The level of care determines the frequency of visits by medical personnel and the documentation required. Documentation is to be clearly identified in the Electronic Medical Record (EMR).

   d.   Quality Improvement Monitoring on a monthly basis.

   e.   The physical presence of a registered nurse at all times if intravenous medications are being administered.

   f.   A manual detailing the nursing care procedures for infirmary care.

18. **EMERGENCY/URGENT MEDICAL CARE FOR INMATES**

   a.   Twenty-four (24) hour Urgent/Emergency care is the responsibility of the medical contractor. The medical contractor shall have unimpeded access to providing care and making medical care decisions for inmate(s) whose condition may result in death, organ failure, or a severe life altering situation without medical intervention.  Actions taken for an emergency situation shall include, but not be limited to:

      1)   Any employee who determines that a medical emergency exists shall immediately call the Nurses Station on the Medical Unit.

      2)   The employee placing the emergency call will provide all necessary information to the nurse in the Nurses Station, i.e., location of injured or ill person, type of injury or illness, and whether the injured person is conscious.  A physician shall speak with the employee who is reporting the incident when a nurse is unavailable.

      3)   The nurse receiving the call will instruct the Officer that the MERT (Medical Emergency Response Team) will respond to the scene.

Immediately afterwards, the nurse will initiate the MERT response, then notify the Command Center.

4)   The Officer in the Command Center will contact the zone or shift supervisor and request that the supervisor immediately report to the site of the emergency.

5)   Medical staff shall respond within four (4) minutes.

6)   All employees shall assist the MERT as directed by the MERT team leader.

7)   All employees shall assure that Fire and Emergency Medical Services (FEMS) responders gain unimpeded access (to providing medical care) to an individual in need of emergency care.

8)   The correctional supervisor shall ensure full cooperation by the correctional staff, to include timely correctional coverage, clearing the emergency area of inmates who are not involved, as well as the provision of security and escort.

9)   The Supervisor shall ensure that the scene where an injury took place has been secured, collect any evidence from the scene (if appropriate) and obtain statements from witnesses as soon as reasonably possible following notification of an injury to an employee.

b.   Emergency Plan.  All Medical Contracts shall adhere to DOC PS 5031.1 *CDF Emergency Plan.*

## 19.   EMERGENCY TRANSPORTATION TO AN OUTSIDE HOSPITAL

a.   If medical personnel determine that a patient requires immediate transportation to an outside hospital, the nurse shall call 911 for DC Fire and Emergency Medical Services (DCFEMS) and shall notify the Command Center.

b.   Medical staff shall directly notify DCFEMS during medical emergencies involving a patient housed in the CTF infirmary.

c.   Medical staff shall provide the DCFEMS with the appropriate documentation needed to accompany the patient to the hospital, to include the trip ticket.

d.   Emergency medical escorts shall be handled in accordance with guidelines set forth in DOC PS 4910.1 *Escorted Trips.*

20. **OFF-SITE PATIENT SERVICES.** The medical contractors responsibilities for Off-Site medical services shall include, but not be limited to:

    a.   Off-Site Visits.  The medical contractor shall make arrangements and prepare medical documents for inmates to receive specialty care at other institutions i.e., United Medical Center, Howard University Hospital, Washington Hospital Center, St. Elizabeth's Hospital, etc.

    b.   Returning from Off-Site Visits.  The escorting officer shall be responsible for collecting any documentation from the off-site service provider and returning it to the medical contractor. The medical contractor shall be responsible for the management of medical/mental health needs, as a part of the Off-Site recommendations that accompany the patient upon return.

21. **SUICIDE AND SUICIDE PREVENTION.**  Suicide and Suicide Prevention shall be governed by the guidelines set forth by DOC PS 6080.2 *Suicide Prevention and Intervention* which is reviewed annually by the Suicide Prevention Intervention and Improvement Team.  It includes specific procedures for handling intake, screening, identifying, and supervising of a suicide-prone inmate. The medical contractor shall provide assistance, guidance and treatment planning for any inmate that a mental health professional determines to be in imminent danger of committing suicide because of a recent suicide attempt, verbalized threat to commit suicide, and/or has displayed other suicide risk indicators.

22. **MEDICAL RESTRAINTS**.  Four/five point restraints are used only in extreme circumstances and only when other types of restraints have proven ineffective. Only after a physician's assessment and order shall restraints be used if it is determined that, as a result of a mental or behavioral disorder, an inmate is an imminent danger to his/her self or others. The Clinical Manager for Mental Health, or his/her designee, shall assign a nurse to provide 1:1 constant observation and documentation every 15 minutes.

23. **INVOLUNTARY ADMINISTRATION OF PSYCHOTROPIC MEDICATION.** Forced psychotropic medication will be used only when an inmate is imminently dangerous to him/herself or others due to mental disease or defect. Health Services staff shall follow the medical provider's policy (Attachment 2) developed for the emergency use of forced psychotropic medications as governed by applicable laws and standards. This policy requires, prior to the use of forced psychotropic medication, that a physician provide authorization and a description of when, where and how the psychotropic medication may be forced. Additionally, when a physician orders psychotropic medication to be forced, he or she shall document the following in the inmate's record:

    a.   The inmate's condition;

    b.   The threat posed;

DC-WAP 000199

c.   The reason for forcing the mediation;

d.   Other treatment modalities attempted, if any, and

e.   Treatment plan goals for less restrictive treatment alternatives as soon as possible.

24.   **PSYCHIATRIC EVALUATION AND HOSPITALIZATION.** Inmates whose acute psychiatric symptoms fail to remit due to medication non-compliance, who are assessed to be a danger to themselves or others due to mental illness shall, upon a face-to-face psychiatric evaluation and in accordance with District of Columbia Superior Court Rules of Procedure for Mental Health Rule 10, Commitment of Prisoners to Mental Institutions, be transferred to the John Howard Pavilion/St. Elizabeth's Hospital. Inmates returning from St. Elizabeth's shall be evaluated by a physician and psychiatrist before they can be housed in order to manage care and determine housing. Inmates with severe developmental disabilities may be housed on a mental health cellblock.

25.   **TREATMENT FOR VICTIMS OF SEXUAL ABUSE/ASSAULT/CONTACT**

a.   The medical contractor shall refer victims of sexual abuse/assault, under appropriate security provisions, to a hospital emergency room for treatment and gathering/preservation of evidence.

b.   The medical contractor shall ensure that the inmate is provided with prophylactic treatment and follow-up for sexually transmitted diseases as is appropriate.

c.   The medical contractor shall ensure that the inmate is provided a mental health evaluation by a mental health professional to assess the need for crises intervention counseling and long-term follow-up.

d.   The medical contractor shall submit a copy of the initial medical referral report to the DOC.  Subsequent treatment and evaluations shall be provided to the DOC and local law enforcement in a manner required by law.

26.   **PREGNANCY MANAGEMENT**

a.   Pregnant inmates shall be provided confidential and comprehensive ongoing prenatal and postpartum follow-up medical services and linkages.

b.   Female inmates who suspect pregnancy shall be referred to the in-house OB clinic to receive pregnancy testing and counseling for routine and high-risk prenatal care.

c.   In accordance with Women Prisoners of the District of Columbia Department of Corrections, et al. v.  District of Columbia et al., the DOC shall place no

27. **ABORTION.**  It is DOC policy to ensure that the legal right to therapeutic or elective abortions is not mitigated by reason of incarceration.  No DOC employee, contract employee or volunteer shall in any manner compel, encourage, discourage, coerce or delay an inmate's decision to either have or not have an abortion.

28. **ELECTIVE PROCEDURES.**  The medical contractor, in conjunction with the DOC Health Services Administrator, and in accordance with local regulations, shall provide guidelines that govern elective procedures or surgery for inmates. They must include decision-making processes for elective surgery needed to correct a substantial functional deficit or if an existing pathology process threatens the well-being of the inmate over a period of time.

29. **ANCILLARY SERVICES.** The medical contractor is responsible for the provision of all radiology, laboratory, pharmacy and other ancillary services.

30. **PHARMACEUTICALS.** The medical contractor shall comply with all applicable District and Federal regulations regarding dispensing, distribution, storage and disposal of pharmaceuticals. The medical contractor shall maintain a pharmacy.

31. **NON-PRESCRIPTION MEDICATION.**  Nonprescription medications are only available to inmates through the medical contractor, i.e. sick call, urgent care.

32. **PROSTHESES AND ORTHODONTIC DEVICES.** The medical contractor is responsible for the assessment of inmates' needs for adaptive medical and dental devices.  These devices shall be provided when the health of the inmate would otherwise be adversely affected, as determined by the physician or dentist.

33. **NUTRITION SERVICES/THERAPEUTIC DIETS.** Inmates housed at CDF and CTF shall be given regular diet trays that a qualified dietitian has ensured meets the nationally recommended allowances for basic nutrition.  The exceptions to this are those inmate patients requiring therapeutic, medical or dental diets:

   a.  The contract Licensed Independent Practitioner (MD, DO, NP, DDS, DMD, etc.) shall order therapeutic diets as defined by law, rules and regulations of District of Columbia.

   b.  The contract Licensed Independent Practitioner (LIP) may also order nutritional supplements.

c.    The DOC licensed Dietician shall be responsible for providing oversight to ensure that all dietary requirements are met in accordance with the American Dietetic Association. This includes regular and medical diets.

34.    **COMMUNICABLE DISEASE AND INFECTION CONTROL PROGRAM.** Under the direction of the contract Health Services Administrator, the contract Infection Control Coordinator maintains the Infection Control Program through the performance of the following duties and responsibilities:

a.    Directs the investigation and institutes appropriate control measures of all risk situations related to infection, prevention, surveillance and control which may endanger patients, personnel or visitors.

b.    Formulates Infection Control policies and practices, including those regarding sterilization and disinfection within all operative locations, and those associated with the storage of sterile supplies and the recall of the same.

c.    Reports of communicable and infectious diseases in accordance with federal and local law(s).

35.    **TUBERCULOSIS.** All persons in the DOC (staff and inmates) shall receive annual screening for tuberculosis (TB). Procedures, for management of TB among employees are addressed in PS 6050.1 *Tuberculosis Control Program* and procedures for management of TB among inmates are provided as a routine component of inmate health care.

36.    **HEPATITIS A, B, C.** Under the direction of the contract Health Services Administrator, there is a plan to identify infected inmates, provide treatment (when indicated), follow-up, and isolation (when indicated).

37.    **HIV/AIDS MANAGEMENT.** Under the direction of the contract Health Services Administrator, the medical contractor shall identify, provide surveillance, immunization (when applicable), treatment, follow-up, and isolation (when indicated).

