## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILLIAM PIERCE, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | )   Civ. No. 13-cv-0134 (KBJ) |
| | ) |
| DISTRICT OF COLUMBIA, | ) |
| | ) |
| DEFENDANT. | ) |
| | ) |

## MEMORANDUM OPINION
### (Public Version of ECF No. 82)

Incarceration inherently involves the relinquishment of many privileges; however, prisoners still retain certain civil rights, including protections against disability discrimination. *See United States v. Georgia*, 546 U.S. 151 (2006); *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998). Plaintiff William Pierce—who is profoundly deaf and communicates with American Sign Language—claims that prison officials in the District of Columbia violated his right to be free from unlawful disability discrimination in 2012, when Pierce was incarcerated in the District's Correctional Treatment Facility following his guilty plea to a simple assault that arose out of a domestic dispute with his then-partner. The District's prison staff was indisputably aware that Pierce was deaf; however, during the entire 51-day period in which Pierce was held in custody, no staff person ever assessed Pierce's need for accommodation or otherwise undertook to determine the type of assistance that he would need to communicate effectively with others during his incarceration. Instead, according to Pierce, the District's employees and contractors merely assumed that lip-reading and

exchanging written notes would suffice, and they largely ignored his repeated requests for an interpreter to assist him in interacting with other people.  As a result, Pierce asserts that he was forced to serve his prison time in abject isolation, generally unaware of what was going on around him and unable to communicate effectively with prison officials, prison doctors, his counselor, his teacher, or his fellow inmates.  Pierce has filed the instant lawsuit against the District under the Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327 (1990), codified as amended at 42 U.S.C. §§ 12101–12213, and the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355 (1973), codified as amended at 29 U.S.C. §§ 701–796, seeking damages for allegedly having been denied an effective means of receiving or imparting information at various critical points during his period of incarceration, including medical appointments, rehabilitative classes, and meetings with prison officials.  (*See* Compl., ECF No. 1, ¶¶ 22, 49–50.)  Pierce also maintains that he was held in solitary confinement as punishment for his repeated requests for an interpreter, and thus, that the District's employees and contractors retaliated against him in violation of federal law.  (*See id.* ¶¶ 30, 45, 51.)

Before this Court at present are the parties' cross motions for summary judgment.  (*See* Pl.'s Mot. for Partial Summ. J. as to Claims I and II of the Compl., ECF No. 47; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 49.)  The parties vehemently disagree about many of the facts related to this case—most notably, whether Pierce actually had the ability to communicate effectively through lip-reading and written notes, and also whether Pierce actually requested an interpreter as an accommodation for his hearing disability.  But in this Court's view, only one fact is

truly material to the question of whether or not Pierce was discriminated against on the basis of his disability and is thus entitled to summary judgment on his discrimination claims (Claims I and II of the complaint), and that fact is entirely undisputed: when Pierce first arrived at the prison facility, the District's employees and contractors did *nothing* to evaluate Pierce's need for accommodation, despite their knowledge that he was disabled.  They did not ask Pierce what type of auxiliary aids he needed.  They did not hire an expert to assess Pierce's ability to communicate through written notes or lip-reading as opposed to sign language.  They did not even consult the Department of Corrections' own policies to figure out what types of accommodations are ordinarily provided to inmates with hearing disabilities.  Instead, they figuratively shrugged and effectively sat on their hands with respect to this plainly hearing-disabled person in their custody, presumably content to rely on their own uninformed beliefs about how best to handle him and certainly failing to engage in any meaningful assessment of his needs.  This Court finds that, in so doing, the District denied Pierce meaningful access to prison services and intentionally discriminated against him on the basis of his disability in violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.  Thus, Pierce is entitled to summary judgment and compensatory damages on Claims I and II of his complaint.

With respect to the District's motion for summary judgment on Pierce's retaliation claim (Claim III), this Court finds that there is a genuine issue of material fact regarding whether or not Pierce's placement in solitary confinement was an act of unlawful retaliation—Pierce contends that prison employees were responding to his repeated requests for an interpreter and the complaints he had made about the prison's

failure to provide accommodations, while the District claims that Pierce was segregated from the general prison population in order to protect him from the violent threats of other inmates.  Pierce's retaliation claim thus involves a genuine dispute of fact that is not appropriately resolved on summary judgment.

Accordingly, Pierce's motion for summary judgment with respect to Claims I and II of the complaint will be **GRANTED**, and the District's motion for summary judgment as to Claims I, II, and III will be **DENIED**.  A separate order consistent with this memorandum opinion will follow.

## I.   BACKGROUND

### A.   Basic Facts[†]

William Pierce is a resident of the District of Columbia who is profoundly deaf and has other serious medical conditions.  (*See* Pl.'s Stmt. of Undisputed Material Facts ("Pl.'s Stmt. of Facts"), ECF No. 48-1, ¶ 1; Compl. ¶ 4.)  Pierce can make sounds that are audible, but he cannot speak words, and American Sign Language ("ASL") is his native language.  (*See* Pl.'s Stmt. of Facts ¶¶ 2, 3.)[1]  Pierce relies on ASL to communicate with others—either by interacting directly with other persons who are using ASL themselves, or through the use of a video conferencing device that involves a remote interpreter.  (*See id*. ¶¶ 8–9.)  Pierce cannot, and does not, use a traditional telephone; instead, he ordinarily uses ASL via videophone to communicate with hearing individuals.  (*See id*.)  Moreover, because Pierce's proficiency in reading and writing

---

[†] Certain facts have been redacted from this Memorandum Opinion by agreement of the parties.  These redactions are represented herein by the characters "[******]."

[1] ASL is a language comprised of hand motions, facial expressions, eye gazes, and body postures.  (*See* Pl.'s Stmt. of Facts ¶ 4.)  Although many deaf people in the United States use ASL to communicate, ASL's syntax and grammar are not derived from English.  (*See id*.)

English is far below that of a hearing person, he rarely writes notes and only uses cellphone texting to convey simple, short messages.  (*See id.* ¶¶ 7, 9.)  Also, as with many deaf individuals, Pierce has limited lip-reading ability.  (*See id.* ¶¶ 10–11.)

At some point prior to February of 2012, Pierce was involved in a domestic dispute with his then-partner, David Holder, after which Pierce was arrested and charged with simple assault.  (*See id.* ¶ 46.)  On February 1, 2012, a D.C. Superior Court Judge sentenced Pierce to 60 days in jail, and committed him to the custody of the District of Columbia Department of Corrections ("DOC") to serve out his sentence in the District's Correctional Treatment Facility ("CTF").  (*See id.*; *see also* Def.'s Stmt. of Facts, ECF No. 50, ¶ 2.)[2]  Pierce was then incarcerated at CTF from February 2, 2012, until March 22, 2012.  (*See* Pl.'s Stmt. of Facts ¶ 51; Def.'s Stmt. of Facts ¶ 6.) He resided in three different units during his incarceration:  Medical 96 while he was in general population, and then Medical 82 and the Special Management Unit when he was placed into protective custody.  (*See* Pl.'s Stmt. of Facts ¶ 50; Def.'s Stmt. of Facts ¶¶ 159–165.)  Pierce was in protective custody from February 23, 2012, to March 7, 2012.  (*See* Pl.'s Stmt. of Facts ¶¶ 102, 112; Def.'s Stmt. of Facts ¶¶ 164, 172.)

It is undisputed that the District's employees and contractors were all fully aware that Pierce is deaf.  (*See* Pl.'s Stmt. of Facts ¶ 69; Def.'s Controverting Stmt. of Facts ("Def.'s Cont. Facts"), ECF No. 61, ¶ 69.)  However, no prison staff member assessed whether, or to what extent, Pierce would need accommodations to ensure that he could communicate effectively with others during his incarceration.  (*See* Hr'g Tr., ECF No.

---

[2] The DOC is an agency of the District of Columbia that, among other things, oversees operation of the CTF, which is a minimum and medium security correctional facility.  (*See* Pl.'s Stmt. of Facts ¶¶ 13, 17.)  The DOC has contracted a private prison company (the Corrections Corporation of America) to run CTF.  (*See id.* ¶ 14.)

80, at 52:3–4, 53:1–12.)  Furthermore, Pierce was not provided with a qualified ASL interpreter at any point during the entire 51-day period he spent in custody, including the 14-day period that Pierce served in solitary confinement-like conditions.

### B.    Disputed Issues

The parties vigorously disagree about how—and, more specifically, whether—Pierce was actually able to communicate effectively with prison officials, health care providers, teachers, and counselors during his incarceration.  Pierce claims that he is not skilled at reading lips when people are speaking English, nor can he skillfully interpret notes that people have written to him in English.  (*See* Pl.'s Stmt. of Facts ¶¶ 3, 5, 7, 9, 11.)  Accordingly, Pierce asserts that he needs ASL interpretation in order to communicate effectively with people who do not know ASL.  (*See id*. ¶ 12.)  The District disagrees, asserting that Pierce can communicate effectively in written English and through lip reading, primarily because Pierce appeared to understand what prison officials said and wrote to him during his incarceration.  (*See* Def.'s Cont. Facts ¶¶ 5, 7, 8, 9; Def.'s Stmt. of Facts ¶¶ 12–17, 28.)  In the District's view, then, exchanging written notes and lip reading were adequate means of effective communication for Pierce while he was in custody.  (*See* Def.'s Cont. Facts ¶¶ 8, 11, 82, 90.)

The parties also disagree about when—and whether—Pierce actually asked prison officials, health care providers, and class instructors to accommodate his hearing disability by providing an interpreter to translate for him.  Pierce claims that he requested an interpreter at his initial medical intake interview, at inmate orientation, in his rehabilitation classes, and at all medical appointments.  (*See* Pl.'s Stmt. of Facts ¶¶ 60, 88, 98.)  By contrast, the District insists that Pierce *only* requested a sign language interpreter for certain sessions of his anger management/substance abuse

6

class.  (*See* Def.'s Stmt. of Facts ¶¶ 19–21, 54, 57.)  From the District's perspective, having not requested an interpreter for most of the interactions that he had with prison officials and others, Pierce is not entitled to contend that the District violated the law by failing to provide him with an interpreter for those interactions.  (*See* Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J. ("Def.'s Opp'n"), ECF No. 60, at 1–3.)[3]

These two issues—Pierce's ability to communicate effectively in English and the extent to which he requested an ASL interpreter—lie at the heart of the parties' cross-motions for summary judgment.  As explained fully in the analysis section below, this Court ultimately finds that these disputed issues are immaterial to the Court's conclusion that Pierce was subjected to disability discrimination while he was in DOC custody.  (*See* Part III.A.1, *infra*.)  However, for present purposes, the parties' opposing views regarding Pierce's linguistic abilities and requests for accommodation provide important context for understanding the parties' allegations regarding Pierce's prison experience.  The specific disputes of fact center on whether Pierce had communication difficulties with respect to (1) the prison facility's medical intake and health services, (2) his inmate rehabilitation classes, (3) the protective custody procedures that were employed in his case, and (4) the prison's provision of telecommunications, official notifications, and visitation.  What follows is a brief summary of the parties' conflicting descriptions of Pierce's custodial experience in regard to these matters.

---

[3] All citations to pages in documents that the parties have filed refer to the page numbers that the Court's electronic filing system assigns.

1.     Pierce's Ability To Communicate Effectively During Medical
Intake And Health Processes

Immediately after Pierce was sentenced and taken into DOC custody, he was sent

to the District's Central Detention Facility for a medical screening and examination, in

accordance with ordinary inmate intake procedures.  (*See* Pl.'s Stmt. of Facts ¶¶ 47, 88;

Def.'s Stmt. of Facts ¶¶ 8, 9.)  This physical was conducted by medical professionals

from Unity Healthcare—a private, non-profit entity that contracts with the District of

Columbia to provide comprehensive health care services to inmates.  (*See* Pl.'s Stmt. of

Facts ¶ 88; Def.'s Stmt. of Facts ¶ 8, 9.)  The parties disagree about whether Pierce

requested, or even needed, an ASL interpreter at this initial intake evaluation and also

at the many subsequent interactions that Pierce had with prison medical professionals in

order to manage his significant and chronic medical conditions.  (*See* Pl.'s Stmt. of

Facts ¶¶ 87–90; Def.'s Stmt. of Facts ¶¶ 27–31.)[4]

According to Pierce, during the initial intake process and at his subsequent

medical appointments and interventions, prison medical personnel simply assumed they

were effectively communicating with him through the exchange of written notes and

gestures, despite his request for an ASL interpreter.  (*See* Pl.'s Stmt. of Facts ¶¶ 88–89,

97–98, 101; *see also* Pl.'s Resp. to Def.'s Stmt. of Facts ("Pl.'s Cont. Facts"), ECF No.