38.    **HEALTH EDUCATION.** DOC and the medical contractor shall coordinate health education and wellness programs for inmates who are in DOC facilities. Topics in the Health Education Program will include, but are not limited to:

a.    Anger Management,

b.    Conflict Management,

c.    Domestic Violence,

d.    HIV/STD Education,

    e.    Life Skills,

    f.    Stress Management,

    g.    Substance Abuse, and

    h.    Violence Prevention

39. Video/DVD enabled televisions are located on the third floor medical unit. Video/DVDs regarding health education topics including, but not limited to, Living with Diabetes, Cancer Awareness, Communicable Diseases, Nutrition, and Stroke Information shall be shown in the medical area. The television is on from 9:00 am until there are no longer inmates in the medical area.

40. **DISCHARGE PLANNING.** Continuity of care is provided from admission to transfer or discharge from the DOC facilities, including discharge planning and referral to community-based providers, when indicated.

    a.    During the intake history and physical the medical contractor's provider will ensure each inmate receives an Initial Discharge Treatment Plan. The physician will provide this to the inmate in a sealed envelope. Information in the plan will support continuity of care in the event an inmate is released within twenty-four hours of intake (i.e. court ordered release).

    b.    The contractor shall ensure that necessary medical documentation required for an inter-institutional transfer is completed on all patients transferred to another facility.

    c.    The contractor shall provide linkages to the community for continuity of care. Upon release, all inmates must receive a discharge treatment plan, and if applicable, an initial appointment to an assigned health care center of their choice in the inmate's neighborhood, ideally with the same health care team that provided services while the inmate was in custody. The contractor shall make every effort to provide an assigned health care provider to inmates who are not District residents.

    d.    The Mental Health Liaison from the D.C. Department of Mental Health (DMH) assigned to the DOC evaluates patients with mental health problems who are due to be released into the community. While the patient is still incarcerated, the liaison links them with a community-based Community Services Agency (CSA) and follow-up appointment within forty-eight hours of their release.

    e.    Inmates shall receive medication sufficient for three (3) days and a prescription for thirty (30) days of medication. If an inmate is released between 10:00 p.m. and 7:00 a.m., they shall receive a seven (7) day supply of medication and a prescription for thirty (30) days of medication. Inmates shall receive HIV medication sufficient for thirty (30) days.

41. **INMATE DEATH.**  If the medical contractor's physician determines through assessment of the inmate that all of the clinically accepted signs and symptoms of death are present and that the inmate is clinically dead and beyond being revived, the contractor's physician may order CPR be ceased and may pronounce death.

   a. The procedure for the identification, verification, reporting and documentation of an inmate death shall be governed by guidelines set forth in DOC PS 4352.1 *Inmate/Offender Deaths.*

   b. Notification about the death of an inmate shall be governed by guidelines set forth by DOC PS 1280.2 *Reporting and Notification Procedures for Significant Incidents and Extraordinary Occurrences.*

DC-WAP 000204

# CHAPTER 5
# INMATE TREATMENT

1.  **FAIR TREATMENT.** DOC, CCA/CTF and the medical contractor shall ensure that inmates are treated humanely, fairly and in accordance with applicable laws.

2.  **NOTIFICATION.** It is DOC policy to notify an individual that the inmate designates in case of serious illness, serious injury or death, unless security restrictions dictate otherwise.

3.  **PRIVACY.** The medical contractor shall ensure that medical and mental health interviews, examinations and procedures are conducted in a setting that respects the inmate's privacy. Female inmates are provided a female escort for encounters with a male medical contractor.

4.  **CONFIDENTIALITY.** The principle of confidentiality applies to an inmate's health records and information about the inmate's health status. Privacy and confidentiality of health care information shall be governed by DOC PS 1300.3 *Health Information Privacy*.

5.  **INFORMED CONSENT.** Health care services shall be rendered according to federal standards, District law(s), and ACA standards in a language understood by the inmate. The rights of inmates shall be taken into consideration when providing medical services.

    a.  When medical care is rendered against the inmate's will, it is in accordance with federal and local laws and regulations.

    b.  Any inmate may refuse (in writing) medical, dental and mental health care services. If the inmate refuses to sign the refusal form, it must be signed by at least two witnesses. A qualified health care professional must review the refusal and conduct a face-to-face evaluation if there is concern about decision-capacity or if the refusal is for critical or acute care.

    c.  An individual's treatment through a new medical procedure will be undertaken only after the inmate has received a full explanation, by their physician, of the positive and negative features of the treatment and only with informed consent.

    d.  In the case of minors, the informed consent of a parent, guardian or a legal custodian applies when required by law.

6.  **HEALTH CARE DECISIONS**

    a.  The health care provider who is treating or providing services for an incapacitated inmate at the time of the health care decision, DOC medical contractors, and all DOC employees are prohibited from authorizing, granting,

refusing or withdrawing consent on behalf of the inmate with respect to a decision regarding health care services, treatments or procedures.

b.  In the absence of a durable power of attorney, and provided that the inmate's incapacity has been certified, the following individuals, in descending order of priority set forth below, shall be authorized to grant, refuse or withdraw consent on behalf of the inmate with respect to the provision of any health-care service, treatment or procedure.  The decision to grant, refuse or withdraw consent shall be based upon the known wishes of the inmate or, if the wishes are unknown and can not be ascertained, a good faith belief as to the best interests of the inmate.  At least one witness shall be present when this person makes the decision.

1)  A court-appointed guardian or conservator, if the consent is within the scope of the guardianship or conservatorship;

2)  The spouse or domestic partner;

3)  Parent;

4)  Adult sibling;

5)  A religious superior if the inmate is a member of a religious order or a diocesan priest;

6)  A close friend; or

7)  The nearest living relative.

DC-WAP 000206

# CHAPTER 6

## MEDICAL RECORDS

1. **INMATE MEDICAL RECORD**

   a. The medical contractor shall maintain both a paper and electronic medical record for each inmate committed to the DOC.

   b. All inmate medical records shall be the property of the DOC.

   c. Health records shall be complete and required information shall be filed in a uniform manner in accordance with ACA and NCCHC standards.

   d. Medical records shall be readily accessible to health care professionals, promptly retrievable, and securely stored.

   e. Non-emergency inmate transfers require the transfer of the inmate's medical record that will contain summaries of the inmate's health condition, treatments, allergies, written treatment instructions and other information necessary to maintain continuity of care.

   f. If the inmate is being transferred to another facility, the medical contractor shall secure a copy of the medical record in a sealed plastic envelope and deliver it to DOC or CCA/CTF correctional personnel for transfer.

   g. Only an authorized employee of the medical contractor shall open the sealed envelope.

2. **CONFIDENTIALITY OF MEDICAL RECORDS**

   a. The medical contractor shall maintain confidentiality of information in the medical record, distribute medical records among health care professionals, and maintain security of medical records in compliance with the Health Insurance Portability and Accountability Act (HIPAA) security standards.

   b. Medical records shall be maintained in the Medical Records Office. They shall never be out of the medical practitioner's span of control, except for the following:

      1) A patient transfer outside of CDF and CTF;

      2) An Office of the Attorney General request for litigation purposes, after a receipt has been secured; or

      3) A review by law enforcement authorities or Court Order/Subpoena in accordance with HIPAA standards.

DC-WAP 000207

    c.    Inmate workers assigned to the Medical Unit shall not have access to patient information, medical records, or make medical determinations or perform any type of health care procedure.

3.    **INACTIVE RECORDS.**  Inactive health record files are retained as permanent records in compliance with the legal requirements of DOC.  Health record information will be transmitted to specific and designated physicians or medical facilities in the community upon written request or authorization of the inmate and in accordance with HIPPA guidelines.

4.    **RECORDS RETENTION AND DISPOSAL**

    a.    The method of recording entries in the health records and the format of the health records shall be approved by the DOC.

    b.    Inmate records are the sole property of DOC.

    c.    The medical contractor shall be responsible for the maintenance, retention and timely transfer of a complete, standardized medical record for all inmates in accordance with prevailing federal law(s), local law(s), medical regulations, and ACA standards.

    d.    The medical contractor shall maintain inmate medical records in an electronic medical record system and a parallel paper record system.

    e.    The medical contractor shall be responsible for the storage and retrieval of archived paper medical records off-site.

    f.    The medical contractor shall retain inactive medical records for ten (10) years and in compliance with HIPAA standards.

# CHAPTER 7

## EMERGENCY MEDICAL TREATMENT FOR EMPLOYEES, CONTRACTORS AND VISITORS

1.   **REQUIREMENT.**  An injured or ill employee shall have unimpeded access to immediate medical attention from the medical contractor.

2.   **PROCEDURES.**  Procedures for notification and treatment of an employee injury or illness shall be as follows:

   a.   **Notification**

   1)   An employee shall immediately call the Nurses Station on the Medical Unit to notify the health care provider about a serious personal injury, major illness while on the job, or traumatic medical situation of another employee.

   2)   An employee shall also notify the Command Center about a serious personal injury, major illness while on the job, or injury to another employee.

   3)   An employee incurring an injury or illness that does require immediate medical attention must make verbal notification to his/her supervisor without delay.

   4)   An employee incurring an injury or illness that does not require immediate medical attention shall report their medical condition to the medical contractor directly following notification to their supervisor and relief coverage for their duty station will be arranged, if necessary.

   b.   **Medical Response**

   1)   The medical contractor shall provide first response services to an injured or ill employee for the purpose of assessment, stabilization, and referral to an outside provider.

   2)   Following notification of an injured or ill employee, the supervisor's first and most important responsibility is to ensure that the employee promptly receives necessary medical attention from the medical contractor, and that there is proper medical documentation of the injury or illness to an employee.

   c.   **Medical Referral**

   1)   The medical contractor shall not be responsible for the ongoing medical management of an employee.

2)   The medical contractor shall arrange for DC Fire and Emergency Medical Services (DCFEMS) to transfer a seriously injured/ill employee by ambulance.

3)   The medical contractor shall document an employee's complaint of an injury or illness. The report of the illness or injury shall be forwarded to the employee's supervisor in a sealed envelope.

d.   **Crime Scene.**  The Supervisor shall ensure that the scene where an injury took place has been secured, collect any evidence from the scene (if appropriate) and obtain statements from witnesses as soon as reasonably possible following notification of an injury to an employee.

e.   **Supervisory Administrative Follow-up.**  The investigation and the reporting of an employee's injury or illness shall be handled in accordance to DOC *PS 2921.2, Reporting Employee Accidents and On-the-Job Injuries*.