59-2, ¶¶ 28–29.)  For example, Pierce claims that, at the initial intake meeting, Pierce

wrote to Dr. Fidelis Doh (the doctor who conducted his intake interview) that he needed

an ASL interpreter because he had complicated health issues to explain, such as HIV,

---

[4] Pierce has both HIV and [******].  (*See* Pl.'s Stmt. of Facts ¶ 87; Def.'s Stmt. of Facts ¶ 40.)  There
is no dispute that, as a result of these conditions, Pierce had several medical interviews, appointments,
and interventions while he was in custody at CTF.  (*See* Pl.'s Stmt. of Facts ¶¶ 87, 97, Def.'s Stmt. of
Facts ¶ 40.)

[******], and new medications.  (*See* Pl.'s Stmt. of Facts ¶ 88.)  Dr. Doh wrote back

that they could use written communication.  (*See id*.)  Pierce continued to write that he

needed an interpreter, but the doctor did not arrange for one to be provided.  (*See id*.)

Instead, Dr. Doh simply turned his computer screen toward Pierce to show him the

questions that were written there.  (*See id*. ¶ 89.)  Pierce wrote to Dr. Doh that he could

not understand the complicated vocabulary and medical jargon on the screen, but the

doctor wrote back that Pierce should not worry about it.  (*See id*.)  Dr. Doh continued to

point at words on the screen; to ask questions orally under the assumption that Pierce

could read lips; and to write notes to Pierce throughout the initial intake process.  (*See

id*. ¶ 90.)

Pierce asserts that, as a result of Unity's failure to provide him with an ASL

interpreter at the initial intake, he was not able to communicate the fact that, prior to his

incarceration, he had been taking five prescription medications and had a history of

[******].  (*See id*.  ¶¶ 91–93.)  Without this information, Unity allegedly failed to give

him any [******] medication (*see id*. ¶ 94), and without that medication, Pierce

allegedly experienced [******] in prison (*see id*. ¶ 96).  Pierce concedes that he

ultimately received treatment for this problem; however, he claims that there was no

ASL interpreter to help him communicate with the doctors about his symptoms or

chronic condition (*see id*. ¶ 97), nor was he provided with an interpreter to facilitate his

conversation with the doctor who treated him for a different medical crisis he

subsequently experienced (*see id*. ¶¶ 100–01 (claiming that Pierce suffered from

[******] while he was in protective custody and that no interpreter was provided)).

For its part, the District maintains that Pierce never requested an ASL interpreter for his medical intake interview or any of his medical appointments, and this was likely so because, in the District's view, no interpreter was necessary.  (*See* Def.'s Stmt. of Facts ¶¶ 20, 27, 31, 35, 39.)  According to the District, Dr. Doh was able to communicate effectively with Pierce in writing and specifically reported that Pierce could read lips.  (*See id*. ¶¶ 27–28.)  The District admits that Dr. Doh showed Pierce the medical intake questions on the computer screen rather than getting an interpreter to translate Dr. Doh's spoken questions, but the District argues that the fact that Pierce answered the questions through gestures and writing shows that Pierce must have understood the questions that he read off the screen.  (*See id*. ¶ 30.)

The District also contends that, even if Pierce did have trouble communicating with Dr. Doh, Pierce did not suffer any adverse consequences as a result of those alleged miscommunications.  For example, the District points out that the medical professionals at Unity were aware of Pierce's pre-existing conditions because Pierce signed a written release allowing Unity to obtain Pierce's medical history from former health care providers.  (*See id*. ¶¶ 32–33.)  Moreover, although Pierce was not prescribed preventative medication for [******], Pierce did receive prescription [******] medication after he [******].  (*See id*. ¶ 42.)  Similarly, the District notes that although Pierce claims he was not able to communicate with his doctors about the [******], the doctor was able to develop a diagnosis ([******]) and prescribed the appropriate treatment ([******]).  (*See id*. ¶ 44.)

### 2.   Pierce's Access To Rehabilitative Classes

Pierce was enrolled in two inmate programs while at CTF: a class intended to help him with anger management and substance abuse issues, and a class about graphic

design.  (*See* Pl.'s Stmt. of Facts ¶ 49; Def.'s Stmt. of Facts ¶¶ 55, 74.)  The anger management/substance abuse course consisted of lectures, videos, and group discussion during six or seven class sessions.  (*See* Pl.'s Stmt. of Facts ¶ 65; Def.'s Stmt. of Facts ¶ 56.)  The graphic arts class involved each inmates' completion of computer-based modules containing written instructions, written tests, and hands-on projects—assignments that were undertaken by the inmates individually and at their own pace, while a CTF employee monitored their progress and made himself or herself available to answer questions and to provide assistance.  (*See* Pl.'s Stmt. of Facts ¶ 66; Def.'s Stmt. of Facts ¶¶ 77–78.)

The parties disagree about the extent to which Pierce was able to understand, and benefit from, these classes.  According to Pierce, in the absence of an interpreter, he had great difficulty following the courses; so much so that, during the first anger management/substance abuse group session that Pierce attended, he allegedly became increasingly agitated and, at one point, even walked out of the session.  (Pl.'s Stmt. of Facts ¶ 64.)  Pierce claims that, after this first session, he wrote to the instructor that he was frustrated because he could not understand the lecture without an interpreter.  (*See id.*)  And, according to Pierce, this was one of many requests for an interpreter that he made related to his classes; Pierce says that his partner also asked prison officials about securing an interpreter for Pierce for this purpose.  (*See id.* ¶¶ 63, 68.) Pierce also makes allegations regarding prison officials' responses to these requests—for example, he claims that, in response to the entreaties his partner made on his behalf, Assistant Warden Fulton eventually contacted Gallaudet University—a university for the deaf located in Washington, D.C.—to see if Gallaudet could provide an ASL interpreter for

Pierce.  (*See id.* ¶ 71.)[5]  According to Pierce, when Fulton learned that Gallaudet

interpreters would need to be *paid* for their services, prison officials demurred, and

started looking for other potential ways of accommodating Pierce.  (*See id.* ¶¶ 71–72.)

Pierce asserts that, ultimately, the District neither sought, nor found, any outside

ASL interpreter for Pierce's classes. (*See id.* ¶ 73.)  Instead, near the end of his term of

incarceration and after some of the sessions had been completed, a chaplain at CTF

volunteered to provide interpretive services for Pierce's last few anger

management/substance abuse classes.  (*See id.* ¶ 75.)  With respect to the graphics arts

course, another inmate (Justin Clary) allegedly was asked to volunteer to sign for Pierce

in approximately two or three classes (*see id.* ¶ 79); however, according to Pierce, Clary

was not a qualified interpreter—he just happened to be severely hard of hearing and

also happened to be enrolled in the class (*see id.* ¶¶ 79, 81)—and thus, Clary was not

able to interpret effectively and accurately the written or oral statements that were

being made in the class (*see id.* ¶ 80).[6]

The District contests these representations, and maintains that Pierce

successfully participated in both the anger management/substance abuse program and

the graphic arts course.  (*See* Def.'s Stmt. of Facts ¶¶ 68, 80.)  With respect to the anger

management/substance abuse program, the District maintains that Pierce was provided

with an interpreter for all of the program sessions that took place after he requested

one.  (*See id.* ¶ 57.)  First, the District says, Assistant Warden Fulton employed Clary to

---

[5] The first names of CCA employees have been omitted from this Memorandum Opinion for security and confidentiality purposes.  (*See* Pl.'s Stmt. of Facts at 6 n.1.)

[6] Pierce describes the alleged problem with Clary's skills as an interpreter in this way: "I had to keep asking for clarification because I couldn't understand what he was saying.  It was not a complete sentence.  It was just words here and there scattered about.  It wasn't anything complete.  It wasn't a complete thought.  I could not understand him clearly."  (*See* Pl.'s Stmt. of Facts ¶ 80.)

attend program sessions with Pierce and to interpret for him.  (*See id.* ¶¶ 59–60.)  Then, after Pierce informed his counselor that Clary was not an adequate interpreter (*see id.* ¶ 61), the District says that Assistant Warden Fulton contacted Gallaudet University and the ADA Coordinator for DOC in an effort to find an interpreter for Pierce, but ultimately did not have to hire an interpreter because the chaplain volunteered, and interpreted for Pierce in four classes.  (*See id.* ¶¶ 63–65.)  The District also asserts that Pierce received three days of good time credit for his participation in the anger management/substance abuse program, and that he ultimately experienced positive behavioral changes, including less drinking and an increased ability to control his anger.  (*See id.* ¶¶ 68–70.)

With respect to the graphic arts vocational programming, the District insists that Pierce did not request an interpreter for the program, and that an interpreter was not necessary for him to participate in that particular program.  (*See id.* ¶¶ 83–84.)  In fact, according to the District, Pierce's instructor reported that he was a quick learner and had performed better than some of the non-hearing impaired students enrolled in the course.  (*See id.* ¶ 82.)  The District also emphasizes that Pierce completed six modules of the graphic arts course and received six days of good time credit for his efforts.  (*See id.* ¶¶ 80–81.)

3.    The Circumstances Surrounding Pierce's Time In Protective Custody

Pierce spent approximately 25% of the total time he was in the custody of the DOC in solitary confinement conditions based on his alleged request for "protective custody" after he was assaulted by another inmate.  The parties have a stark

disagreement about the circumstances surrounding Pierce's entrance into protective custody, and also how he was eventually released from that status.

Pierce maintains that, on February 23, 2012, he was shoved to the floor by another inmate and that he reached out to Tutwiler, his assigned case manager, to complain about the incident.  Tutwiler allegedly wrote a note to Pierce, asking him if he would like to be placed in protective custody.  (*See* Pl.'s Stmt. of Facts ¶ 102.)  Pierce contends that he did not understand what protective custody meant or entailed; he wrote back "If necessary."  (*See id*. ¶¶ 102, 104.)  Pierce was then taken to Medical 82, where a unit manager named Points came to Pierce's new cell and allegedly wrote to Pierce that Pierce needed to handwrite out "I fear for my safety" on a form Points was providing.  (*See id*. ¶ 105.)  Pierce was confused by the request and initially refused, but allegedly at Points's insistence, Pierce copied that statement onto the form.  (*See id*.)

Pierce was then placed in protective custody for fourteen days.  (*See id*. ¶¶ 105, 112.)  Pierce claims that, because there was no ASL interpreter to facilitate his conversations with Tutwiler and Points, Pierce did not understand that protective custody meant 23 hours per day of solitary confinement; that it would last for at least seven days; that it was voluntary; or that there were procedures by which he could promptly end protective custody status.  (*See id*. ¶¶ 103–04.)  According to Pierce, four days after he was placed into protective custody, Pierce allegedly notified Allen, the Facilities Grievance Coordinator, that he had not understood what protective custody meant.  (*See id*. ¶ 107.)  Pierce also allegedly stated his belief that his case manager should have discussed the meaning of protective custody with him.  (*See id*.)  Allen

allegedly responded in writing: "You should have read it before you signed it."  (*See id*.)  Pierce allegedly replied in writing, "I had no choice because they told me to sign." (*See id*.)

At some point, Pierce told Griffin, another case manager, that he wanted to leave protective custody and return to the general population.  (*See id*. ¶ 108.)  Griffin passed Pierce's request on to other staff, and on March 1, 2012, Assistant Warden Fulton learned that Pierce wanted to leave protective custody.  (*See id*. ¶¶ 108, 109.)  Fulton was also allegedly told that Pierce had asked to have a lawyer present before signing the waiver form that was necessary for release back into the general population, and although Fulton apparently thought this was unusual, he purportedly did not ask why Pierce would not sign the form despite wanting to leave protective custody.  (*See id*. ¶ 109.)  Instead, Pierce alleges that Fulton advised the staff to keep Pierce in protective custody and to review his status in one week.  (*See id*.)  Thereafter, according to Pierce, CTF employees moved Pierce to a different segregation cell, this time in the Special Management Unit ("SMU").  (*See id*. ¶¶ 110–111.)  Pierce felt that SMU was much worse than Medical 82; in SMU, Pierce was still on 23-hour lockdown, but he did not have a roommate and could only see out of his cell through a small window in the metal door.  (*See id*. ¶ 111.)  Pierce was not released from SMU until March 7, 2012.  (*See id*. ¶ 112.)