DC-WAP 000210

EXHIBIT 26

UNITY HEALTH CARE, INC.

| EPARTMENT: CENTRAL DETENTION AND CORRECTIONAL TREATMENT FACILITIES HEALTH SERVICES DIVISION | TITLE: SPECIAL NEEDS PATIENTS TREATMENT PLAN | POLICY #: CF702 |
|---|---|---|
| | | PAGE: 1 OF 3 |
| REVIEWED BY: | EFFECTIVE DATE: October 1,2006 | DATE REVISED: February 25, 2008 June 1, 2010 October 4, 2010 April 15, 2011 |
| APPROVED BY CMO: | APPROVED BY CEO: | |

SUBJECT:     MANAGEMENT OF SPECIAL NEEDS PATIENTS

PURPOSE:     To establish procedures for the care and management of patients with special medical or mental health needs at the Central Detention Facility (CDF) and Correctional Treatment Facility (CTF).

POLICY:      It is the policy of Unity Health Care that patients with special medical or mental health conditions are evaluated and the appropriate steps taken to address those needs.

PROCEDURES:

I.     Intake Health Assessment

   A.     During the Intake Health Screening, patients are evaluated to determine if any acute or chronic medical, mental health problem or disability exists by receiving a comprehensive health assessment.  If an issue is identified, referral to the appropriate provider or resource is made for follow up.  All special needs are identified in the "Directives" section on the record.

   B.     Patients who have one of the following conditions identified during the intake Health Assessment are transferred to the Correctional Treatment Facility to be housed in the Infirmary; the handicapped Unit or open population as medically indicated:

      1.     Pregnancy
      2.     Physical Handicapped Requiring a Wheelchair, walker or crutches
      3.     Blindness
      4.     Terminal Illness
      5.     Wired Jaw Fracture
      6.     Urinary or Fecal Incontinence
      7.     Communicable Diseases such as Varicella, Zoster, Possible Active Tuberculosis, Measles, etc.
      8.     Postoperative patients or those recovering from a debilitating illness requiring infirmary care.

    9.      Those individuals requiring specialty medical equipment such as oxygen tanks/condenser, CPAP, wound vacs, etc.

C.     Patients with significant acute or chronic mental health problems may be admitted to the Inpatient Mental Health Unit after evaluation by Intake Mental Health staff (CDF for males and CTF for females).

D.     Elderly and /or frail patients will be considered for special placement and connected to the Chronic Care Clinic as indicated.

E.     Those individuals with significant communication barriers such as those unable to speak and/or deaf patients will be considered for specialty housing.

II.     Chronic Illness

A.     Patients identified with chronic illnesses are enrolled in the Primary Care Clinic (also known as Chronic Care Clinic).  Protocols exist for major chronic illnesses, including, but not limited to Asthma, Hypertension, Diabetes Mellitus, Seizure Disorder, HIV/AIDS, etc.  Patients are seen by the provider where individual treatment plans are developed, implemented and revised as needed.

B.     The treatment plans will include type of treatment received, frequency of follow up, description of diagnostic and/or therapeutic regimens and, when appropriate instructions regarding diet, exercise, medications, and the correctional environment.

C.     Patients admitted to one of the Inpatient Mental Health Units shall be evaluated and monitored, as outlined in the Inpatient Mental Health Policy, individualized treatment plans are developed, implemented and revised as needed.

III.     Other Special Needs Patients

A.     Patients with chronic disabilities who require canes for ambulation may be housed at either the Central Treatment Facility or the Central Detention Facility.  If these devices are ordered by the provider, the patient is given the appropriate medical order and a copy of the order is given to the Correctional Officer in the housing unit by the patient.

B.     Patients requiring bottom bunks for clinical reasons are given a bottom bunk pass, a copy of which is given to the Correctional Officer in the housing unit.

C.     A proactive approach will be taken with the juvenile population and reasonable attempts will be made to identify legal guardians when available and verify update vaccination records.

2

WP2-2000026

IV.   Inmate Movement

    A.   Medical staff are informed of inmate movement primarily by way of the daily census which also shows which inmates are in court.

    B.   There are occasions where patients, particularly patients on the Inpatient Mental Health Unit or on Suicide Watch, may be placed on "Court Hold" by a provider.

## RELEVANT STANDARDS:

I.   National Commission on Correctional Healthcare (2008).  Standards for Health Services in Jails, Special Treatment, J-G-02.

II.   American Correctional Association, Performance-Based Standards for Adult Local Detention Facilities (2004), 4th Ed., 4-ALDF-4C-40.

3

EXHIBIT 27

## Superior Court of the District of Columbia

United States of America/
District of Columbia

vs.                                         Case No. _2011DVM 2701_

_William Pierce_

### PLEA AGREEMENT AND WAIVER OF TRIAL

PLEA AGREEMENT: Defendant and the Government enter into the following plea agreement:
_∆ will plead guilty to one count of Simple Assault, the government_
_will dismiss remaining 2 counts of Destruction of Property, waive, waive, reserve,_
_∆ agrees to pay restitution for damaged property._
**YOU ARE NOT REQUIRED TO PLEAD GUILTY.** If you do plead guilty, you will give up important rights, some of which are stated below.

First, you give up your right to a trial by the court or a jury, comprised of 12 members of the community. At a trial you would be presumed to be innocent and the Government would be required to present evidence in open court to prove its case beyond a reasonable doubt.

At the trial you have the right to have a lawyer represent you. The lawyer would be able to cross-examine witnesses, file motions to suppress evidence and statements, and make objections and arguments on your behalf. You would have the right to question any witness and you could have witnesses come to court and testify for you. You would also have the right to testify if you wanted to; however, if you chose not to present testimony that decision could not be used against you. You could not be convicted at trial unless the court found that the Government had proved your guilt beyond a reasonable doubt.

Second, you give up your right to appeal your conviction to the Court of Appeals. This is a right you would have if you were convicted after trial. The right to appeal includes the right to have the Court of Appeals appoint a lawyer for you and pay for your lawyer's services if you could not afford a lawyer.

Third, if you are not a citizen of the United States, your plea of guilty could result in your deportation, exclusion form admission to the United States, or denial of naturalization.

**Your signature on this form means that you wish to plead guilty and give up your right to trial and your right to appeal. If the court accepts your guilty plea, you will be convicted and the only matter left in the case will be for the court to sentence you. No person can guarantee what your sentence will be.**

**I HAVE REVIEWED THIS FORM WITH MY LAWYER AND HAVE DECIDED TO PLEAD GUILTY IN THIS CASE. I HAVE DECIDED TO GIVE UP MY CONSTITUTIONAL RIGHT TO HAVE A TRIAL AND TO GIVE UP MY RIGHT OF APPEAL.**

Asst. U.S. Attorney/
Asst. Corporation Counsel

X _____
Defendant

Approved this _5TH_ day of _January_, 20__ _12_

_____
Attorney for Defendant

_____
Judge

EXHIBIT 28

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

United States of America
Vs.

**WILLIAM, PIERCE**
DOB: 10/22/1968

JUDGMENT IN A CRIMINAL CASE
(Incarceration / Probation)

Case No. **2011 DVM 002701**
PDID No. **657099**
DCDC No.

THE DEFENDANT HAVING BEEN FOUND GUILTY ON THE FOLLOWING COUNT(S) AS INDICATED BELOW:

| Count | Court Finding | Charge |
|-------|---------------|--------|
| 1. | Found Guilty-Plea | Simple Assault |

## SENTENCE OF THE COURT

Count 1. Simple Assault  Sentenced to 180 day(s) incarceration, execution of sentence suspended as to all but time served plus 60 day(s), *Supervised Probation for 18 month(s), $100.00 VVCA, VVCA Due Date 08/01/2012, Restitution: $2516.20.

***INCARCERATION IS TO RUN CONSECUTIVE TO ANY CURRENT OR FUTURE SENTENCE.***

***PROBATION IS TO RUN CONCURRENT WITH ANY OTHER PERIOD OF PROBATION, SUPERVISED RELEASE, OR PAROLE.***

The defendant is hereby committed to the custody of the Attorney General to be incarcerated for a total term of **60 days** . MANDATORY MINIMUM term of _____ applies.

The Court makes the following recommendations to the Bureau of Prisons/Department of Corrections:

Defendant is hereby ordered placed on probation - See Page 2 of this Order for Conditions of Probation; *upon release from either the courtroom or incarceration, Defendant must report to 300 Indiana Avenue, NW, Room 2070, Washington, DC, by the next business day after release from jail or prison.*

Total costs in the aggregate amount of $ **100.00** have been assessed under the Victims of Violent Crime Compensation Act of 1996, and ☐ have ☑ have not been paid. ☐ Appeal rights given ☐ Gun Offender Registry Order Issued

☐ Advised of right to file a Motion to Suspend Child Support Order ☐ Sex Offender Registration Notice Given
☐ Domestic violence notice given prohibiting possession/purchase of firearm or ammunition ☐ Voluntary Surrender
☐ In addition to any condition of probation, restitution is made part of the sentence and judgment pursuant to D.C. Code § 16-711.

_2/1/12_
Date

BRIAN F HOLEMAN
Judge

Certification by Clerk pursuant to Criminal Rule 32(d)

_2/1/12_
Date

Marlene Milgram
Deputy Clerk

Received by DUSM: Washington   Badge#: 30131   Signature: _____ Date: 2/1/12   Time: 1331
Printed Name

CDJCSPI.IT.doc

WP0000210

Judgment Page 2 of 2

CASE NUMBER: **2011 DVM 002701**
DEFENDANT: **PIERCE WILLIAM**



The Defendant is hereby placed on **\*Supervised Probation** for a term of  18 month(s)

## GENERAL CONDITIONS OF PROBATION

1. Obey all laws, ordinances, and regulations.
2. Report to CSOSA today and then for all appointments scheduled by your Community Supervision Officer (CSO).
3. Permit your CSO to visit your place of residence.
4. Notify your CSO within one business day of (A) an arrest or questioning by a law enforcement officer, (B) a change in your residence, or (C) a change in your employment.
5. Obtain the permission of your CSO before you relocate from the District of Columbia.
6. Do not illegally possess or use a controlled substance or any paraphernalia related to such substances (you may take lawfully prescribed medication).  You must not frequent a place where you know a controlled substance is illegally used or distributed.
7. You must drug test at the discretion of CSOSA. In the event of illicit drug use or other violation of conditions of probation, participate as directed by your CSO in a program of graduated sanctions that may include periods of residential placement or services.
8. Participate in and complete CSOSA's employment/academic program, if directed by your CSO.
9. Participate in and complete other CSOSA's programs as identified through CSOSA's risk and needs assessment.
10. Satisfy all court imposed financial obligation(s) (fines, restitution, Victim of Violent Crime Act assessments, etc.) to which you are subject.  You must provide financial information relevant to the payment of such a financial obligation that is requested by your CSO.  A payment plan will be established by your CSO so that you will be in a position to pay your court imposed financial obligation(s) within 90 days prior to the termination of your probation.