The District has an entirely different view of the circumstances preceding Pierce's confinement in protective custody.  First of all, according to the District, Points fully explained to Pierce in writing what "protective custody" meant.  (*See Def.'s Cont. Facts* ¶ 104.)  The District claims that Points also told Pierce that, if Pierce

15

wanted to be placed in protective custody, Pierce would need to write on the protective custody request form why Pierce wanted to be placed in protective custody. (*See id.* ¶ 105.)  Pierce then allegedly voluntarily wrote out on the form, "I fear for my safety. HIV +" and signed it.  (*See id.*)  Thus, the District maintains that Points did not require Pierce to write on the form at all, much less to make any specific statement.  (*See id.*)

The District also claims that, once Pierce filled out the protective custody request form, Assistant Warden Fulton was prohibited from removing Pierce from protective custody status until Pierce signed a protective custody waiver indicating that Pierce no longer feared for his safety.  (*See id.* ¶ 109.)  According to the District, Pierce knew that he needed to sign the waiver if he wanted to be removed from protective custody, but Pierce refused to sign the waiver form anyway.  (*See id.*)  Moreover, the District claims that, per CTF policy, inmates in protective custody are subject to review every seven days and thus Fulton's direction to the staff to review Pierce's status in seven days was in accordance with facility policy.  (*See id.*)  The District also contends that Pierce was confined under the same conditions in both Medical 82 and the Special Management Unit.  (*See id.* ¶ 111.)

             4.      <u>Deaf Inmates' Rights To Telecommunications, Official Notifications, And Visitation</u>

Finally, and not surprisingly, the parties tell completely different stories regarding certain privileges that inmates ordinarily receive at CTF and the extent to which deaf inmates such as Pierce are afforded equal access to them.

For example, according to Pierce, hearing inmates in the general population in the prison's medical unit have access to telephones seven days a week, are permitted to use the telephone for 10 minutes at a time, and do not need to request permission in

16

advance to use the telephones.  (*See* Pl.'s Stmt. of Facts ¶ 114.)  Pierce, on the other

hand, allegedly had much more limited access to telecommunications, even apart from

the fact that CTF provides deaf inmates with an outmoded TTY device instead of a

modern videophone.[7]  Pierce claims that his access to the TTY device varied depending

on where he was housed because, in order for him to place a call, DOC officials

required him to make an appointment in advance to use the TTY, which was available

only in his case manager's office.  (*See id.* ¶¶ 115, 124.)  Moreover, according to

Pierce, prison officials demanded the presence of his case manager or another CTF

employee while he was using the TTY device.  (*See id.* ¶ 124.)  Pierce alleges that his

case manager's hours were typically only Monday through Friday from 8:00 a.m. to

5:00 p.m., which substantially restricted his TTY usage window, and even when his

case manager was on duty, she allegedly would only grant Pierce's requests to use the

TTY machine at her convenience. (*See id.* ¶¶ 124–25.)  Pierce also alleges that his calls

were strictly limited to 10 minutes, even though communicating using a TTY device

takes substantially more time than communicating using a telephone.  (*See id.* ¶ 126.)[8]

---

[7] A TTY consists of a keyboard, display screen, and telephone. (*See* Pl.'s Stmt. of Facts ¶ 116.)  Typed messages from each party are sent over the telephone lines and appear on the screen of the other (*see id.* ¶ 116), and thus both parties must have a TTY to have a direct conversation (*see id.* ¶ 118).  Indirect conversations are also possible, if the telephone company provides relay services, which involve communicating through the assistance of a third-party telephone operator, who reads aloud words typed by the deaf party and types out the spoken responses of the hearing person.  (*See id.* ¶ 117)  Two deaf individuals cannot communicate via TTY unless both parties have a TTY device and can type in English effectively.  (*See id.* ¶ 118).

Pierce avers that, like many other deaf individuals, he uses a videophone in the outside world. (*See id.* ¶ 8.)  A videophone uses high-speed internet to enable real-time video communication so that deaf individuals can communicate with one another in ASL.  (*See id.* ¶ 57).  Videophones also enable communication between deaf and hearing individuals through the use of a video relay service ("VRS").  VRS is a system by which a deaf individual signs via video monitor to a remote sign language interpreter, and the interpreter communicates the deaf person's message to the hearing individual in spoken English and vice versa.  (*See id.* ¶ 58.)  VRS is free to all users and has been widely available since at least the mid-2000s.  (*See id.* ¶ 59.)

[8] In this same vein, Pierce contends that hearing inmates who were in protective custody in the Medical 82 unit and the SMU could ask to have a telephone brought to their cell during the day by asking the

17

In response to Pierce's accusations regarding his unequal access to telecommunications, the District maintains that Pierce was provided access to the TTY device when he requested it (*see* Def.'s Stmt. of Facts ¶ 110), and that he did not request use of a videophone while at CTF (*id.* ¶ 22).  Furthermore, the District contends that the TTY device must be kept in the case manager's office "for security reasons" (*id.* ¶ 112), and that the practical differences between using a TTY device and using a telephone justify the different access policies that apply to hearing and hearing-disabled inmates.  (*See, e.g.*, *id.* ¶ 115 ("The TTY device cannot be left unsecured in the housing unit, where it could pose a security risk or become contraband."); *id.* ¶ 116 ("CTF staff must be present during TTY calls, which are not subject to security monitoring and recording like the regular inmate telephones.").)

Pierce alleges that inequities also exist with respect to both the visitation processes that are afforded to deaf inmates at CTF and the official notification announcements that CTF staff make.  Regarding visitation, Pierce claims that he was handcuffed during at least one visit from his partner and his mother (*see* Pl.'s Stmt. of Facts ¶ 137), which is problematic because Pierce communicates with his mother using ASL and needs to have his hands free in order to speak.  The District responds that Pierce did not request any accommodations with respect to visitation while he was at CTF (*see* Def.'s Stmt. of Facts ¶ 150), and that it is standard CTF policy that all inmates in protective custody be restrained when they are outside their cells.  (*See id.*

---

officer on the unit.  (*See id.* ¶ 127.)  By contrast, deaf and hard of hearing inmates had to request to use a TTY in the case manager's office, which allegedly involved writing a request to use a TTY in the office and giving it to an officer during that officer's daily walkthrough.  (*See id.* ¶¶ 128, 131.)  If the request was granted, the inmate would be brought to the office in handcuffs and would be permitted to use the TTY device, still in handcuffs.  (*See id.*)

¶ 139.)[9]  Thus, the District claims that it was merely following policy when Pierce was restrained during a visit with his mother and Holder.  (*See id.* ¶ 148.)  The District also points out (and Pierce concedes) that an exception was made in Pierce's case, and that his handcuffs were removed once Pierce's mother explained the problem to CTF authorities.

Pierce's alleged concern about official notifications remained unresolved, however.  Pierce asserts that, because there was no visual alarm to alert him to announcements or to notify him of an emergency lockdown, fire, or other emergency when his cell door was closed, he was constantly anxious and worried about missing important information.  (*See* Pl.'s Stmt. of Facts ¶¶ 134–135.)  The District contends that Pierce's anxiety was unfounded, because each housing unit at CTF has alarms in the hallways consisting of a very loud alarm and strobe lights that are visible from inside each of the cells, including the cells that Pierce occupied during his incarceration at CTF.  (Def.'s Stmt. of Facts ¶¶ 123–24.)  Furthermore, with respect to Pierce's claim that he was not provided access to a visual alarm for other notifications, the District claims that CTF does not use a loud speaker or other type of auditory system for making notifications or announcements to inmates (*see id.* ¶ 129), and that, instead, written notifications and announcements are posted on the bulletin boards in the housing units, which are accessible to all inmates when they are out of their cells.  (*See id.* ¶ 127.)

---

[9] According to Defendants, this policy applies to all "status inmates," a category that includes inmates in protective custody, administrative segregation, and disciplinary segregation.  (*See* Def.'s Stmt. of Facts ¶ 140.)

### C.    Procedural History

On February 1, 2013—exactly one year after Pierce was first committed to the custody of the DOC—Pierce filed the instant three-count complaint against the District. (*See* Compl., ECF No. 1.)  Claims I and II of Pierce's complaint allege that the District "intentionally" discriminated against Pierce in violation of Title II of the ADA and Section 504 of the Rehabilitation Act "by failing to provide Mr. Pierce adequate access to a qualified ASL interpreter, telecommunications devices, visual alarms[,] and visitation."  (*Id*. ¶ 49 (Claim I, Title II of the ADA); *id*. ¶ 50 (Claim II, Section 504 of the Rehabilitation Act).)  In Claim III, Pierce alleges that the District also violated the ADA and the Rehabilitation Act by "retaliat[ing] against [him] for asserting his rights" under those statutes.  (*See id*. ¶ 51.)  After the parties engaged in discovery and attempted to resolve the case through mediation (*see* Order Referring Case for Mediation, ECF No. 40), Pierce filed a motion for summary judgment as to Claims I and II of his complaint (*see* Pl.'s Mot. for Partial Summ. J. as to Claims I and II of the Compl., ECF No. 47).

Pierce argues that he is entitled to summary judgment on Claims I and II because the District violated Title II and Section 504 by (1) failing to provide Pierce with a qualified ASL interpreter for his rehabilitation classes, medical treatment, and the grievance process (*see* Pl.'s Mem. in Supp. of Pl.'s Mot ("Pl.'s Mot."), ECF No. 48-2 at 18–32); (2) providing a TTY machine to Pierce to make phone calls rather than a videophone and limiting the times at which and duration for which Pierce could make phone calls (*see id*. at 32–35); (3) not providing a visual or tactile alarm to Pierce for both routine and emergency notifications (*see id*. at 35–36); and (4) handcuffing Pierce during a visit with his mother and partner (*see id*. at 36).  Pierce asserts that he did not

move for summary judgment with respect to Claim III of his complaint because there is a material factual dispute regarding whether he was placed in protective custody because he requested accommodations for his disability.  (*See* Pl.'s Mem. in Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), ECF No. 59-1, at 45–48.)

The District has not only opposed Pierce's motion for summary judgment (*see* Def.'s Opp'n to Pl.'s Mot. ("Def.'s Opp'n"), ECF No. 60), it has also filed one of its own (*see* Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 49).  The District contends that it is entitled to summary judgment on Claims I and II because, in the District's view, the only accommodations that Pierce requested during his time at CTF were an interpreter for his anger management/substance abuse class, the use of a TTY device, and to be un-cuffed during his visit with his mother and partner—accommodations that the District says it readily provided.  (*See* Def.'s Mot. at 7–16.)  To the extent that Pierce argues that the District should have accommodated him by providing an ASL interpreter at other times, the District contends that it cannot be held liable for its failure to provide accommodations that were not requested.  (*See id*. at 5, 6, 16, 21.) The District also argues that it is entitled to summary judgment on Pierce's retaliation claim (Claim III) because, in the District's view, the prison staff did not take any adverse action against Pierce as a result of his requests for accommodation.  (*See id*. at 17–18.)

This Court held a hearing on the parties' cross-motions for summary judgment on April 23, 2015.  (*See* Minute Entry for Proceedings dated Apr. 23, 2015.)

## II.    LEGAL STANDARDS

### A.    Motions for Summary Judgment Under Rule 56

The parties' cross motions for summary judgment compel this Court to undertake "the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Moreover, such "evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party."  *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). This is because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Liberty Lobby, Inc.*, 477 U.S. at 255; *see also Celotex Corp.*, 477 U.S. at 330 n.2 ("If . . . there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment[.]" (internal quotation marks and citation omitted)).

That being said, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Liberty Lobby, Inc.*, 477 U.S. at 255.  The

contested fact must be material and the dispute must be genuine.  A fact is only material if it could establish an element of a claim or defense and, therefore, "might affect the outcome of the suit under the governing law[.]"  *See id*. at 248; *see also Celotex*, 477 U.S. at 322–23 (noting that where a nonmoving party "fails to make a showing sufficient to establish an element essential to that party's case . . . there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" (internal quotation marks and citations omitted)).  Likewise, a dispute is only genuine if "the evidence presents a sufficient disagreement to require submission to a jury." *Liberty Lobby*, 477 U.S. at 251–52; *see also id*. at 249 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted).)