## SPECIAL CONDITIONS OF PROBATION

1. Cooperate in seeking and accepting medical, psychological or psychiatric treatment in accordance with written notice from your CSO.
2. Restitution of $   2516.20   in monthly installments of $   250.00   beginning  05/01/2012 until balance is

  ☑ The Court will distribute monies to:  David Holder, 1313 R St. NW, Washington,   paid in full.

D.C. 20009

3. ☐ You are to stay away from the person(s) and or address(es) listed below: _____

  ☐ You are to stay away from the following places or area(s): _____

You are not to have contact with any of the persons named above.  You must remain at least 100 yards away from them, their home, and/or their places of employment.  You are not to communicate, or attempt to communicate with any of these persons, either directly or through any other person, by telephone, written message, electronic message, pager, or otherwise, except through your lawyer.

4. **Other Special Conditions**: -Enter and Complete Domestic Violence Intervention Program.
  -Submit to mental health and substance abuse assessments every 6 months, to be followed by any treatment deemed appropriate by CSOSA—this requirement may be satisfied through enrollment, participation and completion of accredited diagnostic and treatment program(s) as long as such program(s) meet requirements of CSOSA.
  -Shall not engage in any harrassing, assaultive, threatening, and stalking conduct as to Mr. David Holder.

CDJCSPLIT.doc

WP0000211

EXHIBIT 29

## Inmate Transfer History Report
### District of Columbia Central Detention Facility

Today's Date: 03/21/2012

Inmate Name: PIERCE, WILLIAM

Booking#  2012  01217

| Transfer Date | From | To | Date Received | Sending Officer | Receiving Officer |
|---|---|---|---|---|---|
| 02/01/2012 15:59 | INITIAL | 12 | 02/01/2012 15:59 | TAYLOR, A ███ | TAYLOR, A ███ |
| 02/02/2012 01:21 | CENTRAL DETENTION | 11 | 02/02/2012 19:01 | SMITH, L ███ | PERKINS, M ███ |

**CONFIDENTIAL**

EXHIBIT 30

STANDARD INTER-INSTITUTIONAL TRANSFER ORDER

| 1. INSTITUTION FROM CODE | 11 |
| --- | --- |

| 4. NAME | 5. DCDC NUMBER | 6. MOVE TO CODE | 7. DESTINATION | 8. REASON CODE | 9. REASON/SPECIAL INSTRUCTIONS |
| --- | --- | --- | --- | --- | --- |
| PIERCE, WILLIAM | 333851 | 12 | CTF/CCA | 61 | MEDICAL |
| MED 96 | | | | | |

| MONTH | DAY | YEAR |
| --- | --- | --- |
| FEB | 1 | 2012 |

| 3. TIME | | |
| --- | --- | --- |
| A.M. | 0:00 | PM |

| 10. CUSTODY |
| --- |

S_____ WAINWRIGHT
WARDEN

EXHIBIT 31

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - -x
WILLIAM PIERCE,

        Plaintiff,

      vs.                 Case No.
                      1:13-cv-00134 KBJ

DISTRICT OF COLUMBIA,

        Defendant.
- - - - - - - - - - - - - - - - - -x

                  Monday, February 24, 2014

                  Washington, D.C.

                  Volume II

Deposition of

          WILLIAM PIERCE,

the plaintiff, called for examination by counsel

for the defendant, pursuant to notice, held at the

offices of Carr Maloney, P.C., 2000 L Street,

Northwest, Suite 450, Washington, D.C., beginning at

9:29 a.m., before Malynda D. Whiteley, a Registered

Professional Reporter and a Notary Public in and for

the District of Columbia, when were present on behalf

of the respective parties:

1  relation to the closed captioning, or another inmate

2  was?

3              INTERPRETER LOCKHART:  Let me -- interpreter

4  clarification.

5      A    It was another inmate, ███████.  That was a

6  deaf prisoner as well.  He got in an altercation with

7  a hearing prisoner because they were complaining about

8  the closed captioning on the TV.  It was a different

9  prisoner, ██████.  He was deaf.  He got in an

10 altercation with a hearing prisoner.

11             But it didn't involve me.  It didn't involve

12 me.  It was a separate inci- -- incident.  Someone

13 pushed me.  But also, like I said, another deaf

14 individual was also -- got into an altercation because

15 he wanted closed captioning on TV, and the deaf -- and

16 the other prisoner -- you know, they got into it.

17     Q    Okay.  Let's talk about when were you

18 pushed.  Can you describe what happened.

19     A    There was a chair.  I think -- okay.  There

20 was a chair -- if your ID's on the chair, that means

21 that's -- that is your chair.  These are -- there --

1  if there's no ID, no call or badge on that chair, that

2  means that chair's available.

3          And so I -- I had my badge on the chair.

4  There was no badge on the chair.  So there's no badge

5  or ID; that means you could sit there.

6          And what happened -- well, of course, it was

7  really -- it was really crazy.  And no one -- okay.

8  So, anyways, so I sat there for five minutes; and then

9  I let the other person sit there.

10          And the next day he pushed me.  And I think

11  he didn't just push me because I sat at that chair.  I

12  think he just pushed me because of ulterior motives,

13  like he didn't like me because I was deaf.

14          And the videotape -- I mean, there's videos

15  there; and it shows him pushing me.  And Richard as

16  well.  There's a video, there's cameras, and the

17  prison guard.

18          And, you know -- and just we -- like I said,

19  the other deaf prisoner ███████ was fighting the

20  other -- there was an altercation because of closed

21  captioning.

1          And that was really my new situation that

2    could have been handled.  It was all easily -- if they

3    just put the closed captioning on so the deaf can see

4    what's going on with TV.  But the hearing prisoner

5    said no.

6          Q    Now, you mentioned videotapes.

7               Have you viewed the videotapes?

8    (Conversation between Interpreter Maldon and the

9    witness.)

10         A    It would be nice if I could see it.  But

11   I -- I've seen the cameras, but I have not actually

12   viewed the videotape.  I've seen the cameras, but I

13   have not actually viewed the videotape per se.

14              But there was -- there was a camera right in

15   front of the TV that showed the situation.  So

16   everywhere there's a camera.  And I think -- I think

17   they should put videotape -- well, they should put

18   the -- they should've played the videotape tape in the

19   trial so you could see the -- see the altercation, see

20   the push, and see the hate.  It's very severe.

21   ///

 1          BY MS. ORCUTT:

 2      Q    But --

 3          MS. WEDEKIND:  I'm sorry to interrupt.  The

 4  clarification that happened a minute ago with Shawn,

 5  that's the type of thing that needs to be voiced.

 6          INTERPRETER MALDON:  Interpreter

 7  clarification.

 8          Pierce (sic), you said they denied the

 9  interpreter right in front of the video camera?

10      A    I asked what was -- I asked for an

11  interpreter.  And there was no interpreter there for

12  anger management, for anger and SA.  It's a -- it's a

13  class.  It's an anger and SA class.

14          And there was no interpreter there, so I

15  wasn't -- so I was not able to participate in the

16  class.  And I was supposed to be in the class with --

17  for the anger and SA class.  That's the substance

18  abuse class.

19          But there were (sic) no interpreter at that

20  class.  I was not able to -- able to understand what

21  was going on in the class.  So I had no interpreter

1  for the class.

2           MS. ORCUTT:  Okay.  I'm going to move to

3  strike that whole portion --

4      A    And I thought that was amazing.

5           MS. ORCUTT:  I'm going to move to strike

6  that whole portion as nonresponsive to the question.

7           BY MS. ORCUTT:

8      Q    We can go back to that subject later on.

9           But I want to follow up on the video

10 cameras.

11     A    (Through Interpreter Maldon) Okay.

12     Q    Now, if you haven't seen a video of the

13 episode of you being pushed, how do you know that it

14 was videotaped?

15     A    Well, the video camera was right there.  And

16 it's everywhere.  I mean, it's all throughout the

17 facilities.  There's -- in the TV room.  You can see

18 them in the hallway.  You can see them in the center

19 lobby.  You can see them everywhere, just not in the

20 rooms.  There's none in the rooms.

21          But everywhere else they're -- they're

1   everywhere.  There's even a video camera -- they're

2   recording in the hole as well.  It's on -- you know,

3   they say it's on 23 hours; but actually, no, it's on

4   24 hours of the day.

5       A    (Through Interpreter Lockhart) They told me

6   I had a 3-hour (sic) lock- -- 3-hour lockdown -- or

7   23-hour -- but they locked me down for 24 hours.

8   (Conversation between Interpreter Lockhart and the

9   witness.)

10      A    I was on lockdown for 24 hours most of the

11  time --

12           MS. ORCUTT:  Okay.

13      A    -- for the duration there.

14           MS. ORCUTT:  I'm again going to move to

15  strike that for being nonresponsive to the question.

16           THE WITNESS:  Could you just keep that on

17  the record, though, that I was, you know --

18           MS. ORCUTT:  We will --

19           THE WITNESS:  -- shut down.  I want to keep

20  that on the record, though.

21           MS. ORCUTT:  We will get to that.  I will

1  ask you a number of questions about your time in

2  lockdown.  I will ask you questions about various

3  topics throughout this.

4          But the way that it works is I ask you a

5  question, and then you answer that question.  And then

6  I will eventually get to other topics.

7          THE WITNESS:  (Through Interpreter Maldon)

8  Okay.  That's fine.

9          MS. ORCUTT:  It makes for a clearer record

10 if you respond only to the question that's asked.

11         THE WITNESS:  Okay.  That's fine.

12         BY MS. ORCUTT:

13     Q    Okay.  Back to the videotape subject.

14         Just because there are cameras everywhere,

15 does that -- do you then assume that they are always

16 videotaping?

17     A    Yes.

18     Q    Now I want to go back to when you were

19 pushed by the other inmate.

20         To make sure I understood that, it's you sat

21 in a chair that did not have an ID on it, so you

1  thought that was free?

2      A    Correct.

3      Q    And then he wanted you to move because he

4  thought that was his seat?

5      A    Correct.

6      Q    And then you stood up, and he pushed you?

7      A    No, no, no.  That happened the next day.

8      Q    Okay.

9      A    That was a five-minute situation there.  I

10  walked out; and, you know, I left.

11          The next day, I think it was -- I don't

12  know -- popcorn, coffee, or something.  We were

13  somewhere.  And he followed me, and he came behind me,

14  and he pushed me down to the ground.  And then, you

15  know, I went to talk to the case manager about that.

16      Q    Were you afraid when he pushed you down to

17  the ground?

18      A    I would say no, not really, because I would

19  just report it to the case manager.

20      Q    Did you have any injuries from being pushed

21  to the ground?

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                    203

1  (Conversation between Interpreter Maldon and the

2  witness.)