Where—as here—the parties file cross-motions for summary judgment, "each must carry its own burden under the applicable legal standard."  *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006).  Accordingly, "[c]ross-motions for summary judgment are treated separately[,]" *Act Now to Stop War & End Racism Coal. v. District of Columbia*, 905 F. Supp. 2d 317, 327 (D.D.C. 2012), such that "[a] cross-motion for summary judgment does not concede the factual assertions of the opposing motion[,]" *CEI Washington Bureau, Inc. v. Dep't of Justice*, 469 F.3d 126, 129 (D.C. Cir. 2006).  Indeed, "'neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion.'"  *See Sherwood v. Washington Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982)

*abrogated on other grounds by Berger v. Iron Workers Reinforced Rodmen*, 170 F.3d 1111 (D.C. Cir. 1999)).

### B.      Section 504 of the Rehabilitation Act & Title II of the ADA

Pierce has filed the instant lawsuit under Section 504 of the Rehabilitation Act and Title II of the ADA.  Congress enacted Section 504 of the Rehabilitation Act ("Section 504") and its companion legislation Title II of the ADA ("Title II") in 1973 and 1990, respectively, in order to address the "lengthy and tragic history of segregation and discrimination" that people with disabilities have faced in the United States. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 461 (1985) (Marshall, J. concurring in part and dissenting in part); *see also* Statement of Representative Vanik, 117 Cong. Rec. 45974 (1971) (denouncing the disregard for the rights of handicapped citizens in our country as a "shameful oversight[]" and noting that handicapped people are "often shunted aside, hidden and ignored"); Statement of Senator Humphrey, 118 Cong. Rec. 525 (1972) (stating that "[t]he time has come when we can no longer tolerate the invisibility of the handicapped in America").  Section 504 and Title II resulted from years of public protests, marches, acts of civil disobedience, and court filings in the 1960s and 1970s—activities that were part of a movement aimed at securing for disabled people the same rights and privileges afforded to able-bodied people.  *See* Robert L. Burgdorf Jr., *The Americans with Disabilities Act: Analysis and Implications of A Second-Generation Civil Rights Statute*, 26 Harv. C.R.-C.L. L. Rev. 413, 426 (1991).  Participants in this civil rights movement insisted that society recognize disabled people not as "unfortunate, afflicted creatures" but as "equal citizens, individually varying across the spectrum of human abilities, whose over-riding

24

needs are freedom from discrimination and a fair chance to participate fully in society." *Id*. at 426–27.

With respect to the programs, services, and activities that are provided by, or funded through, government entities, Congress responded by enacting legislation "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" as well as "strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)–(2) (2012); *see also* 29 U.S.C. § 701(a)(5) (2012) (acknowledging that "individuals with disabilities continually encounter various forms of discrimination in . . . critical areas" of life).  To this end, Section 504 of the Rehabilitation Act specifically states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).  Similarly, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[10]

---

[10] Notably, the D.C. Circuit has long held that the "[c]laims and defenses under [Section 504 and Title II] are virtually identical," *Harrison v. Rubin*, 174 F.3d 249, 253, (D.C. Cir. 1999), and that "cases interpreting either [statute] are applicable and interchangeable[,]" *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1260 n.2 (D.C. Cir. 2008).  There are only two material differences between the two provisions.  First, the Rehabilitation Act only applies to federal agencies and departments, federal programs, and recipients of federal funding, whereas the ADA applies to all entities that provide services to the public.  *See* Paul V. Sullivan, Note, *The Americans with Disabilities Act of 1990: An Analysis of Title III and Applicable Case Law*, 29 Suffolk U. L. Rev. 1117, 1120 (1995).  Second, the statutes have different causation requirements. Section 504 of the Rehabilitation Act provides that "[n]o

Significantly for present purposes, because Congress was concerned that "[d]iscrimination against the handicapped was . . . most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect[,]" *Alexander v. Choate*, 469 U.S. 287, 295 (1985), the express prohibitions against disability-based discrimination in Section 504 and Title II include *an affirmative obligation* to make benefits, services, and programs accessible to disabled people.  That is, an entity that provides services to the public cannot stand idly by while people with disabilities attempt to utilize programs and services designed for the able-bodied; instead, to satisfy Section 504 and Title II, such entities may very well need to act affirmatively to modify, supplement, or tailor their programs and services to make them accessible to persons with disabilities.  *See* 42 U.S.C. § 12131(2) (requiring entities that provide services to the public to (1) make "reasonable modifications to rules, policies, or practices"; (2) "remov[e] . . . architectural, communication, or transportation barriers"; and (3) "provi[de] auxiliary aids and services" so as to enable disabled persons to participate in programs or activities).  Moreover, these modifications—called "accommodations" in Section 504 and Title II parlance—must be sufficient to provide a disabled person with an "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement" as a person who is not disabled.  *Alexander,* 469 U.S. at 305 (quoting regulations implementing Section 504 (internal

---

otherwise qualified individual with a disability in the United States . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a) (emphasis added).  By contrast, under Title II of the ADA, "discrimination need not be the sole reason" for the exclusion of or denial of benefits to the plaintiff.  *Soledad v. U.S. Dep't of Treasury,* 304 F.3d 500, 503–04 (5th Cir. 2002); *see also Alston v. District of Columbia,* 770 F. Supp. 2d 289, 298 (D.D.C. 2011).  Neither of these differences are relevant to the claims in this case.

quotation marks omitted)); *see also* 28 C.F.R. § 35.130(b)(1)(ii) (2014) (stating that a public entity discriminates in violation of Title II if qualified individuals with disabilities are given an "opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others").

## III.   ANALYSIS

As explained fully below, this Court will grant Pierce's motion for summary judgment with respect to his Section 504 and Title II discrimination claims (Claims I and II of his complaint) and will deny the District's motion for summary judgment in its entirety.  The Court reaches this conclusion because it finds that the District violated Section 504 and Title II as a matter of law when it failed to evaluate Pierce's need for accommodation at the time he was taken into custody.  (This legal conclusion is entirely independent of the hotly disputed issues regarding whether or not Pierce was, in fact, able to communicate effectively with prison officials, and whether or not Pierce did, in fact, request an ASL interpreter for his interactions while in custody; however, as discussed below, the Court finds that no reasonable jury could agree with the District on these issues, and thus, the District violated Section 504 and Title II on this basis as well.)  The Court also finds that, because the District's failure to evaluate Pierce's needs amounted to deliberate indifference to Pierce's rights and the District's obligations under Section 504 and Title II, the District's conduct constituted intentional discrimination, and thus, Pierce is entitled to compensatory damages for the mental, emotional, and physical injuries he sustained.  However, with respect to Pierce's retaliation claim, the Court concludes that there are genuine issues of material fact that

still need to be resolved; consequently, the District's motion for summary judgment on the retaliation claim must be denied.

### A. The District Intentionally And Unlawfully Discriminated Against Pierce When It Eschewed Its Duty To Assess His Need For Accommodation And Denied Him Meaningful Access To Prison Programs And Services

To establish disability-based discrimination under Section 504 and Title II, a plaintiff must prove (1) that he is a qualified individual with a disability; (2) that he is being excluded from participation in, or is being denied benefits, services, programs, or other activities for which a public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *Alston v. District of Columbia*, 561 F. Supp. 2d 29, 37 (D.D.C. 2008). Only the second element is at issue here, because the District does not deny that Pierce is a qualified individual with a disability, or that the DOC is a public entity. (*See* Def.'s Opp'n at 5); *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (holding that a disabled inmate can state a claim under Title II if, by reason of his disability, he is denied participation in an activity provided in state prison).[11]

---

[11] Under Title II of the ADA and Section 504 of the Rehabilitation Act, an individual has a disability if he or she "[has] a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A) (2012); *see also* 29 U.S.C. § 705(20) (2012). Hearing is a "major life activity," and deafness is clearly established as a disability. 42 U.S.C. § 12102(2)(A) (hearing is a "major life activity" pursuant to the ADA); 29 U.S.C. § 705(20)(B) (definition of "individual with a disability" pursuant to the Rehabilitation Act includes those who have a disability pursuant to 42 U.S.C. § 12102); *see also Ball v. AMC Entm't, Inc.*, 246 F. Supp. 2d 17, 20 (D.D.C. 2003) (deafness is a disability recognized by the ADA). Furthermore, the ADA defines a public entity as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of the State or States or local government[,]" 42 U.S.C. § 12131(1), and prisoners "have the same interest in access to the programs, services, and activities available to the other inmates of their prison as disabled people on the outside have to the counterpart programs, services, and activities available to free people[,]" *Crawford v. Indiana Dep't of Corr.*, 115 F.3d 481,

With respect to the question of whether or not Pierce was excluded from
participation in, or denied the benefits of, prison services by reason of his disability in
violation of Section 504 and Title II, both parties maintain that they are entitled to
summary judgment on the record here, and as discussed above, they have highlighted as
"material" certain facts that are primarily related to Pierce's alleged need for an ASL
interpreter and other accommodations, and the circumstances under which Pierce may
or may not have requested those accommodations. (*See, e.g.*, Pl.'s Mot. at 26 ("Without
a qualified interpreter in any of his graphics arts classes, and without an interpreter in
all but his last three or four anger management/substance abuse classes, Mr. Pierce was
clearly denied meaningful access to these programs and was unable to derive any of the
benefits from them."); Def.'s Opp'n at 11 ("Pierce did not request an interpreter for his
medical intake and appointments, [and] his providers were able to communicate with
him in writing.").)  However, there is an undisputed threshold fact that, in this Court's
view, so clearly establishes intentional discrimination in violation of Section 504 and
Title II that summary judgment must be issued in Pierce's favor notwithstanding the
factual disputes over Pierce's actual requests and needs:  the District took Pierce—an
obviously disabled inmate—into custody without undertaking any ex ante evaluation of
his accommodation requirements, and when he later requested aid, either rebuffed his
inquiries entirely or provided him with whatever auxiliary tools it had on hand.  As
explained below, this Court holds that the failure of prison staff to conduct an informed
assessment of the abilities and accommodation needs of a new inmate who is obviously

---

486 (7th Cir. 1997) *abrogated on other grounds by Erickson v. Bd. of Governors of State Colleges &*
*Universities for Ne. Illinois Univ.*, 207 F.3d 945 (7th Cir. 2000).

disabled is intentional discrimination in the form of deliberate indifference and violates Section 504 and Title II as a matter of law.  Moreover, the Court concludes that even if the District is correct to contend that the Section 504 and Title II duty to provide accommodations for disabled inmates is triggered only if the inmate requests and ultimately needs accommodation, no reasonable jury could find that Pierce failed to request an ASL interpreter, or that he could communicate effectively without one, on the record presented here.

1.    The District Had An Affirmative Duty To Evaluate Pierce's Accommodation Requirements, And Its Failure To Do So Constituted Disability Discrimination As A Matter Of Law

It is clear beyond cavil that the core principle that underlies the protections of Section 504 and Title II is equal access.  As explained above, Congress has required entities to provide reasonable accommodations that would permit disabled individuals to access programs and services in addition to prohibiting discriminatory animus, *see Alexander v. Choate*, 469 U.S. 287, 295 (1985), and the regulatory scheme that undergirds the anti-discrimination statutes reinforces this reasonable accommodations mandate.  Thus, without regard to whether persons with disabilities who seek the benefit of public services have *requested* accommodation, a public entity that is covered by Title II must "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by, people with disabilities[,]" 28 C.F.R. § 35.150 (2014), and to satisfy Section 504, recipients of federal funding "shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program or activities receiving Federal financial assistance[,]" 28 C.F.R. § 42.503(f).