3       A    No, not really, nothing major.  The main

4  thing was the shock of it all.

5       Q    And then you said that you went to the case

6  manager?

7       A    Correct.

8       Q    Is that Ms. Tutwiler?

9       A    Correct.  And also the other officer whose

10 name fails me now, some guy.  He's -- he's a sergeant

11 with the -- within the department.  He -- he and

12 Tutwiler went together.

13      Q    Do you recall what he looked like?

14      A    He was a (sic) old black guy.

15      Q    Would you say that he's tall or short?

16      A    Average.  I'd say he's average.  He was very

17 thin.  And he was -- he could always be seen with

18 Tutwiler.  They'd kind of work together often.

19      Q    Was he the officer that was assigned to your

20 housing unit?

21      A    Yes.

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                              204

1      Q    And do you recall which unit you were in at

2 the time?  Was this Medical 96?

3      A    My room?  Is that where you're asking?

4      Q    No.  Which housing unit.

5      A    Medical 96, I think.

6      Q    Okay.  So the sergeant would have been,

7 then, the officer assigned to Medical 96 during the

8 time in which you were housed there?

9      A    Correct.  Correct.  That's right.

10      Q    Do you recall which shift that would have

11 been?

12      A    I would say noon because, you know, that's

13 when my partner had come to visit me that day.  So

14 sometime, I'd say, noon-ish.

15      Q    Is when he started the shift or when the

16 incident happened?

17      A    Well, it happened that after- -- it happened

18 in the afternoon.  The shift, I'm not sure exactly

19 what it was.  But that's when he and Tutwiler went

20 over to discuss the issue together.

21      Q    Okay.  So at noon is when this sergeant and

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                    205

1  Tutwiler discussed the incident?

2      A    Correct, with the -- you know, those people

3  that were there.

4      Q    By "those people" do you mean witnesses to

5  the incident?

6      A    Correct, and the other inmates.

7      Q    Okay.  So if I understand correctly, then,

8  the incident occurred sometime before noon if they

9  went and spoke with the witnesses at about noon?

10     A    Roughly, give or take, yes.

11     Q    Do you have any sense for how long -- how

12 much time passed between the incident and when they

13 came to talk to the other inmates?

14     A    I'm not sure I really understand the

15 question.

16     Q    I'll try to rephrase it.

17          About how much time passed between the

18 incident and when Tutwiler and the sergeant went to

19 talk to the other inmates?

20     A    Oh, it was right away; it was quick.  I'd

21 say three or four minutes.  The fall, I went to go get

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                    206

1  them, and they came right away.  Oh, a couple minutes;

2  two, three, or four minutes.

3      Q    Okay.  And then just going back to the

4  shift, do you recall what time that sergeant came on

5  duty approximately?

6      A    No, I don't.  No, I don't.

7      Q    Okay.

8      A    Again, he tends to work kind of all day

9  during the day.  He's not a night worker, so his shift

10 tends to be during the day.

11     Q    Okay.  And by "during the day" would you

12 approximate maybe 8:00 to 5:00?

13     A    I could approximate 8:00 to 5:00, yes.

14     Q    Okay.

15     A    And the case -- same time that the other

16 case managers arrived.  They tend to arrive at the

17 same time.  They end maybe about 4:00 or 5:00 in the

18 afternoon.  So around that time.

19     Q    Okay.  And when you went to Ms. Tutwiler,

20 did you -- what did you do?

21     A    Well, I told her that, you know, he pushed

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                    207

1  me and I fell.  And then, you know, the officers came

2  over to speak with the people who were around who were

3  witnessing -- who were witnesses.

4       Q    Okay.  Let's just focus on what happened

5  with Ms. Tutwiler first, and then we can talk about

6  the witnesses.

7            Now, when you say "told," I assume -- did

8  you write it down on a piece of paper?

9       A    No, I just kind of used some visual

10 gestures.  I showed he pushed me like this, and then I

11 pointed, and then she kind of just followed me over.

12      Q    Okay.  Was the sergeant there while you were

13 gesturing to Ms. Tutwiler?

14      A    I think so, yes.

15      Q    Was --

16      A    But I -- my focus was on Tutwiler.  And then

17 later the police officer somehow got involved and came

18 over as well.  So I was talking directly to Tutwiler.

19      Q    You said "police officer".  Do you mean the

20 sergeant?

21      A    Right, the sergeant.  You're right.

1  title of the document is "Protective Custody

2  Request/Waiver Form" -- is that your handwriting on

3  that paper?

4       A    Yes, right here.  That's when I was in the

5  hole, not on --

6            INTERPRETER LOCKHART:  92.

7       A    -- not on 92, Medical 92.  92?  I think it's

8  92.  Or 96.  I'm not sure which one --

9            BY MS. ORCUTT:

10      Q    96 is the first unit, and then 82 is the

11 second.

12      A    So I signed it on the 8- -- so that's when I

13 was in 82.  They encouraged me to sign it, but I

14 refused.  They urged me to sign it, and I gave up.

15 And they were looking at me and trying to have me sign

16 it under duress, so I signed it under duress.

17           At first I refused, but they kept standing

18 there, and I finally signed it and signed it under

19 duress.  The guard was a lady there that kind of

20 forced me to sign it, so a lady guard that was there.

21      Q    Do you recall her name?

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                    217

1       Q    Did you sign any other papers after --

2       A    No, just --

3       Q    -- the push?

4       A    -- that one.  Just this one.  This is the

5  only paper I signed after the push.

6            And I told them I didn't want the hole and

7  tell why they're still sending me to the hole.

8       Q    I want to talk about what's written on this

9  paper.  It says, "I fear for my safety      " --

10      A    Which one -- which one are you talking

11 about?

12      Q    Page No. 3, the one you're looking at.

13           Is that your writing where it says, "I fear

14 for my safety"?

15      A    Yes, that's my writing, yes.

16      Q    Why did you write, "I fear for my safety"?

17      A    Well, because she was right there standing

18 and that's why we're here.  That's why we're here, to

19 sign it.  And the lady was right there watching me as

20 I was signing and writing it.

21      Q    Did she tell you that you needed to write,

1  "I fear for my safety," on the paper?

2      A    Yes.

3      Q    How did she tell you that?

4      A    She said, "You have to write."

5      Q    Did she say what you had to write?

6      A    Yes.  She wrote it to me.  She wrote it to

7  me, and I copied it.  I added -- I added ███

8  ██████████  here, on the end here.  She wrote the rest,

9  "fear for my safety," that part.  And then I added on

10  the end, ████████████████

11      Q    So the "I fear for my safety" is her

12  handwriting?

13      A    Yes, that's the guard's.  And I copied it;

14  and I gave it to Dave, my partner, who has a letter of

15  everything I sent to him.

16      Q    Okay.  But I want to focus on this actual

17  paperwork that you have in front of you where it says,

18  "I fear for my safety."

19          Is that your handwriting on the form, or is

20  that Ms. Tutwiler's?

21      A    You mean, on this paper here?

1            MS. WEDEKIND:  Objection --

2       A    That's mine.

3            MS. WEDEKIND:  -- misstating --.

4            MS. ORCUTT:  I'm trying to clarify because

5  at first he said that --

6            MS. WEDEKIND:  But you said, "Ms. Tutwiler".

7            BY MS. ORCUTT:

8       Q    Oh, I'm sorry.  The other officer.

9       A    The guard lady; right.

10      Q    Okay.

11      A    Right.  And she wrote it, and I copied what

12  she wrote, and I copied it right here.

13      Q    Okay.  So this is your handwriting, not the

14  guard's?

15      A    The guard wrote it, and I copied it right

16  here on this paper.

17      Q    Okay.  What we see here on this paper today,

18  however, is your writing; correct?

19      A    Yes, it's my handwriting.  And I told her,

20  and I -- she said what to write, and I copied it, and

21  I copied it right here on the paper.

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                    225

1      Q    And as far as you know, they did not say

2 anything about witnessing the event?

3      A    Right, yeah.  And they were talking.  And

4 so, you know, they talked.

5           And I was still sent to the hole.  And I

6 didn't understand why I was being punished when I had

7 been pushed, why didn't he who pushed me go to the

8 hole instead of me.

9      Q    Okay.  So I want to just follow the sequence

10 of events.

11          After Ms. Tutwiler spoke with the other

12 inmates, what happened right after that?

13     A    They sent me to -- I was -- they told me to

14 go to the room.  And I told them, you know, "Look at

15 the video.  It's there."  And they said, "No.  Go to

16 the room."  I said, "You have a video right here, you

17 know; and why listen to them?"

18     Q    Okay.  When you say you -- they told you to

19 go to "the room," which room are you referring to?

20     A    My room.  They told me go to my room.  She

21 said go to my room.  And I went into the room -- and I

1      A     Well, he came; and then he sent me to the

2   hole.

3            Now, the guard said, "You'll be on 23-hour

4   lockdown," which I didn't understand what he was

5   trying to say.  But, you know, I was told to get my

6   clothes together and go to the room.  And I went into

7   the room and got my clothes together.

8      Q     Did the sergeant write this to you, or did

9   he tell you verbally?

10     A     Yes, he wrote it.

11     Q     Okay.  And just to make sure I'm clear on

12  what you mean by "the hole," you're talking at this

13  point about moving to Medical 82?

14     A     Correct.

15     Q     Okay.

16     A     Sol- -- it's something, s-o-l-i or whatever.

17  But basically it's just the hole.  Instead of trying

18  to remember the whole name for it, it's just called

19  the hole.

20     Q     Okay.  Now, earlier I understood you to mean

21  that you were using the term "hole" to describe both

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                    236

1  Medical 82 and SMU?

2     A    Right -- no.  But they're different.  SMU is

3  much, much worse.  82 is just like 96 really; it's

4  pretty much the same.  They're similar except for

5  locked down completely, complete lockdown.

6     Q    Okay.  So for the time being when you're

7  using "hole," you're referring to Medical 82; but you

8  also use it to refer to SMU?

9     A    Right, which is later.  SMU is later.

10    Q    Right.

11    A    First is 82 and then SMU.

12    Q    Okay.  To keep the record clear, it would be

13 better if we refer to it by "Medical 82" and "SMU" so

14 that we know which one we're talking about.

15    A    Okay.  No --

16    Q    Does that work?

17    A    -- that's fine.   82 and SMU, I can keep

18 those separate.

19    Q    Okay.

20    A    That's fine.

21    Q    So the sergeant told you that you needed to

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                    237

1  pack your things because you were moving to Medical

2  82?

3       A    Correct.

4       Q    Okay.  And what happened next?

5       A    Well, I packed my things.  I was escorted to

6  the elevator, to the floor beneath the room.  I sat

7  there, and I waited.  I was wondering, Well, gee, why

8  am I here, until the lady had me sign this.  She came

9  in, and that was that.