30

Given Congress's unmistakable intent to create "clear, strong, consistent, [and] enforceable standards addressing discrimination against individuals with disabilities" in various aspects of life, 42 U.S.C. § 12101(b)(2), and also its recognition that "benign neglect" is a particularly pernicious form of disability discrimination, *Alexander*, 469 U.S. at 295, the District's insistence here that prison officials have no legal obligation to provide accommodations for disabled inmates unless the inmate specifically requests such aid—and even then, only if it actually turns out that the inmate really needs the requested accommodation—is untenable and cannot be countenanced.  First of all, nothing in the disability discrimination statutes even remotely suggests that covered entities have the option of being passive in their approach to disabled individuals as far as the provision of accommodations is concerned.  Quite to the contrary, as explained above, Section 504 and Title II mandate that entities act *affirmatively* to evaluate the programs and services they offer and to ensure that people with disabilities will have meaningful access to those services.  *See, e.g.*, 42 U.S.C. § 12131(2); 28 C.F.R. § 35.150(a); 28 C.F.R. § 35.150.  This affirmative duty is seemingly at its *apex* in the context of a prison facility, in light of the uneven power dynamic between prison officials and inmates that inherently and appropriately exists, and also the fact that departments of corrections have complete control over whether prison inmates (disabled or not) receive any programs or services at all.  *Cf. Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011) (explaining that, "to incarcerate, society takes from prisoners the means to provide for their own needs" and thus prisons must provide for prisoners); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (referring to "the common-law view that 'it is but just that the public be required to care for the prisoner, who cannot by reason of the

deprivation of his liberty, care for himself'") (quoting *Spicer v. Williamson*, 132 S.E. 291, 293 (N.C. 1926)).  Put another way, given that Section 504 and Title II require *all* entities that provide public services to act affirmatively to ensure that disabled individuals have meaningful access, prisons seemingly have even *more* responsibility in this regard, because inmates necessarily rely totally upon corrections departments for all of their needs while in custody and do not have the freedom to obtain such services (or the accommodations that permit them to access those services) elsewhere.

What is more, the District's suggestion that a prison facility need not act to accommodate an obviously disabled inmate if the inmate does not ask for accommodations (*see* Def.'s Mot. at 5) is truly baffling as a matter of law and logic. The District does not explain how inmates with known communications-related difficulties (such as Pierce) are supposed to communicate a need for accommodations, or, for that matter, why the protections of Section 504 and Title II should be construed to be unavailable to such disabled persons unless they somehow manage to overcome their communications-related disability sufficiently enough to convey their need for accommodations effectively.  The implications of the District's analysis are troubling, and they sweep broadly—by the District's reasoning, it would appear that only a specific request for a wheelchair would trigger any duty to accommodate an inmate who cannot walk, and a blind inmate would need to make a specific request for a cane or a guide if he desired to move about the prison grounds; meanwhile, prison officials could sit idly by, taking no affirmative steps to accommodate such disabled prisoners and expecting to be able to wield the inmate's failure to request accommodation like some sort of talisman that wards off Section 504 and Title II liability in any future legal

action.  This imagined state of affairs is unquestionably inconsistent with the text and

purpose of the Rehabilitation Act and the ADA, which means that the District must now

face a stark reality: no matter how fervently it holds the belief that a public entity's

duty to provide accommodations arises only by request, there is neither legal nor logical

support for that proposition.

    To be sure, there are times in which courts have held that a disabled person must

request accommodation.  *See, e.g.*, *Flemmings v. Howard Univ.*, 198 F.3d 857, 858,

861–62 (D.C. Cir. 1999) (holding that an employer did not violate an employee's rights

under Title I of the ADA by failing to accommodate employee's vertigo-related

disabilities because employee failed to request an accommodation).  But it is equally

clear that the legal significance of the request requirement is merely to put the entity on

notice that the person is disabled; it does not serve as a means of shifting the burden of

initiating the accommodations process to the disabled individual.  *See Paulone v. City

of Frederick*, 787 F. Supp. 2d 360, 403–04 (D. Md. 2011) (explaining that the "'request

requirement' . . . is a function of the fact that 'a person's disability and concomitant

need for accommodation are not always known . . . until the [person] requests an

accommodation'") (quoting *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir.

2006) (internal quotation marks omitted)).  In other words, the request performs a

signaling function—*i.e.*, it alerts the public entity to the disabled person's need for an

accommodation—and where, as here, the inmate's disability is obvious and indisputably

known to the provider of services, no request is necessary.  *See Robertson v. Las

Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197–98 (10th Cir. 2007) ("[A] public

entity is on notice that an individual needs an accommodation when it knows that an

individual requires one, either because that need is obvious or because the individual requests an accommodation."); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) ("When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required. . . .").

The second overarching reason that the District's legal position is untenable is that, by reading the antidiscrimination statutes as mandating that public entities provide needed accommodations but *not* as requiring those entities to take any affirmative steps to *ascertain* what accommodations might be needed, the District suggests that Section 504 and Title II permit reliance on guesswork and happenstance with respect to the provision of accommodations, when the law clearly requires otherwise.  It is well-established (albeit in the employment context) that it violates the ADA if an employer with a duty to provide reasonable accommodations responds to the known disabled condition of an employee by giving that employee whatever aids the employer alone thinks might do the trick, without any actual assessment of the employee's individual condition or needs in consultation with the employee.  *See, e.g.*, *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d Cir. 1999) (reversing grant of summary judgment to employer because notwithstanding fact that employee's son "requested accommodations [for plaintiff], informed [the employer] about [employee's] condition, and provided [the employer] with the means to obtain more information if needed[,]" employer "offered no accommodations or assistance in finding them, made [employee's] job more difficult, and simply sat back and continued to document her failures").  To the contrary, "[o]nce an employer is aware of its responsibility to provide a reasonable

accommodation . . . it must 'identify the precise limitations resulting from the disability and potential reasonable accommodations,' which is best done through an 'informal, interactive process' that involves both the employer and the employee with a disability." *McNair v. District of Columbia*, 11 F. Supp. 3d 10, 16 (D.D.C. 2014) (quoting 29 C.F.R. § 1630.2(o)(3)).

This apparently comes as no news to the District—the DOC's own regulations mandate something of an interactive process with respect to accommodations insofar as they specifically direct prison officials to give preference to the requests of disabled inmates regarding the auxiliary aids to be provided.  (*See* D.C. Dep't of Corr., *Program Statement 3800.3*, Ex. 9 to Rocap Decl., ECF No. 48-5, at 92, § 12(a)(2); *see also id.* § 12(b)(2) (stating that the "DOC shall honor the [inmate's] expressed choice" regarding accommodations unless, *inter alia*, "it can show that another equally effective means of communication is available").)  Nevertheless, the District here resists the conclusion that the law required CTF's employees and contractors to take affirmative steps up front to evaluate Pierce's needs in order to identify which accommodations would be appropriate for him.  Instead, by insisting that the accommodations process that was employed in the instant case is consistent with Section 504 and Title II, the District suggests that the law permits corrections staff to treat the reasonable accommodations mandate much like a game of chance--i.e., on the one hand, prison staff can play it safe by undertaking an ex ante assessment of the actual needs of a disabled inmate in their custody, or on the other, they can opt to forgo that expense, and if accommodations are requested, provide a hodgepodge of whatever aids are in the prison's possession, thereby betting either that the inmate will remain silent or that he

ultimately will be found to have needed no more than the auxiliary aids that the corrections facility randomly provided.  There will, of course, be times when corrections staff will take that bet and get it right.  *Cf.* Charles Clay Doyle et al., *Dictionary of Modern Proverbs* 287 (2012) (noting that even a broken clock gets the time right twice a day).  But to the extent that the District contends that Section 504 and Title II permit public entities to engage in this sort of gamble with respect to the accommodation needs of disabled individuals whom they are required to serve, it is sorely mistaken.  *See* 42 U.S.C. § 12131(2); *see also* 28 C.F.R. § 35.160(b)(2) (indicating that a public entity has a duty to "determin[e] what types of auxiliary aids and services are necessary" for the disabled individuals it serves).

The bottom line is this:  this Court squarely rejects the legal position that the District seeks to advance in this action, which is, in essence, that the DOC acts consistently with Section 504 and Title II when it takes custody of an obviously disabled prisoner without undertaking any evaluation of that inmate's needs and the accommodations that will be necessary to ensure that he or she has meaningful access to prison services, and instead, provides a random assortment of auxiliary aids upon request and at various times based primarily on considerations of its own convenience.[12] Quite to the contrary, based on its reading of federal law, this Court holds that prison officials have an affirmative duty to assess the potential accommodation needs of inmates with known disabilities who are taken into custody and to provide the

---

[12] With respect to hearing-disabled inmates in particular, it appears that the District of Columbia's DOC is not the only prison system that engages in this sort of practice.  *See, e.g.*, Matt Zapotosky, *Justice Dept. Looking into Treatment of Deaf Inmates in Arlington Jail*, Washington Post, July 29, 2015, available at: http://www.washingtonpost.com/local/crime/justice-dept-looking-into-treatment-of-deaf-inmates-in-arlington-jail/2015/07/29/ae910412-360a-11e5-b673-1df005a0fb28_story.html.

accommodations that are necessary for those inmates to access the prison's programs and services, without regard to whether or not the disabled individual has made a specific request for accommodation and without relying solely on the assumptions of prison officials regarding that individual's needs.  And because it is undisputed that the District's employees and contractors did no such thing when Pierce arrived at CTF, this Court finds that the District violated Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act as a matter of law.

> 2. <u>Even If The District Is Only Legally Required To Provide Inmates With Accommodations That Are Both Requested And Ultimately Needed, There Is No Genuine Dispute That Pierce Requested The Assistance Of An ASL Interpreter Or That He Needed One</u>

Having already determined that the District committed a violation of Section 504 and Title II as a matter of law when it failed to evaluate Pierce's accommodation needs at the time he was taken into custody, the Court pauses here (prior to turning to the matter of damages) to address the myriad factual disputes that arise under the District's view of its legal obligations.  The District maintains that its legal obligation to accommodate Pierce depended on three things: (1) whether Pierce requested an accommodation, (2) whether the requested accommodation was necessary, and (3) whether the requested accommodation could be provided.  (*See* Hr'g Tr. at 52:18, 53:7–12; *see also, e.g.*, Def.'s Mot. at 5 ("An entity cannot be held liable for failure to provide accommodations that were not requested."); Def.'s Opp'n at 1–2 ("Pierce's Motion focuses largely on what accommodations may be *possible* for a hearing impaired inmate in a correctional setting, rather than on what accommodations were *actually* requested and necessary for Pierce to participate in the available programs and activities while he was incarcerated at [CTF].") (emphasis in original).)  As mentioned,

the Court's legal analysis renders the parties' various arguments regarding whether and to what extent Pierce *actually* requested an interpreter and *actually* could communicate in English immaterial to the Court's conclusion that Pierce is entitled to summary judgment on Claims I and II.  (*See supra* Part III.A.1.)  However, as explained below, this Court finds that no reasonable jury could conclude on the record presented here that Pierce failed to request an ASL interpreter to assist him while he was detained at CTF, or that Pierce could communicate effectively without an interpreter, and thus Pierce would be entitled to summary judgment on his discrimination claims even if the law is as the District says it is.

> a.    *The Record Establishes That Pierce Requested An Interpreter*

The instant record is replete with specific references to Pierce's multiple requests for an ASL interpreter in various contexts during his time at CTF.  (*See, e.g.*, Pierce Dep. 427:12–20, Feb. 25, 2014, Ex. 2 to Pl.'s Mot., ECF No. 48-4, at 34.)  Deposition testimony from the District's own employees confirms that Pierce repeatedly asked for an interpreter.  (*See, e.g.*, Tutwiler Dep. 63:4–19, Sept. 9, 2013, Ex. 16 to Pl.'s Mot., ECF No. 48-6, at 10 (Case Manager Tutwiler admitting that Pierce requested an ASL interpreter); Allen Dep. 48:16–22, Sept. 10, 2013, Ex. 17 to Pl.'s Mot., ECF No. 48-6, at 26 (Facilities Grievance Coordinator Allen stating that Pierce requested an ASL interpreter); McNeal Dep. 31:14–32:3, Sept. 11, 2013, Ex. 19 To Pl.'s Mot, ECF No. 48-6, at 47–48 (Counselor McNeal remarking that Pierce requested an ASL interpreter).)  And the accounts of various eyewitness are not the only proof: contemporaneous log book entries, handwritten notes, and memoranda all document Pierce's persistent efforts to seek and obtain an ASL interpreter from the authorities at

CTF.  (*See, e.g.*, Feb 27, 2012 Informal Resolution Form, Ex. 33 to Pl.'s Mot., ECF No. 48-6, at 216; Mar. 6, 2012 Memorandum from P. McNeal to W. Fulton, Ex. 34 to Pl.'s Mot., ECF No. 48-6, at 219; CCA logbook entries, Ex. 35 to Pl.'s Mot., ECF No. 48-6, at 221.)