10          I was very confused then as to what was

11  going on.  Communication was definitely not clear, and

12  I was just confused.

13      Q    Okay.  But just to make sure I understand,

14  when you say "the room," you mean your cell that you

15  were assigned to in Medical 82?

16      A    82, right, correct.

17      Q    Okay.  Did you stay in that cell the entire

18  time that you were housed on Medical 82?

19      A    Correct, just the same cell.

20          Later I was sent to SMU.  Again, that was

21  later.

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                    242

1      Q    Did anyone check your blood pressure or do

2   any other checks --

3      A    Yes --

4      Q    -- on you?

5      A    -- the nurse.  The nurse just checked just

6   that.

7      Q    On Friday?

8      A    Friday is -- the nurse came on Friday.  The

9   guard lady too.  You know, that's it.  Those were the

10  only two that I saw.

11     Q    Okay.

12     A    I asked the guard -- I said I wanted to see

13  my case manager.  But I think she said the case

14  manager wouldn't be available until a few days later.

15          And I said I wanted to call Dave to let him

16  know that I'm in Medical 82.  But they were going

17  around and around with me, and so I had to wait until

18  Monday.

19     Q    Okay.  We'll get to that.

20          But let's focus on the -- what happened with

21  the nurse in your cell on Medical 82 on Friday.

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                    243

1          Did she take your blood pressure that day?

2     A    I think so.  I was checked, I guess, my

3 vitals or whatnot.  ███████████████████████████

4 ████████████████████████████████████████████████

5 ███████████████

6          It was really brief.  She was in and out.

7 She didn't want to really communicate with me because,

8 you know, we had to write back and forth.  So she was

9 really in and out.

10    Q    Okay.  And that's the same nurse that

11 explained the call button system to you or a different

12 nurse?

13    A    No, that was -- it was just one, one lady.

14 It was the same nurse.

15    Q    Is she the nurse that's --

16    A    Um --

17    Q    -- posted on that unit?

18    A    She was really getting on my -- I was -- I

19 was really getting on her nerves.  She was a little

20 sick of me because I kept pushing it.  You know, I

21 couldn't scream for help or anything, so I just kept

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                          366

1       A     No.

2       Q     Were there any fire drills while you were in

3   CTF?

4       A     No, not while I was there.

5       Q     Were there any other emergencies that caused

6   the activation of the visual alarm system?

7       A     No.  There were lockdowns.  Yes, in

8   lockdowns there were -- if there was a fight in the

9   building, but not anything regards with the visual

10  alarm.  Only for emergency lockdown, but not fire

11  emergency or anything like that.

12      Q     Right.

13            And during an emergency lockdown, they do

14  not activate the visual alarm system, do they?

15      A     Correct.

16      Q     Did you review the bulletin board in Medical

17  96 in the hallway?

18      A     I looked at some of the postings.  Yes, I

19  did.

20      Q     Okay.  In your complaint it states that you

21  were concerned you would not know about recreation and

1 town hall meetings and that the lack of a visual alarm

2 in your cell would have prevented you from knowing

3 about these things.

4    A    Correct, yes.  I preferred to have a fire

5 alarm in the cell room so I could see a visual alarm.

6 I would prefer to have a visual alarm in the cell

7 room.

8         INTERPRETER MALDON:  All hospitals.

9    A    All hospitals have a visual device.  But for

10 some reason -- in jail they didn't have it for some

11 reason.

12        MS. ORCUTT:  I'm going to strike that last

13 portion as nonresponsive to the question, though, as

14 asked.

15        BY MS. ORCUTT:

16    Q    My question was about the town hall meetings

17 and the recreation time.

18         What about a visual alarm do you think would

19 have alerted you to recreation time or a town hall

20 meeting?

21    A    The alarm will help me to go know where to

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                     368

1  go and -- if something's happening.

2      Q    Did you think that the alarm would go off

3  when it was time to go to recreation?

4      A    Yeah.  There was no flashing lights, there

5  was no -- there was nothing.  If -- if they did add

6  it, it would be a benefit to the deaf community.  But

7  while I was there, there was no flashing lights to let

8  me know if there were (sic) anything going on.

9      Q    Right.

10         I'm not talking about emergency situations

11  in which they would activate the alarm system for both

12  hearing people and hearing impaired people.

13         I'm talking about for regular occurrences

14  like recreation, town hall meetings.

15     A    Uh-huh.  So what is your question?

16     Q    So is it your belief that they should use

17  the emergency system to also alert inmates to daily

18  occurrences such as recreation time?

19     A    Yes, they should.  Yes.

20     Q    And is it your belief that they should use

21  the emergency notification system to alert inmates to

1  town hall meetings?

2      A    Yes.  Yes, in the cell room as well for deaf

3  people who sleep in cell rooms so they have the light

4  flashing, they know.  If it's in the hallway and

5  they're asleep, they're not going to be able to see it

6  in the hallway, you know, and if the door's closed.

7      Q    Okay.  But to be clear, you believe that the

8  emergency notification system should be used for

9  routine occurrences like recreation that happen on a

10 daily or --?

11          MS. ORCUTT:  It keeps falling off.

12          BY MS. ORCUTT:

13     Q    -- that occur on a daily or several-times-a-

14 week basis?

15     A    Yes, for the deaf.

16     Q    When you --

17     A    For the hearing, they can hear.  And the

18 guards might yell their names.  But as -- you know,

19 for me, I'm not able to know what's going on.  And me

20 and the other deaf inmate didn't know what was going

21 on.

1  form out?

2      A    Oh, it was too many.  It was many times,

3  many.

4      Q    So when you requested to use the TTY when

5  you were in Medical 96, how did you get access to the

6  TTY?

7      A    I would ask, and then I would be led in

8  room.  The TTY would be there.  I can't remember how I

9  used -- I couldn't remember how to use the TTY

10  because, gosh, I hadn't use a TTY for ten or twelve

11  years.  I had forgotten.

12          So I asked my deaf cellmate.  He came, and

13  he dialed 711.  I forgot the relay system, that you

14  first connect to 711 and then you take the phone and

15  place it on the receiver and then you start typing.  I

16  forgot how to do that.  But I asked him.

17          Really it's out of date, and it's not used

18  anymore.  90 percent use a video phone today in -- in

19  all America, 90 percent, everywhere.  So, I mean, I'm

20  surprised it was still there.

21      Q    Okay.  So you went to the case manager's

1  office, Ms. Tutwiler, to use the phone?  Is that what

2  you mean by "the room"?

3       A     Right, her office.  That's right.

4       Q     Okay.  And how long did your calls on the

5  TTY last?

6       A     Ten minutes.  About ten minutes.  That's it.

7       Q     Did you have a watch while you were at CTF?

8       A     No, I didn't.  The lady would hold up a

9  symbol.  I mean, she kind of gestured like this

10 (indicating) ten minutes; and so I'd hurry up and

11 finish my conversation.

12      Q     Without a watch how do you know that it was

13 ten minutes?

14      A     Because the lady Tutwiler would -- would

15 tell me.

16      Q     Now, did she write down that it was ten

17 minutes?

18      A     No, just hold up her hands just like this,

19 you know, like this (indicating).  And that would get

20 me to hurry up and finish my conversation.  Or she'd

21 gesture like this (indicating), and I'd hurry up and

CONTINUED VIDEOTAPED DEPOSITION OF WILLIAM PIERCE
CONDUCTED ON 2/24/2014                    386

1  type what I had to type.  And she was right there in

2  front of me looking at me, like, right there.

3       Q    Can you describe what you mean by she was

4  right there looking at you?

5       A    So the table was set up here in front of me.

6  And the lady was across from me on (sic) the table,

7  and I was across from her using the TTY.  And the

8  computer screen was right there in front of us as

9  well, between us, on the side.  She was right there in

10  front of me.

11      Q    So if understand right, you were sitting at

12  her desk, then?  You were on one side, and she was on

13  the other --

14      A    Correct.

15      Q    -- the TTY was on the desk, and the computer

16  screen was in there somewhere as well?

17      A    That's correct.  We sat opposite each other.

18  So she was right there in front of me, across from the

19  desk.

20           And there was, you know, no printer there.

21  It was empty.

EXHIBIT 32

**Central Detention Facility**
1901 D Street, SE  Washington, DC 20003
 Fax:

**WILLIAM PIERCE**                                                    : 333851
Male  DOB:10/22/1968                    333851

Note: An exclamation mark (!) indicates a result that was not dispersed into
the flowsheet.
Document Creation Date: 03/22/2012 5:11 AM
─────────────────────────────────────────────────────────

(1) Order result status: Final
Collection or observation date-time: 03/22/2012 05:11:48
Requested date-time:
Receipt date-time:
Reported date-time:
Referring Physician:
Ordering Physician:
Specimen Source:
Source: JACCS
Filler Order Number:
Lab site:

**Filed automatically (without signature) on 03/22/2012 at 5:11 AM**
─────────────────────────────────────────────────────────

**03/22/2012 - Release: Out Of Jail**
**Provider: Electronic Signature**
**Location of Care: Central Detention Facility**

Patient: WILLIAM PIERCE
Note: All result statuses are Final unless otherwise noted.