Most notably in this regard, the record contains a revealing set of handwritten notes between Pierce and his case manager (Tutwiler) in which Pierce writes: "They violate my rights here – Thire [sic] was no interpreter for inmate program, Hall meeting, or orientation process.  I feel I [sic] abandoned.  ADA law says there's a must [sic] for everyone to access <u>equal</u>!"  (*See* Ex. 36 to Pl.'s Mot., ECF No. 47-6, at 224 (emphasis in original).)  To which Tutwiler replies, "[a]s long as we are able to communicate through writing, your rights have not been violated."  (*See id.*)  And Pierce responds, "My writing is not good[;] I feel our communication is vey[sic] limited.  That's why I want an interpreter so it could [sic] prevent our misunderstand [sic].  I want to fully understand what all of you say."  Pierce continues, "It's not fair[;] everyone understands whats'[sic] going on here, I dont'[sic] understand at all [sic] since I got here."  (*See id.*)

Given this telling paper trail and the confirmatory statements of witnesses, this Court finds that the District's suggestion here that Pierce did not, in fact, request an ASL interpreter to assist him while he was incarcerated (*see* Def.'s Opp'n at 1–2) is preposterous.  Perhaps to avoid losing all credibility with respect to this issue, the District has also offered a more limited representation:  that Pierce's repeated requests for an ASL interpreter were limited to his anger management/substance abuse class, and that he did not specifically request an interpreter with respect to any other service or

program at CTF.  (*See* Def.'s Reply at 5 ("Pierce *only* requested an interpreter for one

setting—his anger management and substance abuse programming—and failed to put

the District (or its contractors) on notice that he believed he needed an interpreter for

any other type of program or activity.") (emphasis in original); *see also, e.g.*, Def.'s

Stmt. of Facts ¶ 24 ("Pierce submitted informal resolutions and grievances requesting

an interpreter for anger management and substance abuse programming."); Def.'s Cont.

Facts ¶ 60 ("The District does not dispute that Pierce made multiple requests for an

interpreter for the anger management and substance abuse program while he was at

CTF."); Def.'s Reply at 5 ("Corrections staff reasonably believed on the basis of his

requests that Pierce felt an interpreter was necessary for him to participate in the anger

management and substance abuse program, but not for other programming, activities, or

events for which he did not request an interpreter.").)  Contrary to the District's

interpretation of the facts, the record clearly establishes that Pierce made so many

requests for an ASL interpreter at so many different times that his case manager

actually told him to stop.  (*See* Feb 27, 2012 Informal Resolution Form, Ex. 33 to Pl.'s

Mot., ECF No. 48-6, at 216 (Pierce stating "I already requested Ms Tutwlier to find an

interpreter and she said, stop requesting and forwarded to Mr Fulton.").)  And it is also

clear from the record evidence that Pierce's requests were not limited to the anger

management/substance abuse class at all, and in fact, Pierce wanted an interpreter to

help him understand most (if not all) of the various conversations that he had with the

District's employees and contractors.  For example, on an informal resolution form

dated February 27, 2012, Pierce writes about how CTF had not yet provided him with

an interpreter for his anger management/substance abuse class, and he closes by stating,

"[p]lease bring an interpreter for our meeting, because the case is very serious." (*See* Feb 27, 2012 Informal Resolution Form, Ex. 33 to Pl.'s Mot., ECF No. 48-6, at 216.)

But even if the District was factually correct to assert that Pierce's request for an interpreter extended only to his anger management/substance abuse class, there is no legal basis for the District's related suggestion that Pierce needed to request an interpreter *with respect to each and every aspect of his prison experience* in order to give rise to any duty on the part of prison employees to provide that accommodation for Pierce in regard to other significant aspects of his imprisonment.  The Eighth Circuit case of *Randolph v. Rodgers*, 170 F.3d 850 (8th Cir. 1999), supports this conclusion. There, an inmate who was deaf alleged that the Missouri Department of Corrections ("MDOC") had violated Title II of the ADA, Section 504 of the Rehabilitation Act, and Missouri state law when it failed to provide him with a sign language interpreter during disciplinary proceedings.  *Randolph*, 170 F.3d at 853–54.  The *Randolph* court found that, while the inmate had not requested an interpreter for his initial disciplinary proceeding, his subsequent request was sufficient to put the MDOC "on notice" of his claim that he could not fully participate in future proceedings without an interpreter, and thus the MDOC could not be heard to contend that the request for an interpreter was limited in scope.  *Id.* at 858.  This was especially so because the MDOC had told the inmate that his request for an interpreter "is a separate subject [that] will not be discussed[,]'" and thus, it was entirely unsurprising that the prisoner did not request an interpreter for subsequent disciplinary proceedings.  *Id.*  The *Randolph* court concluded that: "While it is true that public entities are not required to guess at what accommodations they should provide, the [request] requirement does not narrow the

ADA or [Rehabilitation Act] so much that the [MDOC] may claim that [the inmate] failed to request an accommodation when it declined to discuss the issue with him." *Id.* at 858–59.

So it is here.  The record shows that Pierce made repeated requests for an ASL interpreter with respect to various aspects of his incarceration experience, and that District's employees and contractors generally declined to discuss the matter further, preferring to rely on lip reading and handwritten notes.  Moreover, as the District concedes, Pierce *did* request an interpreter for the purpose of his anger management/substance abuse class (*see* Pl.'s Stmt. of Facts ¶ 61; *see also id.* ¶ 62 (Pierce represented on one informal resolution form that he "wrote about 8 request forms" for an interpreter); therefore, even assuming that a specific request for accommodation was legally required in order for prison officials to have any obligation to accommodate Pierce, the undisputed facts establish that Pierce did make such a request, and under *Randolph*, his request was sufficient to put DOC "on notice" that he might need a similar accommodation to communicate effectively in other contexts as well.  Thus, this Court finds that no reasonable jury could conclude on this record that Pierce had failed to mount the request hurdle (assuming there is one), and as a result, no genuine dispute of material fact remains with respect to whether or not Pierce made an adequate request for an interpreter, even under the District's view of the applicable discrimination standard.

> b.    *The Record Shows That Pierce Needed An Interpreter*

The record here also clearly establishes that Pierce cannot communicate effectively in English, and thus no reasonable jury could find otherwise.  It is undisputed that Pierce is profoundly deaf and that he ordinarily communicates through

ASL.  (*See* Pl.'s Stmt. of Facts ¶¶ 1, 3; Def.'s Stmt. of Facts ¶ 1.)  ASL is not derived

from English; ASL has its own syntax and grammar and utilizes signs made by hand

motions, facial expressions, eye gazes, and body postures.  (*See* Pl.'s Stmt. of Facts ¶ 4;

Def.'s Cont. Facts ¶ 4.)  Therefore, the vast majority of deaf people—Pierce included—

lack the ability to communicate effectively in English, whether by writing notes or

reading lips.  (*See* Pl.'s Stmt. of Facts ¶ 5, 7, 10; *see also* Expert Report of Prof.

Bienvenu, Ex. 3 to Pl.'s Mot., ECF No. 48-4, at 104 (expert in Deaf culture, literacy,

and ASL assessment concluding that "[b]oth my personal interaction with Pierce and

the case-related documents I reviewed to prepare this report lead me to strongly believe

that Pierce, *at a minimum*, requires both quality ASL interpretation services and

videophone telecommunications technology to effectively communicate with others"

(emphasis in original)).)[13]

Despite this evidence, the District asserts that Pierce actually *can* communicate

effectively in English, through both written notes and lip reading.  *See* 28 C.F.R. part

---

[13] Pierce has offered the testimony of two experts—Martina Bienvenu and Richard Ray—both of whom the District has moved to exclude.  (*See* Def.'s Mot. to Preclude Pl.'s Experts, ECF No. 46.)  Pierce says that Bienvenu would testify about ASL, deaf culture, literacy within the deaf community, lip-reading, the importance of using qualified ASL interpreters, and Pierce's own communicative abilities and needs.  (*See* Pl.'s Opp'n to Def.'s Mot to Preclude Pl.'s Experts, ECF No. 57, at 5.)  Ray would give expert testimony about the accommodations that would have provided Pierce with the means to communicate effectively and have meaningful access to prison programs, services, and activities during Pierce's incarceration in early 2012.  (*See id.* at 6.) The District argues that neither of these experts will help the trier of fact because their testimony does not speak to what accommodations were necessary for the Plaintiff in *this* case, as opposed to the deaf community at large.  (*See* Def.'s Mot. to Preclude Pl.'s Experts at 4–5.) The District also argues that the proffered testimony is not based on sufficient facts, and is not the product of reliable scientific methods, because the experts did not evaluate what accommodations were available at CTF, what accommodations Pierce actually requested, and what accommodations were necessary for Pierce to participate in the programs and activities at CTF.  (*See id.* at 5–9.)  Even assuming *arguendo* that the District's objections have a sound legal basis, they clearly relate to the *weight* of the proffered expert testimony, not its admissibility.  *See Fox v. Dannenberg*, 906 F.2d 1253, 1257 (8th Cir. 1990) ("[I]t is . . . for the jury, with the assistance of vigorous cross-examination, to measure the worth of the opinion[s]") (citation and internal quotations omitted); *see also Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 596 (1993) (Rule 702 favors the admission of expert witness testimony over its exclusion).  Therefore, the District's motion to preclude Bienvenu and Ray's testimony is **DENIED**.

35, App. A (noting that if the public entity does not provide a disabled person with their requested accommodation, the public entity must "demonstrate that another effective means of communication" was provided).  The District's contention regarding Pierce's writing ability is based on its assertion that Pierce "is college educated, has researched and written term papers for high school and college courses, wrote an autobiography during his anger management and substance abuse [class] at CTF, . . . scored above average on a written test administered at CTF to assess his reading and writing abilities[,]" and "communicates with his mother, who lives out of state, through written Facebook messages."  (*See* Def. Mot. at 2.)  And with respect to lip reading, the District asserts that the prison employees and contractors who dealt with Pierce believed they were effectively communicating with him through lip-reading because Pierce gave appropriate responses to their oral questions.  (*See* Def.'s Opp'n at 10–11.)

This Court finds that none of these observations is sufficient to create any genuine issue of fact regarding Pierce's alleged inability to engage in the kinds of complex communications that are required to navigate one's way through the prison system and to understand official communications regarding medical treatment, rehabilitative classes, and custodial issues, for several reasons.  With respect to the college-level courses that Pierce purportedly took, the record indicates that, although Pierce did attempt to take certain classes, he dropped out after a short period of time. (*See* Pl.'s Stmt. of Facts ¶ 12; *see also* Pierce Dep. 32:21–35:2, Oct. 10, 2013, Ex. 1 to Pl.'s Mot., ECF No. 48-4, at 13–16.)  Pierce's high school research papers were only a few pages long, and the record shows that it not only took him two months to write each paper, he also had classmates edit the papers before he submitted final drafts.  (*See* Pl.'s

Cont. Facts ¶ 13.) Similarly, Pierce apparently asked another inmate to correct his autobiography for the anger management/substance abuse class, to "edit from, you know quote/unquote, deaf language." (*See* Pierce Dep. 245:17–247:21, Feb. 24, 2014, Ex. 2 to Pl.'s Opp'n, ECF No. 58-5, at 9–11.) And whatever Pierce's score may have been on the standard inmate reading and writing assessment, Pierce's "above average" performance in a test situation says little about his overall ability to understand and to communicate effectively in the context of discussions with prison doctors, teachers, and other officials.