Tests: (1) Out Of Jail (OOJ)
  Out Of Jail                    Out Of Jail (R)

Note: An exclamation mark (!) indicates a result that was not dispersed into
the flowsheet.
Document Creation Date: 03/22/2012 7:08 AM
─────────────────────────────────────────────────────────

(1) Order result status: Final
Collection or observation date-time: 03/22/2012 07:08:31
Requested date-time:
Receipt date-time:
Reported date-time:
Referring Physician:
Ordering Physician:
Specimen Source:
Source: JACCS
Filler Order Number:
Lab site:

**Filed automatically (without signature) on 03/22/2012 at 7:08 AM**
─────────────────────────────────────────────────────────

Confidential                                    WP0000247

EXHIBIT 33

CONFIDENTIAL

14-5A.p1

# INFORMAL RESOLUTION

| To be completed by inmate/resident: |
|---|

Date: 2-27-12

Name (Print): Pierce            William           A
               Last Name                      First Name            Middle Initial

Number: 333851     HOUSING ASSIGNMENT: M 82    Cell - 18 b

Description of issue, problem, and solution you suggest:

There was no solution about NO interpreter for Anger management: Substance Abuse Education. I already requested Ms Tutwiler to find an interpreter and she said, stop requesting and forwarded to Mr Fulton, I wrote about 8 Request forms. I'm frustration about Phone limit. Last Thursday they sent me to Protective Custody for my safety (HIV+)

Inmate signature required: Will Pierce (DEAF)

Attach additional pages, if necessary. Please bring an interpreter for our meeting, because the case is

My charge: The American Civil Liberties Union know about that situation, very serious."

| FOR STAFF USE ONLY: |
|---|

Date received from inmate/resident: 2/29/12

Name of staff member completing informal resolution process: Fulton

Date response due to inmate/resident: 3/14/12

Date and time initial meeting held with the inmate/resident: _____

**Additional information received from initial meeting:**

**Names of staff members involved with the inmate/resident's issue:**

M Redact FULTON Redacted

Distribution
Original: Facility
Copy: Inmate/Resident

01/09

DC-WAP 000148

14-5A p2

**Dates and times of contact with staff members concerning the inmate/resident's issue:**

**Additional information received from meetings with staff members:**

**STAFF RESPONSE:**

I am sensitive to your needs. Based on your request we are working on identifying someone who can sign for you in a group setting. Your assignment to Protective custody was based on your written request that you were in fear for your safety. Counselor Mondeal will continue to work with you individually in the interim, since in this status you can not participate in groups

Tentative completion date if remedy suggested: _____

**Completion of Informal Resolution Process:**

**By signing below, the inmate/resident verifies agreement with the remedy suggested above. If the inmate/resident is not satisfied with the remedy suggested above, the inmate/resident is not required to sign below and may choose to file a formal grievance with the Facility Grievance Officer. In either case, the inmate/resident will receive a copy of this form on the day the final resolution process is completed.**

Inmate Signature: _Refused to sign_    Date: 3/9/12

Designated Staff Signature: Ⓝ Redacted _edacte_    Date: 3/6/2017

*Witness Signature: _____    Date: 3/9/12

*In the event the inmate/resident refuses to sign this form, a witness signature must be obtained to verify that the inmate/resident was offered the opportunity for informal resolution.

**Informal Resolution Outcome:**       ☐ RESOLVED       ☑ UNRESOLVED

Distribution
Original: Facility
Copy: Inmate/Resident

01/09

DC-WAP 000149

EXHIBIT 34

**CCA/ CTF**

# Memo

TO:        Wଵdactɛ Fulton Jac
           *Deputy Warden Program*

THROUGH:   Aଵdactɛ Points
           *Unit Manager*

FROM:      Pଵdactɛ MCNEAL
           *CAC1 / Addictions Specialist*

DATE:      March 6, 2012

RE:        Inmate Pierce William Program Status

Unit Manager Points, A. this correspondence is being generated to notify you that on the above date and approx. time being 11:45am, this Writer met with Inmate Pierce, W. DCDC # 333 - 846 who is currently housed on our Special Management Unit (SMU – Cell # 10). This Counselor and Mr. Pierce W. conversation would subsequently cover the following topics:  1. His true commitment to completing CCA / CTF Drug Education Program, 2.Housing Hearing, and 3. His Protective Custody Status. Mr. Pierce William has expressed to this Writer that he is willing to sign off on a NONANIMOSITY/SEPERATION WAIVER and a PROTECTIVE CUSTODY WAIVER thus creating conditions for a possible placement back on Medical Unit # 82.  In addition to the above mentioned issues Mr. Pierce W. has also agreed to work with this Clinician and an Off Unit Detail (Inmate ▊▊▊ ▊▊▊who is also deaf and is willing to provided sign language / communication interpretation to Mr. Pierce W. during our group sessions. Finally, it has once again been communicated to Mr. Pierce that if he is to receive credit for the completion of this Program, he will need to apply himself in such a way pursuant to earlier agreements made on February 28, 2012 between this Counselor and Inmate Pierce.

1

EXHIBIT 35

= Author: FULTON, Jac W Redactec
= Date: 2/13/2013 12:55:53

= Author: TUTWILER, B edacte
= Date: 3/19/2012 18:05:07
= Inmate: PIERCE, WILLIAM
= Permanent Number: 1826337

Spoke with inmate about who his probation officer is and the address he has to report to upon release.

= Author: TUTWILER, B edacte
= Date: 3/17/2012 11:17:35
= Inmate: PIERCE, WILLIAM
= Permanent Number: 1826337

Rec'd phone call ▓▓▓▓▓▓▓

= Author: TUTWILER, B edacte
= Date: 3/13/2012 09:38:15
= Inmate: PIERCE, WILLIAM
= Permanent Number: 1826337

An interpreter is on medical 96 to translate for anger management and the drug education group today.

= Author: TUTWILER, B edacte
= Date: 3/12/2012 18:27:46
= Inmate: PIERCE, WILLIAM
= Permanent Number: 1826337

REC'D PHONE CALL TO ▓▓▓▓▓▓ AND ▓▓▓▓▓▓▓

= Author: TUTWILER, B edacte
= Date: 3/12/2012 18:19:23
= Inmate: PIERCE, WILLIAM
= Permanent Number: 1826337

An interpreter was on medical 96 to translate anger management and the drug educational group today.

= Author: KORNEGAY, K edacte
= Date: 3/7/2012 09:05:09
= Inmate: PIERCE, WILLIAM
= Permanent Number: 1826337

inmate refused his personal call

= Author: GRIFFIN, M edacte
= Date: 3/2/2012 16:20:28
= Inmate: PIERCE, WILLIAM
= Permanent Number: 1826337

THIS INMATE RECEIVED A CALL TO A MR DAVE ON ▓▓▓▓▓▓ HE USED THE TTY
PHONE PER UNIT MANAGER POINTS THE CALL IS COMPLETE HE STARTED AT 4:15PM
AND ENDED AT 4:29 PM ISSUE RESOLVED.

= Author: GRIFFIN, M edacte

CONFIDENTIAL

= Inmate: PIERCE, WILLIAM
= Permanent Number: 1826337

received a call to a mr dave on ▮▮▮▮▮▮ the call went well and according to the inmate wants to know how can he be moved to general population.

= Author: TUTWILER, B Redacte
= Date: 2/23/2012 13:46:55
= Inmate: PIERCE, WILLIAM
= Permanent Number: 1826337

REC'D LEGAL CALL ▮▮▮▮ AND ▮▮▮▮▮

= Author: TUTWILER, B edacte
= Date: 2/21/2012 09:29:45
= Inmate: PIERCE, WILLIAM
= Permanent Number: 1826337

REC'D A CALL TO DAVE HOLDER ▮▮▮▮▮

= Author: TUTWILER, B Redacte
= Date: 2/17/2012 09:19:30
= Inmate: PIERCE, WILLIAM
= Permanent Number: 1826337

INMATE CONTINUES TO WRITE REQUEST FOR AN INTERPRET FOR ANGER MANAGEMENT AND DRUG EDUCATION.  MR. MCNEIL HAS PROVIDED HIM WITH THE LITERATURE FOR THE TWO GROUPS AND COMMUNICATES WITH THE HIM BY WRITING.  ALL HIS REQUEST HAVE BEEN FORWARDED TO ASST. WARDEN FULTON AND HE IS TRYING TO OBTAIN SOMEON WHO WOULD LIKE TO VOLUNTEER TO DO SIGN LANGUAGE FOR OUR HEARING IMPAIRED POPULATION.

= Author: KENNEDY, T Redacted
= Date: 2/10/2012 13:40:22
= Inmate: PIERCE, WILLIAM
= Permanent Number: 1826337

INMATE PIERCE RECEIVED HIS ACCOUNT BALANCE. AND HE ALSO USED THE TTY PHONE.

= Author: TUTWILER, B edacte
= Date: 2/7/2012 18:37:41
= Inmate: PIERCE, WILLIAM
= Permanent Number: 1826337

REC'D A HS DIPLOMA AND HAS ABOUT THREE YRS OF COLLEGE
DENIES HISTORY OF MENTAL ILLNESS
HAS A HISTORY OF DRUG ABUSE (MARIJUANA)
INMATE IS HEARING IMPAIRED AND IS UNABLE TO MAKE A CALL AT THIS TIME BECAUSE HE DOES NOT HAVE ANY NUMBERS.  THE INMATE HAS REC'D ALL OF THE PROPER PAPERWORK FOR SEXUAL MISCONDUCT AND HOW TO SEND MONEY INTO THE FACILITY.

DC-WAP 000147

EXHIBIT 36

They violate my rights here — There was no interpreter for inmate programs, Hall meeting, and Orientation process. I feel I abandoned. ADA Law says There's a must for everyone to Access equal!

I am going to meet w/ you to let you know what was discussed @ the town Hall meeting also when we meet this after noon I will orientate you. As long as we are able to communicate through writing your rights have not been violated.

My writing is not good... I feel our communication is very limited. That's why I want an interpreter so it could prevent our misunderstand. I want to fully understand what all of you say. w/ every words! I still feel that It violate my basic rights. It's not fair .... everyone understands what's going on here, I don't understand at all since I got here. Hearing guys can make a call anytime, but I cant... only limit if you are in the office.

She will be back.

Are you sure you are familiar w/ ADA Law?

EXHIBIT
TUTMILER 4
9-9-13   mc
PENGAD 800-631-6989

WP0000160

I filled out the form for requesting an interpreter for Anger management & Substance abuse education. Unbelievably, I write about 7th to request, and you didn't respond back at all. Also, I didn't understand why you have refused to provide an interpreter. How can I get better al learn to prevent before it happens again??

First of all I do not conduct Anger Management or Substance abuse education! I don't sign so I can't interpete anything for you. You need to get some reading materials from Mr. McNeal and have him write the information down. Also you are not permitted in this area without permission from the officer!

WP0000161

EXHIBIT 37

CONFIDENTIAL

**CCA/ CTF**

# Memo

TO: Wedact Fulton dact
*Deputy Warden Program*

THROUGH: Aadact Points
*Unit Manager*

FROM: Pedact MCNEAL
*CAC1 / Addictions Specialist*

DATE: February 28, 2012

RE: Inmate Pierce William Program Status

Unit Manager Points, A. this correspondence is being generated to notify you that on the above date and approx. time being 1:00 pm, this Writer met with Inmate Pierce, W. DCDC # 333 - 846 on Med. Unit # 82. Please note that said Inmate voluntarily placed himself or thus requested Protective Custody of this administration as he "feared for his personal safety after an alleged altercation with another Inmate." However, Mr. Pierce continue to express interest in receiving help for his admitted drinking problem / anger management issues . Therefore; this administration has made every effort to provide the above name Client with special accommodations as it is not our common practice to provided theses services to any Inmate who has assigned themselves (volunteer to be placed on such status! Further said Client has agreed to participate in the CCA / CTF Drug Education Program, while completing all written assignments given him, and to provide this Counselor with an Autobiography of his life experiences as this is part of a prerequisite for completing the programs curriculum. Also Inmate Pierce has requested an AA/NA Book, and this Clinician plans to provide him with the "Big Book." Finally; both parties plans to met again on Friday the 2nd @ 1:00pm to view a Movie on anger.