Similarly, it goes almost without saying that the District's argument that Pierce could read lips because the District's employees believed that he could is a nonstarter; the District has not shown that its employees had any prior knowledge of, or had received any training about, communicating with deaf inmates. (*See* Pl.'s Stmt. of Facts ¶¶ 34, 36.) Furthermore, because the prison staff did not undertake any genuine assessment of Pierce's limitations and abilities whatsoever, their lay opinions about what worked for Pierce and what Pierce could do amounted to entirely uninformed speculation that provides no support for any motion of summary judgment or opposition thereto. *Cf. Lucas v. Ozmint*, CIV.A. No. 9:10-0017-CMC-BM, 2011 WL 6979995, at *6 (D.S.C. Sept. 15, 2011) report and recommendation adopted, C/A No. 9:10-17-CMC-BM, 2012 WL 77178 (D.S.C. Jan. 10, 2012) (noting that "rank speculation is not evidence"). This all means that the expert testimony and evidence that supports Pierce's claim that he needed an ASL interpreter in order to communicate effectively while he was incarcerated—*i.e.*, in order to give information to, and to receive information from, prison officials and others with whom he interacted—stands

unrebutted, and in this Court's view, that evidence is sufficient to establish Pierce's

need for an interpreter, even under the District's legal standard.

This Court also finds that the District has failed to show that providing an

interpreter for Pierce would have posed an unduly burdensome financial or

administrative hardship. *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266

(D.C. Cir. 2008) (explaining that, once a plaintiff has established a prima facie case for

disability discrimination, the defendant may assert that accommodating the plaintiffs'

disabilities would constitute an undue financial or administrative burden or

fundamentally alter the nature of the service, as an affirmative defense to liability).

While the District maintains that the provision of anything other than a TTY machine

for Pierce in order to accommodate his request for telecommunications would have been

an undue burden (*see* Def.'s Opp'n at 13), and implies that permitting deaf inmates who

are in protective custody to have visitation without handcuffs would be a fundamental

alteration of existing policy (*see id*. at 17–18), the District makes no such "undue

burden" or "fundamental alteration" contention with respect to Pierce's request for an

interpreter, nor could it reasonably have done so, because the DOC apparently has taken

the official position that ASL interpreters should be provided as a matter of policy.

(*See D.C. Dep't of Corr. Program Statement 3800.3*, Ex. 9 to Rocap Decl., ECF No. 48-

5, at 92 § 12(a)(2) ("Written communication cannot be used as a substitute where the

individual has expressed a preference for a sign language interpreter.").)

Finally, with respect to the parties' disputes of fact regarding the extent to which

Pierce was (or was not) denied equal access to accommodations other than an ASL

interpreter (*e.g.*, use of the TTY machine, official notifications, and CTF's visitation

procedures), the Court notes that Pierce has alleged that he was treated unequally with respect to these aspects of his prison experience in addition to being denied an interpreter, and these various alleged instances of discrimination are cited as alternative bases for finding that the District violated Section 504 and Title II.  Thus, the Court finds that it need go no further than to conclude that Pierce would be entitled to summary judgment on Claims I and II on the basis of Pierce's unfulfilled request for an ASL interpreter.  That is, even if the law is as the District says it is, no reasonable jury could find that Pierce failed to request an interpreter, that he needed an interpreter, and that the District could have—but did not—provide an interpreter for Pierce with respect to significant aspects of his incarceration experience.  As a result, there is no need for the Court to decide whether any genuine issues of fact exist with respect to the prison's provision of telecommunications, notifications, or visitation.

3.      Because The District Committed Intentional Discrimination, Pierce Is Entitled To Compensatory Damages On Claims I and II

At this point, the Court has concluded that the District's failure to evaluate Pierce's need for accommodation constituted a violation of Section 504 and Title II as a matter of law.  (*See* Part III.A.1 *supra*.)  It has also determined, in the alternative, that even if the District was only legally obligated to accommodate Pierce's hearing disability if he requested an ASL interpreter and actually needed one, there is no genuine dispute that Pierce cannot communicate effectively in English and thus needed an ASL interpreter in the prison context, or that Pierce actually requested an ASL interpreter, which the District could have provided to him.  (*See* Part III.A.2 *supra*.)  In either case, all that remains of Claims I and II of Pierce's complaint is the question of damages.

The remedies available for violations of Section 504 and Title II are the remedies that pertain to a violation of Title VI of the Civil Rights Act, subject to certain defenses specific to public entities.  *See* 29 U.S.C. § 794a(a)(2) (2012) (the "remedies, procedures, and rights" available under the Rehabilitation Act are those set forth in Title VI of the Civil Rights Act of 1964); 42 U.S.C. § 12133 (2012) (providing that the "remedies, procedures, and rights" for violations of Title II of the ADA are those set forth in the Rehabilitation Act); *see also Alexander v. Choate*, 469 U.S. 287, 295 n.13 (1985) ("Although § 504 ultimately was passed as part of the Rehabilitation Act of 1973, the nondiscrimination principle later codified in § 504 was initially proposed as an amendment to Title VI.").  A plaintiff may recover compensatory damages for violations of Title II of the ADA or Section 504 of the Rehabilitation Act if he proves that the defendant's discriminatory actions were intentional.  *See Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012); *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011); *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998).[14]

In disability discrimination lawsuits, many courts have authorized plaintiffs to establish intentional conduct by establishing that the defendant acted with "deliberate indifference" to the plaintiff's rights.  *See Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 829 (D. Md. 1998) ("The question of intent in accommodations cases does not require that plaintiff show that defendants harbored an animus towards her or those disabled such as she.  Rather, intentional discrimination is shown by an

---

[14] Punitive damages are not recoverable in private suits under Title II of the ADA or Section 504 of the Rehabilitation Act.  *See Barnes v. Gorman*, 536 U.S. 181, 189 (2002).

intentional, or willful, violation of the Act itself.") (internal quotation marks and citation omitted); *see also id.* at 829 n.6 (noting that "the level of proof necessary for finding intentional discrimination under [the] Rehabilitation Act means a deliberate indifference to a strong likelihood that a violation of federal rights would result"). Deliberate indifference is "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall*, 260 F.3d at 1139 (citation omitted). The "knowledge" element is satisfied where the public entity has notice of the plaintiff's accommodation need, and the "failure to act" element is satisfied by conduct that is "more than negligent, and involves an element of deliberateness." *Id.*

Notably, while the D.C. Circuit has not addressed the appropriate legal standard for establishing intentional discrimination in violation of Section 504 and Title II, the majority of circuits that have considered the standards issue have held that the "deliberate indifference" standard is appropriate. *See, e.g.*, *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) (adopting the deliberate indifference standard); *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012) (same); *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (same); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) (same); *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999) (same); *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 156 F.3d 321, 331 (2d Cir. 1998) (same), *vacated on other grounds* 527 U.S. 1031 (1999).  Two circuits have suggested that plaintiffs suing under Title II and Section 504 should bear a heavier burden than showing mere deliberate indifference, such as showing actual animus against disabled persons, *see, e.g.*, *Nieves-*

*Márquez v. Puerto Rico*, 353 F.3d 108, 126–27 (1st Cir. 2003) (suggesting that

discriminatory animus is the level of intent required); *Delano–Pyle v. Victoria Cnty.,*

*Tex.,* 302 F.3d 567, 575 (5th Cir. 2002) (explicitly rejecting deliberate indifference

standard and instead suggesting that an unnamed, but more demanding, showing is

necessary); however, this Court agrees with the vast majority of the courts of appeals

that the deliberate indifference standard "is better suited to the remedial goals of the

[Rehabilitation Act] and the ADA than is the discriminatory animus alternative." *S.H.*

*ex rel. Durrell*, 729 F.3d at 264.  As the Supreme Court has reasoned, Congress was

keenly aware of the evils of benign neglect when it enacted the federal

antidiscrimination statutes, and "[f]ederal agencies and commentators on the plight of

the handicapped similarly have found that discrimination against the handicapped is

primarily the result of apathetic attitudes rather than affirmative animus." *Alexander*,

469 U.S. at 296.  Thus, the Rehabilitation Act and ADA "are targeted to address 'more

subtle forms of discrimination' than merely 'obviously exclusionary conduct[,]'" and it

is "[c]onsistent with these motivations" to employ "a standard of deliberate

indifference, rather than one that targets animus" in this context.  *S.H. ex rel. Durrell*,

729 F.3d at 248 (quoting *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 945 (9th

Cir. 2011).)[15]

---

[15] Notably, in the instant case, neither party appears to object to Court's application of the deliberate indifference standard (*see* Pl.'s Mot. at 14 (citing only cases that apply the deliberate indifference standard and none that require animus); Def.'s Mot. at 19 (same)).  Furthermore, at least one other court in this district has applied the deliberate indifference standard in a case involving disability discrimination.  *See Hunter ex rel. A.H. v. District of Columbia*, 64 F. Supp. 3d 158, 168 n.8 (D.D.C. 2014) (noting that the D.C. Circuit has not addressed the appropriate standard for intentional discrimination, and assuming, without deciding, that the deliberate indifference standard applies).

This Court's conclusion that the deliberate indifference standard is applicable here makes short work of the damages analysis.  It is well established that "[d]eliberate indifference requires [only] knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood[,]" *Duvall*, 260 F.3d at 1139, and the District's knowing failure to evaluate Pierce's need for accommodation and to provide the auxiliary aids easily satisfies this standard.  The District's employees and contractors knew that Pierce had a hearing disability, and yet they did not undertake an assessment of the accommodations that Pierce might need in order to access prison services, nor did they provide him with an ASL interpreter for all significant interactions.  (*See* Pl.'s Stmt. of Facts ¶¶ 60–64, 77, 88–89, 97, 101, 107.) This willful blindness to Pierce's hearing disability and his need for accommodation plainly amounts to deliberate indifference, and Pierce is therefore entitled to compensatory damages on Claims I and II of his complaint.  *See, e.g.*, *Bartlett*, 970 F. Supp. at 1151 (holding that defendant was deliberately indifferent where it was aware of plaintiff's disability and refused to accommodate the plaintiff).

**B.    There Is A Genuine Dispute Of Fact Regarding Whether Or Not Pierce Was Placed In Protective Custody In Retaliation For His Requests For Accommodation**

Pierce alleges in Claim III of his complaint that the District violated the ADA and the Rehabilitation Act by "retailat[ing] against [him] for asserting his rights" under those statutes.  (*See* Compl. ¶ 51.)  Pierce maintains that the District changed his conditions of confinement for the worse by placing him in protective custody and then moving him to the Special Management Unit ("SMU") within CTF in order to punish him for his repeated requests for an ASL interpreter.  (*See* Pl.'s Opp'n at 45–47.)  The District seeks summary judgment on this claim, contending that no adverse action was

taken against Pierce—he was placed in protective custody because he stated that another inmate had threatened him, and he was moved to the SMU for administrative convenience.  (*See* Def.'s Mot. at 18.)

Generally speaking, to prevail on a retaliation claim brought under Section 504 and Title II, a plaintiff must satisfy the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny, *see, e.g.*, *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014).  Pursuant to this framework, the plaintiff first makes a prima facie case of retaliation; then, the burden shifts to the defendant to identify "some legitimate, nondiscriminatory reason" for the adverse action, *McDonnell Douglas*, 411 U.S. at 802; and if the defendant does this, the burden shifts yet again such that the plaintiff must prove that the defendant's stated reason for the adverse action was merely a "pretext" for the real, retaliatory purpose, *id*. at 804. Because the District—and the District alone—has moved for summary judgment in its favor on Pierce's retaliation claim, its task under Rule 56 is to demonstrate that no reasonable jury could conclude that retaliatory animus motivated prison officials with respect to Pierce's placement in protective custody, a task that the District might accomplish by demonstrating that Pierce cannot establish a prima facie case for retaliation, or by showing that there is no genuine issue that District's proffered explanation was not a pretext.  As explained below, the District has done neither in this case.