FULTON
EXHIBIT NO.
10/1/13
C. CRUMP

EXHIBIT 38

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

----------------------------X

WILLIAM PIERCE,                    :

      Plaintiff,              :

     v.                          :

DISTRICT OF COLUMBIA,              :   No. 1:13-cv-00134 KBJ

      Defendant.              :

                             :

----------------------------X

Washington, D.C.

Monday, September 23, 2013

Deposition of A. POINTS, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by ANDREA P. HUSTON, Certified Real Time Reporter, a Notary Public in and for the District of Columbia, taken at the offices of Steptoe & Johnson LLP, 1330 Connecticut Avenue N.W., Washington, D.C., at 2:00 p.m., September 23, 2013, and the proceedings being taken down in Stenotype bu ANDREA P. HUSTON and transcribed under her direction.

1        A.      Uh-huh.

2        Q.      -- protective custody?

3        A.      Yes.

4        Q.      Okay.  And I don't ask trick questions,

5    but just for the record, what -- what words on this

6    document would indicate to someone what protective

7    custody means or would involve?

8        A.      I wrote out to inmate Pierce, do he fear

9    for his life and safety.  He said yes.  So I had him

10   to sign this.  He said he feared for his safety.

11   When a person fears for their safety it's our job to

12   take precaution measures and put them on protective

13   custody if they fear for their safety.  Because they

14   are placed in general population.

15       Q.      Uh-huh.  What I'm trying to understand is,

16   is how would Mr. Pierce or another inmate understand

17   what protective custody is, versus general

18   population?

19       A.      Well, if they out in general population

20   and they don't feel comfortable being in general

21   population, then they write out a request.  And then

22   he said someone attacked him.  And all the other

Page 24

1    inmates are saying it didn't happen.  And because I

2    am responsible for his safety, and he's saying that

3    he doesn't feel comfortable, he fears for his safety,

4    then they go on protective custody.

5         Q.    But protective custody is different than

6    general population?

7         A.    Yes.

8         Q.    How would Mr. Pierce have been able to be

9    aware of the difference between general population

10   and general custody?

11        A.    Because he allegedly stated someone

12   attacked him in the TV room and that he feared for

13   his safety.  So -- and we have other inmates saying

14   it didn't occur.  And I got written statements from

15   them.

16        Q.    What I'm trying to get to and I don't mean

17   to keep asking the question.

18        A.    Uh-huh.

19        Q.    I'm not asking why he was in protective

20   custody.  I'm trying to ask if it was explained to

21   him what protective custody means.  Like what would

22   the experience be, or what kind of room he would be

1   in, or where he would be?

2        A.    Right.  I had written all that down to

3   him, and explained to him that it's lockdown 23 hours

4   and you receive one hour rec.

5        Q.    And when did you write that down and

6   explain to him?

7        A.    During the same day, because you know, I

8   explained to him, I said you fear for your safety;

9   you will go in protective custody.

10             And I asked him if he can, you know, write

11   down why he want to go on protective custody, because

12   we just can't put people on protective custody unless

13   they ask for it or unless we can see that they been

14   hurt, like have any body marks on them, then we will

15   put them on there for they protection.

16             And because we didn't have evidence and no

17   witnesses, that's why I asked him to write this down,

18   write it out.  Because he didn't have to write this

19   out, but I asked him to write out why he wanted to go

20   on protective custody.

21        Q.    And under either "witness" or "case

22   manager", is either one your signature?

1          Q.     Do you recall being aware of whether Mr.

2     Pierce refused recreation?

3          A.     They -- they would just document on the

4     card.

5          Q.     Okay.  During the time that Mr. Pierce was

6     in Medical 82, are you aware that he didn't go out

7     for his one hour recreation?

8          A.     If he refuses it's documented on the

9     activity card.

10          Q.     And where are the activity cards generally

11     kept?

12          A.     In archives.  You know.

13          Q.     I'm going to ask you a few questions, and

14     I think they apply whether Mr. Pierce was on Medical

15     96 or Medical 82, as you were the supervisor for both

16     at the time.

17               Did you ever become aware of any special

18     accommodations that were needed because Mr. Pierce

19     was deaf?

20          A.     Yes, for the substance abuse.  He

21     requested for that.  You know, to still have the

22     substance abuse education part and the anger

1    management part when he was on Medical 82.  And

2    that's why Mr. McNeal wrote the request and it had to

3    be approved through Warden Fulton.

4         Q.    Are you aware of any other accommodations

5    that Mr. Pierce requested?

6         A.    That's it.  That's the only accommodation

7    was for the sign interpreter for the drug education.

8         Q.    And did you think that Mr. Pierce did need

9    an interpreter to participate?

10        A.    Well, it was a video footage with captions

11   and we provided like a paper and an ink pen.  So if

12   there is something he didn't understand he had asked

13   us to write it out, write it back out -- and we would

14   respond back, writing to each other.

15        Q.    Okay.  Let's talk about that for a minute.

16   Did you ever get a sense of Mr. Pierce's level of

17   writing?

18        A.    He -- I have saw when he write -- he had

19   wrote to me and I responded back.  And I looked at

20   the Paper Clips and he had a high school diploma so

21   he can read and write.

22        Q.    Did you ever ask him directly if he could

Page 49

1      Q.    I just want to ask you a bit regarding --

2   and again I think this is for Medical 82 and for

3   Medical 96 relating to the alarm system.  Do you

4   recall there being any discussion about getting Mr.

5   Pierce a vibrating alarm or a device to make

6   notifications easier?

7      A.    As far as notification in cases of

8   emergency?

9      Q.    Yeah, as an example.

10      A.    They would have to go around and get

11   everybody out of his cell.  It's just like a normal

12   housing unit.  You have to walk in and get everybody

13   to come and line up.

14      Q.    Okay.

15      A.    Then you also have a secondary alarm and

16   you have a response team that comes, and someone will

17   come behind to make sure everybody is out, clear.

18      Q.    Okay.  I don't believe I have any other

19   questions.  If you would just give me five minutes to

20   check with my team, and we can come back on the

21   record to finish up.

22            MS. ORCUTT:  Okay.

EXHIBIT 39

**CONFIDENTIAL**

**CCA**

1901 E Street SE
Washington DC 20003
202 547-7822 ext. 2215 or 2216

To:   A/W Fulton

Thru:   J. Allen-Mills
        Grievance Coordinator

From:   [    ]Johnston
        Warden

RE:   Attached Grievances (s)   7CTF 00008-G CC4

Date Issued: 3/12/12 Return Date: 3/25/12

Unit Managers, Shift Commanders, and Department Heads, are to
investigate the attached grievance(s). You are to meet with the
inmate (the writer of the grievance), the staff involved, and the
witnesses (staff/inmates referenced in the grievance) to obtain
incident statements and other supporting documentation. All
supervisors **must** provide a written assessment of their findings at
the conclusion of their investigation on the inmate grievance form,
in the Grievance Officer's Report section. Grievances are to be
submitted to the Office of the Grievance Coordinator by the above
Return Date.

**EXTENSIONS MUST BE PROCESSED WHEN YOU ARE
UNABLE TO RESOLVE THE GRIEVANCE WITHIN THE
FIFTEEN (15) DAY TIME PERIOD.**



EXHIBIT
Allen 8
9-10-13   mc

DC-WAP 000152

CONFIDENTIAL

Grievance No.: 7CTF-00008- CCA Closed          14-5B

## INMATE/RESIDENT GRIEVANCE

| FULL NAME: | William Pierce | |
|---|---|---|
| NUMBER: | 333851 | HOUSING ASSIGNMENT: M97 |

INFORMAL RESOLUTION ATTACHED (Not required for an emergency grievance)?  ☑ YES  ☐ NO

GRIEVANCE CATEGORY (CIRCLE ONE):

| 1. Facility Staff | 8. Dental Services | 15. Housing |
|---|---|---|
| 2. Access to Legal Materials | 9. Mental Health Services | 16. Laundry |
| 3. Denied Access to Informal Resolution/Grievance Process | 10. Trust Account | 17. Recreation |
| 4. Reprisal for Using Informal Resolution/Grievance Process | 11. Commissary | 18. Visitation |
| 5. Safety/Security | 12. Food Service | 19. Programs-education, work, religious, etc. |
| 6. Sanitation | 13. Mail | 20. Violations of federal or state regulations, laws, court decisions (i.e. ADA or Constitutional rights) |
| 7. Medical Services | 14. Intake | 21. Other |

STATE GRIEVANCE: (Include documentation, witnesses, date of incident, and any other information pertaining to the grievance subject. Attach additional pages if necessary).

I refused to sign, because I dont understand.
Do me a favor, bring an interpreter, so we can can
have a meeting al clority our problem situation.

Requested Action: (Attach additional pages if necessary)

Inmate/Resident's Signature: _____   Date Submitted: 3-13-12

Page 1 of 2                    03/07

DC-WAP 000153

**CONFIDENTIAL**

Grievance No.: _7CTF_                                                          14-5B-P2

**RESPONDING STAFF MEMBER'S REPORT:** (Attach additional pages if necessary. All pages must include the grievance number.)

An Interpreter was provided to you on Monday, 4/6/14 per day B&N Friedrich "Interpreter" Anger Management (SSS.) U.Ph Substance Abuse Counselor McNeil

**RESPONDING STAFF MEMBER'S DECISION:** (Attach additional pages if necessary. All pages must include the grievance number.)

U/M POINTS DISCUSSED THE RESPONSE WITH INMATE PIERCE AT WHICH TIME HE INDICATED THAT HE WAS IN AGREEMENT. WBF.

Responding Staff Member's Printed Name: __GRedacted Point__    Title: _Unit Manager_

Responding Staff Member's Signature: __GRedacted__    Date: _____

Inmate/Resident's Signature (upon receipt): _____    Date: _3-14-13_

Thank you so much!!!    3-14-14

**INMATE/RESIDENT APPEAL:** (Attach additional pages if necessary. All pages must include grievance number.)

**WARDEN/ADMINISTRATOR'S DECISION:** (Attach additional pages if necessary. All pages must include the grievance number.)

Warden/Administrator's Signature: _____    Date: _____

Inmate/Resident's Signature: (Upon receipt)_____    Date: _____

Page 2 of 2                                                                    01/09

DC-WAP 000154

EXHIBIT 40



Corrections Corporation of America
Correctional Treatment Facility

# CERTIFICATE OF COMPLETION

Be Known That

## WILLIAM PIERCE

Has successfully completed a Module on

# GETTING MOTIVATED TO CHANGE

TCU Brief Interventions

Awarded March 21, 2012 at CCA/CTF
Date

Facilitator

Unit Manager

CONFIDENTIAL

DC-WAP 000054