      1.    <u>Taking All Facts And Inferences In The Non-Movant's Favor, A Reasonable Jury Could Find That The Evidence Establishes A Prima Facie Case For Retaliation</u>

Under *McDonnell Douglas*, a plaintiff may establish a prima facie case that creates a presumption of retaliation by showing (1) that he engaged in a protected

activity; (2) that the defendant took adverse action against him; and (3) that there was a causal link between the plaintiff's request for an accommodation and the adverse action.  *See Alston v. District of Columbia*, 561 F. Supp. 2d 29, 40 (D.D.C. 2008); *Duncan v. Wash. Metro. Area Transit Auth.*, 425 F. Supp. 2d 121, 126 (D.D.C. 2006).[16] Here, as noted above, Pierce identifies two alleged instances of retaliation.  First, Pierce claims that prison officials placed him in protective custody because he kept asking for an ASL interpreter.  (*See* Pl.'s Opp'n at 45–46.)  As Pierce tells the story, he repeatedly asked Tutwiler (his case manager) for an interpreter (*see* Pl.'s Stmt. of Facts ¶ 61), and he continued to do so even after Tutwiler told him to stop (*see id*. ¶ 62).  Then, on February 23, 2012, less than one week after Tutwiler made a note that Pierce "continues to write request for an interpret [sic] for anger management and drug education" (*id*. ¶ 61), another inmate shoved Pierce in the TV room and Pierce went to Tutwiler for assistance (*see id*. ¶ 102).  Tutwiler purportedly asked Pierce if he would like to be placed in protective custody—without explaining to him what protective custody was, why it is ordinarily used, how long it would last, or how to request release back into the general population.  (*See id*. ¶¶ 104, 106.)  And when Pierce responded "If necessary[,]" he was summarily placed in protective custody in Medical 82, where his freedom of movement was substantially more limited.  (*See* Pierce Dep. at 236:5 (stating that Medical 82 is "complete lockdown").)  Pierce contends that these facts give rise to a plausible inference that Tutwiler placed him in protective custody in retaliation for his requests for an interpreter. (*See* Pl.'s Opp'n at 45.)

---

[16] Because the test for retaliation under the ADA and the Rehabilitation Act was originally developed in the employment discrimination context, the standards articulated in employment discrimination cases are applicable to disability discrimination cases.  *See Alston*, 561 F. Supp. 2d at 40.

Second, Pierce claims that he was retaliated against when he was transferred to the SMU while he was in protective custody status and was kept there longer than necessary. (*See id*. at 46–47.) Pierce alleges that, after he went into protective custody on February 23, 2012, he filed two informal resolutions (on February 27, 2012 and March 2, 2012) requesting an interpreter and complaining about limitations on his use of the TTY. (*See* Pl.'s Stmt. of Facts ¶¶ 62, 132.) Then, on March 1, 2012, Assistant Warden Fulton was made aware of Pierce's desire to leave protective custody and to have an attorney, but instead of granting Pierce's requests, Assistant Warden Fulton allegedly advised the staff to and "review" Pierce's status again in one week, forcing Pierce to remain in protective custody. (*See id.* ¶ 109.) Furthermore, in the interim— on March 4, 2012—Pierce was allegedly transferred to the SMU, a unit Pierce describes as "much, much worse" than his prior protective custody circumstances. (*See id*. ¶ 111; *see also* Pierce Dep. at 235:20–236:5.) Based on these facts, Pierce alleges that Assistant Warden Fulton both kept Pierce in protective custody and transferred Pierce from Medical 82 to the Special Management Unit in retaliation for Pierce's requests for an interpreter and greater access to the TTY.

This Court concludes that Defendant is not entitled to summary judgment on the grounds that Pierce's has failed to make out the elements of a prima facie case because Pierce has made plausible allegations—supported by evidence—that (1) he engaged in a protected activity; (2) the defendant took adverse action against him; and (3) there was a causal link between the plaintiff's request for an accommodation and the adverse action. *See Alston*, 561 F. Supp. 2d at 40; *see also Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) ("At the prima facie stage of a retaliation claim, a plaintiff's

burden 'is not great; [she] merely needs to establish facts adequate to permit an inference of retaliatory motive.'"); *see also id.* (reversing grant of summary judgment to employer because employee had shown that she engaged in a protected activity and the employer took adverse action against her shortly thereafter).  There is no question that Pierce's request for an interpreter was a protected activity.  *See Solomon*, 763 F.3d at 15 (noting that a good faith request for reasonable accommodation constitutes a protected activity pursuant to the ADA and the Rehabilitation Act).  Moreover, Pierce alleges that placing him in protective custody in Medical 82 and then transferring him to the SMU were adverse actions because Pierce alleges that the conditions of confinement in both of those units were worse than in the general population.  *See Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (noting that a plaintiff suffers an adverse action where there are "materially adverse consequences affecting the terms, conditions, or privileges" of plaintiff's status with defendant).  And Pierce claims that it is reasonable to infer that the District kept Pierce out of the relative comfort of general population because Tutwiler was fed up with his requests and/or wished to punish him for his requests for accommodation.  (*See* Pl.'s Opp'n at 46.)

Although the District concedes that a request for accommodation is a protected activity under the ADA and the Rehabilitation Act and that Pierce made such a request (*see* Def.'s Stmt. of Facts ¶ 24), it argues that "Pierce's retaliation claim fails because he cannot show that the District or any of its contractors at CTF took any adverse action against him as a result of his requests for accommodation, much less that any alleged adverse action would not have occurred 'but for' his requests for accommodation." (Def.'s Mot. at 17.)  But the District is wrong to contend that the only cognizable

"adverse action" in the prison context is a disciplinary infraction (*see* Def.'s Mot. at 18); indeed, it is well established that any "decision causing a significant change in benefits" can constitute an adverse action for the purpose of a retaliation claim.  *Cf. Bowie v. Ashcroft*, 283 F. Supp. 2d 25, 30 (D.D.C. 2003) (internal quotation marks and citation omitted) (defining "adverse action" in the employment context).[17]  And when the facts that appear on the record in this case are viewed in the light most favorable to the non-movant plaintiff this Court finds that a reasonable jury could certainly conclude that the conditions in Medical 82 and the Special Management Unit were such that Pierce's placement, and continued detention, in those units constituted a change in the conditions of confinement that amounted to an adverse action.[18]

A reasonable jury could also conclude on this record that the District moved Pierce into protective custody in Medical 82, and later transferred him to the Special Management Unit, *because of* Pierce's requests for accommodation.  There is a close temporal connection between the protected activity and the alleged adverse actions, and it is clear that such proximity can support an inference of causation. *See Alston*, 561 F. Supp. 2d at 43 (citing *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007)).  That is, a reasonable jury could believe Pierce's assertion that Tutwiler placed him in protective custody without explaining to him what that was less than one week after she wrote in

---

[17] Although *Bowie v. Ashcroft*, 283 F. Supp. 2d 25 (D.D.C. 2003) discusses the definition of "adverse action" in the employment context, the test for retaliation under the ADA and Rehabilitation Act was originally developed in the employment discrimination context.  *See Alston*, 561 F. Supp. 2d at 40. Accordingly, the standards articulated in employment discrimination cases are applicable here.  *See id.*

[18] Pierce's evidence must be credited and all reasonable inferences must be construed in his favor because the motion for summary judgment on the retaliation claim belongs to the District.  *See Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (internal quotation marks and citation omitted)).

her notes that Pierce was continuously requesting an interpreter in order to end his incessant entreaties.  (*See* Pl.'s Stmt. of Facts ¶¶ 61, 102, 104, 106.)  Similarly, a reasonable jury might find that Pierce was transferred to the Special Management Unit less than one week after he filed informal resolution forms requesting an interpreter and complaining about the limitations on his use of the TTY (*see id*. ¶¶ 62, 109, 132), because he had made those requests for accommodation.  Indeed, "courts have recognized that proof of causal connection can be established indirectly by showing that protected activity is followed by discriminatory treatment."  *Mitchell v. Baldrige*, 759 F.2d 80, 86 n.6 (D.C. Cir. 1985) (internal quotation marks and citation omitted).

Therefore, the District has failed to show that Pierce cannot make out a prima facie case on his retaliation claim in a manner that entitles it to summary judgment.

2.     A Reasonable Jury Could Conclude That The District's Proffered Reasons For Placing Pierce In Protective Custody Are Pretextual

Nor has the District shown that it would be impossible for a reasonable jury to find that its proffered explanation for sending Pierce to protective custody in Medical 82, and then allegedly keeping him there longer than requested while transferring him to the Special Management Unit, was pretext for retaliation.  In fulfillment of its obligation to proffer "some legitimate, nondiscriminatory reason" for its actions, *McDonnell Douglas*, 411 U.S. at 802, the District argues that it placed Pierce in protective custody because Pierce had stated that he feared for his safety, not because of his repeated requests for an interpreter (*see* Def.'s Mot. at 18), and it points out that it is standard policy at CTF that inmates who request protective custody must be taken out of general population (*see* Def.'s Stmt. Of Facts ¶ 157).  Thus, far from retaliating against Pierce, the District asserts that Tutwiler was merely following protocol when

she placed Pierce—who had just reported that he had been pushed by another inmate and had written out on a protective custody request form that "I fear for my safety"—in protective custody. (*See* Def.'s Mot. at 17; *see also* Tutwiler Aff., Ex. 11 to Def.'s Mot., ECF No. 52-5, ¶¶ 26–31.)  But Pierce disputes the District's assertion that he actually requested protective custody status knowingly and voluntarily, and in fact, he argues that Tutwiler deliberately failed to explain to him what protective custody means.  (*See* Pl.'s Opp'n at 45–46.)  Similarly, Pierce contends that a reasonable jury could disbelieve the District's assertion that Pierce was kept in protective custody because he wouldn't sign the waiver form (Def.'s Stmt. of Facts ¶¶ 167–70), and that he was moved from Medical 82 to the Special Management Unit because bed space was needed in Medical 82 for an inmate who had serious medical needs (*see id.* ¶¶ 161, 165; *see also* Fulton Aff., Ex. 2 to Def.'s Mot., ECF No. 52-2, ¶ 31), based on the close temporal proximity between the move and his filing of an internal grievance.  (*See* Pl.'s Opp'n at 47.)

It is clear to this Court that there are genuine issues of fact regarding whether it was because of his repeated requests for an interpreter and his filing of complaints that prison officials and employees segregated Pierce initially and held him in that allegedly undesirable segregated status longer than was necessary, and that the resolution of these factual disputes depends on the credibility of the testimony of prison staff.  Thus, the retaliation claim cannot be decided by this Court as a matter of law.  *See Liberty Lobby, Inc.*, 477 U.S. at 255 (noting that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not

those of a judge").  Accordingly, the District's motion for summary judgment on Pierce's retaliation claim must be denied.

## IV.   CONCLUSION

The record in this matter clearly reveals that, when Pierce arrived at CTF to be taken into custody, prison officials took no steps whatsoever to evaluate his need for accommodation so that he would be able to have meaningful access to prison programs and services within the prison facility.  The District's employees and contractors *knew* that Pierce was profoundly deaf, but instead of engaging in an interactive process designed to ascertain what accommodations would be necessary for Pierce to communicate effectively in prison, they merely *assumed* that he could read (and understand) the words they mouthed to him and the notes they wrote to him, even after he told them "I dont'[sic] understand at all [sic] since I got here" and specifically requested an ASL interpreter.  It is no wonder that Pierce was confused and upset throughout his 51-days in custody, and once even woefully declared, "I feel I [sic] abandoned."

What *is* astonishing, however, is the District's insistence in the context of this lawsuit that its employees' conduct with respect to accommodating Pierce's hearing disability was entirely consistent with the law.  The text and purpose of the Rehabilitation Act and the ADA clearly establish otherwise, and as a result, this Court easily concludes that the District's willful blindness regarding Pierce's need for accommodation and its half-hearted attempt to provide Pierce with a random assortment of auxiliary aids—and only after he specifically requested them—fell *far* short of what the law requires.  Perhaps most significantly, this Court holds that the District's clear

violation of Section 504 and Title II was manifest *from the start*, when prison employees took no steps whatsoever to ascertain what accommodations this new inmate with a known hearing disability would require so that communications with him would be "as effective as communications with others," for the purpose of ensuring that he had "an equal opportunity to participate in, and enjoy the benefits of" the prison's services, programs, and activities. 28 C.F.R. §§ 35.160(a)(1), (b)(1)–(2).

Because this Court finds that the District's deliberate indifference to Pierce's accommodation needs violated Section 504 and Title II as a matter of law, Pierce's motion for summary judgment on Claims I and II of the complaint will be **GRANTED**. Moreover, the Court finds that the District's motion for summary judgment must be **DENIED** in its entirety, because not only does this Court conclude that the District unlawfully failed to provide Pierce with meaningful access to prison services, it also holds that, on the instant record, a reasonable jury could find that CTF employees retaliated against Pierce as well.  Thus, in accordance with the accompanying order, all that remains of Pierce's complaint for trial is the determination of the amount of compensatory damages to be awarded to Pierce with respect to Claims I and II, and the issue of liability (and, if necessary, damages) for Claim III.

DATE:  September 11, 2015          *Ketanji Brown Jackson*
                                   KETANJI BROWN JACKSON
                                   United States District Judge